UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION
NO. 05-30182-MAP

|  |  |
|---|---|
| MICHELLE BEEBE, | ) |
| Plaintiff, | ) |
| v | ) |
| WILLIAMS COLLEGE, | ) |
| Defendant. | ) |

**THE PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S MOTION TO COMPEL**

The Plaintiff, Michelle Beebe, respectfully submits this opposition to the Defendant's Motion to Compel. The Defendant's motion should not be allowed for the following reasons:

(1) Rule 35 cannot be invoked to compel an interview by an "employability" expert. The reach of Rule 35 is limited to physical or mental examinations by a suitably licensed or certified professionals." The expert designated by the Defendant to conduct the requested interview, Mr. Miller, is neither licensed not certified.

(2) Rule 35 extends only to experts who are going to conduct a "physical or mental examination." Mr. Miller intends only to interview Ms. Beebe about her educational background, work history, job qualifications and efforts to secure alternative employment. Such an interview does not constitute a "physical or mental examination."

(3) The Plaintiff, Ms. Beebe's, mental and physical condition is not "in controversy," rendering an examination by anyone pursuant to Rule 35 unwarranted.

(4) The Defendant has failed to establish good clause for the order. It is required to show "specific facts that demonstrate the need for the information sought and <u>lack of means for</u>

obtaining it elsewhere." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964). The information sought was readily attainable at the Plaintiff's deposition. The Defendant should not be permitted a second bite at the apple by way of an interview by their expert.

## FACTS

The Defendant has asserted that it will contend at trial that the Plaintiff has failed to mitigate the damages she has sustained as a result of the Defendant's illegal termination of her employment. Recognizing its burden to prove that the Plaintiff has failed to mitigate, the Defendant has retained a witness – Mr. Steve Miller – who apparently will testify that the Plaintiff has unreasonably failed to seek for and obtain suitable alternative employment. Toward the end of obtaining information with which to ostensibly support this conclusion, the Defendant seeks an order compelling the Plaintiff to attend an interview by Mr. Miller. During the interview, "Mr. Miller will ask the Plaintiff questions concerning solely the subjects of Plaintiff's educational background, employment history, other experiences qualifying her for particular types of employment, and the specific efforts she has made, along with the results of those efforts, to find employment since her discharge from the College. . . ." Defendant's Memorandum in Support of Motion to Compel at 2.

Mr. Miller is a so-called employability expert. He has owned and operated two employment agencies. Mr. Miller has an undergraduate degree in sociology. A review of his C.V. reveals that he holds no licenses or certificates in any profession, healthcare related or otherwise.

Every one of the proposed areas of inquiry has already been pursued by the Defendant's counsel during the Plaintiff's deposition, preceded by interrogatories. For example, counsel inquired about the Plaintiff's educational background at page 12 of the deposition and following, her employment history at page 14 and following, other experiences that might qualify her for

2

particular types of employment at page 12 and following, and the specific effort she has made to find employment at page 23 and following. Deposition of Michelle Beebe, dated February 2, 2007. Copies of deposition excerpts are attached as Exhibit 1.)

## ARGUMENT

**I.    RULE 35 DOES NOT AUTHORIZE THE COURT TO ORDER THE PLAINTIFF TO UNDERGO AN INTERVIEW BY THE DEFENDANT'S SO CALLED EMPLOYABILITY EXPERT**

Rule 35 of the Federal Rules of Civil Procedure allows a court to order a party to undergo a physical or mental examination by a suitably licensed or certified examiner when the party's mental or physical condition is in controversy, so long as the moving party can demonstrate good cause. The rule does not extend to the Defendant's present request because none of the above criteria are met. The proposed examiner is neither a licensed nor certified professional, the Plaintiff's physical and mental conditions are not in controversy, the examiner will not be conducting a "physical or mental examination," and the Defendant has failed to establish good cause for the requested order.

A.    <u>The Defendant's Employability Expert is Not a Suitably Licensed or Certified Examiner as Required by Rule 35.</u>

Prior to amendments in 1988 and 1991, Rule 35 applied by its terms to examinations by physicians. In 1988, the reach of the rule was extended to licensed clinical psychologists to conduct mental examinations. In 1991, the rule was extended again "to include <u>other certified or licensed professionals,</u> such as dentists or occupational therapists, who are not physicians or clinical psychologists, but who may be well-qualified to give valuable testimony about the about <u>the physical or mental condition</u> that is the subject of dispute." Fed. R. Civ. P. 35 Advisory Committee Notes (emphasis added).

