UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30182-MAP

| | |
|---|---|
| MICHELLE BEEBE, | : |
|           Plaintiff, | : |
| v. | : |
| WILLIAMS COLLEGE, | : |
|           Defendant. | : |

**PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF THE DEFENDANT'S MEDICAL EXPERT AND SUPPORTING MEMORANDUM**

Pursuant to this Court's Final Scheduling Order, dated June 22, 2007, the Plaintiff, Michelle Beebe, respectfully moves this Court in limine to exclude the testimony of the Defendant's medical expert, Dr. Waxman.

Dr. Waxman's testimony should be excluded because the Defendant did not exercise its right to request Ms. Beebe to provide medical certification from her health care provider of her need for medical leave <u>at the time</u> that she requested the time off (circa the end of July, 2003). By choosing not to exercise this right and, therefore, failing to timely request certification, the Defendant waived this right and is now precluded from challenging with medical testimony at trial whether Ms. Beebe's leave request qualifies under the Family Medical Leave Act (FMLA).

In like fashion, the Defendant did not exercise it right to request Ms. Beebe to provide medical certification of her children's serious health conditions during 2001

through 2003 each time that she took leave to care for them, and so waived its right challenge, through a medical expert, that the children were not incapacitated.

I.  TESTIMONY REGARDING THE PLAINTIFF'S SERIOUS HEALTH CONDITION

Undisputed Facts

Ms. Beebe missed work from Thursday, July 24, 2003, for the final 3 hours of her shift starting at 1:00 p.m., through Friday, August 1, 2003.  Joint Pretrial Memorandum (Joint Memo), II. Stipulations, ¶¶ 27, 28, & 36.  She told her supervisor was she sick when she left early on July 24th.  Id.  She called in sick on July 25th.  Ms. Beebe went to the local hospital's emergency room on Sunday evening, July 27th.  Id. at ¶ 30.  She followed up on Wednesday, July 30, 2003, with a visit to the office of her primary care physician, Dr. Payne, and saw his partner, Dr. Kober.  Id. at ¶ 33.

During the above leave, Ms. Beebe provided two doctor's notes to her supervisor each excusing her from work.  Joint Memo at ¶¶ 31, 32, 34 & 35.  The first note, dated July 27, 2003, was from Dr. Landes, a North Adams Regional Hospital emergency room physician, and was written on hospital letterhead.  The note stated that Ms. Beebe was excused from work until July 31, 2003.  Id. at ¶ 31.  Ms. Beebe hand delivered the note her supervisor on Monday, July 28, 2003.  The second note, dated July 30, 2003, was from Dr. Kober and was written on the doctor's office's letterhead.  This note stated that Ms. Beebe was excused from work until August 4th.  Id. at ¶¶ 33 – 34.  Ms. Beebe hand delivered this note to her supervisor on or about July 30, 2003.

Upon Ms. Beebe's return to work on August 4, 2003, the Defendant terminated her employment and gave her a letter stating that she had had an unacceptable amount of absences from work. Id. at ¶ 37.

At no time during or after the above absences did Ms. Beebe's supervisors request that she provide any additional certification or doctor's documentation in support of her medical absence. Beatrice Miles, Ms. Beebe's supervisor, testified at her deposition as follows:

> Q. . . . whenever you became aware of that note [the note from Dr. Landes] do you recall making either a request directly of Shelly or passing the request through Mr. Mason that Shelly provide further medical information in support of this note excusing her from work?
>
> A. I'm sure that I did not do that. That is not something we require of our employees. We do not, unless instructed through the benefits office to get documentation from a doctor for leave policies, whatever they may be. It is not something I require or ask my employees to do.
>
> . . .
>
> A. Not from me, no. As I said, we don't request doctor's documentation.
>
> Q. All right. In the normal course of a request for sick leave or sick time.
>
> A. Right. Not when they call in, nor when they come back.

Beatrice Miles Deposition, at 58 – 60, a copy of which is attached as Exhibit 1.

The Defendant does not assert that it ever requested medical certification from Ms. Beebe at the time that she took unforeseeable leave for her own illnesses or for her children's illnesses.

