UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE BEEBE,

            Plaintiff,

   v.

WILLIAMS COLLEGE,

            Defendant.

Civil Action No.  05-30182

## DEFENDANT'S MOTION IN LIMINE NO. 1 TO PRECLUDE ANY ARGUMENT OR EVIDENCE ON THE ISSUE OF COLLEGE TUITION FOR NICHOLAS BOUCHER

Defendant Williams College (the "College") hereby moves the Court for an order precluding Plaintiff Michelle Beebe ("Plaintiff") from presenting any evidence or argument in support of a claim for college tuition reimbursement on behalf of her son, Nicholas Boucher, who has neither applied for nor attended any college or university.  The evidence of record, therefore, indicates that Plaintiff has not suffered any compensable damages based upon the loss of this "benefit" and, therefore, any evidence on this subject would be irrelevant and highly speculative.

### Factual Background and Summary of Argument

In this case, Plaintiff argues that the College violated the Family and Medical Leave Act, 29 U.S.C. 2601 et seq. ("FMLA") when it disciplined her and ultimately terminated her for excessive absenteeism.  Plaintiff retained an economic expert, Craig L. Moore, Ph.D., who prepared a report setting forth Plaintiff's claim for damages.  In this report, Dr. Moore claims that as a result of termination from the College, Plaintiff "has lost substantial employee benefits including tuition for her oldest son."  Report of Craig L. Moore, Ph.D., at 1 (Mar. 15, 2007)

("Moore Report") (attached as <u>Exhibit A</u>).

The College provides a Tuition Grant Benefit for dependent children of eligible faculty and staff at the College who are enrolled in an accredited college program leading to an academic degree. College's Tuition Grant Program, excerpted from the College's Buildings and Grounds Support Staff Handbook (June 1994) (attached as <u>Exhibit B</u>). The grant covers the tuition costs at state institutions, up to an annual maximum dollar amount of one-half the prevailing tuition at the College for a maximum of four years per dependent child. *Id*. To qualify, a child need only be considered a dependent of the eligible employee, meeting the dependent criteria established by the Internal Revenue Service. Affidavit of Kristine Maloney, Benefits Administrator, Williams College, at ¶ 6 (July 2, 2007) ("Maloney Affidavit") (attached as <u>Exhibit C</u>). An employee must have completed five years of full-time service at the College to qualify. *Id*. at ¶ 5.

Dr. Moore reported that "[i]n October of 2003 [Plaintiff] would have become eligible for an annual tuition benefit for her son Nicholas who was planning on going to College. That benefit was worth $13,946 per year… As a result, he has not been able to afford to go to college and has had to go to work since graduating from high school." Moore Report, at 4. This section of Dr. Moore's report and any argument or evidence concerning lost college tuition must be excluded as highly speculative and irrelevant because it is undisputed that Plaintiff never incurred any damages from her "loss" of this benefit and Dr. Moore's opinion was not based upon sufficient facts or data.

**ARGUMENT**

Federal Rule of Evidence 702 provides that an expert witness may testify in the form of an opinion if "the testimony is based upon sufficient facts or data." As Rule 702 makes clear,

expert testimony is admissible only if it is both relevant and reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147-49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Huber v. JLG Industries, Inc.*, 344 F. Supp. 2d 769, 772 (D. Mass. 2003)

Here, Dr. Moore simply did not have "sufficient facts or data" to support the highly speculative statement that Nicholas Boucher "has not been able to afford to go to college." Dr. Moore's report provides a listing of the documents and information provided to him which enabled him to reach the opinions he expresses in his report. Moore Report, at 10. He indicates that he reviewed (1) the Complaint filed in this action; (2) the College's answers to interrogatories; (3) a copy of Plaintiff's attendance records; (4) a copy of the Beebe family's federal tax returns for 2001 through 2004; (5) a copy of the College's Handbook; (6) a copy of a letter from Martha Tetrault, the College's Director of Human Resources, to Plaintiff dated May 16, 2003; (7) a copy of Plaintiff's deposition transcript; (8) a copy of Plaintiff's husband's deposition transcript; and (9) an interview with Plaintiff and her husband. At his deposition, Dr. Moore confirmed that these were the only documents he looked at for purposes of preparing his report. Deposition of Craig L. Moore, at 41:17-42:1 (June 19, 2007) ("Moore Dep.") (excerpts attached as Exhibit D). These documents and the interview with Plaintiff and her husband are woefully insufficient for Dr. Moore to support his claim.

First, Dr. Moore never addressed whether Nicholas Boucher could have acquired the College's tuition benefit from a source other than Plaintiff. Dr. Moore reported that "[i]n October of 2003 [Plaintiff] would have become eligible for an annual tuition benefit for her son Nicholas who was planning on going to College." Moore Report, at 4. At that time, however, Nicholas' biological father, Steve Boucher, was still employed by the College and eligible for the tuition benefit. Maloney Affidavit, at ¶¶ 7, 8. Thus, Nicholas would have been eligible for the

exact same benefit through his father even after Plaintiff's termination from the College. Prior to his voluntary resignation from the College in June 2004 after nearly twenty years of service, Steve Boucher never applied for the tuition benefit on behalf of Nicholas. *Id.*, at ¶ 9.

Similarly, Dr. Moore incorrectly stated that "[w]hile that benefit may still be available to David Jr. and Daniel because their father [David Beebe] still works for Williams, it does not cover Nicholas as he is not David's son." Moore Report, at 4. According to the College's policy, however, a child need not be the biological child of an employee to qualify. Rather, he simply needs to be a child considered a dependent for purposes of the Internal Revenue Service. Maloney Affidavit, at ¶ 6.

Second, assuming for the sake of argument only that Nicholas could not obtain the benefit through either Steve Boucher or David Beebe's employment at the College, Dr. Moore still did not base his conclusion on sufficient data. The Joint Pretrial Memorandum indicates that it is an uncontested fact that Nicholas has lived with his biological father, Steve Boucher, and stepmother, Robin Boucher, since at least 2000. Joint Pretrial Memorandum (Docket Entry No. 34), Facts Established By Pleadings or by Stipulation or Admissions of Counsel, No. 16. At the very least, therefore, Dr. Moore would need to learn from Mr. and Mrs. Boucher about their financial position and whether they saved for their son to attend college. Dr. Moore would need to analyze their joint income, tax returns, and any statements from bank or investment accounts they established to finance Nicholas' higher education. This information would be critical for Dr. Moore to reach any conclusion about whether limited finances prevented Nicholas from attending college since, based upon the information we do have, Mr. and Mrs. Boucher have been solely responsible for the financial needs of Nicholas. For example, we know that Nicholas has lived with the Bouchers for the past nearly eight years and they did not receive any child

support payments for Nicholas from Plaintiff, even when she was employed, for at least the period from January 2000 until August 4, 2003. Plaintiff's Answers to the Defendant's Second Set of Interrogatories, No. 24 (attached as <u>Exhibit E</u>). We also know that Dr. Moore, during his interview with Plaintiff, did not attach any importance to a discussion about with whom Nicholas lived, deeming it not relevant. Moore Dep., at 52:24-53:11.

