UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE BEEBE, <br><br> Plaintiff, <br><br> v. <br><br> WILLIAMS COLLEGE, <br><br> Defendant. | Civil Action No.  05-30182 |

**DEFENDANT'S MOTION IN LIMINE NO. 2 TO PRECLUDE ANY EVIDENCE OR TESTIMONY FROM PLAINTIFF'S ECONOMIC EXPERT ON THE ISSUE OF HIS VOCATIONAL ASSESSMENT OF PLAINTIFF**

Defendant Williams College (the "College") hereby moves the Court for an order precluding Plaintiff Michelle Beebe ("Plaintiff") from presenting any evidence or argument from her economic expert, Craig L. Moore, Ph.D., concerning his vocational assessment of Plaintiff. Dr. Moore is not qualified by knowledge, skill, experience, training or education to make such an assessment and, therefore, evidence as to his opinion on this subject should be excluded.

**Factual Background and Summary of Argument**

In this case, Plaintiff argues that the College violated the Family and Medical Leave Act, 29 U.S.C. 2601 et seq. ("FMLA") when it disciplined her and ultimately terminated her for excessive absenteeism.  Plaintiff retained an economic expert, Craig L. Moore, Ph.D., who prepared a report setting forth Plaintiff's claim for damages.  In this report, Dr. Moore also expresses his opinion with respect to his vocational assessment of Plaintiff, despite having no relevant education, training or experience in the field of making vocational or employability assessments.

Specifically, Dr. Moore claims that as a result of her termination from the College,

Plaintiff "lost the opportunity to earn a living and to pursue her occupation in the most

advantageous manner." Report of Craig L. Moore, Ph.D., at 1 (Mar. 15, 2007) ("Moore Report")

(attached as Exhibit A). He adds that "her alternative employment opportunities in the area are

clearly less desirable in terms of security, pay and benefits." Id. at 5. He further states that

> Given the potential employers in the local labor market, it is
> unlikely that she will be able to find a job as good as the one at
> Williams. It is more likely that she might be able to work as a
> kitchen helper in a school cafeteria or restaurant, as a cashier in a
> supermarket or retail store, or at a comparable job. Such jobs
> typically do not have any retirement benefits or 401(k) matching.
> They pay much less than what she was earning at Williams.
>
> A survey of unskilled and semi skilled jobs in the Pittsfield labor
> market show a wage rates that vary from $7.92 for food
> preparation workers (including fast food) to $10.65 for retail
> clerks. In between fall such occupations as cashiers that earn an
> average of $8.72 per hour and home care aides that earn an average
> of $10.24 per hour. Employment at these low wages is made more
> problematic by the cost and scheduling of childcare. As her
> children get older, this problem will diminish, but at present it is a
> real constraint. Prior to her termination, Mrs. Beebe was done with
> work in time to care for her sons after school. Now this is a
> problem and her hours would have to fit childcare requirements.
> Given this situation, I have included mitigation in my analysis of
> future damages, but finding suitable employment may be difficult
> and even unrealistic at present…

Id. at 7-8.

By contrast, the College retained an expert, Nancy L. Segreve, MA, CRC, who has a

Master's degree in Rehabilitation Counseling and over twenty years experience in the field, who

reached very different conclusions. For example, Ms. Segreve opined that

> Since leaving work in August 2003, Ms. Beebe would have been
> and continues to be qualified to pursue work in areas compatible
> with her work history such as janitor, cleaner, housekeeper, food
> service worker, home health aide, homemaker, and companion.
> This list is not inclusive of all jobs available to her but rather
> examples of jobs that exist in her labor market and are directly
> related her work experience and skill base. It is my opinion, based

> on a reasonable degree of vocational certainty that Ms. Beebe *as of 2003* would have received a job offer for suitable employment at wages ranging from $10.00 - $12.00 per hour had she conducted a reasonable job search.

Report of Nancy L. Segreve, MA, CRC, at 2 (May 21, 2007) ("Segreve Report") (emphasis added) (attached as <u>Exhibit B</u>).  Ms. Segreve also reported that from September 2003 through July 2006, "employers were consistently, throughout this period, seeking individuals to fill positions identified as suitable for Ms. Beebe such as housekeeper, janitor, food preparation worker, dietary aide, home health aide, and homemaker." *Id.* at 4.  She further stated that "[t]hese types of employers offer a variety of scheduling options in terms of varying shifts as well as full time or part time schedules and routinely offer employment benefits." *Id.* at 3.

Because Dr. Moore does not have the necessary education, training or experience to make vocational or employability assessments and since his testimony on this subject would confuse the jury as it contradicts the opinions made by an expert qualified in that field, the opinions expressed in his report and any testimony from Dr. Moore as to his vocational assessment of Plaintiff should be excluded.

## ARGUMENT

Federal Rule of Evidence 702 requires that a purported expert be qualified to testify by knowledge, skill, experience, training or education.  A testifying expert "should have achieved a meaningful threshold of expertise" in the given area.  *Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc.,* 405 F.3d 36, 40 (1st Cir. 2005).  That "a witness qualifies as an expert with respect to certain matters or areas of knowledge, [does not mean] that he or she is qualified to express expert opinions as to other fields." *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (quoting *Nimely v. City of New York,* 414 F.3d 381, 399 n.13 (2d Cir. 2005)).  Opinions are properly excluded where they are shown to be beyond the witness's expertise.  *Levin v. Dalva*

*Brothers, Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (citing to *Weinstein's Evidence,* § 702.04[6]

(2006)).

## I.    PLAINTIFF MADE AN AFFIRMATIVE DECISION TO OPT AGAINST RETAINING A VOCATIONAL EXPERT.

Here, Plaintiff already made a decision to forego retaining an actual vocational expert and

seeks to have her damages expert opine on her employability despite his lack of vocational

expertise.  On March 30, 2007, Plaintiff filed The Plaintiff's Motion to Amend the Scheduling

Order to Allow Her Time to Designate a Vocational Expert If and When the Defendant

Designates Such an Expert.  Docket Entry No. 26.  That motion requested the opportunity to

designate a vocational expert to rebut the testimony of any vocational expert designated by the

College.  The Court granted that motion and set a date of May 16 for Plaintiff to designate her

rebuttal expert.  Plaintiff, however, never designated a rebuttal expert and never otherwise

retained a vocational expert.  Dr. Moore is not qualified to act as the "pinch hitter" for an actual

vocational expert that Plaintiff simply opted against retaining.

## II.    PLAINTIFF'S EXPERT LACKS THE EXPERTISE REQUIRED TO OPINE ON EMPLOYABILITY.

Dr. Moore does not have the education, training, and experience to qualify as a

vocational expert who can opine on Plaintiff's employability.  According to his *curriculum vitae*

(also attached with his report at <u>Exhibit A</u>)*,* Dr. Moore has a Bachelor of Science degree in

Economics, a Masters degree in Economics, and a Ph.D. in Economics, Statistics, and Public

Finance.  He was a Professor of Political Economy at the University of Massachusetts from 1972

until 2003, and in 2004, served as the Chief Operating Officer of Marox Corporation.  His

*curriculum vitae* does not reflect any education, training or experience in vocational counseling

or performing employability assessments.  At Dr. Moore's deposition, he conceded his lack of

training in the area of vocational counseling.  Deposition of Craig L. Moore, Ph.D., at 103:19-24

(June 19, 2007) (attached as <u>Exhibit C</u>).

By contrast, the *curriculum vitae* of the College's vocational expert, Nancy L. Segreve, MA, CRC (also attached with her report at <u>Exhibit B</u>), indicates that she has the necessary qualifications to opine on an individual's employability.  Ms. Segreve has a Bachelor of Arts degree in Psychology, a Master's degree in Rehabilitation Counseling, and has worked in the field of vocational counseling for more than twenty years.  In 1997 she founded and has since been the managing partner of her own vocational counseling firm, the Occupational Resource Network.  She is a Nationally Certified Rehabilitation Counselor and is a member of the American Board of Vocational Experts, National Rehabilitation Association, International Association of Rehabilitation Professionals, National Rehabilitation Counseling Association and was a member of the Massachusetts Office of Education & Vocational Rehabilitation Advisory Board.  Ms. Segreve, thus, has more than adequate education, training and experience to assess an individual's employability.

While the College does not challenge Dr. Moore's qualifications as an economic expert by this Motion *In Limine*, it does challenge his qualifications to opine on Plaintiff's employability and to essentially rebut the conclusions made by a qualified expert, Ms. Segreve. Just because Dr. Moore may be qualified as an expert for one subject matter, does not mean he is qualified as an expert for all subject matters in dispute.  Given Dr. Moore's lack of qualifications in making employability or vocational assessments, Plaintiff should not be permitted to use his report or elicit testimony from him as to her employability.

## III.    EVIDENCE OF THE OPINION OF PLAINTIFF'S EXPERT WOULD SIMPLY CONFUSE THE JURY.

Evidence of the opinion of Dr. Moore on the issue of Plaintiff's employability would merely serve to confuse the jury, especially where he and Ms. Segreve, an expert qualified in the

field of vocational counseling, differ in their conclusions.  For example, in his report he indicates that the types of jobs Plaintiff could obtain "typically do not have any retirement benefits or 401(k) matching."  Moore Report, at 7.  Ms. Segreve, by contrast, indicates that "these types of employers … routinely offer employment benefits."  Segreve Report, at 3.  As another example, Dr. Moore opines that "finding suitable employment may be difficult and even unrealistic at present."  Moore Report, at 8.  Ms. Segreve, on the other hand, reports that "[i]t is my opinion, based on a reasonable degree of vocational certainty that Ms. Beebe as of 2003 would have received a job offer for suitable employment at wages ranging from $10.000 - $12.00 per hour had she conducted a reasonable job search."  Segreve Report, at 2.

Despite the fact that in their reports, Dr. Moore and Ms. Segreve differ on Plaintiff's likelihood of obtaining suitable employment, the speed at which Plaintiff could obtain such employment, the wages and benefits Plaintiff could receive, and the availability of flexible scheduling, Dr. Moore admitted at his deposition that he did not have any disagreement with any of the conclusions made by the College's vocational expert.  Moore Dep., at 116:9-18; *see also id.* at 116:16-18 ("No.  If I had done it I might have come up with a slightly different answer, but it would have been in the same ballpark.").  Specifically, he agreed with Ms. Segreve's assessment that "since leaving work in August of 2003, Ms. Beebe would have been and continues to be qualified to pursue work in areas compatible with her work history; such as janitor cleaner housekeeper, food service worker, home health aid, homemaker and companion." *Id.*, at 119:23-120:7.  He also did not dispute that his numbers for the wages she could expect to earn as a custodian would "all be in the same ballpark" as Ms. Segreve's estimated wages. *Id.* at 120:14-121:2.  Therefore, evidence should not be introduced that would simply confuse the jury as Dr. Moore contradicts even his own conclusions on Plaintiff's employability.

**Conclusion**

For the foregoing reasons, the College requests that the Court grant this Motion *In Limine* and order that Plaintiff is precluded from presenting any evidence or argument from her economic expert concerning his vocational assessment of Plaintiff. He is not qualified by knowledge, skill, experience, training or education to make such an assessment.