3

By its plain language, the revised rule does not open up the field of possible examiners to anyone who may ultimately be qualified by the court to testify as an expert. Although somewhat expanded beyond physicians, the field is still restricted to licensed or certified health care professionals, now including therapists, who are qualified to give testimony about a party's physical or mental condition. Use of the word "condition" connotes a clinical aspect to the sought after examination and testimony. The examples listed by the Advisory Committee (rather conveniently omitted from the Defendant's Memorandum at the top of page 3 by use of an ellipsis) – dentists or occupational therapists – support this conclusion.

The Defendant is correct that some courts have extended the reach of Rule 35 to vocational-rehabilitation counselors, but exaggerates with its assertion that the rule flatly applies to "vocational examinations." In each case cited by the Defendant, the plaintiff asserted an inability to work as a result of injuries the cause of which was the subject of the litigation. In each case, the Defendant asserted that the Plaintiff was able to work and sought the testimony of an expert to support that contention. The experts proffered to conduct the examinations all were licensed health care professionals, usually rehabilitation counselors, who would evaluate, among other things, the party's physical and/or mental condition as it related to the party's injury and ability to work. *Fischer v. Coastal Towing, Inc.*, 168 F.R.D. 199, 201 (E.D. Tex. 1996)("Defendant's expert is a licensed rehabilitation counselor with the appropriate educational background and experience to conduct a vocational-rehabilitation evaluation of Plaintiff"); *Olcott v. LaFiandra*, 793 F. Supp. 487, 492 (D.Vt. 1992)(Expert who had an M.S. and was the director of the New England Rehabiliation and Clinical Consultants, Inc. was qualified to render a <u>physical</u> examination in case where Plaintiff contended her injuries prevented her from entering the work force); *Malone v. Med Inn Ctrs. Of Am., LLC*, No. 00-CV-0720E(SR), 2004 WL 108155 at 2 (W.D.N.Y. April 20, 2004)(Proposed expert qualified as "suitably licensed"

inasmuch as he was a Certified Rehabilitation Counselor). The other two cases cited by the Defendant offer no helpful analysis of the above issue either way as the issue of the qualifications of the expert was not before the court. See *Stewart v. Burlington N.R.R.Co.*, 173 F.R.D. 254 (D.Minn. 1995) and *Smolinsky v. State Farm Ins. Co.*, No. Civ. A 99-CV-2065, 1999 WL 1285824 (E.D.Pa. Dec. 22, 1999). The Smolinsky Court does cite with favor the *Fischer* and *Olcott* decisions, along with *Jefferys v. LRP Publications, Inc.*, 184 F.R.D. 262 (E.D.Pa. 1999)(permitting examination by Dr. Lukas, who has a Ed.D., is a diplomate of the American Board of Vocational Experts, and is a certified rehabilitation counselor).

Neither the plain meaning of the Rule nor the above cases support the Defendant's contention that its proposed examiner – a so-called employability expert – comes within Rule 35's ambit. Mr. Miller runs an employment agency and is, in the vernacular, a head hunter. He is not a vocational-rehabilitation counselor. He is not a licensed professional. He is not a certified professional. Accordingly, Rule 35 does not apply to any examination proposed to be conducted by Mr. Miller.

B.    The Plaintiff's Mental or Physical Condition is Not "In Controversy," as Required by Rule 35.

The Defendant asserts that the Plaintiff has placed her mental and physical condition "in controversy" -- thereby meeting that prong of the test of the applicability of Rule 35 – solely by virtue of bringing a claim under the Family Medical Leave Act (FMLA). By definition, Ms. Beebe's underlying claim involves an assertion that, during discrete times during her employment, she and her children suffered from serious health conditions that qualified her to take leave covered by the FMLA. She claims that she had to miss work during her employment to care for her children because they suffered at various times from asthma, chronic ear infections, bronchitis, and other ailments. Ms. Beebe also contends that she missed work during

the last week of her employment because she suffered from a bout of bronchial asthma. The Defendant apparently contends that because Ms. Beebe and her children were sick at some points in the past, Ms. Beebe's general physical and mental condition at any time has been placed in controversy.