Argument

The Defendant seeks to introduce the testimony of Dr. Waxman in support of the proposition that Ms. Beebe's doctors erred in excusing her from work during the last week of July, 2003. For example, in his report, based solely on a review of Ms. Beebe's

3

medical records, Dr. Waxman states that Ms. Beebe was appropriately treated in the emergency room on July 27, 2003 for a post viral condition and was discharged home with appropriate medications. He went on to conclude, however, that "this does not suggest a chronic condition or a condition that requires ongoing treatments from a health care provider." He goes to say that "I do not find anything in the medical record that supports a diagnosis of any serious chronic health condition." Report of Dr. Waxman, dated April 18, 2007, a copy of which is attached as Exhibit 2.

Yet, Dr. Landes, the emergency room physician, excused Ms. Beebe from work until July 31st and then Dr. Kober, after seeing Ms. Beebe on July 30th, excused her until August 4th and continued her on the course of antibiotics originally prescribed.[1] Dr. Waxman would testify, in essence, that Ms. Beebe was not incapacitated and did not need to miss work; in other words, that Ms. Beebe did not suffer from a serious health condition covered by the FMLA. If the Court allows Dr. Waxman's testimony, the Defendant will be permitted to challenge the medical conclusions of Ms. Beebe's doctors well after the fact of her illness.

---

[1] It is interesting to note that Dr. Payne, Ms. Beebe's primary care physician, saw her again on August 5th, and continued her on the same antibiotics that she had been taking for over a week. At his deposition, Dr. Payne testified that during his examination of Ms. Beebe on August 5th, "she still sounds like she has a lower respiratory infection or bronchitis, because I hear wheezing and rhonchi. So I re-treat her with another antibiotic at that point." Payne Deposition at 111. When asked whether it was reasonable that she had been kept out of work during week prior to his seeing her on the 5th, Dr. Payne testified that: "Yeah. I generally – if a person has a lower respiratory tract infection, I don't like to send them back to work until their lungs are cleared. I'm worried about them deteriorating so I try to keep them out." Id. at 113. Finally, when asked if he had an opinion as to whether Ms. Beebe should have remained out of work for some period of time from August 5th onward, had she still been employed, he answered: "Yes. With the wheezing, that would have been reasonable." Id. at 114. Copy attached as Exhibit 3.

The scheme of the FMLA does not provide for this kind of post hoc attack on the health care providers who treated the employee at the time – it does not countenance a battle of medical experts at trial on the issue of whether the employee suffered from a serious health condition at the time that she requested and took medical leave. The "statutory scheme is designed to have medical determinations made by health care providers, rather than the courts." Sims v. Alameda-Contra Costa Transit Dist., 2 F.Supp.2d 1253, 1261 (N.D.Cal. 1998).

If the employer doubts that an employee has a serious health condition, its recourse is to the certification process set out in the regulations. "An employer who does not believe that its employee suffers from incapacity due to illness, or otherwise doubts its employee's qualifications for FMLA leave, has several statutory and regulatory remedies." Wheeler v. Pioneer Developmental Services, Inc., 349 F.Supp.2d 158, 168 (D. Mass. 2004).

> Once an employee gives notice, and the circumstances suggest that the employee's request may involve FMLA leave, it becomes the employer's obligation to inquire further in order to determine if the requested leave qualifies for FMLA protection. (Citations omitted).
>
> The employer has the right under the FMLA to require that the employee support her request for leave with medical certification issued by the employee's health care provider. 29 U.S.C. § 2613(a)(2004); 29 C.F.R. 825.305(a). To exercise this right, the employer must give a written notice of a requirement for medical certification each time the employer requires it, 29 C.F.R. 825.305(a), and must advise the employee of anticipated consequences of the employee's failure to provide adequate certification, 29 C.F.R. 825.305(d). In general, the employer must request certification at the time the employee gives notice or, in cases of unforeseen leave, within two days after leave commences. 29 C.F.R. 825.305(c). Once requested, the employee must provide a copy of such certification to the employer. 29 U.S.C § 2613(a)(2004).

Wheeler, 349 F.Supp.2d at 166.