Third, in order to claim that Nicholas "has not been able to afford to go to college," Dr. Moore would need to learn from Mr. and Mrs. Boucher and Nicholas as to whether Nicholas actually applied for financial aid which would have enabled him to attend college, either for free or at a reduced cost. Dr. Moore did not indicate in his report, for example, that Nicholas applied for, but did not receive, any scholarships or grants. Importantly, Dr. Moore failed to mention whether Nicholas submitted a Free Application for Federal Student Aid (FAFSA) in order to qualify for Federal Pell Grants, Federal Stafford Loans, Federal PLUS loans, Federal-Work Study, or Perkins Loans, to name a few federal forms of financial assistance. If Nicholas did file a FAFSA, he would have received a Student Aid Report indicating the Expected Family Contribution (EFC). This EFC calculation would be used by any schools Nicholas applied to in order to determine how much financial aid he would receive. Admittedly, Nicholas would have had to first apply to a college or university before he would learn what amount of financial aid he could expect. (General information obtained from the U.S. Department of Education's Federal Student Aid Web site, http://www.fafsa.ed.gov/index.htm., (last visited June 30, 2007).)

Had he applied to a college or university, Nicholas may very well have received a very generous financial aid package. Dr. Moore never indicated that he reviewed any financial aid packages that Nicholas received. Dr. Moore, however, admitted that he did not know whether Nicholas applied for any financial aid from colleges. Moore Dep., at 96:21-24. Furthermore,

Dr. Moore never saw any documents that supported a contention that Nicholas applied to college or intended to apply to any colleges. Moore Dep., at 97:12-17. His notes of the "salient points" from the interview confirmed that he did not see any college applications or financial aid packages. He was simply told by Plaintiff and her husband that Nicholas "couldn't go to college." Dep. 98:4-99:2. In fact, no such financial aid packages existed because it is undisputed that Nicholas never applied to any college or university. When counsel for the College informed Plaintiff's counsel that she would need to see documents concerning college applications and financial aid packages if Plaintiff intended to claim this tuition benefit as damages, she was told that no such documents exist since Nicholas never applied to any schools. Affidavit of Judy Malone, at ¶ 3 (July 2, 2007), attached as <u>Exhibit F</u>.

And finally, aside from Dr. Moore, the College also notes that Plaintiff has not disclosed any witnesses or documents that Plaintiff would need to present at trial in order to establish that Plaintiff actually sustained damages as a result of the "loss" of this benefit. Clearly, the tuition benefit is offered as a means to assist employees with the burden of tuition. Had Nicholas applied and attended college and had Plaintiff been required to fund that education, through loans or other means, she would then be able to claim damages in the amount that she was required to pay up to the amount of the tuition grant from the College. Instead, Plaintiff seeks a windfall of $55,00 with no indication that it ever would have been used for its intended purpose.

**Conclusion**

For the foregoing reasons, the College requests that the Court grant this Motion *In Limine* precluding Plaintiff from presenting any evidence or argument in support of a claim for college tuition reimbursement on behalf of her son, Nicholas Boucher, as highly speculative and irrelevant.

Respectfully submitted,
Williams College
By its attorneys,


/s/  Patricia M. Mullen
Judith A. Malone (BBO #316260)
Patricia M. Mullen (BBO # 663318)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199-7613
617.239.0100
jmalone@eapdlaw.com
pmullen@eapdlaw.com

Dated: July 2, 2007


CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/  Patricia M. Mullen

# EXHIBIT A

65B Hatfield St.
Northampton MA 01060
Tel: 413-587-9405
Fax: 413-587-9581
craiglmoore@hotmail.com

**CRAIG L. MOORE**
*ECONOMIC CONSULTING*

# *Economic Report*

| | |
|---|---|
| *To:* | **Thomas J. McCormick, Esq.** |
| *From:* | **Craig L. Moore, Ph.D.** |
| *Date:* | **March 15, 2007** |
| *Re:* | ***Michelle Beebe v. Williams College*** |

## Background

It is my understanding that Michelle Beebe was terminated from her job as a custodian at Williams College (Williams) on August 4, 2003 after approximately 15 years of service. She claims, in summary, that she was wrongfully terminated by Williams when absences were not credited under FMLA. Mrs. Beebe has stated that she missed work to care for her children who suffered from serious medical conditions and when she was seriously ill during the month just prior to being fired. Further, she claims that Williams terminated her for having excessive absences after failing to comply with its own stated policies regarding medical leave and thereby breached its employment contract with Mrs. Beebe.

Michelle Beebe was born on December 19, 1964. She lives with her husband, David Beebe, and their two sons, David Jr. (DOB 5/99), and Daniel (DOB 11/00) in Clarksburg, Massachusetts. She also has a son, Nicholas (DOB 12/86), by a prior marriage who now lives with his father.

The focus of my analysis is to estimate the economic damages arising from her termination by Williams. The facts relied upon in this analysis will be stated and all computations of estimated damages will be shown in tables included in this report.

## The Basis for Economic Damages

Economic damages are based on the concept of *opportunity cost*. If, as a result of an illegal act, a person is deprived of the opportunity to earn a living, enjoy life, or anything else that would have been possible prior to that act, the resulting damages are equal to the cost of restoring the injured person's opportunity or providing what would have reasonably been the fruits of exercising it. In this case, Michelle Beebe lost the opportunity to earn a living and to pursue her occupation in the most advantageous manner. She was forced to incur substantial debt to survive financially. She was forced to withdraw funds from her retirement account and has lost substantial employee benefits including tuition for her oldest son. The Beebe household has suffered and will continue to suffer financial losses for many years as a result of her termination by Williams.

Economic damages can be reasonably estimated and evaluated using methods that are regularly employed in economics and recognized by the courts. Damages should be equal to what a person would reasonably demand for giving up the opportunities they had prior to the illegal act. The general method used to evaluate such damages is to determine the present value of reasonably anticipated future cash flows that could have accrued to the injured party less any mitigating income earned. Making such an assessment of opportunity costs begins with an understanding of the background and situation that the plaintiff enjoyed prior to the alleged illegal termination by Williams.

## Education, Work History and Earnings

Michelle Beebe attended Mount Greylock Regional High School through the 10th grade. She did not complete high school. She left school to take care of her mother who was ill and took employment in a fast food restaurant and then a pizza parlor. She worked for Excelsior Printing as an inspector for approximately 2 years. She then worked as a cashier at a Cumberland Farms store for about 1 year before taking a job at Williams in 1988. During her first 13 years at Williams, Mrs. Beebe was a food service worker and earned between $11 and $12 per hour. In April of 2001, she became a Custodian in the Buildings and Grounds Department at Williams and received a substantial raise.