Respectfully submitted,
Williams College
By its attorneys,


/s/ Patricia M. Mullen
Judith A. Malone (BBO #316260)
Patricia M. Mullen (BBO # 663318)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199-7613
617.239.0100
jmalone@eapdlaw.com
pmullen@eapdlaw.com

Dated: July 2, 2007


CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Patricia M. Mullen

# EXHIBIT A

**CRAIG L. MOORE**
*ECONOMIC CONSULTING*

*65B Hatfield St.  /*
*Northampton MA 01060*
*Tel: 413-587-9405*
*Fax: 413-587-9581*
*craiglmoore@hotmail.com*

# *Economic Report*

| | |
|---|---|
| *To:* | **Thomas J. McCormick, Esq.** |
| *From:* | **Craig L. Moore, Ph.D.** |
| *Date:* | **March 15, 2007** |
| *Re:* | ***Michelle Beebe v. Williams College*** |

## Background

It is my understanding that Michelle Beebe was terminated from her job as a custodian at Williams College (Williams) on August 4, 2003 after approximately 15 years of service. She claims, in summary, that she was wrongfully terminated by Williams when absences were not credited under FMLA. Mrs. Beebe has stated that she missed work to care for her children who suffered from serious medical conditions and when she was seriously ill during the month just prior to being fired. Further, she claims that Williams terminated her for having excessive absences after failing to comply with its own stated policies regarding medical leave and thereby breached its employment contract with Mrs. Beebe.

Michelle Beebe was born on December 19, 1964. She lives with her husband, David Beebe, and their two sons, David Jr. (DOB 5/99), and Daniel (DOB 11/00) in Clarksburg, Massachusetts. She also has a son, Nicholas (DOB 12/86), by a prior marriage who now lives with his father.

The focus of my analysis is to estimate the economic damages arising from her termination by Williams. The facts relied upon in this analysis will be stated and all computations of estimated damages will be shown in tables included in this report.

## The Basis for Economic Damages

Economic damages are based on the concept of *opportunity cost*. If, as a result of an illegal act, a person is deprived of the opportunity to earn a living, enjoy life, or anything else that would have been possible prior to that act, the resulting damages are equal to the cost of restoring the injured person's opportunity or providing what would have reasonably been the fruits of exercising it. In this case, Michelle Beebe lost the opportunity to earn a living and to pursue her occupation in the most advantageous manner. She was forced to incur substantial debt to survive financially. She was forced to withdraw funds from her retirement account and has lost substantial employee benefits including tuition for her oldest son. The Beebe household has suffered and will continue to suffer financial losses for many years as a result of her termination by Williams.

Economic damages can be reasonably estimated and evaluated using methods that are regularly employed in economics and recognized by the courts. Damages should be equal to what a person would reasonably demand for giving up the opportunities they had prior to the illegal act. The general method used to evaluate such damages is to determine the present value of reasonably anticipated future cash flows that could have accrued to the injured party less any mitigating income earned. Making such an assessment of opportunity costs begins with an understanding of the background and situation that the plaintiff enjoyed prior to the alleged illegal termination by Williams.

## Education, Work History and Earnings

Michelle Beebe attended Mount Greylock Regional High School through the 10th grade. She did not complete high school. She left school to take care of her mother who was ill and took employment in a fast food restaurant and then a pizza parlor. She worked for Excelsior Printing as an inspector for approximately 2 years. She then worked as a cashier at a Cumberland Farms store for about 1 year before taking a job at Williams in 1988. During her first 13 years at Williams, Mrs. Beebe was a food service worker and earned between $11 and $12 per hour. In April of 2001, she became a Custodian in the Buildings and Grounds Department at Williams and received a substantial raise.

At the time of her termination, Mrs. Beebe's duties included "dusting and polishing furniture, washing walls, washing windows, cleaning bathrooms, using an automatic floor machine, mopping floors, vacuuming, using a rotary machine, removing trash and recycling materials, moving furniture and boxes, reporting damages and work orders, scrubbing showers, using carpet extractor, shoveling snow, making beds, policing the grounds, changing light bulbs, and making minor equipment repairs." While her regular pay of $15.13 per hour was based on a 40 hour work week, she was often required to work overtime on weekends when there were alumni events, graduation ceremonies, conferences, at the end and start of each semester when students were moving in and out of campus housing and when it snowed. For this extra work she received time and a half and, at times, was given time off as compensation.

Following her termination, she searched for alternative employment. She reports contacting a number of companies for jobs as a cashier and as a CNA at a nursing home. At present, she remains unemployed and blames, in part, Williams for telling perspective employers that she was terminated for excessive absenteeism when she believes that her absences were for good cause and covered under FMLA. She is about to have surgery that will make it impossible for her to work until early summer. She intends to continue her job search at that time. She has also earned a small amount of money selling produce.

I have reviewed Williams' employment records for Michelle Beebe that indicates her hours of regular work, overtime, vacations, sick time, STD, unpaid leave, holidays, and personal leave. I have also calculated the potential regular hours in each pay period in each year. The annual totals at the bottom of each year show the percent of time that falls into each category. These figures are shown in Table 1 below:

2

Hours Worked as a Custodian
Table 1.

| 2001 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|------|------|---------|----------|-----|------|-----|--------|---------|------------|-----------|
| 4/22 to 5/5 | 13.64 | 77.00 | 3.00 | 3.00 | | | | | | 77.00 |
| 5/6 to 5/19 | 13.64 | 48.00 | | 17.50 | 14.50 | | | | | 62.50 |
| 5/20 to 6/2 | 13.64 | 72.00 | 20.00 | | | | | 8.00 | | 72.00 |
| 6/3 to 6/16 | 13.64 | 72.00 | 6.00 | 8.00 | | | | | | 72.00 |
| 6/17 to 6/30 | 13.64 | 64.00 | 4.00 | 8.00 | 8.00 | | | | | 72.00 |
| 7/1 to 7/14 | 14.19 | 61.50 | 7.00 | 10.50 | | | | 8.00 | | 61.50 |
| 7/15 to 7/28 | 14.19 | 56.00 | | 16.00 | 8.00 | | | | | 64.00 |
| 7/29 to 8/11 | 14.19 | 64.00 | 3.00 | 16.00 | | | | | | 64.00 |
| 8/12 to 8/25 | 14.19 | 72.00 | 7.50 | | | | | | | 80.00 |
| 8/26 to 9/8 | 14.19 | 72.00 | | | | | | 8.00 | | 72.00 |
| 9/9 to 9/22 | 14.19 | 72.00 | | | 8.00 | | | | | 80.00 |
| 9/23 to 10/6 | 14.19 | 72.00 | | 8.00 | | | | | | 72.00 |
| 10/7 to 10/20 | 14.19 | 53.00 | | 3.00 | | | | 8.00 | 16.00 | 69.00 |
| 10/21 to 11/3 | 14.19 | 73.00 | | 7.00 | | | | | | 73.00 |
| 11/4 to 11/17 | 14.19 | 72.00 | | | 8.00 | | | | | 80.00 |
| 11/18 to 12/1 | 14.19 | 52.00 | | 12.00 | | | | 16.00 | | 52.00 |
| 12/2 to 12/15 | 14.19 | 61.50 | 2.00 | 10.50 | 8.00 | | | | | 69.50 |
| 12/16 to 12/29 | 14.19 | 43.00 | | 16.00 | 5.00 | | | 16.00 | | 48.00 |
| **Totals** | | 1,157.00 | 52.50 | 135.50 | 59.50 | - | - | 64.00 | 16.00 | 1,240.50 |
| **% of Potential** | | 93.3% | 4.2% | | 4.8% | | | | | 1.3% |

| 2002 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|------|------|---------|----------|-----|------|-----|--------|---------|------------|-----------|
| 12/30 to 1/12 | 14.19 | 56.00 | 2.00 | 8.00 | | | | 16.00 | | 56.00 |
| 1/13 to 1/26 | 14.19 | 59.50 | 2.00 | 9.50 | 11.00 | | | | | 70.50 |
| 1/27 to 2/9 | 14.19 | 59.00 | 2.00 | 13.00 | 8.00 | | | | | 67.00 |
| 2/10 to 2/23 | 14.19 | 24.00 | | 41.00 | | | 7.00 | 8.00 | | 31.00 |
| 2/24 to 3/9 | 14.19 | 22.00 | | | | 20.75 | 37.25 | | | 80.00 |
| 3/10 to 3/23 | 14.19 | 60.00 | | | 5.25 | 6.75 | 8.00 | | | 80.00 |
| 3/24 to 4/6 | 14.19 | 78.50 | | | 1.50 | | | | | 80.00 |
| 4/7 to 4/20 | 14.19 | 35.00 | | | 9.25 | | 35.75 | | | 80.00 |
| 4/21 to 5/4 | 14.19 | 66.00 | | | 5.00 | | 9.00 | | | 80.00 |
| 5/5 to 5/18 | 14.19 | 58.50 | | | 3.00 | | 18.50 | | | 80.00 |
| 5/19 to 6/1 | 14.19 | 72.00 | 22.00 | | | | | 8.00 | | 72.00 |
| 6/2 to 6/15 | 14.19 | 72.00 | 9.50 | | | | 8.00 | | | 80.00 |
| 6/16 to 6/29 | 14.19 | 71.50 | | | 8.00 | | 0.50 | | | 80.00 |
| 7/1 to 7/13 | 14.69 | 67.00 | 2.50 | | | | 5.00 | 8.00 | | 72.00 |
| 7/14 to 7/27 | 14.69 | 80.00 | | | | | | | | 80.00 |
| 7/28 to 8/10 | 14.69 | 72.00 | | | 8.00 | | | | | 80.00 |
| 8/11 to 8/24 | 14.69 | 80.00 | 7.00 | | | | | | | 80.00 |
| 8/25 to 9/7 | 14.69 | 67.50 | | | 4.50 | | | 8.00 | | 72.00 |
| 9/8 to 9/21 | 14.69 | 76.00 | | | 4.00 | | | | | 80.00 |
| 9/22 to 10/5 | 14.69 | 80.00 | 5.25 | | | | | | | 80.00 |
| 10/6 to 10/19 | 14.69 | 51.50 | 2.00 | 8.00 | 12.50 | | | 8.00 | | 64.00 |
| 10/20 to 11/2 | 14.69 | 73.50 | 2.00 | 3.00 | 2.50 | | | | 1.00 | 77.00 |
| 11/3 to 11/16 | 14.69 | 51.50 | 1.00 | 24.00 | | | | | 4.50 | 56.00 |
| 11/17 to 11/30 | 14.69 | 56.00 | | | 3.00 | | | 16.00 | 5.00 | 64.00 |
| 12/1 to 12/14 | 14.69 | 57.00 | 1.50 | 19.00 | | | | | 4.00 | 61.00 |
| 12/15 to 12/28 | 14.69 | 37.00 | | 27.00 | | | | 16.00 | | 37.00 |
| **Totals** | | 1,583.00 | 58.75 | 152.50 | 85.50 | 27.50 | 129.00 | 88.00 | 14.50 | 1,839.50 |
| **% of Potential** | | 86.1% | 3.2% | | 4.6% | 1.5% | 7.0% | | | 0.8% |