This contention misconstrues the "in controversy" requirement of Rule 35. For the conditions to be in controversy in the context of Rule 35, they must relate to the Plaintiff's ability to obtain work post termination. The "serious health conditions" potentially in issue with regard to liability have no bearing what so ever on her mitigation efforts post termination. Ms. Beebe does not contend that she was unable to work post termination because of any of the above conditions – and the Defendant does not suggest otherwise. Accordingly, the Plaintiff's physical and mental condition is not in controversy for the purposes of Rule 35, and for that independent and sufficient reason, the Rule does not apply to the pending motion.

C.    Rule 35 Extends Only to Experts Who Are Going to Conduct a "Physical or Mental Examination."

In *Storms v. Lowe's Home Centers, Inc.*, 211 F.R.D. 296, 297 (W.D.Virg. 2002), Magistrate Judge Crigler denied the Defendant's motion to compel a "mere vocational assessment" under Rule 35 because the "assessment was not connected with any physical or mental examination." Explaining his ruling, the judge pointed out that the 1991 amendment to Rule 35 "explicitly expanded the scope of examiners to be covered, it did not expand the scope of examinations available under the Rule." *Id.*

This reasoning is consistent with the plain meaning of the language of the Rule, which, as argued above, has a clinical connotation. For this reason, the assessment requested in this case should be denied.

D.  The Defendant Has Failed to Establish Good Cause for Invoking Rule 35.

An order to compel an examination may be had only upon good cause shown. The Defendant is required to show "specific facts that demonstrate the need for the information sought and lack of means for obtaining it elsewhere." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964)(emphasis added).

The information now sought was readily obtainable at the Plaintiff's deposition. Indeed, the Defendant, through counsel, at that deposition, explored all of the areas of inquiry about which the Defendant now wishes its expert to inquire. One can only conclude that the Defendant now believes that its earlier inquiry was inadequate. Such a circumstance, if true, does not state good cause to have a second bite at the apple by way of an interview by their expert. Given the Defendant's assertion in its Memorandum that the issue of mitigation "will be strongly contested at trial," it is fair to conclude that the Defendant would have conducted as thorough an inquiry as it felt it needed while it had the Plaintiff under oath.

The Defendant asserts that good cause can be found from the fact that the Plaintiff intends to introduce vocational evidence from its own expert. The Defendant puts the cart before the horse. As clearly stated in her Motion to Amend the Scheduling Order, the Plaintiff only has sought the opportunity to designate a rebuttal vocational-rehabilitation expert and certainly reserves the option to not designate such an expert. No decision has been made on this issue, nor will it be made until the Plaintiff reviews the report submitted by the Defendant's expert.

The Defendant also claims that it was not able to conduct a more thorough examination of the Plaintiff during her deposition because the Plaintiff had not produced certain documents that the Defendant had requested. The documents that ultimately were produced consisted of the first pages of the Plaintiff's (and her husband's) federal income tax returns and W-2 forms that

show income for the Plaintiff. The documents simply do not reflect any specific sources of income of which the Defendant was not already aware. Accordingly, the scope and depth of questioning of the Plaintiff at her deposition in the areas proposed by the present motion was in no way compromised by the Defendant not having the above documents.

## II.    THE PLAINTIFF SHOULD NOT BE REQUIRED TO BE DEPOSED IN THE PRESENCE OF THE DEFENDANT'S EXPERT

As a fall back position, the Defendant alternatively seeks an order that the Plaintiff submit to a second deposition conducted in the presence of Mr. Miller.

Depositions are private proceedings at which members of the public may not attend. See *BancoPopular de Puerto Rico v. Greenblatt*, 964 F.2d 1227, 1233 (1st Cir. 1992)(quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) which stated that "pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice."); see also *Gannett Co. v. DePasquale*, 443 U.S. 368, 396 (1979)(Burger, C.J., concurring)("[I[t has never occurred to anyone, so far as I am aware, that a pretrial deposition or pretrial interrogatories were other than wholly private to the litigants.")