The above statutory remedies are perfectly clear. The consequences, if an employer fails to available itself of the remedies, are equally clear. "An employer who chooses not to exercise these rights waives them and is precluded from challenging the propriety of the employee's leave request at a later trial." Id.

> Congress did not allow an employer to deny a leave request without using the statutory procedures, and then argue in court after engaging in civil discovery that the certification presented by the employee did not accurately present the employee's medical condition.

Sims at 1263.

The Eighth Circuit in Thorson v. Gemini, Inc., 205 F.3d 370 (8th Cir. 1999), further clarified that an employer's failure to seek certification waives only its right to contest the medical opinions of the Plaintiff's doctors. In Thorson, the court expressly separated the issue of whether a "serious health condition" was proved into objective and subjective components. The objective component focuses on whether the ailment in question met 'bright line' statutory requirements. For example, the court in Thorson concluded that the Plaintiff in that case, who had visited her doctor twice within a week and whose illness exceeded three calendar days, met the requirements of the objective standard set forth in the regulations. Thorson, 205 F.3d at 377. It may well be the case that an employer may always challenge, including at summary judgment or trial, whether the employee met the objective criteria for a serious health condition.

The court then turned to the more subjective issue of whether Plaintiff's illness actually rendered her incapacitated, as her own physician's notes suggested.

> Thorson was absent for more than three days with notes from her physician, written on two different occasions within that period of absence, indicating that she was not to work. At that point, Gemini became obligated either to count

>   Thorson's absence as FMLA leave under the 'serious health condition' provision or to follow the procedures set out in the statute and the regulations designed to prevent employee abuse of the Act.... That is, Gemini could have initiated the FMLA's certification process before summarily terminating Thorson.  Had it done so, it may have been able to determine that Thorson did not have a 'serious health condition' within the meaning of the FMLA."

Id. at 381.

The posture of the Thorson case was an appeal of a grant of summary judgment as to liability for the Plaintiff.  The employer relied on its own medical expert, as the employer does here, who evaluated the Plaintiff's condition many months (years, in the case at bar) after the employee's termination and for the purposes of the litigation.  The expert in that case concluded that there was no obvious reason that the employee should have missed work; that it, that in his opinion, she was no incapacitated.  The Circuit Court agreed with the District Court's conclusion that "[i]n the face of the contemporaneous notes from Thorson's physician indicating that she was not to work, . . . Gemini cannot show, with its evaluations made long after the fact, that there remains a genuine issue of material fact on the question of Thorson's capacity to do her job." Id. at 382.

The above decisions, and others, have made clear that the certification procedures are the exclusive means by which an employer can challenge the medical facts underlying an employee's certification.  *See also,* Miller v. AT&T, 60 F.Supp. 574, 580 (S.D.W.Va. 1999), *affirmed*, 250 F.3d 820 (4th Cir. 2001). The failure of the Defendant in this case to invoke the statutory certification scheme after receiving notice of the need for

7

leave from the Plaintiff deprives it of the right to challenge the substance of the certification via its own expert offering his post hoc opinion.

Finally, it may be the case that the Defendant's supervisor did not believe that the Plaintiff was ill enough to miss work during the last week of July, 2003. However, "employers may not substitute their personal judgments for the test in the regulations or the opinions of the health care providers of employees . . . to determine whether an employee is entitled to FMLA leave for a serious health condition." Id. (quoting 60 Fed.Reg. 2180, 2235 (1995). The proper recourse for the Defendant was to challenge the Plaintiff's doctors' conclusions at the time of her illness, not today.

II.   TESTIMONY REGARDING THE SERIOUS HEALTH CONDITION OF THE PLAINTIFF'S CHILDREN

The Defendant also intends to offer testimony from Dr. Waxman that neither of the Plaintiff's two sons, Daniel or David Beebe, suffered from any serious chronic health conditions during the period from January 2002 through July 2003.

The following facts are not in dispute: The Defendant did not designate any of the leave that Ms. Beebe took during the above time frame as Family Medical Leave. Joint Memo, Stipulation No. 17. The Defendant issued a written warning to the Plaintiff on July 1, 2003 because of the excessive use of unscheduled time off. Joint Memo, Stipulation No. 25.