At the time of her termination, Mrs. Beebe's duties included "dusting and polishing furniture, washing walls, washing windows, cleaning bathrooms, using an automatic floor machine, mopping floors, vacuuming, using a rotary machine, removing trash and recycling materials, moving furniture and boxes, reporting damages and work orders, scrubbing showers, using carpet extractor, shoveling snow, making beds, policing the grounds, changing light bulbs, and making minor equipment repairs." While her regular pay of $15.13 per hour was based on a 40 hour work week, she was often required to work overtime on weekends when there were alumni events, graduation ceremonies, conferences, at the end and start of each semester when students were moving in and out of campus housing and when it snowed. For this extra work she received time and a half and, at times, was given time off as compensation.

Following her termination, she searched for alternative employment. She reports contacting a number of companies for jobs as a cashier and as a CNA at a nursing home. At present, she remains unemployed and blames, in part, Williams for telling perspective employers that she was terminated for excessive absenteeism when she believes that her absences were for good cause and covered under FMLA. She is about to have surgery that will make it impossible for her to work until early summer. She intends to continue her job search at that time. She has also earned a small amount of money selling produce.

I have reviewed Williams' employment records for Michelle Beebe that indicates her hours of regular work, overtime, vacations, sick time, STD, unpaid leave, holidays, and personal leave. I have also calculated the potential regular hours in each pay period in each year. The annual totals at the bottom of each year show the percent of time that falls into each category. These figures are shown in Table 1 below:

2

Hours Worked as a Custodian
Table 1.

| 2001 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/22 to 5/5 | 13.64 | 77.00 | 3.00 | 3.00 | | | | | | 77.00 |
| 5/6 to 5/19 | 13.64 | 48.00 | | 17.50 | 14.50 | | | | | 62.50 |
| 5/20 to 6/2 | 13.64 | 72.00 | 20.00 | | | | | 8.00 | | 72.00 |
| 6/3 to 6/16 | 13.64 | 72.00 | 6.00 | 8.00 | | | | | | 72.00 |
| 6/17 to 6/30 | 13.64 | 64.00 | 4.00 | 8.00 | 8.00 | | | | | 72.00 |
| 7/1 to 7/14 | 14.19 | 61.50 | 7.00 | | 10.50 | | | 8.00 | | 61.50 |
| 7/15 to 7/28 | 14.19 | 56.00 | | 16.00 | 8.00 | | | | | 64.00 |
| 7/29 to 8/11 | 14.19 | 64.00 | 3.00 | 16.00 | | | | | | 64.00 |
| 8/12 to 8/25 | 14.19 | 72.00 | 7.50 | | | | | | | 80.00 |
| 8/26 to 9/8 | 14.19 | 72.00 | | | | | | 8.00 | | 72.00 |
| 9/9 to 9/22 | 14.19 | 72.00 | | | 8.00 | | | | | 80.00 |
| 9/23 to 10/6 | 14.19 | 72.00 | | 8.00 | | | | | | 72.00 |
| 10/7 to 10/20 | 14.19 | 53.00 | | 3.00 | | | | 8.00 | 16.00 | 69.00 |
| 10/21 to 11/3 | 14.19 | 73.00 | | 7.00 | | | | | | 73.00 |
| 11/4 to 11/17 | 14.19 | 72.00 | | | 8.00 | | | | | 80.00 |
| 11/18 to 12/1 | 14.19 | 52.00 | | 12.00 | | | | 16.00 | | 52.00 |
| 12/2 to 12/15 | 14.19 | 61.50 | 2.00 | 10.50 | 8.00 | | | | | 69.50 |
| 12/16 to 12/29 | 14.19 | 43.00 | | 16.00 | 5.00 | | | 16.00 | | 48.00 |
| Totals | | 1,157.00 | 52.50 | 135.50 | 59.50 | - | - | 64.00 | 16.00 | 1,240.50 |
| % of Potential | | 93.3% | 4.2% | | 4.8% | | | | 1.3% | |

| 2002 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/30 to 1/12 | 14.19 | 56.00 | 2.00 | 8.00 | | | | 16.00 | | 56.00 |
| 1/13 to 1/26 | 14.19 | 59.50 | 2.00 | 9.50 | 11.00 | | | | | 70.50 |
| 1/27 to 2/9 | 14.19 | 59.00 | 2.00 | 13.00 | 8.00 | | | | | 67.00 |
| 2/10 to 2/23 | 14.19 | 24.00 | | 41.00 | | | 7.00 | 8.00 | | 31.00 |
| 2/24 to 3/9 | 14.19 | 22.00 | | | | 20.75 | 37.25 | | | 80.00 |
| 3/10 to 3/23 | 14.19 | 60.00 | | | 5.25 | 6.75 | 8.00 | | | 80.00 |
| 3/24 to 4/6 | 14.19 | 78.50 | | | 1.50 | | | | | 80.00 |
| 4/7 to 4/20 | 14.19 | 35.00 | | | 9.25 | | 35.75 | | | 80.00 |
| 4/21 to 5/4 | 14.19 | 66.00 | | | 5.00 | | 9.00 | | | 80.00 |
| 5/5 to 5/18 | 14.19 | 58.50 | | | 3.00 | | 18.50 | | | 80.00 |
| 5/19 to 6/1 | 14.19 | 72.00 | 22.00 | | | | | 8.00 | | 72.00 |
| 6/2 to 6/15 | 14.19 | 72.00 | 9.50 | | | | 8.00 | | | 80.00 |
| 6/16 to 6/29 | 14.19 | 71.50 | | | 8.00 | | 0.50 | | | 80.00 |
| 7/1 to 7/13 | 14.69 | 67.00 | 2.50 | | | | 5.00 | 8.00 | | 72.00 |
| 7/14 to 7/27 | 14.69 | 80.00 | | | | | | | | 80.00 |
| 7/28 to 8/10 | 14.69 | 72.00 | | | 8.00 | | | | | 80.00 |
| 8/11 to 8/24 | 14.69 | 80.00 | 7.00 | | | | | | | 80.00 |
| 8/25 to 9/7 | 14.69 | 67.50 | | | 4.50 | | | 8.00 | | 72.00 |
| 9/8 to 9/21 | 14.69 | 76.00 | | | 4.00 | | | | | 80.00 |
| 9/22 to 10/5 | 14.69 | 80.00 | 5.25 | | | | | | | 80.00 |
| 10/6 to 10/19 | 14.69 | 51.50 | 2.00 | 8.00 | 12.50 | | | 8.00 | | 64.00 |
| 10/20 to 11/2 | 14.69 | 73.50 | 2.00 | 3.00 | 2.50 | | | | 1.00 | 77.00 |
| 11/3 to 11/16 | 14.69 | 51.50 | 1.00 | 24.00 | | | | | 4.50 | 56.00 |
| 11/17 to 11/30 | 14.69 | 56.00 | | | 3.00 | | | 16.00 | 5.00 | 64.00 |
| 12/1 to 12/14 | 14.69 | 57.00 | 1.50 | 19.00 | | | | | 4.00 | 61.00 |
| 12/15 to 12/28 | 14.69 | 37.00 | | | | | | 16.00 | | 37.00 |
| Totals | | 1,583.00 | 58.75 | 152.50 | 85.50 | 27.50 | 129.00 | 88.00 | 14.50 | 1,839.50 |
| % of Potential | | 86.1% | 3.2% | | 4.6% | 1.5% | 7.0% | | 0.8% | |