| 2003 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|------|------|---------|----------|-----|------|-----|--------|---------|------------|-----------|
| 12/29 to 1/11 | 14.69 | 36.00 | | 16.00 | 20.00 | | | 8.00 | | 56.00 |
| 1/12 to 1/25 | 14.69 | 56.00 | | 23.00 | 1.00 | | | | | 57.00 |
| 1/26 to 2/8 | 14.69 | 70.50 | | | 8.00 | | | | 1.50 | 80.00 |
| 2/9 to 2/22 | 14.69 | 56.00 | | | 0.50 | | 15.50 | 8.00 | | 72.00 |
| 2/23 to 3/8 | 14.69 | 72.00 | 1.00 | | | | 8.00 | | | 80.00 |
| 3/9 to 3/22 | 14.69 | 40.00 | | | | | 32.00 | | | 80.00 |
| 3/23 to 4/5 | 14.69 | 78.50 | | | | | 1.50 | | | 80.00 |
| 4/6 to 4/19 | 14.69 | 78.50 | | | 1.50 | | | | | 80.00 |
| 4/20 to 5/3 | 14.69 | 32.00 | | | 14.50 | | 33.50 | | | 80.00 |
| 5/4 to 5/17 | 14.69 | 76.00 | | | | | 4.00 | | | 80.00 |
| 5/18 to 5/31 | 14.69 | 62.50 | 8.00 | | | | 9.50 | 8.00 | | 72.00 |
| 6/1 to 6/14 | 14.69 | 72.00 | 10.00 | | 8.00 | | | | | 80.00 |
| 6/15 to 6/28 | 14.69 | 51.00 | | | | | 29.00 | | | 80.00 |
| 6/29 to 7/12 | 15.13 | 64.00 | | | | | 8.00 | 8.00 | | 72.00 |
| 7/13 to 7/26 | 15.13 | 69.00 | | | | | 32.00 | | | 80.00 |
| 7/27 to 8/9 | 15.13 | 1.00 | | | | | 32.00 | | | 80.00 |
| **Totals** | | 915.00 | 19.00 | 39.00 | 53.50 | - | 176.00 | 32.00 | 1.50 | 1,399.00 |
| **% of Potential** | | 75.7% | 1.6% | | 4.4% | 0.0% | 14.6% | | | 0.1% |

3

It is interesting to note that Michelle Beebe worked 93.3% of the potential hours after being made a Custodian in 2001. In 2002 she worked over 86% of potential hours and in the first half of 2003 prior to being terminated, she worked over 75% of the potential hours on the job. It is also interesting to observe that the majority of the time she took off, over and above vacation and sick time to which she was entitled, was unpaid leave and cost Williams nothing. The most important information, however, shows her hourly wages and is the basis for establishing her earnings capacity on this job. Income tax records, including W-2 forms, verify the earnings that are reflected in Table 1 above.

## Employee Benefits

In addition to wages, Michelle Beebe's earnings capacity also includes employee benefits that were part of her compensation package. The scope and cost of employee benefits have been increasing steadily as many employees would rather receive these benefits than an increase in wages because they represent non-taxable income. Social Security taxes, state and federal unemployment taxes, Medicare contributions, and Workers Compensation premiums are often cited as employee benefits. They are not. The payments going to support these programs are taxes and the amount paid in does not directly affect the benefits received by the employee.

As an employee of Williams, Michelle Beebe received a variety of benefits paid by her employer. These included 3 weeks of paid vacation, 10 paid holidays, 1 day per month of sick leave, and 16 hours of paid personal leave. She was provided with Blue Cross Blue Shield HMO Blue and dental insurance through Delta Dental that Williams contributed $591.64 and $66.08 respectively. She also received contributions from her employer of $7 monthly for life insurance, $8.40 monthly for long term disability and $9.10 monthly for supplemental long term disability insurance. Williams also made biweekly matching contributions of $69.90 and $34.95 to the TIAA-CREF retirement plan.

David Beebe worked for Williams at the time Michelle was terminated and still does. At that time, the family was receiving health and dental coverage based on Michelle's employment. Following her termination, these benefits were transferred over to David and the family continued to have this coverage. What Michelle lost was the contributions to her retirement plan. The Beebe family also lost the added protection they had when both of them worked there. If anything happens to David at this point and he was unable to work, all the family benefits will be lost.

The other important benefit that was lost was college tuition. In October of 2003 Michelle would have become eligible for an annual tuition benefit for her son Nicholas who was planning on going to college. That benefit was worth $13,946 per year. While that benefit may still be available for David Jr. and Daniel because their father still works for Williams, it does not cover Nicholas as he is not David's son. As a result, he has not been able to afford to go to college and has had to go to work since graduating from high school. The tuition benefits, along with the lost retirement contributions are the primary benefits that Mrs. Beebe and her family lost. And, Michelle Beebe's retirement income will now be much lower in her later years.

**Work-life Estimates**

An important element in the analysis is the determination of the normal work-life expectancy of Ms. Beebe. The estimate that was often used in the past came from the *Worklife Estimates* published by the United States Department of Labor, Bureau of Labor Statistics, February 1986, Bulletin 2254. These tables provide the number of active and inactive years of work-life a person has given their age, sex, race, education and work-life status.

The accuracy of using these work-life estimates has been criticized in recent years as understating the work-life associated with most people and women in particular. The changing economic demands, lifestyles, participation rates of women and people of various age groups clearly make it inappropriate to use the average work histories of people over the past thirty years to predict what a person is likely to do in the future. The government has, in fact, suspended the publication of these tables and does not plan to provide them past the 1986 estimates. Subsequent published estimates all suffer from the same problems that the earlier government tables did because they are based on historical patterns that no longer apply. There have been more recent estimates presented in the *Journal of Legal Economics* in 1995 using a Markov chain approach, for example, but these are also open to the same criticisms. The most recent studies show that people are tending to retire later rather than earlier.

One could argue that any of several ages might be most appropriate for the work-life a particular individual based on their personal characteristics. It is reasonable to assume that most people have the capacity to work until age 65 and have a financial incentive to work to age 67 under the rules concerning Social Security retirement benefits. Recent published studies indicate that the majority of Americans plan on working beyond the age of 65 to insure their financial security.

In this particular case, there are a number of factors that make it reasonable to assume that Michelle Beebe would have continued to work at Williams until retirement had she not been fired. First, she had 15 years of seniority. Second, there is virtually no chance that Williams will either go out of business or experience falling sales making it necessary to lay off employees. Williams is a non-profit institution that has consistently ranked as one of the very top liberal arts colleges in America. Third, Williams is one of the largest and best paying employers in the region. Fourth, David Beebe works at Williams and this provided security and convenience. Finally, and most important, Mrs. Beebe has told me that it was her intention to continue to work at Williams until she retired. This opportunity has been taken away and her alternative employment opportunities in the area are clearly less desirable in terms of security, pay and benefits. Had she been terminated by a company that was vulnerable to ever changing technology, foreign competition, and other market factors, one might think it unreasonable to estimate lost earnings for so many years into the future. But given the very great likelihood of Williams remaining in business and offering the best alternative employment in the area, in my opinion it is quite reasonable to assume that Michelle Beebe would have continued to work at Williams until she retired. Thus, it will be assumed that Michelle Beebe will work to at least the age of 67 and the earnings she would have garnered at Williams, less reasonable mitigation, will be the basis for future economic damages.

5

## Estimating the Present Value of Lost Future Earnings

The determination of the present value of lost future earnings involves two steps. First, it is necessary to estimate what the loss of earnings will be during Michelle Beebe's work-life. This involves projecting her prior earnings to age 67 and netting out the earnings she now is making in her present employment. The second step requires the computation of the present value of those losses today rather than in the future. To do this it is necessary to calculate how much would have to be invested today to provide those losses in each period that they will occur. Each of these elements of the analysis is described in the following sections in detail.

## Rate of Economic Growth, Prices, and Real Wages

The current economic picture is characterized by moderate economic growth. Interest rates are expected to be stable and inflation, with the exception of energy and transportation costs, remains relatively low. There is uncertainty related to the price of oil and the future of the Iraq war, but over the long-term, most economists expect the economy to experience continued moderate growth and stability.

In this case Ms. Beebe's earnings were typically increased each July. Williams indicates that in the years following her termination that the flat rate raises given to Custodians were 3% in 2004, 3 % in 2005, 3.25% in 2006, and 3.25% in 2007. These figures will be used to determine the lost earnings from the time of termination to through 2007. For future years, it is assumed that real earnings will only increase at the cost of living. The analysis will apply a real discount (also net of inflation) and thus, speculation regarding future inflation is avoided.

## Present Value

Once the rate of growth of future earnings and the value of lost future income is established, this must be reduced to its present value. That is, one must determine how much money would have to be set aside and invested today to provide that future financial support. The only element in calculating the present value that is uncertain is the net rate of return that will be earned on the funds that are invested for future use.

The courts have found that it is reasonable to use a real rate of return in the range of 1% to 3% that is net of taxes on the earnings. In 1983, the United States Supreme Court ruled in *Jones & Laughlin Steel Corp. v. Pfeifer* that 1% to 3% is an appropriate discount rate interval within which courts may operate without risk of reversal on appeal[1]. In this case, a net real discount rate of 2% would be conservative and is in line with the net real rate of return on a combination of long and medium term securities as currently reflected in the financial markets[2].

---

[1] For a discussion of *Pfeifer* and related cases, see George, Simien & Culbertson, "The Courts and Inflation", *TRIAL*, July 1984, p22.

[2] In cases where the number of years taken into account is great, such as in this case, the discount rate used reflects the rate of return earned on a portfolio of short, medium and long term securities as the losses must be compensated over a variety of time horizons. No one interest rate or security is appropriate.

## Determination of Damages To Date

The termination of Michelle Beebe by Williams in 2003 cost her a great deal. She lost a secure job with good benefits. She lost at least 15 years of seniority. Given this situation, one has to first look at the value of lost earnings and benefits from the time of the termination to the present. This is summarized in Table 2 below. Prior Earnings are based on employment records through the time of termination and subsequent raises given by Williams as described above. There has also been some mitigation for unemployment compensation received following her termination as well as some cash income from selling produce at the local farmer's market and working at a nursing home.

The benefits include the lost tuition that would have been available for Nicholas when he graduated from high school in 2004 and continuing for 4 years of college. It also includes TIAA-CREF contributions by Williams. These contributions have also been increased based on the percent increases in wages given in each year.

Based on this analysis, the termination of Michelle Beebe by Williams in August of 2003 resulted in lost earnings and benefits of approximately $197,300 to date. What this does not capture, however, is the withdrawals that the Beebe family had to make from Michelle's retirement account to remain financially solvent. Nor does it include the cost of a $46,000 home equity loan they had to borrow and their large credit card debt.