Mr. Miller, as a non-party, would not have been allowed to attend the deposition of Ms. Beebe that took place in February. The Defendant's "alternative" of having Mr. Miller attend a second deposition, is no alternative at all, but simply an interview by him through proxy. The only vehicle that could be invoked to permit such an event is Rule 35. For the reasons stated above, this Court should deny the Defendant's request for an order that Ms. Beebe be required to attend a second deposition at which Mr. Miller is present.

## III.    DEFENDANT'S REQUEST FOR EXTENSION OF TIME

The Plaintiff has no objection to the Defendant's request for an extension of time for the completion of Mr. Miller's report. The Plaintiff does request that if such an extension is granted, that the Plaintiff's time for designation of a rebuttal expert be extended to June 8, 2007, due in part to the fact that counsel will be out of state on vacation from May 22, 2007 through June 3, 2007. The Plaintiff further requests that the deadline for conducting expert depositions be extended to June 30, 2007. Because the Final PTC is presently scheduled for June 21, 2007, the Plaintiff also respectfully suggests that it be rescheduled to a date in mid July, 2007.

### IV.   CONCLUSION

For the above stated reasons, the Plaintiff respectfully requests that this Court deny the Defendant's Motion to Compel.

Respectfully submitted,
MICHELLE BEEBE
By Her Attorney,

Dated: April 20, 2007            ___/s/ Thomas J. McCormick_____
                                 Thomas J. McCormick, BBO # 561760

Heisler, Feldman & McCormick, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988
Fax (413) 788-7996
tmccormick01060@yahoo.com

CERTIFICATE OF SERVICE

    I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF).

    /s/  Thomas J. McCormick
Thomas J. McCormick

MICHELLE BEEBE  
2.2.07                                                          1

1                UNITED STATES DISTRICT COURT
2                 DISTRICT OF MASSACUSETTS
3
4  MICHELLE BEEBE
5  vs.                        Civil Action No. 05-30182
                              Pages 1-226
6  WILLIAMS COLLEGE
7
8        DEPOSITION OF: **MICHELLE BEEBE**, taken
   before Heather J. Davis, Certified Shorthand
9  Reporter and Notary Public, pursuant to Rule 30 of
   the Federal Rules of Civil Procedure, at the
10 offices of Grinnell, Dubendorf & Smith, Bank
   Street, Williamstown, Massachusetts on February 2,
11 2007, commencing at 10:45 AM.
12
13 APPEARANCES:
14   (SEE PAGE TWO)
15
16
17
                    Heather J. Davis
18                  Registered Merit Reporter
19
20
21
22
23              DAVIS & MITCHELL
                P.O. Box 1367
24              Pittsfield, MA 01202
        Tel. (413) 499-0035    Fax (413) 499-7823

9

1  A.  I understand.
2  Q.  You have to give me a verbal response
3  because the court reporter can't take down
4  mm-hmms and a-hahs, they're not clear.
5       If you need a break at any time,
6  I would ask that you answer the question that's
7  before you before taking a break, but I will
8  accommodate you, other than that.
9       If you don't understand a
10 question, I'd like you to tell me.  Is that all
11 right?
12 A.  Yes.
13 Q.  And if you don't tell me that you
14 don't understand the question, I'm going to
15 assume that you've understood it.  Is that clear?
16 A.  That's clear.
17 Q.  Okay.  Now, have you taken any
18 medications today or is there any reason that you
19 can't answer my questions fully and completely?
20 A.  I did take a medication today.  It's
21 Zoloft.  I have to take one to two every day.
22 Q.  All right.  But do you think that
23 will affect your ability to answer?
24 A.  No.

DAVIS & MITCHELL
(413) 499-0035

10

1  Q.  And you have to let me finish my
2  question.
3  A.  I'm sorry.
4  Q.  Because she can't take down more than
5  one person at a time.  She's good but she's not
6  that good.
7  A.  Sorry.
8  Q.  Now, can you tell me what you did to
9  get ready for today's deposition?
10 A.  I met with Tom.
11 Q.  Tom is Mr. McCormick, your attorney?
12 A.  Yeah, my attorney.
13 Q.  Did you review any documents?
14 A.  He just --
15     MR. MCCORMICK:  Don't go into
16 what we talked about but listen to what her
17 question was.
18 Q.  (BY MS. MALONE)  I don't want you to
19 tell me what he said to you, but you can
20 certainly tell me what you looked at.
21 A.  Some paperwork I didn't see before.
22 Q.  Do you remember what it was?
23 A.  Some paperwork, I guess, from like a
24 time sheet or my attendance sheet.  And then