On several occasions during 2002 and 2003, Ms. Beebe missed more than three consecutive days of work and the Defendant was on notice on each of those occasions that the reason for her absence was to care for her sick children. For example, the Defendant's attendance records show that Ms. Beebe took unexcused leave from work on

8

June 25, 26, 27 and 30, 2003, a period of more than three days. Those records also show that Ms. Beebe notified the Defendant that the reason for the absences was because she had "sick children" at home and she had to care for them. The attendance records also show that Ms. Beebe took a sick day on March 10, and then unexcused leave for March 11, 12, 13, and 14, 2003. Again, the records reveal that Ms. Beebe notified the Defendant that the reason for the absences was because she had "sick children" at home and she had to care for them.

For at least the above two described periods of time, the Defendant was on timely notice that the leave taken by Ms. Beebe might qualify as FMLA leave. She was absence for than three days and the absences were due to the fact that her children were sick. For the same reasons articulated above, once the Defendant was on notice that the leave might qualify under FMLA, it had an obligation to inquire further, if it so chose, by requesting that Ms. Beebe provide medical certification from the children's health care provider that the children had a serious health condition and that they required assistance from Ms. Beebe. The Defendant does not contend that it requested medical certification during or after either of the above two periods of absences. Accordingly, the Defendant has waived the right to challenge whether the children's illnesses during these periods were incapacitating.

The only testimony that Dr. Waxman has to offer regarding the children's illnesses is his opinion that neither child had a serious chronic health condition during those periods – that is, that neither child was incapacitated. Because the Defendant the right to challenge this point, Dr. Waxman's testimony should be excluded.

Conclusion

9

For the above reasons, the expert testimony of Dr. Waxman should be excluded in all respects.

|  |  |
|---|---|
|  | Respectfully submitted,<br>THE PLAINTIFF, MICHELLE BEEBE,<br>By her attorney, |
| Dated: July 2, 2007 | ____/s/ Thomas J. McCormick____<br>Thomas J. McCormick, BBO# 561760<br>Heisler, Feldman, McCormick<br>    & Garrow, P.C.<br>1145 Main Street, Suite 508<br>Springfield, MA  01103<br>Ph. (413) 788-7988<br>Fax (413) 788-7996<br>tmccormick01060@yahoo.com |

CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF).

　　/s/ Thomas J. McCormick_____
　　　　Thomas J. McCormick

EXHIBIT 1

## Page 57

1  at that point about it, so I would say that
2  Martha and I already were on this road.
3      Q.  (BY MR. MCCORMICK) All right.  I
4  understand.  Do you recall making any requests of
5  Shelly that she take any particular action when
6  you met with her on or about July 31?
7      A.  That she -- I guess I need to know
8  what you want --
9      Q.  Did you request that she provide you
10  with any further documentation or medical
11  certification or information from her doctor or
12  doctors on the occasion of the meeting that seems
13  to be documented by Exhibit 22?
14      A.  No.  Because during this conversation
15  with Shelly I had been told that Shelly was at
16  the fireworks in Pownal.  I asked Shelley that
17  and she freely admitted that she was there.  And
18  to me that indicated that I hadn't been
19  successful in any of the messages that I was
20  trying to give to Shelly.  And I didn't formulate
21  any other plan, other than I knew that I had to
22  speak with Martha.
23      Q.  All right.  Fair enough.  And with
24  regard to Exhibit 21, which is another note --

DAVIS & MITCHELL
(413) 499-0035

## Page 58

1      A.  Mm-hmm.
2      Q.  And I think we've established that
3  you don't have a recollection as to when you
4  became aware of that note, but whenever you
5  became aware of that note do you recall making
6  either a request directly of Shelly or passing
7  the request through to Mr. Mason that Shelly
8  provide further medical information in support of
9  this note excusing her from work?
10      A.  I'm sure that I did not do that.
11  That is not something we require of our
12  employees.  We do not, unless instructed through
13  the benefits office to get documentation from a
14  doctor for leave policies, whatever they may be.
15  It is not something I require or ask my employees
16  to do.
17      Q.  All right.  And to take that just a
18  little further, with regard to the absences in
19  2002 and 2003 that are documented or represented
20  on her absence sheets, Exhibits 15 and 13, are
21  you aware of any occasions where after Shelly was
22  to call in sick, either for herself or her
23  children, that a request would have been made of
24  her or was made of her to provide any further