| 2003 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/29 to 1/11 | 14.69 | 36.00 | | 16.00 | 20.00 | | | 8.00 | | 56.00 |
| 1/12 to 1/25 | 14.69 | 56.00 | | 23.00 | 1.00 | | | | | 57.00 |
| 1/26 to 2/8 | 14.69 | 70.50 | | 8.00 | | | | | 1.50 | 80.00 |
| 2/9 to 2/22 | 14.69 | 56.00 | | | 0.50 | | 15.50 | 8.00 | | 72.00 |
| 2/23 to 3/8 | 14.69 | 72.00 | 1.00 | | | | 8.00 | | | 80.00 |
| 3/9 to 3/22 | 14.69 | 40.00 | | | | | 32.00 | | | 80.00 |
| 3/23 to 4/5 | 14.69 | 78.50 | | | | | 1.50 | | | 80.00 |
| 4/6 to 4/19 | 14.69 | 78.50 | | | 1.50 | | | | | 80.00 |
| 4/20 to 5/3 | 14.69 | 32.00 | | | 14.50 | | 33.50 | | | 80.00 |
| 5/4 to 5/17 | 14.69 | 76.00 | | | | | 4.00 | | | 80.00 |
| 5/18 to 5/31 | 14.69 | 62.50 | 8.00 | | | | 9.50 | 8.00 | | 72.00 |
| 6/1 to 6/14 | 14.69 | 72.00 | 10.00 | | 8.00 | | | | | 80.00 |
| 6/15 to 6/28 | 14.69 | 51.00 | | | | | 29.00 | | | 80.00 |
| 6/29 to 7/12 | 15.13 | 64.00 | | | | | 8.00 | 8.00 | | 72.00 |
| 7/13 to 7/26 | 15.13 | 69.00 | | | | | 32.00 | | | 80.00 |
| 7/27 to 8/9 | 15.13 | 1.00 | | | | | 32.00 | | | 80.00 |
| Totals | | 915.00 | 19.00 | 39.00 | 53.50 | - | 176.00 | 32.00 | 1.50 | 1,399.00 |
| % of Potential | | 75.7% | 1.6% | | 4.4% | 0.0% | 14.6% | | 0.1% | |

3

It is interesting to note that Michelle Beebe worked 93.3% of the potential hours after being made a Custodian in 2001. In 2002 she worked over 86% of potential hours and in the first half of 2003 prior to being terminated, she worked over 75% of the potential hours on the job. It is also interesting to observe that the majority of the time she took off, over and above vacation and sick time to which she was entitled, was unpaid leave and cost Williams nothing. The most important information, however, shows her hourly wages and is the basis for establishing her earnings capacity on this job. Income tax records, including W-2 forms, verify the earnings that are reflected in Table 1 above.

**Employee Benefits**

In addition to wages, Michelle Beebe's earnings capacity also includes employee benefits that were part of her compensation package. The scope and cost of employee benefits have been increasing steadily as many employees would rather receive these benefits than an increase in wages because they represent non-taxable income. Social Security taxes, state and federal unemployment taxes, Medicare contributions, and Workers Compensation premiums are often cited as employee benefits. They are not. The payments going to support these programs are taxes and the amount paid in does not directly affect the benefits received by the employee.

As an employee of Williams, Michelle Beebe received a variety of benefits paid by her employer. These included 3 weeks of paid vacation, 10 paid holidays, 1 day per month of sick leave, and 16 hours of paid personal leave. She was provided with Blue Cross Blue Shield HMO Blue and dental insurance through Delta Dental that Williams contributed $591.64 and $66.08 respectively. She also received contributions from her employer of $7 monthly for life insurance, $8.40 monthly for long term disability and $9.10 monthly for supplemental long term disability insurance. Williams also made biweekly matching contributions of $69.90 and $34.95 to the TIAA-CREF retirement plan.

David Beebe worked for Williams at the time Michelle was terminated and still does. At that time, the family was receiving health and dental coverage based on Michelle's employment. Following her termination, these benefits were transferred over to David and the family continued to have this coverage. What Michelle lost was the contributions to her retirement plan. The Beebe family also lost the added protection they had when both of them worked there. If anything happens to David at this point and he was unable to work, all the family benefits will be lost.

The other important benefit that was lost was college tuition. In October of 2003 Michelle would have become eligible for an annual tuition benefit for her son Nicholas who was planning on going to college. That benefit was worth $13,946 per year. While that benefit may still be available for David Jr. and Daniel because their father still works for Williams, it does not cover Nicholas as he is not David's son. As a result, he has not been able to afford to go to college and has had to go to work since graduating from high school. The tuition benefits, along with the lost retirement contributions are the primary benefits that Mrs. Beebe and her family lost. And, Michelle Beebe's retirement income will now be much lower in her later years.

4

**Work-life Estimates**

An important element in the analysis is the determination of the normal work-life expectancy of Ms. Beebe. The estimate that was often used in the past came from the *Worklife Estimates* published by the United States Department of Labor, Bureau of Labor Statistics, February 1986, Bulletin 2254. These tables provide the number of active and inactive years of work-life a person has given their age, sex, race, education and work-life status.

The accuracy of using these work-life estimates has been criticized in recent years as understating the work-life associated with most people and women in particular. The changing economic demands, lifestyles, participation rates of women and people of various age groups clearly make it inappropriate to use the average work histories of people over the past thirty years to predict what a person is likely to do in the future. The government has, in fact, suspended the publication of these tables and does not plan to provide them past the 1986 estimates. Subsequent published estimates all suffer from the same problems that the earlier government tables did because they are based on historical patterns that no longer apply. There have been more recent estimates presented in the *Journal of Legal Economics* in 1995 using a Markov chain approach, for example, but these are also open to the same criticisms. The most recent studies show that people are tending to retire later rather than earlier.

One could argue that any of several ages might be most appropriate for the work-life a particular individual based on their personal characteristics. It is reasonable to assume that most people have the capacity to work until age 65 and have a financial incentive to work to age 67 under the rules concerning Social Security retirement benefits. Recent published studies indicate that the majority of Americans plan on working beyond the age of 65 to insure their financial security.