### Lost Earnings and Benefits to Date
### Table 2.

| Period | Lost Earnings | Lost Benefits | Mitigation | Total |
|--------|---------------|---------------|------------|-------|
| 2003 | $   17,490.28 | $   1,572.75 | $   16,817.00 | $   2,246.03 |
| 2004 | 33,297.50 | 16,753.88 | 5,923.50 | 44,127.88 |
| 2005 | 34,287.84 | 16,838.12 | 2,500.00 | 48,625.96 |
| 2006 | 35,366.01 | 16,932.11 | 1,525.00 | 50,773.13 |
| 2007 | 36,511.83 | 17,029.16 | 2,000.00 | 51,540.99 |
| Total | | | | $   197,313.99 |

## Determination of the Present Value of Future Damages

To calculate the present value of future damages one has to begin with a set of reasonable assumptions. Under a reasonable scenario, one could assume that Mrs. Beebe will be able to work at some job commensurate with her skills until retirement. She only has a 10th grade education and has never worked at more than a semi-skilled job in her life. Given the potential employers in the local labor market, it is unlikely that she will be able to find a job as good as the one at Williams. It is more likely that she might be able to work as a kitchen helper in a school cafeteria or restaurant, as a cashier in a supermarket or retail store, or at a comparable job. Such jobs typically do not have any retirement benefits or 401(k) matching. They pay much less than what she was earning at Williams.

A survey of unskilled and semi skilled jobs in the Pittsfield labor market show a wage rates that vary from $7.92 for food preparation workers (including fast food) to $10.65 for retail clerks. In between fall such occupations as cashiers that earn an average of $8.72 per hour and home care aides that earn an average of $10.24 per hour.[3] Employment at these low wages is made more problematic by the cost and scheduling of childcare. As her children get older, this problem will diminish, but at present it is a real constraint. Prior to her termination, Mrs. Beebe was done with work in time to care for her sons after school. Now this is a problem and her hours would have to fit childcare requirements. Given this situation, I have included mitigation in my analysis of future damages, but finding suitable employment may be difficult and even unrealistic at present.

The calculation of the present value of damages in that case is shown in Table 3 below. The first column shows the year in question followed by Michelle Beebe's age in that year. The third column shows what her prior earnings at Williams. Future earnings are assumed to only increase at the cost of living (i.e. real earnings are in constant dollars). Lost future benefits are based the value of the TIAA-CREF contributions that Williams was making. Mitigation is base on full-time employment starting on January 1, 2008 at an hourly wage of $10.00 per hour. In my opinion, this is a reasonable wage rate to use given Michelle Beebe's education, experience and the prevailing wage rates in the Pittsfield Labor Market for semi-skilled workers. The net loss is then reduced to present value using a real after tax rate of return of 2%. The computations are made monthly assuming the payment at the end of each month and summed to an annual value shown in the last column of the table.

As the computations in Table 3 show, the present value of lost future income based on the assumption that Michelle Beebe could have worked to age 67 given that she is able to make at least $10.00 per hour in real wages is approximately $358,216.65. Given her current circumstance, it seems more likely that her actual damages will be higher.

## Long-term Financial Impact on the Beebe Household

The total impact of Michelle Beebe's termination is evident when one begins to sort through the Beebe's household financial records and consider the affect this action by Williams has had on future retirement benefits.

The Beebe family is deeply in debt based on having to borrow against their home equity and they have incurred substantial new credit card debt following Michelle's termination. They also had to sell one of their cars to get money.

Mrs. Beebe has already lost substantial contributions to her TIAA-CREF account. Following her termination, it became necessary to withdraw funds from this account to support the family. In addition, she lost Social Security contributions that will diminish her retirement income after the age of 67.

---

[3] Massachusetts Department of Employment and Training, September 2004 , Hourly earnings by occupation and labor market figures published by the Bureau of Labor Statistics for all labor markets in the United States.

Present Value of Future Economic Damages
Table 3.

| Year | Age | Prior Earnings | Lost Benefits | Mitigation | Net Loss | Present Value |
|------|-----|----------------|---------------|------------|----------|---------------|
| 2008 | 44 | $ 36,511.83 | $ 3,083.16 | $ 20,800.00 | $ 18,794.99 | $ 18,592.95 |
| 2009 | 45 | 36,512.83 | 3,083.16 | 20,800.00 | 18,795.99 | 18,226.06 |
| 2010 | 46 | 36,513.83 | 3,083.16 | 20,800.00 | 18,796.99 | 17,866.41 |
| 2011 | 47 | 36,514.83 | 3,083.16 | 20,800.00 | 18,797.99 | 17,513.85 |
| 2012 | 48 | 36,515.83 | 3,083.16 | 20,800.00 | 18,798.99 | 17,168.26 |
| 2013 | 49 | 36,516.83 | 3,083.16 | 20,800.00 | 18,799.99 | 16,829.48 |
| 2014 | 50 | 36,517.83 | 3,083.16 | 20,800.00 | 18,800.99 | 16,497.38 |
| 2015 | 51 | 36,518.83 | 3,083.16 | 20,800.00 | 18,801.99 | 16,171.84 |
| 2016 | 52 | 36,519.83 | 3,083.16 | 20,800.00 | 18,802.99 | 15,852.72 |
| 2017 | 53 | 36,520.83 | 3,083.16 | 20,800.00 | 18,803.99 | 15,539.91 |
| 2018 | 54 | 36,521.83 | 3,083.16 | 20,800.00 | 18,804.99 | 15,233.26 |
| 2019 | 55 | 36,522.83 | 3,083.16 | 20,800.00 | 18,805.99 | 14,932.66 |
| 2020 | 56 | 36,523.83 | 3,083.16 | 20,800.00 | 18,806.99 | 14,638.00 |
| 2021 | 57 | 36,524.83 | 3,083.16 | 20,800.00 | 18,807.99 | 14,349.15 |
| 2022 | 58 | 36,525.83 | 3,083.16 | 20,800.00 | 18,808.99 | 14,066.00 |
| 2023 | 59 | 36,526.83 | 3,083.16 | 20,800.00 | 18,809.99 | 13,788.43 |
| 2024 | 60 | 36,527.83 | 3,083.16 | 20,800.00 | 18,810.99 | 13,516.35 |
| 2025 | 61 | 36,528.83 | 3,083.16 | 20,800.00 | 18,811.99 | 13,249.63 |
| 2026 | 62 | 36,529.83 | 3,083.16 | 20,800.00 | 18,812.99 | 12,988.18 |
| 2027 | 63 | 36,530.83 | 3,083.16 | 20,800.00 | 18,813.99 | 12,731.88 |
| 2028 | 64 | 36,531.83 | 3,083.16 | 20,800.00 | 18,814.99 | 12,480.65 |
| 2029 | 65 | 36,532.83 | 3,083.16 | 20,800.00 | 18,815.99 | 12,234.37 |
| 2030 | 66 | 36,533.83 | 3,083.16 | 20,800.00 | 18,816.99 | 11,992.95 |
| 2031 | 67 | 36,534.83 | 3,083.16 | 20,800.00 | 18,817.99 | 11,756.29 |

**Total**                                                      $    358,216.65

## Summary of Findings

Based on my assessment of the documents, figures and facts as related to me in this case, I believe to a reasonable degree of economic certainty, that the present value of economic damages arising from the termination of Michelle Beebe by Williams is equal to at least $555,500. This figure does not encompass the financial loss that the family has and will continue to suffer due to increased interest payments on debt. Nor does it include the present value of lost retirement benefits that Michelle Beebe will suffer after the age of 67.

If further information become available, I reserve my right to supplement this opinion in a timely fashion.

The opinions expressed here are based the documents and information listed below and their disclosure is made in accordance with "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony":

1. A copy of the complaint filed in United States District Court;
2. A copy of the Defendant's Answers to Plaintiff's First Set of Interrogatories;
3. A copy of attendance records for Michelle Beebe from her personnel file;
4. A copy of federal tax returns for the Beebe family and W-2 forms for the years 2001 through 2004;
5. A copy of the Williams College Buildings and Grounds Support Staff Handbook;
6. A copy of a letter from Martha Tetrault, Director of Human Resources at Williams College to Michelle Beebe dated May 16, 2003;
7. A copy of the deposition transcript of Michelle Beebe;
8. A copy of the deposition transcript of David Beebe;
9. Information provided to me in a personal interview with Michelle Beebe and David Beebe made in the presence of their counsel.

I hereby disclose that I am being paid at the rate of $200 per hour for any time spent working on this case and will be paid $300 per hour for any testimony that is required. I have received a $1,000 retainer for work done to date.

A list of recent testimony is attached in the appendix to this report along with a current copy of my curriculum vitae as required under "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony."


Craig L. Moore, Ph.D.

# Curriculum Vita

## Craig L. Moore

65B Hatfield Street
Northampton MA 01060

**Phone: 413-587-9405**          **Fax 413-587-9581**          email: *Craiglmoore@hotmail.com*

| | |
|---|---|
| **Education** | B. S. Economics, West Virginia University, 1967;<br>M. A. Economics, Maxwell School, Syracuse University, 1972;<br>Ph.D. Maxwell School, Syracuse University, 1972;<br>Areas of study: Economics, Statistics, and Public Finance. |
| **Present Positions** | Executive Consultant to MAROX Corporation, Holyoke, Massachusetts;<br>Private Management and Legal Consultant;<br>Member of the New England Business Advisory Council of the Federal Reserve Bank of Boston, 2004 – 2008;<br>Board of Directors of Holyoke Medical Center and Hospital;<br>Board of Directors of the Regional Employment Board of Hampden County. |
| **Previous Positions** | Chief Operating Officer of Marox Corporation, 2004<br>University Professor of Political Economy, University of Massachusetts;<br>Full Professor at the Isenberg School of Management, University of Massachusetts, Amherst, 1972 through 2003;<br>Adjunct Professor of Regional Planning; Amherst;<br>Director of the Masters Program, School of Management, 1978-1979;<br>Special Assistant to the President of the University, 1979-1981;<br>Special Assistant to the President of the University, 1997-2000;<br>Policy Advisor to the President of the University, 2000-2003;<br>Chairman of the Department of Finance & Operations Management from September 1982 to August 1994;<br>Founder and Editor of *Massachusetts Benchmarks* from 1997 to 2002. |
| **Professional History** | Joined the faculty of the University of Massachusetts Isenberg School of Management as an Assistant Professor in 1972;<br>Promoted to Associate Professor in 1976;<br>Awarded Tenure in 1978;<br>Promoted to Full Professor in 1980;<br>Named University Professor of Political Economy in 1997;<br>Retired from the University of Massachusetts December 31, 2003;<br>Joined MAROX Corporation as Chief Operating Officer on January 1, 2004;<br>Served as a Legal Consultant and Expert Witness for the past 33 years. |
| **Teaching Experience** | Financial Models – required for all finance majors;<br>Statistical Tools for Management - required undergraduate course;<br>Business Data Analysis – MBA Statistics requirement;<br>Quantitative Methods II – Ph.D. Statistics requirement;<br>Macro Economic Theory – Ph.D. requirement; |

# PUBLICATIONS

## BOOKS AND MONOGRAPHS

Publications in this category include government publications reviewed by professional and academic economists before their publication.

*Regional Economic Analysis for Community Development Planning*, Massachusetts Department of Community Affairs, 119 pages, Oct. 1978.

*Massachusetts Reconsidered: an Economic Anatomy of the Commonwealth*, School of Management, University of Massachusetts, 148 pages, September, 1978.

"The Regional Industrial System" in *Spatial Analysis and the Industrial Environment* by F.I. Hamilton and G.J.R. Linge, London: John Wiley Ltd. (with Karaska and Susman), 1980.

*The New Economic Reality, Massachusetts Prospects for Long-Term Growth;* School of Management, University of Massachusetts, sponsored by the Massachusetts Taxpayers Foundation, 75 pages printed, May 1994 with Edward Moscovitch.