DAVIS & MITCHELL
(413) 499-0035

11

1  basically to get me ready for my deposition.
2  Q.  Okay.  Did you speak -- before coming
3  here today did you speak with anyone from the
4  college, any former co-workers?
5  A.  No.
6  Q.  Okay.
7       MS. MALONE:  Could you mark this
8  as the first exhibit, please?
9
10      (Exhibit Number 1
            offered and marked for
11          identification)
12 Q.  (BY MS. MALONE)  Ms. Beebe, I'm
13 showing you a document that's been marked Beebe
14 Exhibit 1, and I would ask you to turn to the
15 last page, which is page twenty-three.  The
16 document is titled Plaintiff's Answers to
17 Defendant's First Set of Interrogatories.  Is
18 that your signature on page twenty-three?
19 A.  Yes.
20 Q.  And you signed this document under
21 the pains and penalties of perjury?
22 A.  Yes.
23 Q.  Did you read these answers carefully
24 before you signed them?

DAVIS & MITCHELL
(413) 499-0035

12

1  A.  Yes, I believe so.
2  Q.  All right.  Now, you can put that
3  aside for a moment, we'll be back to it in a bit.
4  Could you tell me briefly what your educational
5  background is?
6  A.  I believe I finished tenth year in
7  high school.
8  Q.  All right.  And did you ever get a
9  GED?
10 A.  I'm glad you brought that up.  I'm in
11 the process of that now.
12 Q.  And when do you think you'll have
13 your GED?
14 A.  I'm working with a professor right
15 now, we just kind of started it, so I don't know
16 how long it takes.
17 Q.  You're working with a professor
18 where?
19 A.  He's certified, he's a retired
20 professor, and, you know, he can help me.  He's
21 helping me along to get my GED.
22 Q.  Okay.  Have you taken any other
23 courses or gotten any certifications in anything?
24 A.  No.

DAVIS & MITCHELL
(413) 499-0035

## Page 13

1  Q. All right. Do you have any licenses?
2  A. Driver's. Oh, I have my license
3  through the state for the farmers' market. It's
4  kind of like a certificate.
5  Q. And when did you get that?
6  A. We've been doing it like right along.
7  I get it every year. It's like a renewal.
8  Q. And when is the first time you
9  obtained a farmers' market certificate or
10 license?
11 A. Well, my husband had it prior to when
12 I married him, going into the business, and we
13 just kept it going and my name was added on.
14 Q. Do you remember when your name was
15 added?
16 A. Probably the first year, because you
17 get it renewed every year.
18 Q. Mm-hmm.
19 A. So then I was added onto it, so I was
20 certified to sell down at farmers' market, also.
21 Q. And from whom do you get this
22 license?
23 A. It's from the state. I want to say
24 the agricultural -- I can't recall the letterhead

DAVIS & MITCHELL
(413) 499-0035

## Page 14

1  that they have on the sheet but it's through the
2  state through being able to produce and sell
3  produce to coupon people, elderly people that
4  have coupons that we have to submit at the end of
5  the season. It's kind of to help them because,
6  you know, they can't afford it and it's healthy.
7  Q. Did you have to take any test or
8  anything to get this license?
9  A. I had to fill out a form and submit
10 it in and then got my results.
11 Q. Okay. Now, you've worked at Williams
12 College, is that correct?
13 A. Correct.
14 Q. How long did you work at Williams
15 College?
16 A. To my recollection, I think it was
17 like -- I want to say fifteen and a half years.
18 Q. Okay. And how old are you?
19 A. Right now?
20 Q. Yes.
21 A. 42.
22 Q. Okay. And before working at Williams
23 College, what did you do?
24 A. I worked at Michael's Pizza.