DAVIS & MITCHELL
(413) 499-0035

## Page 59

1  documentation on these earlier occasions of
2  absences in '02 and '03?
3          MS. HIGGINS:  And you can look at
4  the calendars to see.
5          THE WITNESS:  The only time I
6  think that Shelly would have been asked for
7  documentation is for this 60 percent.  That is
8  short-term disability and that's a standard
9  policy, where she would have been asked for it.
10  And that is not something that I do.  That's
11  something, again, that the benefits, they handle
12  short-term disability.
13      Q.  (BY MR. MCCORMICK) All right.
14      A.  And if Shelly went on that, then she
15  would have been required to show some kind
16  of thing, and then a return to work.  So that's
17  all medical documentation.
18      Q.  And that would have happened through
19  the benefits office?
20      A.  Yes.
21      Q.  Not by any request that you would
22  make?
23      A.  Not from me, no.  As I said, we don't
24  request doctor's documentation.

DAVIS & MITCHELL
(413) 499-0035

## Page 60

1      Q.  All right.  In the normal course of a
2  request for sick leave or sick time.
3      A.  Right.  Not when they call in, nor
4  when they come back.
5      Q.  All right.  Did you ever become aware
6  of what some of the illnesses of Shelly's
7  children were?
8      A.  There were a lot of conversations
9  that I had with Shelly, some that are documented
10  and some that aren't.
11      Q.  Yes.
12      A.  So, yes, I was aware.  I knew that
13  they were at daycare so they tended to pick up a
14  lot of sniffles and sneezes and bugs.  And I also
15  knew that one of them had asthma.  I was aware of
16  that.  And that's -- you know, just general
17  stuff.  Nothing more than what I've just told
18  you.
19      Q.  All right.  Were you involved at all
20  in the grievance process that happened after
21  August 4?
22      A.  I was called by the grievance
23  committee to come up, and they asked me questions
24  about what we had done and how we had done it.

DAVIS & MITCHELL
(413) 499-0035

EXHIBIT 2

 

MASSACHUSETTS GENERAL HOSPITAL

HARVARD MEDICAL SCHOOL

55 Fruit Street, Bulfinch 148
Boston, Massachusetts 02114-2696
Tel: 617.724-3705; Fax: 617.724.1721
E-mail: abwaxman@partners.org

**Aaron B. Waxman, M.D., Ph.D.**
*Assistant Physician in Medicine*
*Pulmonary and Critical Care Unit*
*Massachusetts General Hospital*

*Assistant Professor of Medicine*
*Harvard Medical School*
*Director, Pulmonary Vascular Disease Program*

April 18, 2007

Arthur Fine
Medical Opinions Associates, Inc.
31 Rich Valley Road
Wayland, Massachusetts 01778

Re: Michelle Beebe v. Williams College

I have reviewed the medical records of Michelle Beebe, David Beebe, and Daniel Beebe, the deposition transcripts of Dr. Michael Gerrity, and Michelle Beebe.

Michelle Beebe had repeated absences from her work as a Custodian at Williams College. She reports several illnesses during the time period of January 2002 and July 2003 including depression, stress, and "asthmatic bronchitis". These are detailed in her medical record. In reviewing her visits to her doctors and her visits to the Emergency Room at North Adams Regional Hospital it is clear that she had episodes of cough and sinus congestion. There is nothing in the medical record to suggest or support a diagnosis of an acute lung disease such as pneumonia, or a chronic lung condition such as asthma, chronic obstructive pulmonary disease, chronic bronchitis, or bronchiectasis. There are no records of inpatient hospitalizations for Ms. Beebe that would suggest a serious illness during this time period. It is also noteworthy that she smoked one and a half packs of cigarettes through out this time and continued to smoke in spite of her doctor urging her to stop. Heavy tobacco uses is certainly an important cause of cough and can exacerbate sinus congestion. The only objective data of any airway problem in Ms. Beebe's medical records are peak expiratory flow rates measured in the emergency room. These were obtained at the time of an upper airway infection and show below normal flow rates (250, 244, and 257) that improve with bronchodilators (340, 330, and 300). She was appropriately treated for this post viral condition and discharged home with appropriate medications. This does not suggest a chronic condition or a condition that requires ongoing treatments from a health care provider. The only other objective information in her medical record are chest radiographs that were all read as normal. I do not find anything in the medical record that supports a diagnosis of any serious chronic health condition.