In this particular case, there are a number of factors that make it reasonable to assume that Michelle Beebe would have continued to work at Williams until retirement had she not been fired. First, she had 15 years of seniority. Second, there is virtually no chance that Williams will either go out of business or experience falling sales making it necessary to lay off employees. Williams is a non-profit institution that has consistently ranked as one of the very top liberal arts colleges in America. Third, Williams is one of the largest and best paying employers in the region. Fourth, David Beebe works at Williams and this provided security and convenience. Finally, and most important, Mrs. Beebe has told me that it was her intention to continue to work at Williams until she retired. This opportunity has been taken away and her alternative employment opportunities in the area are clearly less desirable in terms of security, pay and benefits. Had she been terminated by a company that was vulnerable to ever changing technology, foreign competition, and other market factors, one might think it unreasonable to estimate lost earnings for so many years into the future. But given the very great likelihood of Williams remaining in business and offering the best alternative employment in the area, in my opinion it is quite reasonable to assume that Michelle Beebe would have continued to work at Williams until she retired. Thus, it will be assumed that Michelle Beebe will work to at least the age of 67 and the earnings she would have garnered at Williams, less reasonable mitigation, will be the basis for future economic damages.

5

### Estimating the Present Value of Lost Future Earnings

The determination of the present value of lost future earnings involves two steps. First, it is necessary to estimate what the loss of earnings will be during Michelle Beebe's work-life. This involves projecting her prior earnings to age 67 and netting out the earnings she now is making in her present employment. The second step requires the computation of the present value of those losses today rather than in the future. To do this it is necessary to calculate how much would have to be invested today to provide those losses in each period that they will occur. Each of these elements of the analysis is described in the following sections in detail.

### Rate of Economic Growth, Prices, and Real Wages

The current economic picture is characterized by moderate economic growth. Interest rates are expected to be stable and inflation, with the exception of energy and transportation costs, remains relatively low. There is uncertainty related to the price of oil and the future of the Iraq war, but over the long-term, most economists expect the economy to experience continued moderate growth and stability.

In this case Ms. Beebe's earnings were typically increased each July. Williams indicates that in the years following her termination that the flat rate raises given to Custodians were 3% in 2004, 3 % in 2005, 3.25% in 2006, and 3.25% in 2007. These figures will be used to determine the lost earnings from the time of termination to through 2007. For future years, it is assumed that real earnings will only increase at the cost of living. The analysis will apply a real discount (also net of inflation) and thus, speculation regarding future inflation is avoided.

### Present Value

Once the rate of growth of future earnings and the value of lost future income is established, this must be reduced to its present value. That is, one must determine how much money would have to be set aside and invested today to provide that future financial support. The only element in calculating the present value that is uncertain is the net rate of return that will be earned on the funds that are invested for future use.

The courts have found that it is reasonable to use a real rate of return in the range of 1% to 3% that is net of taxes on the earnings. In 1983, the United States Supreme Court ruled in *Jones & Laughlin Steel Corp. v. Pfeifer* that 1% to 3% is an appropriate discount rate interval within which courts may operate without risk of reversal on appeal[1]. In this case, a net real discount rate of 2% would be conservative and is in line with the net real rate of return on a combination of long and medium term securities as currently reflected in the financial markets[2].

---

[1] For a discussion of *Pfeifer* and related cases, see George, Simien & Culbertson, "The Courts and Inflation", *TRIAL*, July 1984, p22.

[2] In cases where the number of years taken into account is great, such as in this case, the discount rate used reflects the rate of return earned on a portfolio of short, medium and long term securities as the losses must be compensated over a variety of time horizons. No one interest rate or security is appropriate.

**Determination of Damages To Date**

The termination of Michelle Beebe by Williams in 2003 cost her a great deal. She lost a secure job with good benefits. She lost at least 15 years of seniority. Given this situation, one has to first look at the value of lost earnings and benefits from the time of the termination to the present. This is summarized in Table 2 below. Prior Earnings are based on employment records through the time of termination and subsequent raises given by Williams as described above. There has also been some mitigation for unemployment compensation received following her termination as well as some cash income from selling produce at the local farmer's market and working at a nursing home.

The benefits include the lost tuition that would have been available for Nicholas when he graduated from high school in 2004 and continuing for 4 years of college. It also includes TIAA-CREF contributions by Williams. These contributions have also been increased based on the percent increases in wages given in each year.

Based on this analysis, the termination of Michelle Beebe by Williams in August of 2003 resulted in lost earnings and benefits of approximately $197,300 to date. What this does not capture, however, is the withdrawals that the Beebe family had to make from Michelle's retirement account to remain financially solvent. Nor does it include the cost of a $46,000 home equity loan they had to borrow and their large credit card debt.

Lost Earnings and Benefits to Date
Table 2.

| Period | Lost Earnings | Lost Benefits | Mitigation | Total |
|--------|--------------|---------------|-----------|-------|
| 2003 | $ 17,490.28 | $ 1,572.75 | $ 16,817.00 | $ 2,246.03 |
| 2004 | 33,297.50 | 16,753.88 | 5,923.50 | 44,127.88 |
| 2005 | 34,287.84 | 16,838.12 | 2,500.00 | 48,625.96 |
| 2006 | 35,366.01 | 16,932.11 | 1,525.00 | 50,773.13 |
| 2007 | 36,511.83 | 17,029.16 | 2,000.00 | 51,540.99 |
| Total | | | | $ 197,313.99 |

**Determination of the Present Value of Future Damages**

To calculate the present value of future damages one has to begin with a set of reasonable assumptions. Under a reasonable scenario, one could assume that Mrs. Beebe will be able to work at some job commensurate with her skills until retirement. She only has a 10th grade education and has never worked at more than a semi-skilled job in her life. Given the potential employers in the local labor market, it is unlikely that she will be able to find a job as good as the one at Williams. It is more likely that she might be able to work as a kitchen helper in a school cafeteria or restaurant, as a cashier in a supermarket or retail store, or at a comparable job. Such jobs typically do not have any retirement benefits or 401(k) matching. They pay much less than what she was earning at Williams.

A survey of unskilled and semi skilled jobs in the Pittsfield labor market show a wage rates that vary from $7.92 for food preparation workers (including fast food) to $10.65 for retail clerks. In between fall such occupations as cashiers that earn an average of $8.72 per hour and home care aides that earn an average of $10.24 per hour.[3] Employment at these low wages is made more problematic by the cost and scheduling of childcare. As her children get older, this problem will diminish, but at present it is a real constraint. Prior to her termination, Mrs. Beebe was done with work in time to care for her sons after school. Now this is a problem and her hours would have to fit childcare requirements. Given this situation, I have included mitigation in my analysis of future damages, but finding suitable employment may be difficult and even unrealistic at present.

The calculation of the present value of damages in that case is shown in Table 3 below. The first column shows the year in question followed by Michelle Beebe's age in that year. The third column shows what her prior earnings at Williams. Future earnings are assumed to only increase at the cost of living (i.e. real earnings are in constant dollars). Lost future benefits are based the value of the TIAA-CREF contributions that Williams was making. Mitigation is base on full-time employment starting on January 1, 2008 at an hourly wage of $10.00 per hour. In my opinion, this is a reasonable wage rate to use given Michelle Beebe's education, experience and the prevailing wage rates in the Pittsfield Labor Market for semi-skilled workers. The net loss is then reduced to present value using a real after tax rate of return of 2%. The computations are made monthly assuming the payment at the end of each month and summed to an annual value shown in the last column of the table.