*A Taxpayer's Look at a Sacred Cow: Public Sector Design in Massachusetts Two Decades After the Ward Commission,* 38 pages printed, November 1995 with Edward Moscovitch

*Connection to the Future; An Analysis of the Telecommunications Industry in Massachusetts,* published by the Massachusetts Telecommunications Council and the University of Massachusetts Economic Project, 45 pages printed, June 1, 1997.

*The Effect of State Tax Policy on the Insurance Industry in Massachusetts*, published by the Massachusetts Business Roundtable, 35 pages printed, October 1, 1997

*The New Foundation; Information Technology*, The Donahue Institute, University of Massachusetts, 18 pages printed, May 1999.

*Science, Technology and Investment; The Cycle of Growth in Massachusetts,* Massachusetts Department of Economic Development, 60 pages printed, August 2001.

*Mathematical Models of a Regional Economy (in Russian), with 4 Russian co-authors, published by the St. Petersburg State Technical University, summer of 2002, 85 pages printed.*

*Critical Transitions in Telecommunications: Shaping the New Economy, Massachusetts Telecommunications Council, November 2002, 60 pages, printed.*

## JOURNAL ARTICLES

[ 1 ]   "The Impact of Non-Profit Institutions on Regional Income, Syracuse University a Case in Point," *Growth and Change*, January 1974, Vol. 5, No. 2, pp. 36-40.

[ 2 ]   "A New Look at the Regional Trade Multiplier," *Northeast Regional Science Review*, Vol. III, 1973, pp. 164-170.

[ 3 ]   "The Impact of Non-Profit Institutions on Regional Income, Upstate Medical Center a Case in Point," *Economic Geography*, Vol. 50, No. 2, April 1974, pp. 124-129.

[ 4 ]   "Social Equity and Retained Earnings," *Rivista Internazionale di Scionzele Economiche e Commerciali*, Ann. XXI, No. 2, 1974, pp. 137-135, with Sidney Sufrin.

[ 5 ]   "A New SYMAP for Viewing Spatial Location Patterns," *Selected Projects*, Graduate School of Design, Harvard University, Vol. VII, pp. 77-80, 1974.

[ 6 ]   "A National Planning Model for Petroleum Allocations," *Rivista Internazionale di Scionzele Economiche e Commerciali*, Ann. XII, 1974, pp. 547-656.

[ 7 ]   "The Impact of a Non-Profit Institution on Regional Income: A Discussion," *Growth and Change*, Vol. 6, No. 3, July 1975, pp. 45-49.

[ 8 ]   "Computer Graphics and Decision Analysis," *Northeast Regional Science Review*, Vol. V, pp. 93-100, 1975, with Roger Calantone.

[ 9 ]   "A New Look at the Minimum Requirements Approach to Regional Economic Analysis," *Economic Geography*, Vol. 51, No. 4, October 1975, pp. 350-356.

[10]   "A Linear Programming Model for Determining an Optimal Regional Distribution of Petroleum Products," *Lecture Notes in Economics and Mathematical Systems*, No. 126, Energy, Regional Science and Public Policy, May 1975, pp. 119-135.

[11]   "Optimal Regional Distribution of Petroleum Products," *Omega*, Vol. 4, No. 3, 1976, pp. 301-311.

[12]   "A Bayesian Approach to Spatial Decision Models," *Northeast American Institute of Decision Sciences Proceedings*, May 1976, pp. 41-44.

[13]   "A Cross-Sectional Analysis of the Municipal Property Tax," *Northeast Regional Science Review*, Vol. 6, pp. 200-210.

[14]   "Modeling Interstate Shifts in Employment," *Northeast Regional Science Review*, Vol. 7, 1977, pp. 143-152.

[15]   "A Critical Review of Shift-Share Analysis as a Forecasting Technique," *Journal of Regional Science*, Vol. 20, No. 4, pp. 419-437.

[16]   "Banking and the Regional Income Multiplier," *Northeast Regional Science Review*, Vol. 9, 1979, pp. 1-7.

[17]   "Interregional Arbitrage and the Supply of Loanable Funds," *Journal of Regional Science*, Vol. 22, No. 4, 1982, pp. 499-512.

[18]  "Minimum Requirements and Required Economics, 1980," *Economic Geography*, Vol. 60, No. 3, July, 1984.

[19]  "The Impact of the Banking System on Regional Analysis," *Regional Studies*, Vol. 19.1, pp. 29-35, 1984.

[20]  "A General Equilibrium Model of Interregional Monetary Flows," *Environment and Planning A*, Vol. 21, pp. 397-404, 1989.

[21]  "Utilizing an Economist to Establish Damages Through Expert Testimony, "*Journal of the Massachusetts Academy of Trial Attorneys*, Vol. 4, No. 2, pp. 7-10, May 1996.

[22]  "Benchmarking – An American Perspective," *Economia & Perspectiva*, No. 15/16, Jan./June, 2001, pp.201 – 211, 2001.

## PUBLISHED CASE STUDIES

The following case studies were gathered and written during the summer of 1973 under a grant from the Center for Business and Economic Research and were subsequently published by the Harvard Case Clearing House, and in the book cited below:

| Case Title | Publication Number |
|---|---|
| Jacobsen Rug Company | 9-375-813 |
| Jacobsen Teaching Note | 8-375-814 |
| | |
| Magnavox CATV | 9-375-815 |
| Magnavox Teaching Note | 8-375-815 |
| | |
| Cherry House Furniture | 9-375-825 |
| Cherry House Furniture [A] | 9-375-826 |
| Cherry House Teaching Note | 8-375-827 |

Baird, Bruce F., *Introduction to Decision Analysis*, 1978 pp. 506-508, Duxbury; Jacobsen Rug Company, Cherry House Furniture [A], Cherry House Furniture Teaching Note.

## BOOK REVIEWS

"The Changing Role of Public Administration," A review of three books and a discussion of how they illustrate the new demand on public administrators. *Management Research*, Vol. 8, No. 3, 1975, page 51.

*Waste Paper Recovery: Economic Aspects and Environmental Impacts*, reviewed in the *Annals of Regional Science*, 1982.

*Economic Geography* by James Wheeler and Peter Muller, reviewed in the *Annals of Regional Science*, 1983.

# OTHER PUBLICATIONS

*Designing an Administrative Control System for MEPA: Massachusetts Environmental Policy Act*, Institute for Man and the Environment and The Executive Office of Environmental Affairs, 130 pages, August 1975, with Richard Smardon.

"A New Technique for Estimating Municipal Property Tax Base," Proceedings of the New England Business and Economic Development Conference, University of New Hampshire, 1974 with Richard Evans.

*A Long Range Systems Development Guide for Transportation Planning in the Commonwealth of Massachusetts*, July 1975, DPW-UMASS. Joint Transportation Program, Contract 17618, 55 pages.

*Computer Assisted Analysis of Geographical Information for Transportation Planning*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 31 pages.
*An Economic Base Analysis of the Fitchburg-Leominster Region*, May 1975, DPW/UMASS. Joint Transportation Program, Contract 17618, 40 pages.

"Welfare Serendipity," editorial page, *New York Times*, July 17, 1975, p. 28, with Joel Morse.

*A Planned Program Budget System*, The Legislative Research Council, Commonwealth of Massachusetts, 65 pages, June 1976, with George Odiorne.

*Economic Development Program - Town of Wareham*, September 1976, Office of Economic Development, Town of Wareham, 152 pages.

*Economic Analysis of the Proposed Park Plaza Urban Renewal Project*, Center for Community Renewal Studies and the Department of Community Affairs, June 1976, 78 pages.

*A Management System for Financial Administration*, The City of Northampton, September 1976, 84 pages, bound.

*The Economic Development Potential of 121B*, Massachusetts Department of Community Affairs, 64 pages, July 1977, with Tom Nutt-Powell at M.I.T.

*New Bedford - Fairhaven Route 6 Corridor Planning Study*, Southeastern Regional Planning and Economic Development District, February 1977, three volumes, 272 pages bound.

Tapping Local Business Talent for Community Development Planning, *Management Research*, Vol. 10, #4, July/August 1977.

*Market Analysis of Retail and Commercial Trade in Downtown Holyoke*. City of Holyoke, Holyoke Redevelopment Authority, April 1977, 45 pages, with Jack Wolf.

*Marketing Industrial Space*, Department of Community Affairs Commonwealth of Massachusetts, August 1978, 114 pages, bound.

*Attitudes Toward Flood Management in Northampton, Massachusetts*; New England Division, U.S. Army Corps of Engineers, Waltham, MA, November 1978, 173 pages, bound, with Alice Carlozzi, James Palmer, Carl Carlozzi, & Arthur Elkins.

*Economic Analysis of the Pioneer Valley*, Pioneer Valley Association, January 1979, 66 pages, printed and bound.

*New Bedford State Pier; Economics and Marketing Study*, Department of Environmental Quality Engineering, Division of Waterways, Commonwealth of Massachusetts, March 1979

## PAPERS PRESENTED    (a partial list)

"A Linear Programming Model for Determining an Optimal Distribution of Petroleum Products," presented at the ORSA-TIMS Meetings in San Juan, Puerto Rico, 1974.

"A Linear Programming Model for Optimal Regional Distribution of Petroleum Products in the U.S.", International Conference on Energy and the Environment, Leuven, Belgium, May 1975.

"A Bayesian Approach to Spatial Decision Models," presented at the Northeast AIDS Meetings, Philadelphia, PA., 1975.

"Modeling Interstate Shifts in Employment," presented at the Northeast Regional Science Meetings, Halifax, Nova Scotia, 1977.

"Banking and the Regional Income Multiplier," Presidential Address, Northeast Regional Science Meetings, Amherst, May 1979.

"Commercial Banking and Regional Growth," presented at the Eastern Economics Association Meetings, Boston, Mass, May 1979.

"Banking and the Regional Income Multiplier," invited paper presented at the National Regional Science Meetings, Los Angeles, California, November 1979.

"The Impact of Energy Price Increases on Consumer Expenditures," invited paper presented to the National Energy Policy Conference, West Virginia University, Morgantown, W. VA., May 1980.

"The Regional Industrial System," presented to the International Geographical Union Commission on Industrial Systems, Tokyo, Japan, August 1980.

"Interregional Arbitrage and the Supply of Loanable Funds" presented to the Northeast Regional Science Meetings, Rutgers University, May 1981.

"Interregional Arbitrage and the Supply of Loanable Funds" invited paper presented to the North American Regional Science Association, Montreal, Canada, November 1981.

"Toward a Systems Approach to Regional Analysis," invited paper presented at the International Congress of Arts and Sciences, Rotterdam Holland, June 1984.

"A General Equilibrium Model of Interregional Monetary Flows," invited paper presented at the National Conference of Modeling and Simulation, Pittsburgh, April 1986.

"The Post Industrial Challenge to Location Theory," presented at the Northeast Regional Science Association meetings in Buffalo, N. Y., May 1990.

"The Application of Real Time Statistical Software to Developing Econometric Models," Umea University, Uppsala University and Lund University, Sweden, October 1990.

"An Empirical Comparison of Diversification Indices," The International Regional Science Meetings, New Orleans, LA, November 1991.