DAVIS & MITCHELL
(413) 499-0035

## Page 15

1  Basically that was the job before I landed
2  Williams College.
3  Q. And was that the first job you had
4  after you left high school?
5  A. I worked at Burger Chef. That was my
6  first job. And that's no longer.
7  Q. What jobs did you hold at Williams
8  College, do you recall? Do you remember the
9  first job you held?
10 A. I was in food service. I think I was
11 a salad B. A salad B.
12 Q. B-E-E?
13 A. No. A B. They had salad A and salad
14 B, and I started off there and I worked
15 approximately six months in that area.
16 Q. Okay.
17 A. Then I landed the job --
18     MR. MCCORMICK: Wait. Try to
19 remember, and I'm instructing you to listen to
20 the question and answer the question that's
21 before you. The question was: What was your
22 first job at Williams College. And you've
23 answered it. Okay?
24 Q. (BY MS. MALONE) And after your six

DAVIS & MITCHELL
(413) 499-0035

## Page 16

1  months as a salad B you said you landed a job as
2  a --
3  A. Snack bar attendant.
4  Q. All right. And how long were you a
5  snack bar attendant?
6  A. Oh, I'd say thirteen years,
7  approximately.
8  Q. And why did you stop being a snack
9  bar attendant?
10 A. Because I applied for a job at
11 buildings and grounds.
12 Q. And why did you want to work at
13 buildings and grounds?
14 A. Better pay. I felt I needed a
15 change.
16 Q. At the time you applied at buildings
17 and grounds were you married to your husband,
18 David Beebe?
19 A. Yes.
20 Q. All right. And was he working at
21 buildings and grounds at that time?
22 A. Yes.
23 Q. And was one of the incentives for
24 working at buildings and grounds that you would

DAVIS & MITCHELL
(413) 499-0035

17

1  both be working in the same department?
2      A.   No.
3      Q.   Okay. And when did you stop working
4  at Williams?
5      A.   August 3, '04.
6      Q.   And prior to working as a custodian
7  in buildings and grounds, did you ever have any
8  attendance problems at Williams College?
9      A.   Yes.
10     Q.   All right. And when did you have
11 those problems?
12     A.   Consistently.
13     Q.   So all through your employment at
14 Williams College you had attendance problems?
15     A.   Are you talking buildings and grounds
16 or the whole --
17     Q.   No. I'm talking before you went to
18 buildings and grounds. Let's take buildings and
19 grounds and put it aside.
20     A.   Okay.
21     Q.   From the time you went to Williams
22 College as a salad B, through the time you went
23 to buildings and grounds, which I believe is
24 April of 2001, did you ever have attendance

DAVIS & MITCHELL
(413) 499-0035

18

1  problems in that period of time?
2      A.   Yes, I believe.
3      Q.   Often?
4      A.   I can't recall that. I wouldn't say
5  often.
6      Q.   Okay. Were you ever disciplined for
7  attendance problems?
8      A.   I was brought in for a talk.
9      Q.   Do you remember when that happened?
10     A.   I don't recall the time but it was
11 with my supervisor, Carol Luscier, and I can't
12 remember the person that was in charge at the
13 time, who no longer works there. He gave me a
14 verbal warning. He understood my kids were sick.
15 He told me that I just needed to try to correct
16 the problem.
17     Q.   So this was then toward the end of
18 your tenure in the snack bar, because you had
19 children at that point? Is that after you had
20 both of your last two children?
21     A.   I think it was prior to that, because
22 I had my older son at the time, which had
23 bronchial asthma conditions, also.
24     Q.   So do you think it was before you had

DAVIS & MITCHELL
(413) 499-0035

19

1  your last two children or after?
2      A.   It was before I had my last two
3  children.
4      Q.   All right. So you just had the one
5  child at that point?
6      A.   Right.
7      Q.   And was his health the only reason
8  that you were having attendance problems?
9      A.   Yes, I believe that was the case.
10     Q.   And was he living with you at the
11 time?
12     A.   Yes.
13     Q.   For what period of time did your
14 older son Nicholas live with you?
15     A.   I want to say David was six months --
16 I would say it was 1999 to maybe the beginning of
17 2000.
18     Q.   That's the period of time he lived
19 with you?
20     A.   No. He lived with me all his life up
21 until then.
22     Q.   Up until either 1999 or 2000?
23     A.   Correct.
24     Q.   And can you tell me why he no longer