Both Daniel and David Beebe are seen regularly by their pediatrician during the same time period. Daniel Beebe was hospitalized in April of 2002 with ataxia, for which there was a negative workup and resolution. While the children are described as having repeated respiratory problems by their parents, there is nothing in the record to suggest anything specific. In all other cases both children are seen for routine acute viral illnesses. There is nothing to suggest, nor is there any objective data to confirm that either child has a serious chronic health condition.

Sincerely,

Aaron B. Waxman, MD, PhD

EXHIBIT 3

## Page 109

1  well, this does not indicate whether or not a
2  note was written for an excuse from work, is that
3  right?
4      A.  Right.
5      Q.  And would that be a normal practice,
6  however, to create such a note?
7          MS. MALONE: Objection.
8          THE WITNESS: It's off and on
9  with patients. Some patients, you know, are
10 self-employed and they don't ask for them. So it
11 is normal practice for some doctors to ask, do
12 you need a note. Some may not and wait for the
13 patient to request one.
14     Q.  (BY MR. MCCORMICK) All right. And
15 it does say, if she has no improvement, she will
16 follow up with Doctor Payne.
17     A.  Right.
18     Q.  And you did see her on August 5,
19 2003.
20     A.  Okay. Yup.
21     Q.  Okay. And you testified earlier that
22 it looked like there were two parts to that
23 visit.
24         MS. MALONE: Objection.

DAVIS & MITCHELL
(413) 499-0035

## Page 110

1      Q.  (BY MR. MCCORMICK) The one part,
2  that she was losing her job.
3          And just so you understand, I'm
4  not being rude to Miss Malone.
5          THE WITNESS: Yeah, this is
6  procedural.
7      Q.  (BY MR. MCCORMICK) That she was
8  concerned about losing her job but that she still
9  was sick.
10     A.  Right.
11     Q.  Is that it? If I'm not saying it
12 right --
13     A.  Yeah. I just want to read it right.
14 **Patient here concerned that she is losing her**
15 **job. She was recently out sick with asthmatic**
16 **bronchitis, still coughing. So, yeah, she's**
17 **still sick.**
18     Q.  And when you say still sick, can you
19 just put some content into that for us?
20     A.  Yes. That as I was talking with her,
21 **I talk with the patient before I examine them, so**
22 **as I was talking to Michelle in the initial**
23 **conversation about why she was there, it was that**
24 **she had just been out sick. I would have looked**

DAVIS & MITCHELL
(413) 499-0035

## Page 111

1  at Doctor Kober's note. And she told me that she
2  was losing her job. And she went into some
3  background about her kids being sick over the
4  year, that that was part of the issue. And
5  appeared distraught. Because it says, also alert
6  and tearful. And then on my examination she
7  still sounds like she has a lower respiratory
8  infection or bronchitis, because I hear wheezing
9  and rhonchi. So I re-treat her with another
10 antibiotic at that point.
11     Q.  Is that the same antibiotic that was
12 earlier prescribed?
13     A.  Yeah.
14     Q.  So a second course?
15     A.  A second course of that antibiotic.
16 And so I, you know, felt that in listening to her
17 and looking at the record, that she was on
18 adequate inhalers and that there was an infection
19 that needed more antibiotic and she didn't have
20 an adequate course at this point of that
21 antibiotic.
22     Q.  And was there -- what sort of
23 followup would be involved after that visit?
24     A.  After that, repeated -- at that point