As the computations in Table 3 show, the present value of lost future income based on the assumption that Michelle Beebe could have worked to age 67 given that she is able to make at least $10.00 per hour in real wages is approximately $358,216.65. Given her current circumstance, it seems more likely that her actual damages will be higher.

## Long-term Financial Impact on the Beebe Household

The total impact of Michelle Beebe's termination is evident when one begins to sort through the Beebe's household financial records and consider the affect this action by Williams has had on future retirement benefits.

The Beebe family is deeply in debt based on having to borrow against their home equity and they have incurred substantial new credit card debt following Michelle's termination. They also had to sell one of their cars to get money.

Mrs. Beebe has already lost substantial contributions to her TIAA-CREF account. Following her termination, it became necessary to withdraw funds from this account to support the family. In addition, she lost Social Security contributions that will diminish her retirement income after the age of 67.

---

[3] Massachusetts Department of Employment and Training, September 2004 , Hourly earnings by occupation and labor market figures published by the Bureau of Labor Statistics for all labor markets in the United States.

### Present Value of Future Economic Damages
### Table 3.

| Year | Age | Prior Earnings | Lost Benefits | Mitigation | Net Loss | Present Value |
|------|-----|----------------|---------------|------------|----------|---------------|
| 2008 | 44 | $ 36,511.83 | $ 3,083.16 | $ 20,800.00 | $ 18,794.99 | $ 18,592.95 |
| 2009 | 45 | 36,512.83 | 3,083.16 | 20,800.00 | 18,795.99 | 18,226.06 |
| 2010 | 46 | 36,513.83 | 3,083.16 | 20,800.00 | 18,796.99 | 17,866.41 |
| 2011 | 47 | 36,514.83 | 3,083.16 | 20,800.00 | 18,797.99 | 17,513.85 |
| 2012 | 48 | 36,515.83 | 3,083.16 | 20,800.00 | 18,798.99 | 17,168.26 |
| 2013 | 49 | 36,516.83 | 3,083.16 | 20,800.00 | 18,799.99 | 16,829.48 |
| 2014 | 50 | 36,517.83 | 3,083.16 | 20,800.00 | 18,800.99 | 16,497.38 |
| 2015 | 51 | 36,518.83 | 3,083.16 | 20,800.00 | 18,801.99 | 16,171.84 |
| 2016 | 52 | 36,519.83 | 3,083.16 | 20,800.00 | 18,802.99 | 15,852.72 |
| 2017 | 53 | 36,520.83 | 3,083.16 | 20,800.00 | 18,803.99 | 15,539.91 |
| 2018 | 54 | 36,521.83 | 3,083.16 | 20,800.00 | 18,804.99 | 15,233.26 |
| 2019 | 55 | 36,522.83 | 3,083.16 | 20,800.00 | 18,805.99 | 14,932.66 |
| 2020 | 56 | 36,523.83 | 3,083.16 | 20,800.00 | 18,806.99 | 14,638.00 |
| 2021 | 57 | 36,524.83 | 3,083.16 | 20,800.00 | 18,807.99 | 14,349.15 |
| 2022 | 58 | 36,525.83 | 3,083.16 | 20,800.00 | 18,808.99 | 14,066.00 |
| 2023 | 59 | 36,526.83 | 3,083.16 | 20,800.00 | 18,809.99 | 13,788.43 |
| 2024 | 60 | 36,527.83 | 3,083.16 | 20,800.00 | 18,810.99 | 13,516.35 |
| 2025 | 61 | 36,528.83 | 3,083.16 | 20,800.00 | 18,811.99 | 13,249.63 |
| 2026 | 62 | 36,529.83 | 3,083.16 | 20,800.00 | 18,812.99 | 12,988.18 |
| 2027 | 63 | 36,530.83 | 3,083.16 | 20,800.00 | 18,813.99 | 12,731.88 |
| 2028 | 64 | 36,531.83 | 3,083.16 | 20,800.00 | 18,814.99 | 12,480.65 |
| 2029 | 65 | 36,532.83 | 3,083.16 | 20,800.00 | 18,815.99 | 12,234.37 |
| 2030 | 66 | 36,533.83 | 3,083.16 | 20,800.00 | 18,816.99 | 11,992.95 |
| 2031 | 67 | 36,534.83 | 3,083.16 | 20,800.00 | 18,817.99 | 11,756.29 |

**Total**                                                                      $    358,216.65

### Summary of Findings

Based on my assessment of the documents, figures and facts as related to me in this case, I believe to a reasonable degree of economic certainty, that the present value of economic damages arising from the termination of Michelle Beebe by Williams is equal to at least $555,500. This figure does not encompass the financial loss that the family has and will continue to suffer due to increased interest payments on debt. Nor does it include the present value of lost retirement benefits that Michelle Beebe will suffer after the age of 67.

If further information become available, I reserve my right to supplement this opinion in a timely fashion.

The opinions expressed here are based the documents and information listed below and their disclosure is made in accordance with "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony":

1. A copy of the complaint filed in United States District Court;
2. A copy of the Defendant's Answers to Plaintiff's First Set of Interrogatories;
3. A copy of attendance records for Michelle Beebe from her personnel file;
4. A copy of federal tax returns for the Beebe family and W-2 forms for the years 2001 through 2004;
5. A copy of the Williams College Buildings and Grounds Support Staff Handbook;
6. A copy of a letter from Martha Tetrault, Director of Human Resources at Williams College to Michelle Beebe dated May 16, 2003;
7. A copy of the deposition transcript of Michelle Beebe;
8. A copy of the deposition transcript of David Beebe;
9. Information provided to me in a personal interview with Michelle Beebe and David Beebe made in the presence of their counsel.

I hereby disclose that I am being paid at the rate of $200 per hour for any time spent working on this case and will be paid $300 per hour for any testimony that is required. I have received a $1,000 retainer for work done to date.

A list of recent testimony is attached in the appendix to this report along with a current copy of my curriculum vitae as required under "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony."


Craig L. Moore, Ph.D.

# EXHIBIT B

# WILLIAMS COLLEGE

# SUPPORT STAFF

# HANDBOOK

# BUILDINGS AND GROUNDS

The support staff group at Williams College includes all
hourly paid and weekly salaried employees.

## SIXTH EDITION

### June, 1994

WIL 00575



## SUMMER EMPLOYMENT FOR EMPLOYEES' CHILDREN

Each summer, the College has a limited number of summer jobs on the campus, and accepts applications for work in various departments according to the following guidelines:

1. The first priority in employment will be for children of College faculty, professional staff and support staff who are currently attending or enrolled in undergraduate colleges;
2. The next priority in employment will be for Williams College students on financial aid whose permanent home address is in the Williamstown area.