"Establishing an Entrepreneurial Base for Economic Transition," Jagellonia University, Cracow, Poland, January 1992.

"The Benefits of Economic and Academic Interaction in Supporting Peace Efforts in Northern Ireland", Ulster University, Londonderry, Northern Ireland, June 1995.

"Prospects for the Economic Monetary Union; an American Perspective", Keynote address, 20th anniversary symposium, Haarlem International School of Business, Haarlem, Netherlands, November 2, 1998.

"A Russian Economic Strategy in the Global Economy", presented at the Saint Petersburg State Technical University in Pskov, Russia 23rd, 2001.

"New Approaches to Economic Analysis in a Knowledge Based Economy", National Association of State Development Agencies, National Research Meetings, Saratoga Springs, July 23, 2001.

"The New Economy and the Law", Proceedings of The Massachusetts Bar Association Annual Conference, Boston, Massachusetts, January 26, 2002, pp 1-4.

"Using Statistics in Employment Cases", Proceeding of the Employment Law Conference, Mass. Continuing Legal Education, December 6, 2002, Boston, pp. 157-168.

## PROFESSIONAL ACTIVITIES AND HONORS

President of the Northeast Regional Science Association: 1975-1976, 1978-1979, 1990-1991.

Associate Editor of the Regional Science Review, 1975, 1991.

*Who's Who in Computer Graphics*, 1985.

Named as a Fellow of the Institute for Man and the Environment, 1976-1977.

Selected as a visiting scholar to Sweden. I gave lectures and worked with faculty at three major universities in Sweden: Umea, Uppsalla and Lund during the fall of 1990.

Helped direct the first postgraduate business program in Poland at the Jagellonia University in Cracow supported by the Mellon Foundation and the U. S. Information Agency, 1992.

School of Management Faculty Service Award, 1994

Recipient of the Chancellor's University Advancement Award, 1995

Invited by Governor William Weld to accompany him on a trade mission to the Republic of Ireland and Northern Ireland, March 1997.

Named as a University Professor of Political Economy by the Board of Trustees of the University of Massachusetts, June 1997.

Named "Professor of the Year" by the Massachusetts Telecommunications Council in recognition of "outstanding achievement in expanding our understanding of issues and opportunities in the Telecommunications Industry", March 1999.

Helped organize the International Conference on Economies Emerging from Conflict, jointly sponsored with Magee College at the University of Ulster, hosted by John Hume, held in Londonderry, Northern Ireland, June 23 - 25, 1999.

Appointed to the New England Business Advisory Council that advises the Federal Reserve Bank of Boston on business and economic policy each quarter, 2004 - 2008.

## Legal Expertise and Consulting

I began working as an expert witness in 1972 and have testified in well over 100 cases. I have testified in Federal District Court in Massachusetts, New York, Pennsylvania, Rhode Island, Maine, and North Carolina. I have testified in superior court and district courts in Massachusetts, Connecticut, Vermont, New Hampshire, and New York. I have been retained by law firms in California, Arizona, New Jersey, South Carolina, Illinois, Indiana, and Queensland, Australia.

I have testified for both plaintiffs and defendants as an economist in a wide variety of cases including wrongful death, personal injury, medical malpractice, divorce, and breach of contract.

I have also testified as both an economist and a statistician in race, sex and age discrimination cases related to termination, promotion and hiring under Title VII and the Age Discrimination in Employment Act of 1967. I testified in Hazen Paper Co. et al. v. Biggins, an important United States Supreme Court case, and in Halligan et al v. Ground Round, Inc. that received national attention.

I was heavily involved in preparing economic damage estimates arising from the deaths in the World Trade Center on September 11, 2001. I prepared reports submitted to the Victim's Compensation Fund for the surviving families of dozens of executives and others killed in that act of terrorism.

I have been regularly invited to lecture in programs conducted by Massachusetts Continuing Legal Education concerning statistical evidence and economic damages:

Age Discrimination, Boston, June 11, 1992.
Personal Injury Damages, Boston, March 11, 1993.
Personal Injury Damages, Boston, July 20, 1994.
Advanced Trial Advocacy Workshop, Boston, August 4, 1994.
Personal Injury Damages, Boston, February 1996.
Advanced Trial Advocacy Workshop, Boston, August 14, 1997.
Trying Employment Cases in the Superior Court, Springfield, April 7, 1999.
Trying Employment Law Cases in the Superior Court, Boston, April 13, 1999.
Annual Employment Law Conference, Boston, December 5, 2002

I have also been invited to lecture by other organizations that include:

The Massachusetts Chapter of the National Employment Lawyers Association; "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Boston, April 27, 1995.
National Employment Lawyers Association, "Statistical Evidence in Employment Discrimination; The Trend Toward Multivariate Methods", Proceedings of the National Employment Lawyers Association, Vol. I., pp.444-454, San Diego, June 27, 1996.
Massachusetts Bar Association, Committee on Employee Rights, Boston, February 7, 2000.
Western New England Law School on several occasions over the past few years.
"The New Economy and the Law", The Massachusetts Bar Association 2002 Annual Conference on January 26th, 2002, published in the proceedings, pp 1-4.
Annual District Court Judges Conference, Southbridge, Massachusetts, May 29, 2003.

I am an elected member of the Board of Overseers of the Historical Society of the Supreme Judicial Court of Massachusetts. I am in my second 3 - year term that ends in 2006.

In addition to legal work, I also regularly consult with government leaders, public agencies, non-profit organizations, and business firms on a wide range of management, financial, and public policy issues.

**Service to the Commonwealth of Massachusetts**
- Department of Community Affairs: economic feasibility study of the Park Plaza Redevelopment Project, reviewed 21 urban renewal projects, and the prepared handbooks concerning the economic development of communities, 1975-1978.
- Chairman of the Task Force on Policy Issues, Northeast Council for Economic Action, sponsored by the Bank of Boston and the Economic Development Admin.; 1977 - 1978.
- Addressed the leadership of the Massachusetts House of Representatives regarding state economic policy, State House, Boston, July 29, 1994.
- Advised the Massachusetts House Committee on Taxation on tax policy and its impact on business development, July 11, 1995
- Invited to testify before the joint session of the Massachusetts House and Senate Taxation Committee on Governor Weld's proposed tax legislation, October 5, 1995.
- Worked with the Mass. Business Roundtable to support pending tax legislation for the mutual funds industry in the Massachusetts Senate, July 1996.
- Invited to testify before a joint session of the Massachusetts House and Senate Technology Committees on the Telecommunications Industry in Massachusetts, February 5, 1997.
- Worked with the Mass. Business Roundtable to present information and analysis concerning pending tax reform legislation in the insurance industry during 1997 and 1998.
- Invited to testify before a joint session of the Massachusetts House and Senate Ways and Means Committees concerning the economy and tax revenues, March 1998, 1999, 2000, and 2001.
- Member of the Massachusetts Labor Market Information Advisory Subcommittee established by the Department of Employment and Training and the Massachusetts Jobs Council, 1999-2003.

**Service to the University of Massachusetts**
- Member of the Faculty Senate, 1973-1974, 2000 – present.
- University Computer Services Committee, 1972-1976, 1978-1979, Chair 1974-1976.
- University Management Systems Advisory Committee, 1974-1976.
- Faculty Research Selection Committee, 1975.
- Member of the Advisory Board of Orchard Hill Residential College, 1974-1977.
- Member of the Campus Center Director Search Committee, 1977.
- Member of the Title IX Salary Review Committee, 1977-78.
- Member of the Graduate Council, 1978.
- Member of the Committee on Academic Priorities, 1978-1980 (Chair, 1978-1979), 2000 to present.
- Special Assistant to the President of the University of Massachusetts, 1979-1981.
- Member of the University Personnel Policies Committee, Chairman, 1988-89.
- Member of the Committee to Advise the Provost on Budget Priorities, 1991.
- Chairman of the Committee on Statistical Pedagogy, 1994-1996
- Member of the Public Policy Planning Council 1996-1997
- Special Assistant to the President of the University of Massachusetts, 1997-2001
- Member of the Program and Budget Council 2000 – 2003, Chair 2000-2002

**Service to the Isenberg School of Management**
- Curriculum Committees' Task Force on Quantitative Studies, 1972-1973.
- Economics Ph.D. Qualifying Examination Committee, 1973-1977, Chair 1974-1977.
- Member of the Graduate Studies Committee, 1972-1975.
- Director of the Graduate Public Management Program, 1973-1977.
- Chairman of the Department Personnel Committee 1978-1979, 1981-1982, 1996-1997.
- Member of the Task Force on Research Policy, 1977.
- Director of Masters Program, 1978-1979.
- Member of Academic Policy Committee, 1981-1982.
- Member of Administrative Committee, 1978-1979, 1982 -1994.
- Quantitative Methods Ph.D. Qualifying Examination Committee, Chair 1990-1992.
- Member of the committee to design the school's computer facilities, 1991.
- Chair of the MBA Task Force to Establish a Professional MBA Program, 1991-1992.
- Chairman of the Department of Finance and Operations Management 1982-1994.
- Chairman of the search committee for the Isenberg Chair in Integrative Studies 2000-2001

# EXHIBIT B

# OCCUPATIONAL RESOURCE NETWORK

Bridging the gap . . . . .

May 21, 2007

Patricia M. Higgins, Esq.
Edwards Angell Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA  02199

**RE:    Beebe v. Williams College**

## EMPLOYABILITY ASSESSMENT

The file of Ms. Michelle Beebe was referred to Occupational Resource Network, Inc., in order to determine her employability based upon her vocational profile subsequent to her termination from Williams College. A request for Ms. Beebe to undergo a vocational interview was declined as per Attorney Higgins. Therefore, this assessment is based upon an analysis of Ms. Beebe's vocational background, including her age, education, work history, and medical status as well as interpretation of employment and wage projections, and customized vocational research in accordance with standard vocational rehabilitation techniques. The vocational resources used to complete this report include, but are not limited to, the following:

*Dictionary of Occupational Titles, U.S. Department of Labor, 4th Edition, 1991*
*Occupational Outlook Handbook, JIST, 2006 – 2007 Edition*
*The Enhanced Guide for Occupational Exploration, JIST, 2nd Edition*
*The Transitional Classification of Jobs, 6th Edition*
*Bureau of Labor Statistics, Occupational Employment Statistics Surveys 2003 - 2006*
*Economic Research Institute Salary Data 2007*
*Records contained in file (see attached list)*

**Brief Profile:** Ms. Michelle Beebe is a 42 year old woman who resides in Clarksburg, MA with her husband and two of her three children; David Beebe (D.O.B. 5/7/1999) and Daniel Beebe (D.O.B. 11/8/2000). She was employed by Williams College from 10/17/1988 through 8/3/2003 at which time she was terminated due to excessive absenteeism. The last position that she held at Williams was that of a custodian in the buildings and grounds department, a position she held as of April 22, 2001. Ms. Beebe reports in her deposition transcript that she has sought employment since her termination, submitting a few applications to employers, but has worked in a limited capacity since her termination.

**Medical Status:** Ms. Beebe has a history of lower airway inflammations having treated for persistent bronchitis with reactive airway; she has a history of tobacco abuse; as well as a history of symptoms of depression and anxiety for which she has been prescribed Lorazepam, Zoloft, and Xanax.