DAVIS & MITCHELL
(413) 499-0035

20

1  lived with you after that?
2      A.   He chose to live with his father.
3      Q.   Okay. Now, after you were terminated
4  from Williams College did you apply for
5  unemployment benefits?
6      A.   Yes, I did.
7      Q.   All right. And did you receive them?
8      A.   Yes, I did.
9      Q.   And are you currently employed?
10     A.   No.
11     Q.   Are you self-employed?
12     A.   Yes.
13     Q.   And what is the nature of your
14 self-employment?
15     A.   Gardening. Gardening business.
16     Q.   And tell me what's entailed in that
17 gardening business, Miss Beebe.
18     A.   It's a lot of work. It's starting
19 seedlings, transplanting, getting them ready.
20     Q.   Do you have a greenhouse where you
21 live?
22     A.   We have a small one, and I have grow
23 lights, I do it down cellar, and then I bring
24 them up onto my sun porch. There's a process

DAVIS & MITCHELL
(413) 499-0035

21

1 that we do.
2    Q. Are these house plants or vegetables?
3    A. Vegetable plants, some flowers, and
4 herbs.
5    Q. And when you are ready to transplant
6 them, do you transplant them on to your own
7 property to grow them?
8    A. Well, yeah, and also to sell.
9    Q. To sell them as plants for people who
10 want their own gardens?
11    A. Right.
12    Q. Okay. And is that a full-time
13 occupation?
14    A. Yes.
15    Q. And about how many hours a week do
16 you spend on that business?
17    A. As many as I can get in. I can't
18 recall. Could be sixty. I mean from daylight to
19 nighttime, dawn to dusk.
20    Q. Do you enjoy that business?
21    A. Yes, I do.
22    Q. Is it something you find fulfilling?
23    A. Yes.
24    Q. And is it something you've wanted to

22

1 do for a while?
2    A. I've always loved it.
3    Q. And how much do you earn with this
4 gardening business?
5    A. It's not worth my time. It's not
6 worth my time. Every year is different. I'm not
7 sure how you want -- do you want a figure?
8    Q. Just if you can give me a range, that
9 would be fine.
10    A. I'm not exactly sure what I had wrote
11 down, I don't have my book in front of me, but we
12 try to keep logs. It could be anywhere from a
13 thousand to two thousand.
14    Q. And what are in these logs that you
15 keep?
16    A. The type of produce that we have,
17 what we sold on that given day. You know what I
18 mean? It's just a log to give us some idea --
19    Q. Sure.
20    A. -- for the following year of what
21 more to do or what less to do.
22    Q. And how long have you actually been
23 in this business?
24    A. Since I married my husband.

23

1    Q. So since 1998? No. '98?
2    A. Yeah.
3    Q. And so you did it on a part-time
4 basis while you were still employed?
5    A. As part-time, maybe more. Like I
6 said, between work and that, it was a lot.
7    Q. More than a full-time job?
8    A. Meaning just --
9    Q. Both of them?
10    A. Oh, yeah. Yeah.
11    Q. Are you currently looking for
12 full-time employment outside of the gardening
13 business?
14    A. Yes. Yes, I am.
15    Q. And what are you doing to find
16 full-time employment outside of the gardening
17 business?
18    A. I've filled out some applications.
19 I've picked up The Advocate from time to time. I
20 have applied, with no response.
21    Q. Can you tell me where you've applied?
22    A. I applied at Big Y.
23    Q. All right. And did you get a
24 response from Big Y?

24

1    A. I didn't even get through my
2 application and they said they had other people
3 more qualified.
4    Q. All right. So you didn't even fill
5 out an application?
6    A. Yes, I did.
7    Q. Oh, okay. And they told you right
8 then they had other people?
9    A. On the computer, yes.
10    Q. Okay. And when was that, do you
11 recall?
12    A. I want to say, and I'm not exactly
13 sure, it could have been over a year ago.
14    Q. Is there anything you could look at
15 that would tell you when that happened?
16    A. Not to my knowledge, no.
17    Q. All right. Where else have you
18 applied?
19    A. Cumberland Farms.
20    Q. All right. And when did you apply at
21 Cumberland Farms?
22    A. I actually applied at two Cumberland
23 Farms.
24    Q. Okay. And which two Cumberland Farms