DAVIS & MITCHELL
(413) 499-0035

## Page 112

1  I kind of directed the -- I didn't really fill
2  it -- I mean what's routine, I didn't express it
3  here, is if you don't get better, come back.
4  That sort of thing. It depends on how sick the
5  person looks to me. But since I knew I was
6  seeing Michelle -- I mean that, you know, she
7  appeared distraught, I wanted to see her again to
8  see how that was going.
9      Q.  You certainly put a note in that
10 there would be a followup specific to the
11 depression and anxiety.
12     A.  Right. She appeared distraught to me
13 at the time so I wanted to see her back and kind
14 of folded that in with her breathing issue at the
15 time.
16     Q.  All right. And does it appear that
17 at the next visit the breathing issue had
18 resolved?
19     A.  Yes. **It says, bronchitis resolved,**
20 **her lungs were clear.**
21     Q.  All right. And the time that she
22 missed from work then, the week prior to the
23 August 5 visit, --
24     A.  Mm-hmm.

DAVIS & MITCHELL
(413) 499-0035

**Page 113**

Q. -- is that, in your opinion, reasonable that she did not go to work that week because of this?

MS. MALONE: Objection.

THE WITNESS: Yeah. I generally -- if a person has a lower respiratory tract infection, I don't like to send them back to work until their lungs are cleared. I'm worried about them deteriorating so I try to keep them out.

Q. (BY MR. MCCORMICK) All right. And just a quick followup to that: On the August 5 visit it looks like your notes say you're concerned that she is losing her job.

A. Mm-hmm.

Q. Would you have -- if she was still working, would you have given her a stay out of work note for that time frame, starting from the 5th?

MS. MALONE: Objection.

THE WITNESS: Looking at this note, I don't really address that, --

Q. (BY MR. MCCORMICK) No.

A. -- when she should go back to work.

**Page 114**

Normally there would be a discussion about, okay, you know, another out-of-work note, or when can I go back to work, or go back to work at a certain time. I don't always document it. It depends.

Q. I'm sorry, I guess what I'm asking is, looking at your notes and sitting here today --

A. Mm-hmm.

Q. -- do you have a conclusion that you would have or she should have continued to remain out of work for a period of time?

MS. MALONE: Objection.

THE WITNESS: Yes. With the wheezing, that would be reasonable.

MR. MCCORMICK: All right. That's all.

MS. MALONE: I just have a few followup to his questions.

MR. MCCORMICK: Mm-hmm.

**REDIRECT EXAMINATION BY MS. MALONE**

Q. (BY MS. MALONE) Doctor Payne, in your earlier testimony, in the July/August 2003 time frame, she was never diagnosed with

**Page 115**

pneumonia, was she?

A. Yeah. No one used the word pneumonia.

Q. She was diagnosed with bronchitis and bronchial asthma, is that correct?

A. Asthmatic bronchitis, that's correct.

Q. And is it unusual after you have a bout with bronchitis to continue to cough for some period of time after the infection has cleared up?

A. Oh, not at all. Yeah. You can cough for quite a while.

Q. For quite a while?

A. Yeah.

Q. So you could be infection-free and still be coughing?

A. Correct.

Q. All right. And how would you determine if you're just having followup coughing or if your infection is active?

A. I pretty much go by how their lungs sound. You know, if their lungs sound clear to me and they're coughing, I don't really worry about it too much.

**Page 116**

Q. Okay. And in the August 5 note there is nothing about -- isn't it true there's nothing about following up with respect to the bronchitis?

A. That's right.

Q. And your concern, as indicated in the note on August 5, was that she follow up with respect to the depression resulting from her termination of her employment, is that correct?

A. That's how it is, yes.

Q. Okay. And the next time you saw her was over a month later, is that correct?

A. That's correct, yeah.

Q. And so you don't know when, between August 5 and September 9, 2003 --

A. Right.

Q. -- the bronchitis completely resolved, which means she didn't have any coughing, is that correct?

A. Right. I think that it definitely resolved sometime well within then. I don't know when, but she recovered sometime between those two dates.

Q. All right.

DAVIS & MITCHELL
(413) 499-0035