Within these guidelines, if enough jobs are not available, older students will be selected over younger ones.

Children of faculty, professional staff and support staff must be age 17 in order to qualify, and be accepted at a college for the fall semester or be currently enrolled in an undergraduate school. Upon graduation from undergraduate school or attainment of age 22, eligibility for summer employment at the College ends.

Each year at the beginning of the second semester, the Director of Personnel circulates a memo to College employees explaining the guidelines and procedures to be followed in filing applications for summer employment.

## COLLEGE TUITION GRANT PROGRAM

Children of all eligible employees who are enrolled in accredited college programs leading to an academic degree (excluding secondary or graduate schools) can obtain grants covering tuition costs only, up to a maximum of one-half the prevailing Williams College tuition for a maximum of four years. Up to four children per eligible employee family can receive benefits under this plan. Currently, these benefits are not considered taxable income.

Support staff who have completed five years of service in a regular College position with an assigned schedule of at least 1300 or more hours annually are eligible for this benefit plan. Children of deceased, retired, and disabled eligible staff employees also are eligible for these benefits. If the spouse of a deceased staff member re-marries, the eligibility for this benefit will be reviewed. Contact the Benefits Office for additional information about this program.

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE BEEBE,

Plaintiff,

v.

WILLIAMS COLLEGE,

Defendant.

Civil Action No. 05-30182

## AFFIDAVIT OF KRISTINE MALONEY

I, Kristine Maloney, state as follows:

1. I am the Benefits Administrator for Defendant Williams College ("the College"). I have held this position since July 1, 2000. This affidavit is based on my personal knowledge.

2. As part of my position as Benefits Administrator, I administer the College's benefits including medical, dental, and life insurance; long-term disability; Family and Medical Leave; and the tuition grant. I am responsible for benefits budgeting and oversee a Benefits Coordinator.

3. The Tuition Grant Benefit covers the tuition costs up to an annual maximum dollar amount of one-half the prevailing tuition at the College for a maximum of four years per dependent child.

4. For the 2007-2008 academic years, the maximum Tuition Grant Benefit amount will be $17,719.

5. An employee in a regular faculty or staff position must have completed five years of full-time service at the College to qualify. The five-year service requirement is counted from

the employee's date of hire in a benefit eligible faculty or staff position, or from the date on which a regular faculty or staff member became full-time with the College.

6.     In order for the child to be considered a dependent of the eligible employee, the child must meet the dependent criteria established by the Internal Revenue Service.

7.     Steve Boucher was employed by the College from September 6, 1985 until June 21, 2004.

8.     From at least 2002 until the time of his voluntary resignation from the College on June 21, 2004, Steve Boucher was eligible to use the tuition benefit for a dependent child.

9.     Steve Boucher never applied for the Tuition Grant Benefit.

Signed under the pains and penalties of perjury this 2nd day of July, 2007.

*Kristine Maloney*

Kristine Maloney

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Patricia M. Mullen

# EXHIBIT D

1

```
 1            UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3                 WESTERN DIVISION
 4
 5 * * * * * * * * * * * * * * * *
 6 MICHELLE BEEBE,              *
 7            Plaintiff        *
 8 v.                          *
 9 WILLIAMS COLLEGE,           *
10            Defendant        *
11 * * * * * * * * * * * * * * * *
12
13
14         DEPOSITION OF:  DR. CRAIG MOORE
15           Heisler, Fledman & McCormick
16               1145 Main Street
17         Springfield, Massachusetts
18            June 19, 2007    10.01 a.m.
19
20
21
22
23            Jessica M. DeSantis
24               Court Reporter
```

2

```
 1 APPEARANCES:
 2
 3 Representing the Plaintiff:
 4     HEISLER, FELDMAN, MCCORMICK & GARROW
 5     1145 Main Street, Suite 508
 6     Springfield,  MA 01103
 7     BY THOMAS J. MCCORMICK, ESQ.
 8     413.788.7988  Fax:  413.788.7996.
 9
10 Representing the Defendant:
11     EDWARDS, ANGELL, PALMER & DODGE
12     111 Huntington Avenue
13      oston,  MA  02199
```

41

1              (Exhibit 2, complaint, marked)

2

3      Q.    (By Ms. Malone)  Dr. Moore, I'm

4 marking a document that's been marked Moore

5 Exhibit 2.

6              Can you identify that document?  I

7 would direct your attention to its first three

8 pages are a cover letter from Mr. McCormick.

9              If you go to the third page, can you

10 identify that document for me?

11     A.    This is an economic report dated

12 March 15, 2007, that I prepared at the request of

13 Thomas McCormick.

14     Q.    In the case Beebe verses Williams

15 College; is that correct?

16     A.    That's correct.

17     Q.    Now, at the very last page of that,

18 on page 10, it indicates the documents that you

19 looked at in making that -- making this report;

20 is that correct?

21     A.    That's correct.

22     Q.    Is this an exaustive list of the

23 documents that you looked at?

24     A.    In connection with making the

42

1 report, yes.

2      Q.    Are there other documents that

3 you've looked at in forming your opinion that

4 aren't reflected in this list?

5      A.    I reviewed another document

6 subsequent to finishing my report.

7      Q.    And what was that other document?

8              Let the record show he's showing me

9 the Occupational Resource Network report of Nancy

17 Mr. McCormick's office in Springfield?

18      A.      I believe it did.

19      Q.      All right.  So how long does it take

20 you to get from Northampton to Springfield?

21      A.      About twenty minutes.  And then you

22 have to park so, say, twenty-five minutes to a

23 half an hour, at the most.

24      Q.      All right.  So couple of hours?

52

1       A.      Probably a couple of hours.

2       Q.      Now, let's turn to the report that

3 you produced in this case, Dr. Moore, which is

4 Exhibit 2, I believe.

5               Do you have it?

6       A.      I was looking for the one you marked

7 actually.

8       Q.      Yeah, I'd rather have you look at

9 the one I marked to make sure you don't wander

10 away with -- here, I think it's this one.

11      A.      Oh, yeah.  That has a cover letter.

12              Okay.

13      Q.      All right.  The first page of the

14 report, which is part of Exhibit 2, gives some

15 background information on Ms. Beebe and her

16 claims.

17              She has three children; is that

18 correct?

19      A.      That's what she tells me.

20      Q.      And her oldest son, Nicholas Bushay

21 (phonetic) lives with his father; is that

22 correct?

23      A.      Yes.

24      Q.      Do you know whether, at any time

53

1 relevant to the events in this case, Nicholas

3       A.    I don't recall if there was any

4 discussion of that or not.  I don't know.

5       Q.    All right.  So you don't know for

6 what period of time he has lived with his father

7 as opposed to living with Ms. Beebe?

8       A.    No, I believe there was some

9 discussion about that.  I didn't take any notes

10 on it.  It wasn't something I found particularly

11 relevant.

12      Q.    All right.  Now, if you go down to

13 the basis for economic damages.