**Work Capacity:** There are no physical, cognitive, or emotional restrictions from employment noted in the medical records at the present time.

## Vocational Profile

**Educational Background:** Ms. Michelle Beebe withdrew from high school in the 11th grade, reporting in her deposition transcript that she believes she finished her tenth year of high school. At the time of deposition, she was working with a tutor in order to pursue her G.E.D.

**Work History:** Ms. Beebe was employed by Williams College from 10/17/1988 through 8/3/2003. From June 2001 to August 2003 she worked as a <u>Custodian</u> for the Buildings and Grounds Department. The tasks involved in this work included: dust and polish furniture; wash walls; wash windows; clean bathrooms; use automatic floor machine; mop floors; vacuum; use rotary machine for shampooing, buffing, and stripping; remove trash and recycling materials; move furniture and boxes; report damages and work orders; scrubs showers; uses carpet extractor.    From 1988 through 2001, Ms. Beebe worked as a <u>Snack Bar Attendant</u>. The tasks involved in this work included: preparing individual menu items for customer orders; sanitizing equipment; cash handling; customer service; restocking inventories; assisting in opening and closing the food production and dining areas.

Prior to Williams College, Ms. Beebe worked for Michaels Pizza and for Burger Chef. Other work experiences have included cleaning houses and growing plants and produce for sale at the Farmer's Market, a job that she continues to perform.

**Work Status:** Since her termination from Williams College, Ms. Beebe has worked as a <u>Personal Care Attendant</u> for Bay State Nurses in Pownal, VT. She has also continued her small business of growing and selling plants at the Farmer's Market. She indicated that she has a garden business that involves tending to three gardens and that she sells product and homemade good such as jams at the North Adams Farmer's Market. She reports that she has been unable to find full time employment.

**Job Search:** Ms. Beebe reports in her deposition transcript that she has filled out some job applications, identifying three employers that she has contacted (Big Y, Cumberland Farms, and Angelina's Sub Shop); and that she has on occasion picked up the *Advocate*. This level of job search activity is not sufficient to render a job offer.

**Vocational Assessment:** Ms. Beebe is a 42 year old woman who has been out of work since August 2003 when she was terminated from Williams College. She has the work skills and physical capacity to perform work consistent with that which she was performing prior to her termination. A persistent and thorough job search is necessary for any job seeker to find employment and particularly to find employment most desirable to that job seekers individual need. Employment resources such as Berkshire Works, the One Stop Career Center, provide job seekers with assistance relative to resume writing, interviewing, obtaining job leads, and identifying training options. Since leaving work in August 2003, Ms. Beebe would have been and continues to be qualified to pursue work in areas compatible with her work history such as janitor, cleaner, housekeeper, food service worker, home health aide, homemaker, and companion. This list is not inclusive of all jobs available to her but rather examples of jobs that exist in her labor market and are directly related to her work experience and skill base. It is my opinion, based on a reasonable degree of vocational certainty, that Ms. Beebe as of 2003 would have received a job offer for suitable employment at wages ranging from $10.00 - $12.00 per hour had she conducted a reasonable job search.

As per the *Occupational Outlook Handbook*, <u>janitors and cleaners</u> work in nearly every type of establishment including firms supplying building maintenance services, public or private educational services, hotels and motels, hospitals, restaurants, manufacturing firms, office buildings. Overall employment of building cleaning workers is expected to grow as fast as average for all occupations through 2014 – faster than average growth is expected among janitors and cleaners but as fast as average growth is expected for maids and housekeeping cleaners. An exploration of these jobs within commuting distance from Clarksburg, reveal

Beebe, Michelle                                                    Employability Evaluation - 3

starting salaries of $12.00 per hour. These positions are available on a part time and on a full time basis. As per the ERI Salary Survey, custodians in the Pittsfield labor market area with two years of experience could expect to earn an annual salary ranging from $19,243 to $25,278 (10th to 90th percentile ranges). A custodian with five years of experience earns from $20,812 - $27,339 (10th – 90th percentile ranges).

Similarly, job growth for <u>home health aides</u>, an occupation that Ms. Beebe has pursued since leaving Williams College, is expected to grow much faster than the average for all occupations through the year 2014. Home health aides are required to complete job specific training which is offered directly by many employers or can be obtained through the Red Cross. Labor market research in the Clarksburg area reveals that these jobs are plentiful with starting salaries in the $10.00 - $11.00 per hour range. Without the competency training, an individual may commence employment in this field as a homemaker and would expect to earn approximately $9.50 per hour to start. As per the ERI Salary Survey Data Base, home health aides with just one year of experience in the Pittsfield labor market earn salaries ranging from $18,081 – $22,701. A home health aide with five years of experience in this area earns $20,302 to $25,491 annually (10th to 90th percentile range).

Ms. Beebe is also well qualified to perform work in food services based upon her thirteen years of experience as a Snack Bar Attendant for Williams College. Employment projections for Food and Beverage Serving Related occupations are for growth as fast as the average for all occupations through the year 2014. Vocational research demonstrates the existence of jobs in this area such as food prep, counter attendant, dietary aide, and short order cook. As per the ERI salary data base, Food Service Workers in the Pittsfield labor market, with 10 years of experience, earn from $21,865 to $28,080 (10th percentile to 90th percentile). Ms. Beebe has the work experience to compete at the high end of this salary range.

**Summary**: Ms. Beebe has several employment options to pursue based upon her vocational profile. Jobs identified for the purpose of this report exist in the current labor market and are compatible with Ms. Beebe's skill base thereby making her an appropriate candidate for application. Moreover, these positions have been in existence and available for her to pursue, through an active, appropriate job search, since her termination in 2003 as cited in the attached Retroactive Labor Market Information sheet. These jobs are found across a wide range of employers including those in hospitality, education, and health care settings. These types of employers offer a variety of scheduling options in terms of varying shifts as well as full time or part time schedules and routinely offer employment benefits.

I reserve the right to amend this report and provide additional rebuttal should new information become available.

Sincerely,

Nancy L. Segreve, MA, CRC
Vocational Rehabilitation Consultant

Encl:  Retroactive Labor Market Information
       List of Records Reviewed

Beebe, Michelle                                                    Employability Evaluation - 4

### Retroactive Labor Market Information

Information regarding expected earnings from 2003 - 2006 for the work categories selected in relation to Ms. Beebe was obtained, in part, from the U.S. Bureau of Labor Statistics, Occupational Employment Statistics (OES). The OES survey is a semiannual mail survey measuring occupational employment and wage rages for wages and salary workers in nonfarm establishment in the United States, Guam, Puerto Rico, and the Virgin Islands. The OES data base is supported by the completion of a retroactive analysis of job openings in the North Adams area. This retroactive job search was conducted by reviewing help wanted advertisements in local papers as well as analyzing positions identified by Occupational Resource Network (ORN) on behalf of ORN clients during the 2003 – 2007 time period. In referencing help wanted advertisement, a sampling of jobs was identified by reviewing *The Berkshire Eagle Times* and the *North Adams Transcript* to assess the availability and existence of such jobs. Help wanted advertisements were reviewed in two month intervals beginning in September 2003 through July 2006. A review of these ads demonstrates that employers were consistently, throughout this period, seeking individuals to fill positions identified as suitable for Ms. Beebe such as housekeeper, janitor, food preparation worker, dietary aide, home health aide, and homemaker.

The employment level and salary ranges are exemplified in the following charts.

**Janitors & Cleaners: Pittsfield Labor Market – OES Survey**

| Year | # Employed | Median Hourly Wage | Mean Hourly Wage | Mean Annual Wage |
|------|-----------|--------------------|--------------------|--------------------|
| 5/2006 | 500 | $10.85 | $11.39 | $23,690 |
| 5/2005 | 490 | $11.28 | $12.02 | $24,990 |
| 5/2004 | 640 | $10.98 | $11.90 | $24,760 |
| 2003 | 600 | $10.97 | $11.62 | $24,160 |

**Maids & Housekeepers: Pittsfield Labor Market – OES Survey**

| Year | # Employed | Median Hourly Wage | Mean Hourly Wage | Mean Annual Wage |
|------|-----------|--------------------|--------------------|--------------------|
| 5/2006 | 380 | $9.33 | $9.93 | $20,650 |
| 5/2005 | 530 | $8.76 | $9.40 | $19.550 |
| 5/2004 | 510 | $8.64 | $8.89 | $18,500 |
| 5/2003 | 430 | $8.55 | $8.83 | $18,370 |

**Food Preparation Workers: Pittsfield Labor Market – OES Survey**

| Year | # Employed | Median Hourly Wage | Mean Hourly Wage | Mean Annual Wage |
|------|-----------|--------------------|--------------------|--------------------|
| 5/2006 | 3,010 | $9.03 | $10.04 | $20,890 |
| 5/2005 | 3,150 | $8.58 | $9.78 | $20,340 |
| 5/2004 | 4,080 | $8.64 | $9.65 | $20,060 |
| 2003 | 4,060 | $8.57 | $9.67 | $20,110 |

**Home Health Aides: Pittsfield Labor Market – OES Survey**

| Year | # Employed | Median Hourly Wage | Mean Hourly Wage | Mean Annual Wage |
|------|-----------|--------------------|--------------------|--------------------|
| 5/2006 | 190 | $9.12 | $10.21 | $21,230 |
| 5/2005 | 150 | $9.45 | $10.31 | $21,440 |
| 5/2004 | 290 | $9.88 | $9.88 | $20,550 |
| 2003 | 450 | $9.82 | $9.79 | $20,370 |

Beebe, Michelle                                           Employability Evaluation - 5

**Records Reviewed in Conducting Vocational Assessment of Michelle Beebe**

    (1)  Plaintiffs answers to two sets of interrogatories;

    (2)  Plaintiff's deposition transcript;

    (3)  Plaintiff's personnel file;

    (4)  Plaintiff's medical records from her primary care physician, emergency room visit in July 2003, gynecologist, psychiatrist, and pharmacy;

    (5)  Deposition transcript of plaintiff's primary care physician, Dr. Stephen Payne;

    (6)  Records from plaintiff's two minor children's daycare provider, Williamstown Community Daycare Center;

    (7)  Plaintiff's economic expert's report, Craig L. Moore.

**NANCY L. SEGREVE, MA, CRC**

## PROFESSIONAL EXPERIENCE

**OCCUPATIONAL RESOURCE NETWORK, ANDOVER , MA**          **1997 to present**

**Vocational Consultant/Managing Partner:** Provide vocational rehabilitation services to include vocational assessments, counseling and placement services, labor market research, ergonomic assessments and work site evaluations to facilitate successful return to work plans. Employer based services include: consultation, training, functional job analyses, and the creation of transitional return to work programs for use individually or as comprehensive programs.

**CRA MANAGED CARE, INC., NEWTON, MA**          **1988 to 1997**
**Rehabilitation Manager**: Managed clinical staff of vocational and nurse consultants. Responsible for hiring, training, and staff development to ensure quality of service. Developed new policies and programs to provide innovative and cost effective services to insurers and employers.

**Regional Job Club Coordinator:** Coordinated a job placement program for injured and ill employees incorporating theories of cognitive motivation to predict and manage case outcomes. Responsible for staff training, program implementation, and program development throughout the Mid-Atlantic region.