14            You state, economic damages are

15 based on the concept of opportunity cost, in

16 italics.  If, as a result of an illegal act, a

17 person is deprived of the opportunity to earn a

18 living, enjoy life or anything else that would

19 have been possible prior to that act, the

20 resulting damages are equal to the cost of

21 restoring the injured person's opportunity or

22 providing what would have reasonably been the

23 fruits of exercising it.

24            Is that just another way of saying

54

1 that you're trying to measure what Michelle

2 Beebe -- would have been economically had the

3 termination never occurred?

4       A.    Not exactly.

5       Q.    And what's the difference?

6       A.    It's probably a technical

7 difference.  Opportunity cost is a concept out of

8 economics.  It is the basis for economic damages.

9            Some people don't, clearly,

10 understand that there's a distinction between

11 lost income and lost earnings or the value of the

12 opportunity to make income or earnings.  Two

13 different things.

14            They have to do with time value of

15 money.  And what people are compensated for is

16 the loss of their opportunity.  Question is, what

17 is the opportunity worth.  Financial markets

2       A.      I don't recall now, but I remember

3 getting that figure from somewhere in the

4 records.  I didn't make it up.  It's a number

5 that was there.

6       Q.      Okay.

7       A.      I believe that that's the amount

8 that Williams is willing to pay, per year, for

9 that program.

10      Q.      All right.  And in order to be

11 eligible for that amount you have to apply for

12 and be accepted at an acredited college; is that

13 correct?

14      A.      I believe that's correct.

15      Q.      All right.  And do you know whether

16 Nicholas Bushay ever applied to college?

17      A.      I was told that he, in fact, was

18 planning on going to college and had to terminate

19 his plans to go to college because they didn't

20 have the money, but he had college lined up.

21      Q.      And do you know whether colleges --

22 and do you know whether Mr. Bushay applied for

23 any financial aid from colleges?

24      A.      No.

□

97

1       Q.      Do you know whether colleges take

2 into account the existing of a grant program like

3 this in determining ones eligibility for

4 financial aid?

5       A.      I believe they do.

6       Q.      All right.  So in some ways this

7 eligibility could be a wash in terms of his

8 getting financial aid from a college?

9       A.      There might have been some offset,

10 but I wouldn't expect it to $14,000.  That's a

11 lot.

12      Q.      All right.  Did you see any

13 documents that supported their contention that

14 Mr. Bushay applied for colleges or intended to

15 apply for any colleges?

16      A.      I didn't see any documents.  I was

17 to

18          MS. MALONE:  All right.  Let me go

19    off the record for a moment.

20

21          (Off record discussion)

22

23          MS. MALONE:  Back on the record.

24    Q.    (By Ms. Malone)  Okay.  Did you

                                              98

1 speak with --

2     A.    Well, just to try to be helpful.

3     Q.    Mm-hmm.

4     A.    There are some notes that I took

5 during my interview relevant to this.

6     Q.    And let me find my copy of your

7 notes.  That would be great.

8     A.    This is the exhibit.

9     Q.    Okay.  Thank you.

10          Up to half.

11          Nicholas couldn't use it because he

12 is not David's son.  Nicholas was working at

13 store delivery appliances.  Couldn't go --

14    A.    Star I think it is.

15    Q.    Star Delivery Applicances.

16          Couldn't go to college.

17          What is that word in parentheses?

18    A.    Drewy.  Honors in high school.

19 Drewy's High School in the college prep program.

20 He was an honor student in the college prep

21 program.

22    Q.    Okay.

23    A.    And that's what I was told.  Those

24 are the notes I took when we had that discussion.

                                              99

1 I was probably told more than that, but those are

2 the salient points that I wrote down.

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION
NO. 05-30182-MAP

|  |  |
|---|---|
| MICHELLE BEEBE, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| WILLIAMS COLLEGE, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## PLAINTIFF'S ANSWERS TO THE DEFENDANT'S SECOND SET OF INTERROGATORIES

The Plaintiff, Michelle Beebe, answers the Defendant's second set of interrogatories as follows:

INTERROGATORY NO. 22:

Identify all pharmacies where you and/or your husband filled prescriptions written on behalf of you and/or your children for the period from January 2001 to August 4, 2003.

ANSWER NO. 22:

Brooks Pharmacy, N.Adams; Brooks Pharmacy, Williamstown; Nasiff's, N. Adams; and Surgimeds, N. Adams.

INTERROGATORY NO. 23:

Identify the daycare provider(s) for your children, Nicolas, David and Daniel, from January 2000 to the present.

ANSWER NO. 23:

Sheryl Witherall, Walker Street, N. Adams.

Williamstown Community Daycare Center, Williamstown

INTERROGATORY NO. 24:

Describe the child support and custody arrangements concerning your child, Nicolas

Boucher, for the period between January 2000 to August 4, 2003, including (a) the identity of

the parent who maintained physical custody of Nicolas during this period; (b) the identity of

the parent who paid child support for Nicolas for this period; (c) the identity of the parent

receiving child support for Nicolas for this period; and (d) the amount of weekly or monthly

child support paid during this period.

ANSWER 24:

During the above period, Nicolas lived with his father, Steve Boucher.  No child

support payments were made during this period.


Signed under the pains and penalties of perjury this _____ day of _____, 2007.


_____

Michelle Beebe



Respectfully submitted,
MICHELLE BEEBE
By Her Attorney,

Dated:                                   _____

Thomas J. McCormick, BBO # 561760
Heisler, Feldman,McCormick
& Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988
Fax (413) 788-7996

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing document was served by first class mail upon the attorneys of record for the Defendant on March 17, 2007.

_____

Thomas J. McCormick



# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE BEEBE,

                Plaintiff,

     v.                                Civil Action No.  05-30182

WILLIAMS COLLEGE,

                Defendant.

## AFFIDAVIT OF COUNSEL JUDITH A. MALONE

I, Judith Malone, state as follows:

1.      I am an attorney at Edwards Angell Palmer & Dodge LLP and counsel to Defendant Williams College ("the College") in the above-captioned action.  This affidavit is based on my personal knowledge.

2.      On June 19, 2007, the day of the deposition of Plaintiff's damages expert, Craig L. Moore, Ph.D., I spoke with counsel for Plaintiff Michelle Beebe ("Plaintiff") and requested that Plaintiff produce documents evidencing that Nicholas Boucher applied to college.  I specifically requested copies of college applications submitted by Nicholas.

3.      Subsequently, Plaintiff's counsel, Thomas J. McCormick, informed me that he spoke with his client and that there were no college applications.

Signed under the pains and penalties of perjury this 2nd day of July, 2007.

                                    */s/  Judith A. Malone*
                                    Judith A. Malone (BBO #316260)
                                    Edwards Angell Palmer & Dodge
                                    111 Huntington Avenue
                                    Boston, MA  02199
                                    (617) 239-4321

CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/  Patricia M. Mullen