**Field Service Coordinator:** Identified account needs, developed specific managed care programs, and coordinated services to be provided by case managers and managed care team.

**Vocational Rehabilitation Supervisor:** Responsible for training, and supervising case managers providing medical and vocational rehabilitation to injured and ill employees. Provided clinical supervision to ensure effectiveness of services.

**Vocational Rehabilitation Counselor:** Provided medical and vocational rehabilitation to injured and ill employees. Coordinated care for employees by communicating with medical providers and employers to assess needs and identify options based upon skills and residual functioning.

**BRAINTREE REHABILITATION HOSPITAL, BRAINTREE , MA**          **1987 to 1989**
**Vocational Rehabilitation Counselor:** Provided rehabilitation counseling and vocational evaluations to inpatient and outpatient adults who sustained traumatic injuries and illnesses. Focused on adjustment to disability, transitions back to the community, and return to work planning with outside agencies and employers. Administered work samples, aptitude tests, interest surveys, and created situational assessments to accurately assess skills and vocational options for successful employment.

**VOCATIONAL ADJUSTMENT CENTER, BOSTON, MA**          **1985 to 1987**
**Chief Vocational Evaluator:** Managed Vocational Assessment Unit of a non-profit agency serving adults with severe physical, developmental, and psychiatric disabilities. Provided extensive vocational evaluations through the administration, interpretation of a wide variety of tests, transferable skills analyses, and client feedback to identify feasible vocational goals. Communicated results to state agencies such as the Mass Rehabilitation Commission to facilitate rehabilitation and employment plans.

**EDUCATION**

1988    **ASSUMPTION COLLEGE, Worcester, MA**
Master's Degree in Rehabilitation Counseling

1985    **BOSTON COLLEGE, Boston, MA**
Bachelor of Arts Degree, Psychology Major

**CERTIFICATIONS**    Nationally Certified Rehabilitation Counselor, # 022786

**PROFESSIONAL AFFILIATIONS**

American Board of Vocational Experts, Associate Member
National Rehabilitation Association
International Association of Rehabilitation Professionals
National Rehabilitation Counseling Association, Member #49965
Massachusetts Office of Education & Vocational Rehabilitation Advisory
Board, 2000-2004

**SEMINARS/PRESENTATIONS**

*Practical Ergonomics* – presented to the following organizations: Harvard
University; Massachusetts, Office of the Attorney General; Masspro

*Vocational Rehabilitation Services for the Injured Worker* - presented to the
following organizations:  AIM Mutual Insurance; EBI Insurance Company; Royal
and Sun Alliance; Harvard University

*Effective Case Management & Return to Work Programs* – presented at 1996
National Risk Insurance Management Society (RIMS) Annual Conference.

*Creating a Successful Return to Work Plan* – Presented to Massachusetts
Employers
 2004.

*New Strategies in Vocational Rehabilitation* – Presented to Worker's
Compensation Division of Massachusetts Bar Association, 2006

**CONTINUING EDUCATION:**

International Association of Rehabilitation Professionals – November 2006
Job Accommodation Network – September 2006
American Board of Vocational Experts – September 2005
Commonwealth of Massachusetts, Office of Education and Vocational
 Rehabilitation – 2002, 2003, 204, 2005, 2006
Harvard School of Public Health, Ergonomic Guidelines for Computer Use, 2001
Harvard School of Public Health, Ergonomics and Human Factors, 2000
Institute of Applied Ergonomics, National Ergonomic Conference, 2001
Assumption College, Vocational Evaluation Training

# EXHIBIT C

1

```
1              UNITED STATES DISTRICT COURT
2               DISTRICT OF MASSACHUSETTS
3                    WESTERN DIVISION
4
5 * * * * * * * * * * * * * * * *
6 MICHELLE BEEBE,                    *
7              Plaintiff            *
8 v.                                 *
9 WILLIAMS COLLEGE,                  *
10            Defendant             *
11 * * * * * * * * * * * * * * * *
12
13
14        DEPOSITION OF:  DR. CRAIG MOORE
15           Heisler, Fledman & McCormick
16                1145 Main Street
17          Springfield, Massachusetts
18           June 19, 2007    10.01 a.m.
19
20
21
22
23             Jessica M. DeSantis
24                Court Reporter
```

2

```
1 APPEARANCES:
2
3 Representing the Plaintiff:
4     HEISLER, FELDMAN, MCCORMICK & GARROW
5     1145 Main Street, Suite 508
6     Springfield,  MA 01103
7     BY THOMAS J. MCCORMICK, ESQ.
8     413.788.7988  Fax:  413.788.7996.
9
10 Representing the Defendant:
11    EDWARDS, ANGELL, PALMER & DODGE
12    111 Huntington Avenue
13     oston,  MA  02199
```

 5      Q.     And there are a number of

 6 educational institutions, hospitals, museums,

 7 hotels in the Williamstown area, aren't there?

 8      A.     There are some, yes.

 9      Q.     And all of those institutions would

10 employ custodians, wouldn't they?

11      A.     That, I guess, or out-sourced their

12 services.

13      Q.     Right.  Someone is cleaning

14 somewhere?

15      A.     Someone is cleaning somewhere.

16      Q.     And she had -- Ms. Beebe had several

17 years as a custodian; is that correct?

18      A.     Yes.

19      Q.     And, yet, you limit her to working

20 as a kitchen helper or cashier.

21             Why is that?

22      A.     That's where she had most of her

23 experience.  And that's where the majority of

24 jobs -- there's a lot more jobs in those

                                        103

 1 occupations in that area than there are custodian

 2 jobs.

 3      Q.     Did you look at the availability of

 4 custodial jobs?

 5      A.     I looked at the DET data that showed

 6 how many jobs there are and how many people are

 7 employed in those occupations.

 8      Q.     Do you have a copy of the DET data

 9 that you looked at?

10      A.     No, it's on-line.

11      Q.     Okay.  For what period of time did

12 you look at that?

13      A.     Most recent period available.

14      Q.     Prior to doing this report?

15      A.     Yes.

16      Q.     Okay.  So 2007?

17      A.     Well, the data is not from 2007, but

18 it's as current as available.

19      Q.     Do you have any training as a

20 vocational counselor?

22    Q.    Yeah.

23    A.    Not -- I'm not formally trained as a

24 vocational counselor.

104

1    Q.    Are you familiar with the Department

2 of Employment and Training?

3    A.    I've consulted for them.  I help

4 build their employee projection models by

5 occupation.  I worked with them under federal

6 contracts.  Yes.

7    Q.    Now, are you familiar with DET's one

8 stop career centers?

9    A.    Yes, I am.

10    Q.    Okay.  Do you know the kinds of

11 services that they offer?

12    A.    Yes, I do.

13    Q.    Okay.  Do you know if Ms. Beebe ever

14 took advantage of any of those services?

15    A.    I do not.

16    Q.    Okay.  Now, getting to, I guess, the

17 meat of your report, Dr. Moore.  You make two

18 calculations, is that correct, lost earnings and

19 benefits to date, and future economic damages; is

20 that fair?

21    A.    Yes.

22    Q.    All right.  Let's go to Table 2,

23 which is the lost earnings to date.

24          You have each year.  Now, in 2003,

105

1 her lost earnings were $17,490.28; is that

2 correct?

3    A.    Yes.

4    Q.    How did you get that number?

5    A.    Earlier in the report I describe

6 raises that were given to the custodians at

1  would disagree with?

2       A.    Not particularly.  The particular

3  database that she used may not have been the same

4  exact database that I would have used, but that's

5  fine.  It's not an unreasonable database.

6       Q.    All right.  The database is not

7  unreasonable.

8       A.    No.

9       Q.    Are any of her assumptions

10 unreasonable?

11      A.    Not particularly.  I mean, I don't

12 have any strong disagreement with what she

13 found.

14      Q.    Do you have any disagreement with

15 what she found?

16      A.    No.  If I had done it I might have

17 come up with a slightly different answer, but it

18 would have been in the same ballpark.

19           MR. MCCORMICK:  I would like to

20      generally object.  It's so vague what we're

21      talking about here.  There are several

22      different conclusions in the report.

23           Could we get just a little more

24      specific?


117

1           MS. MALONE:  Certainly.  I'd be

2      happy to.  Now, that I have the broad

3      picture I'd be happy to.

4       Q.    (By Ms. Malone) Would you -- do you

5  have any reason to disagree with her conclusion

6  that there are no physical cognitive or emotional

7  restrictions from employment by Ms. Beebe?

8       A.    I agree with that.

9       Q.    And you actually met her; is that

10 correct?

11      A.    Yes.

12      Q.    Ms. Beebe?

13      A.    Yes.

14      Q.    And you didn't see anything in your

3 years as a custodian?

4        A.      They're all very, you know,

5 unskilled jobs.

6        Q.      But the custodian, clearly, is at

7 the higher wage level?

8        A.      A little bit, not significantly.

9        Q.      Well, but you say in your report

10 that when she went from being a food-service

11 worker to a custodian she received a significant

12 wage increase?

13        A.      In that particular situation she

14 did.

15        Q.      Do you remember how much it was?

16        A.      Not offhand.  I've got the

17 numbers.

18        Q.      What would you consider a

19 significant wage increase?

20        A.      That's subjective.

21        Q.      More than 10% of her wages?

22        A.      Sure.

23        Q.      Would you agree that with Ms.

24 Segreve's assessment, that since leaving work in

                                                  120

1 August of 2003, Ms. Beebe would have been and

2 continues to be qualified to pursue work in areas

3 compatible with her work history; such as,

4 janitor, cleaner, housekeeper, food-service

5 worker, home health aid, homemaker, and

6 companion?

7        A.      Yes.

8        Q.      Would you agree with her assessment

9 that work of that type continues to be available

10 especially in the Williamstown area?

11        A.      Yeah, that's kind of a general

12 statement.  That kind of work is available

13 anywhere.

14        Q.      Okay.  And do you agree with her

15 conclusion that -- I'm looking at page 2, the

16 bottom of page 2.

17       That custodians in the Pittsfield

18 labor market area with two years of experience

19 could expect to earn an annual salary raning form

20 19,000 to 25,000.  And with five years of

21 experience, 20,000 to 27,000.

22          Do you have any reason to dispute

23 that conclusion?

24     A.    Yeah, again, my numbers might be


121


1 somewhat, but they'd all be in the same

2 ballpark.

3     Q.    Okay.

4     A.    I mean, I don't -- to be honest with

5 you, I don't particularly like to use ranges like

6 that because when you look at something like

7 custodians with five years of experiences with

8 ranges, you know, almost to $7,000 a year and

9 it's a third.  That's a 33% range.  I mean, that

10 makes that number almost meaningless.

11          What it means is that there are

12 people, even who are experienced, who get hired

13 by various employers for more money or less money

14 depending what the job really involves.  So when

15 you get into what a custodian is, if you're being

16 hired by, let's say, a manufacturing company.

17     Q.    Mm-hmm.

18     A.    You're going to get a lot different

19 salary than if you're being hired by a car

20 wash.

21     Q.    Mm-hmm.

22     A.    That's just going to be different

23 depending on the employer and the type of work.

24 A custodian is a pretty general description.


122


1          At Williams we know exactly what

2 being a custodian meant.  We know exactly what

3 she earned.