UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE BEEBE,

               Plaintiff,

    v.

WILLIAMS COLLEGE,

               Defendant.

Civil Action No.  05-30182

**DEFENDANT'S MOTION IN LIMINE NO. 3 TO PRECLUDE ANY JURY INSTRUCTION, ARGUMENT OR EVIDENCE ON THE ISSUE OF CONSEQUENTIAL DAMAGES**

Defendant Williams College (the "College") hereby moves the Court for an order precluding Plaintiff Michelle Beebe ("Plaintiff") from obtaining an instruction to the jury on the issue of consequential damages or presenting any evidence or argument in support of a claim for consequential damages.  The plain language of the Family and Medical Leave Act, 29 U.S.C. 2601 et seq. ("FMLA") does not provide for such damages.

**Summary of Argument**

In this case, Plaintiff argues that the College violated the FMLA when it disciplined her and ultimately terminated her for excessive absenteeism.  Among other forms of relief, Plaintiff seeks money damages in the form of back pay for this alleged violation.  As evidenced by the report of her expert, Craig L. Moore, Ph.D. (attached as <u>Exhibit A</u>), Plaintiff's responses to one of the College's document requests (representative excerpts attached as <u>Exhibit B</u>), and Plaintiff's witness list for trial (appearing in the Joint Pretrial Memorandum, Docket Entry No. 34), it appears that Plaintiff also intends to introduce evidence of consequential damages resulting from her termination from the College.  Specifically, she plans to demonstrate that her

termination caused her to borrow additional funds and withdraw retirement savings and that her

physical and emotional health suffered as well.  She also seeks to recover the value of a tuition

grant and lost wages through 2031.  (These latter two categories are subject to separate motions

*in limine*.)  This evidence should be excluded as irrelevant since the plain language of the Act

does not provide for this type of relief and courts have rejected any interpretation of the Act

which would allow for such a recovery.

## ARGUMENT

The FMLA does not expressly provide for an award of consequential damages.  With

respect to damages available under the FMLA, the language of the statute provides as follows:

> (A) for damages equal to –
>     (i) the amount of –
>         (I) any wages, salary, employment benefits, or other
>         compensation denied or lost to such employee by reason of
>         the violation; or
>         (II) in a case in which wages, salary, employment benefits,
>         or other compensation have not been denied or lost to the
>         employee, any actual monetary losses sustained by the
>         employee as a direct result of the violation, such as the cost
>         of providing care, up to a sum equal to 12 weeks of wages
>         or salary for the employee;
>     (ii) the interest on the amount described in clause (i) calculated
>     at the prevailing rate; and
>     (iii) an additional amount as liquidated damages equal to the
>     sum of the amount described in clause (i) and the interest
>     described in clause (ii), [unless the employer proves the
>     unlawful act or omission was in good faith and it had
>     reasonable grounds for believing that its act or omission  would
>     not violate the Act]

29 U.S.C. § 2617(a)(1)(A).  Nowhere in the Act does it state that consequential damages are

recoverable.  The Supreme Court has stated that the "cause of action under the FMLA is a

restricted one: The damages recoverable are strictly defined."  *Nevada Dep't of Human Res. v.*

*Hibbs*, 538 U.S. 721, 739-40 (2003).

"Other circuits have held that nominal and consequential damages (including emotional distress damages) are not available under the FMLA." *Colburn v. Parker Hannifin/Nichols Portland*, 429 F.3d 325, 334 n.5 (1st Cir. 2005); *see e.g. Nero v. Industrial Molding Corp.*, 167 F.3d 921, 930 (5th Cir. 1999); *Montgomery v. Maryland*, 72 Fed. Appx. 17, 19 (4th Cir. 2003). With respect to strictly nonmonetary losses, courts have routinely held that the Act does not provide recovery for such losses. Report and Recommendation With Regard to Defendant's Motion to Dismiss, at 6 (Apr. 18, 2006) (Docket Entry No. 12) (holding emotional distress damages not recoverable under the FMLA where FMLA specifically lists only monetary damages); *Lufkin v. Eastern Maine Medical Ctr.*, 401 F. Supp. 2d 145, 145-46 (D. Maine 2005) (holding that FMLA does not provide a recovery for pain and suffering, emotional distress, damaged reputation and punitive damages); *Scarborough v. Trans World Airlines*, No. 4:99-679, 2000 WL 98273, at *3 (E.D. Mo. Jan. 18, 2000) (rejecting claim where plaintiff sought damages for embarrassment, humiliation, and other nonmonetary losses).

Some plaintiffs have argued that the phrase "other compensation denied or lost to [her] by reason of the violation" in § 2617(a)(1)(A)(i)(I) may be interpreted to cover consequential damages. Courts have rejected that argument. *See, e.g., Nero v. Industrial Molding Corp.*, 167 F.3d 921, 930 (5th Cir. 1999); *Johnson v. Georgia Television Company d/b/a WSB-TV*, 435 F. Supp. 2d 1237, 1241 (N.D. Ga. 2006). In *Nero*, for example, the plaintiff sought consequential damages in the form of out-of-pocket expenses he incurred after his wrongful termination, including moving and job search expenses. 167 F.3d at 929. In rejecting his entitlement to those damages, the court first analyzed the meaning of "other compensation denied or lost." *Id*. at 930. Applying the doctrine of *noscitur a sociis*, which is the principle that "a word is known by the company it keeps," the court held that the phrase "other compensation" appearing as it does with

the terms "salary" and "wages" implies a *quid pro quo* exchange for services rendered. *Id.*; s*ee also Lloyd v. Wyoming Valley Health Care Sys., Inc.*, 994 F. Supp. 288, 291 (M.D. Pa. 1998) (applying same analysis); *McAnnally v. Wyn South Molded Prods. Inc.*, 912 F. Supp. 512, 513 (N.D. Ala. 1996) (same).

Furthermore, § 2617 distinguishes between "actual monetary damages" and "other compensation." Section 2617(a)(1)(A)(i)(II) provides that where "wages, salary, employment benefits, or other compensation have not been denied or lost, [an employee may recover] any actual monetary losses sustained by the employee as a direct result of the violation…" If Congress intended "other compensation" to mean those things which traditionally comprise compensatory damages, there would have been no need to add § 2617(a)(1)(A)(i)(II) to cover "actual monetary losses" – they would already be included. *Lloyd*, 994 F. Supp. at 291. This distinction suggests that "other compensation" has a narrower meaning than "actual monetary damages" and one that is best understood in the context of its placement next to the terms, "wages," "salary" and "employment benefits." *Id.*; s*ee also, Barrilleaux,* 1998 WL 614181, at *2 (holding that costs incurred for child care and parental care not contemplated by the phrase "other compensation" as they do not contemplate a *quid pro quo* exchange between an employer and employee).

In instances in which wages, salary, employment benefits, or other compensation have *not* been denied or lost to the employee, actual monetary losses may be recovered if they are shown to be sustained by the employee as a *direct* result of the violation. § 2617(a)(1)(A)(i)(II). When a plaintiff seeks an award of back pay, however, she may not simultaneously seek actual monetary losses. The statute provides for one or the other, not both. *Barrilleaux v. Thayer Lodging Group, Inc.*, No. 97-3252, 1998 WL 614181, at *1 (E.D. La. 1998).

Even in cases alleging direct, actual monetary losses, courts have refused to award the types of medical damages Plaintiff appears to be seeking based on the documents produced to the College. In *Dawson v. Leewood Nursing Home, Inc.*, 14 F. Supp. 2d 828, 830 (E.D.Va. 1998), for example, the plaintiff there claimed that the employer violated her FMLA rights when it refused to allow her to reassume the same position she had before she went on FMLA leave. While she conceded that she lost no wages or benefits as an immediate result of her employer's alleged violation of the FMLA, she claimed she sustained actual monetary losses directly caused by the unlawful act. *Id*. at 833. Specifically, she claimed that the stress caused by her employer's decision was a major cause of cardiac and pulmonary symptoms which necessitated her taking a disability leave and the decision made her so distraught she had to see a mental health care counselor. *Id*. The court found no authority standing for the proposition that medical damages caused by the stress of a FMLA violation are recoverable. *Id*. at 833. Thus, it denied her claim for relief. *Id*. at 834; *see also Johnson v. Georgia Television Company d/b/a WSB-TV*, 435 F. Supp. 2d 1237, 1241 (N.D. Ga. 2006) (holding consequential damages not available under FMLA and, accordingly, denying claim for costs associated with aggravation of preexisting medical condition (fibromyalgia), which aggravation plaintiff claimed was caused by employer's allegedly wrongful act).

Here, Plaintiff seeks to introduce evidence that speaks to losses that are not recoverable under the FMLA. For example, Plaintiff's economic expert, Dr. Moore, indicates in his report that Plaintiff "was forced to incur substantial debt to survive financially," "to withdraw funds from her retirement account," "to borrow against their home equity" with a "$46,000 home equity loan," "to sell one of their cars to get money," and to "incur[] substantial new credit card debt." Report of Craig L. Moore, Ph.D., at 1, 7, 8 (Mar. 15, 2007) ("Moore Report") (attached as

Exhibit A).  He adds that "[t]he Beebe household has suffered and will continue to suffer

financial losses for many years as a result of her termination by Williams."  *Id*. at 1.  These

losses, even if true, are not recoverable as they cannot be characterized as "wages, salary,

employment benefits, or other compensation denied or lost to [the Plaintiff]" by reason of her

discipline or termination from the College.  Therefore, these sections of his report  and any

testimony bearing on topics describing the alleged consequences of Plaintiff's termination,

unrelated to "wages, salary, employment benefits, or other compensation," must be excluded as

irrelevant and prejudicial.  As explained, courts have repeatedly rejected a broad reading of the

phrase "other compensation" as contradicting the intent of Congress.  Like the out of pocket

expenses for moving and conducting a job search in *Nero*, 167 F.3d  at 930, Plaintiff's losses are

not recoverable.

Dr. Moore could not even state whether these purported losses were a direct result of or

caused by her termination since he could not answer *when* Plaintiff incurred this specific debt.

Deposition of Craig L. Moore, at 63:2-14 (June 19, 2007) ("Moore Dep.") (attached as Exhibit

C).  He also made no inquiry of whether they had the same or similar debt before her

termination.  *Id*. at 64:3-8.

In addition, Plaintiff has claimed that her damages include insurance co-payments made

during the period of 2001 through 2004 on behalf of her two children and herself.  Specifically,

on September 19, 2006, the College requested the following documents from Plaintiff:

> All records, invoices, bills, correspondence or other documents
> concerning any **damages suffered or expenses** claimed to have
> been incurred by you as a result of the facts and circumstances
> alleged in the Complaint.

Defendant's First Request for the Production of Documents, Request No. 56.  On March 17,

2007, in response to that document request, Plaintiff produced a series of documents relating to

Plaintiff and her two minor children for the period from 2001 through 2004 entitled "Receipt for Services" listing insurance co-payments for doctors' appointments and claims submitted to her insurer, in addition to reports indicating insurance co-payments for prescription drugs. Plaintiff's Responses to the Defendant's First Request for the Production of Documents, No. 56 (Dec. 8, 2006); Letter from Thomas McCormick to Patricia Higgins (Mar. 17, 2007); and relevant excerpts of response attached as <u>Exhibit B</u>. These types of costs or expenses are not recoverable under the FMLA as they cannot be characterized as "wages, salary, employment benefits, or other compensation denied or lost" They also would not constitute, nor would Plaintiff be entitled to, these damages as "actual monetary losses sustained by the employee as a direct result of the violation." Plaintiff may seek either "wages, salary, employment benefits or other compensation" or "actual monetary losses," not both.

For similar reasons, this Court should not permit Plaintiff to introduce evidence through her primary care doctor, Stephen Payne, M.D., gynecologist, Bonnie Herr, M.D., or husband, David Beebe, that her termination aggravated any existing medical conditions she may have or caused any new illnesses. This Court has already ruled that, if successful, this Plaintiff would not be entitled to emotional distress damages. Memorandum and Order on Motion to Dismiss of Defendant Williams College, Docket Entry No. 13. Furthermore, any evidence of an aggravation of a medical condition is not relevant for the reasoning set forth in *Nero v. Industrial Molding Corp.*, 167 F.3d 921 (5th Cir. 1999) and *Johnson v. Georgia Television Company d/b/a WSB-TV*, 435 F. Supp. 2d 1237 (N.D. Ga. 2006).

### Conclusion

For the foregoing reasons, the College requests that the Court grant this Motion *In Limine* and order that Plaintiff is precluded from obtaining any jury instruction or presenting any

argument or evidence in support of a claim for consequential damages.

<div style="margin-left: 50%;">

Respectfully submitted,
Williams College
By its attorneys,


*/s/  Patricia M. Mullen*

Judith A. Malone (BBO #316260)
Patricia M. Mullen (BBO # 663318)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199-7613
617.239.0100
jmalone@eapdlaw.com
pmullen@eapdlaw.com
</div>

Dated: July 2, 2007


<div style="text-align: center;">

CERTIFICATE OF SERVICE
</div>

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<div style="margin-left: 50%;">

*/s/  Patricia M. Mullen*
</div>

# EXHIBIT A

**CRAIG L. MOORE**
*ECONOMIC CONSULTING*

65B Hatfield St.
*Northampton MA 01060*
*Tel: 413-587-9405*
*Fax: 413-587-9581*
*craiglmoore@hotmail.com*

# *Economic Report*

**To:**      **Thomas J. McCormick, Esq.**

**From:**    **Craig L. Moore, Ph.D.**

**Date:**    **March 15, 2007**

**Re:**      ***Michelle Beebe v. Williams College***

## Background

It is my understanding that Michelle Beebe was terminated from her job as a custodian at Williams College (Williams) on August 4, 2003 after approximately 15 years of service. She claims, in summary, that she was wrongfully terminated by Williams when absences were not credited under FMLA. Mrs. Beebe has stated that she missed work to care for her children who suffered from serious medical conditions and when she was seriously ill during the month just prior to being fired. Further, she claims that Williams terminated her for having excessive absences after failing to comply with its own stated policies regarding medical leave and thereby breached its employment contract with Mrs. Beebe.

Michelle Beebe was born on December 19, 1964. She lives with her husband, David Beebe, and their two sons, David Jr. (DOB 5/99), and Daniel (DOB 11/00) in Clarksburg, Massachusetts. She also has a son, Nicholas (DOB 12/86), by a prior marriage who now lives with his father.

The focus of my analysis is to estimate the economic damages arising from her termination by Williams. The facts relied upon in this analysis will be stated and all computations of estimated damages will be shown in tables included in this report.

## The Basis for Economic Damages

Economic damages are based on the concept of *opportunity cost*. If, as a result of an illegal act, a person is deprived of the opportunity to earn a living, enjoy life, or anything else that would have been possible prior to that act, the resulting damages are equal to the cost of restoring the injured person's opportunity or providing what would have reasonably been the fruits of exercising it. In this case, Michelle Beebe lost the opportunity to earn a living and to pursue her occupation in the most advantageous manner. She was forced to incur substantial debt to survive financially. She was forced to withdraw funds from her retirement account and has lost substantial employee benefits including tuition for her oldest son. The Beebe household has suffered and will continue to suffer financial losses for many years as a result of her termination by Williams.

Economic damages can be reasonably estimated and evaluated using methods that are regularly employed in economics and recognized by the courts. Damages should be equal to what a person would reasonably demand for giving up the opportunities they had prior to the illegal act. The general method used to evaluate such damages is to determine the present value of reasonably anticipated future cash flows that could have accrued to the injured party less any mitigating income earned. Making such an assessment of opportunity costs begins with an understanding of the background and situation that the plaintiff enjoyed prior to the alleged illegal termination by Williams.

## Education, Work History and Earnings

Michelle Beebe attended Mount Greylock Regional High School through the 10th grade. She did not complete high school. She left school to take care of her mother who was ill and took employment in a fast food restaurant and then a pizza parlor. She worked for Excelsior Printing as an inspector for approximately 2 years. She then worked as a cashier at a Cumberland Farms store for about 1 year before taking a job at Williams in 1988. During her first 13 years at Williams, Mrs. Beebe was a food service worker and earned between $11 and $12 per hour. In April of 2001, she became a Custodian in the Buildings and Grounds Department at Williams and received a substantial raise.

At the time of her termination, Mrs. Beebe's duties included "dusting and polishing furniture, washing walls, washing windows, cleaning bathrooms, using an automatic floor machine, mopping floors, vacuuming, using a rotary machine, removing trash and recycling materials, moving furniture and boxes, reporting damages and work orders, scrubbing showers, using carpet extractor, shoveling snow, making beds, policing the grounds, changing light bulbs, and making minor equipment repairs." While her regular pay of $15.13 per hour was based on a 40 hour work week, she was often required to work overtime on weekends when there were alumni events, graduation ceremonies, conferences, at the end and start of each semester when students were moving in and out of campus housing and when it snowed. For this extra work she received time and a half and, at times, was given time off as compensation.

Following her termination, she searched for alternative employment. She reports contacting a number of companies for jobs as a cashier and as a CNA at a nursing home. At present, she remains unemployed and blames, in part, Williams for telling perspective employers that she was terminated for excessive absenteeism when she believes that her absences were for good cause and covered under FMLA. She is about to have surgery that will make it impossible for her to work until early summer. She intends to continue her job search at that time. She has also earned a small amount of money selling produce.

I have reviewed Williams' employment records for Michelle Beebe that indicates her hours of regular work, overtime, vacations, sick time, STD, unpaid leave, holidays, and personal leave. I have also calculated the potential regular hours in each pay period in each year. The annual totals at the bottom of each year show the percent of time that falls into each category. These figures are shown in Table 1 below:

Case 3:05-cv-30182-MAP     Document 44-2     Filed 07/02/2007     Page 4 of 11

Hours Worked as a Custodian
Table 1.

| 2001 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/22 to 5/5 | 13.64 | 77.00 | 3.00 | 3.00 | | | | | | 77.00 |
| 5/6 to 5/19 | 13.64 | 48.00 | | 17.50 | 14.50 | | | | | 62.50 |
| 5/20 to 6/2 | 13.64 | 72.00 | 20.00 | | | | | 8.00 | | 72.00 |
| 6/3 to 6/16 | 13.64 | 72.00 | 6.00 | 8.00 | | | | | | 72.00 |
| 6/17 to 6/30 | 13.64 | 64.00 | 4.00 | 8.00 | 8.00 | | | | | 72.00 |
| 7/1 to 7/14 | 14.19 | 61.50 | 7.00 | | 10.50 | | | 8.00 | | 61.50 |
| 7/15 to 7/28 | 14.19 | 56.00 | | 16.00 | 8.00 | | | | | 64.00 |
| 7/29 to 8/11 | 14.19 | 64.00 | 3.00 | 16.00 | | | | | | 64.00 |
| 8/12 to 8/25 | 14.19 | 72.00 | 7.50 | | | | | | | 80.00 |
| 8/26 to 9/8 | 14.19 | 72.00 | | | | | | 8.00 | | 72.00 |
| 9/9 to 9/22 | 14.19 | 72.00 | | | 8.00 | | | | | 80.00 |
| 9/23 to 10/6 | 14.19 | 72.00 | | 8.00 | | | | | | 72.00 |
| 10/7 to 10/20 | 14.19 | 53.00 | | 3.00 | | | | 8.00 | 16.00 | 69.00 |
| 10/21 to 11/3 | 14.19 | 73.00 | | 7.00 | | | | | | 73.00 |
| 11/4 to 11/17 | 14.19 | 72.00 | | | 8.00 | | | | | 80.00 |
| 11/18 to 12/1 | 14.19 | 52.00 | | 12.00 | | | | 16.00 | | 52.00 |
| 12/2 to 12/15 | 14.19 | 61.50 | 2.00 | 10.50 | 8.00 | | | | | 69.50 |
| 12/16 to 12/29 | 14.19 | 43.00 | | 16.00 | 5.00 | | | 16.00 | | 48.00 |
| **Totals** | | 1,157.00 | 52.50 | 135.50 | 59.50 | - | - | 64.00 | 16.00 | 1,240.50 |
| **% of Potential** | | 93.3% | 4.2% | | 4.8% | | | | 1.3% | |

| 2002 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/30 to 1/12 | 14.19 | 56.00 | 2.00 | 8.00 | | | | 16.00 | | 56.00 |
| 1/13 to 1/26 | 14.19 | 59.50 | 2.00 | 9.50 | 11.00 | | | | | 70.50 |
| 1/27 to 2/9 | 14.19 | 59.00 | 2.00 | 13.00 | 8.00 | | | | | 67.00 |
| 2/10 to 2/23 | 14.19 | 24.00 | | 41.00 | | | 7.00 | 8.00 | | 31.00 |
| 2/24 to 3/9 | 14.19 | 22.00 | | | | 20.75 | 37.25 | | | 80.00 |
| 3/10 to 3/23 | 14.19 | 60.00 | | | 5.25 | 6.75 | 8.00 | | | 80.00 |
| 3/24 to 4/6 | 14.19 | 78.50 | | | 1.50 | | | | | 80.00 |
| 4/7 to 4/20 | 14.19 | 35.00 | | | 9.25 | | 35.75 | | | 80.00 |
| 4/21 to 5/4 | 14.19 | 66.00 | | | 5.00 | | 9.00 | | | 80.00 |
| 5/5 to 5/18 | 14.19 | 58.50 | | | 3.00 | | 18.50 | | | 80.00 |
| 5/19 to 6/1 | 14.19 | 72.00 | 22.00 | | | | | 8.00 | | 72.00 |
| 6/2 to 6/15 | 14.19 | 72.00 | 9.50 | | | | 8.00 | | | 80.00 |
| 6/16 to 6/29 | 14.19 | 71.50 | | | 8.00 | | 0.50 | | | 80.00 |
| 7/1 to 7/13 | 14.69 | 67.00 | 2.50 | | | | 5.00 | 8.00 | | 72.00 |
| 7/14 to 7/27 | 14.69 | 80.00 | | | | | | | | 80.00 |
| 7/28 to 8/10 | 14.69 | 72.00 | | | 8.00 | | | | | 80.00 |
| 8/11 to 8/24 | 14.69 | 80.00 | 7.00 | | | | | | | 80.00 |
| 8/25 to 9/7 | 14.69 | 67.50 | | | 4.50 | | | 8.00 | | 72.00 |
| 9/8 to 9/21 | 14.69 | 76.00 | | | 4.00 | | | | | 80.00 |
| 9/22 to 10/5 | 14.69 | 80.00 | 5.25 | | | | | | | 80.00 |
| 10/6 to 10/19 | 14.69 | 51.50 | 2.00 | 8.00 | 12.50 | | | 8.00 | | 64.00 |
| 10/20 to 11/2 | 14.69 | 73.50 | 2.00 | 3.00 | 2.50 | | | | 1.00 | 77.00 |
| 11/3 to 11/16 | 14.69 | 51.50 | 1.00 | 24.00 | | | | | 4.50 | 56.00 |
| 11/17 to 11/30 | 14.69 | 56.00 | | | 3.00 | | | 16.00 | 5.00 | 64.00 |
| 12/1 to 12/14 | 14.69 | 57.00 | 1.50 | 19.00 | | | | | 4.00 | 61.00 |
| 12/15 to 12/28 | 14.69 | 37.00 | | 27.00 | | | | 16.00 | | 37.00 |
| **Totals** | | 1,583.00 | 58.75 | 152.50 | 85.50 | 27.50 | 129.00 | 88.00 | 14.50 | 1,839.50 |
| **% of Potential** | | 86.1% | 3.2% | | 4.6% | 1.5% | 7.0% | | 0.8% | |

| 2003 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/29 to 1/11 | 14.69 | 36.00 | | 16.00 | 20.00 | | | 8.00 | | 56.00 |
| 1/12 to 1/25 | 14.69 | 56.00 | | 23.00 | 1.00 | | | | | 57.00 |
| 1/26 to 2/8 | 14.69 | 70.50 | | | 8.00 | | | | 1.50 | 80.00 |
| 2/9 to 2/22 | 14.69 | 56.00 | | | 0.50 | | 15.50 | 8.00 | | 72.00 |
| 2/23 to 3/8 | 14.69 | 72.00 | 1.00 | | | | 8.00 | | | 80.00 |
| 3/9 to 3/22 | 14.69 | 40.00 | | | | | 32.00 | | | 80.00 |
| 3/23 to 4/5 | 14.69 | 78.50 | | | | | 1.50 | | | 80.00 |
| 4/6 to 4/19 | 14.69 | 78.50 | | | 1.50 | | | | | 80.00 |
| 4/20 to 5/3 | 14.69 | 32.00 | | | 14.50 | | 33.50 | | | 80.00 |
| 5/4 to 5/17 | 14.69 | 76.00 | | | | | 4.00 | | | 80.00 |
| 5/18 to 5/31 | 14.69 | 62.50 | 8.00 | | | | 9.50 | 8.00 | | 72.00 |
| 6/1 to 6/14 | 14.69 | 72.00 | 10.00 | | 8.00 | | | | | 80.00 |
| 6/15 to 6/28 | 14.69 | 51.00 | | | | | 29.00 | | | 80.00 |
| 6/29 to 7/12 | 15.13 | 64.00 | | | | | 8.00 | 8.00 | | 72.00 |
| 7/13 to 7/26 | 15.13 | 69.00 | | | | | 32.00 | | | 80.00 |
| 7/27 to 8/9 | 15.13 | 1.00 | | | | | 32.00 | | | 80.00 |
| **Totals** | | 915.00 | 19.00 | 39.00 | 53.50 | - | 176.00 | 32.00 | 1.50 | 1,399.00 |
| **% of Potential** | | 75.7% | 1.6% | | 4.4% | 0.0% | 14.6% | | 0.1% | |

3

It is interesting to note that Michelle Beebe worked 93.3% of the potential hours after being made a Custodian in 2001. In 2002 she worked over 86% of potential hours and in the first half of 2003 prior to being terminated, she worked over 75% of the potential hours on the job. It is also interesting to observe that the majority of the time she took off, over and above vacation and sick time to which she was entitled, was unpaid leave and cost Williams nothing. The most important information, however, shows her hourly wages and is the basis for establishing her earnings capacity on this job. Income tax records, including W-2 forms, verify the earnings that are reflected in Table 1 above.

## Employee Benefits

In addition to wages, Michelle Beebe's earnings capacity also includes employee benefits that were part of her compensation package. The scope and cost of employee benefits have been increasing steadily as many employees would rather receive these benefits than an increase in wages because they represent non-taxable income. Social Security taxes, state and federal unemployment taxes, Medicare contributions, and Workers Compensation premiums are often cited as employee benefits. They are not. The payments going to support these programs are taxes and the amount paid in does not directly affect the benefits received by the employee.

As an employee of Williams, Michelle Beebe received a variety of benefits paid by her employer. These included 3 weeks of paid vacation, 10 paid holidays, 1 day per month of sick leave, and 16 hours of paid personal leave. She was provided with Blue Cross Blue Shield HMO Blue and dental insurance through Delta Dental that Williams contributed $591.64 and $66.08 respectively. She also received contributions from her employer of $7 monthly for life insurance, $8.40 monthly for long term disability and $9.10 monthly for supplemental long term disability insurance. Williams also made biweekly matching contributions of $69.90 and $34.95 to the TIAA-CREF retirement plan.

David Beebe worked for Williams at the time Michelle was terminated and still does. At that time, the family was receiving health and dental coverage based on Michelle's employment. Following her termination, these benefits were transferred over to David and the family continued to have this coverage. What Michelle lost was the contributions to her retirement plan. The Beebe family also lost the added protection they had when both of them worked there. If anything happens to David at this point and he was unable to work, all the family benefits will be lost.

The other important benefit that was lost was college tuition. In October of 2003 Michelle would have become eligible for an annual tuition benefit for her son Nicholas who was planning on going to college. That benefit was worth $13,946 per year. While that benefit may still be available for David Jr. and Daniel because their father still works for Williams, it does not cover Nicholas as he is not David's son. As a result, he has not been able to afford to go to college and has had to go to work since graduating from high school. The tuition benefits, along with the lost retirement contributions are the primary benefits that Mrs. Beebe and her family lost. And, Michelle Beebe's retirement income will now be much lower in her later years.

4

**Work-life Estimates**

An important element in the analysis is the determination of the normal work-life expectancy of Ms. Beebe. The estimate that was often used in the past came from the *Worklife Estimates* published by the United States Department of Labor, Bureau of Labor Statistics, February 1986, Bulletin 2254. These tables provide the number of active and inactive years of work-life a person has given their age, sex, race, education and work-life status.

The accuracy of using these work-life estimates has been criticized in recent years as understating the work-life associated with most people and women in particular. The changing economic demands, lifestyles, participation rates of women and people of various age groups clearly make it inappropriate to use the average work histories of people over the past thirty years to predict what a person is likely to do in the future. The government has, in fact, suspended the publication of these tables and does not plan to provide them past the 1986 estimates. Subsequent published estimates all suffer from the same problems that the earlier government tables did because they are based on historical patterns that no longer apply. There have been more recent estimates presented in the *Journal of Legal Economics* in 1995 using a Markov chain approach, for example, but these are also open to the same criticisms. The most recent studies show that people are tending to retire later rather than earlier.

One could argue that any of several ages might be most appropriate for the work-life a particular individual based on their personal characteristics. It is reasonable to assume that most people have the capacity to work until age 65 and have a financial incentive to work to age 67 under the rules concerning Social Security retirement benefits. Recent published studies indicate that the majority of Americans plan on working beyond the age of 65 to insure their financial security.

In this particular case, there are a number of factors that make it reasonable to assume that Michelle Beebe would have continued to work at Williams until retirement had she not been fired. First, she had 15 years of seniority. Second, there is virtually no chance that Williams will either go out of business or experience falling sales making it necessary to lay off employees. Williams is a non-profit institution that has consistently ranked as one of the very top liberal arts colleges in America. Third, Williams is one of the largest and best paying employers in the region. Fourth, David Beebe works at Williams and this provided security and convenience. Finally, and most important, Mrs. Beebe has told me that it was her intention to continue to work at Williams until she retired. This opportunity has been taken away and her alternative employment opportunities in the area are clearly less desirable in terms of security, pay and benefits. Had she been terminated by a company that was vulnerable to ever changing technology, foreign competition, and other market factors, one might think it unreasonable to estimate lost earnings for so many years into the future. But given the very great likelihood of Williams remaining in business and offering the best alternative employment in the area, in my opinion it is quite reasonable to assume that Michelle Beebe would have continued to work at Williams until she retired. Thus, it will be assumed that Michelle Beebe will work to at least the age of 67 and the earnings she would have garnered at Williams, less reasonable mitigation, will be the basis for future economic damages.

5

## Estimating the Present Value of Lost Future Earnings

The determination of the present value of lost future earnings involves two steps. First, it is necessary to estimate what the loss of earnings will be during Michelle Beebe's work-life. This involves projecting her prior earnings to age 67 and netting out the earnings she now is making in her present employment. The second step requires the computation of the present value of those losses today rather than in the future. To do this it is necessary to calculate how much would have to be invested today to provide those losses in each period that they will occur. Each of these elements of the analysis is described in the following sections in detail.

## Rate of Economic Growth, Prices, and Real Wages

The current economic picture is characterized by moderate economic growth. Interest rates are expected to be stable and inflation, with the exception of energy and transportation costs, remains relatively low. There is uncertainty related to the price of oil and the future of the Iraq war, but over the long-term, most economists expect the economy to experience continued moderate growth and stability.

In this case Ms. Beebe's earnings were typically increased each July. Williams indicates that in the years following her termination that the flat rate raises given to Custodians were 3% in 2004, 3 % in 2005, 3.25% in 2006, and 3.25% in 2007. These figures will be used to determine the lost earnings from the time of termination to through 2007. For future years, it is assumed that real earnings will only increase at the cost of living. The analysis will apply a real discount (also net of inflation) and thus, speculation regarding future inflation is avoided.

## Present Value

Once the rate of growth of future earnings and the value of lost future income is established, this must be reduced to its present value. That is, one must determine how much money would have to be set aside and invested today to provide that future financial support. The only element in calculating the present value that is uncertain is the net rate of return that will be earned on the funds that are invested for future use.

The courts have found that it is reasonable to use a real rate of return in the range of 1% to 3% that is net of taxes on the earnings. In 1983, the United States Supreme Court ruled in *Jones & Laughlin Steel Corp. v. Pfeifer* that 1% to 3% is an appropriate discount rate interval within which courts may operate without risk of reversal on appeal[1]. In this case, a net real discount rate of 2% would be conservative and is in line with the net real rate of return on a combination of long and medium term securities as currently reflected in the financial markets[2].

---

[1] For a discussion of *Pfeifer* and related cases, see George, Simien & Culbertson, "The Courts and Inflation", *TRIAL*, July 1984, p22.

[2] In cases where the number of years taken into account is great, such as in this case, the discount rate used reflects the rate of return earned on a portfolio of short, medium and long term securities as the losses must be compensated over a variety of time horizons. No one interest rate or security is appropriate.

## Determination of Damages To Date

The termination of Michelle Beebe by Williams in 2003 cost her a great deal. She lost a secure job with good benefits. She lost at least 15 years of seniority. Given this situation, one has to first look at the value of lost earnings and benefits from the time of the termination to the present. This is summarized in Table 2 below. Prior Earnings are based on employment records through the time of termination and subsequent raises given by Williams as described above. There has also been some mitigation for unemployment compensation received following her termination as well as some cash income from selling produce at the local farmer's market and working at a nursing home.

The benefits include the lost tuition that would have been available for Nicholas when he graduated from high school in 2004 and continuing for 4 years of college. It also includes TIAA-CREF contributions by Williams. These contributions have also been increased based on the percent increases in wages given in each year.

Based on this analysis, the termination of Michelle Beebe by Williams in August of 2003 resulted in lost earnings and benefits of approximately $197,300 to date. What this does not capture, however, is the withdrawals that the Beebe family had to make from Michelle's retirement account to remain financially solvent. Nor does it include the cost of a $46,000 home equity loan they had to borrow and their large credit card debt.

Lost Earnings and Benefits to Date
Table 2.

| Period | Lost Earnings | Lost Benefits | Mitigation | Total |
|--------|---------------|---------------|------------|-------|
| 2003 | $ 17,490.28 | $ 1,572.75 | $ 16,817.00 | $ 2,246.03 |
| 2004 | 33,297.50 | 16,753.88 | 5,923.50 | 44,127.88 |
| 2005 | 34,287.84 | 16,838.12 | 2,500.00 | 48,625.96 |
| 2006 | 35,366.01 | 16,932.11 | 1,525.00 | 50,773.13 |
| 2007 | 36,511.83 | 17,029.16 | 2,000.00 | 51,540.99 |
| Total | | | | $ 197,313.99 |

## Determination of the Present Value of Future Damages

To calculate the present value of future damages one has to begin with a set of reasonable assumptions. Under a reasonable scenario, one could assume that Mrs. Beebe will be able to work at some job commensurate with her skills until retirement. She only has a 10th grade education and has never worked at more than a semi-skilled job in her life. Given the potential employers in the local labor market, it is unlikely that she will be able to find a job as good as the one at Williams. It is more likely that she might be able to work as a kitchen helper in a school cafeteria or restaurant, as a cashier in a supermarket or retail store, or at a comparable job. Such jobs typically do not have any retirement benefits or 401(k) matching. They pay much less than what she was earning at Williams.

7

A survey of unskilled and semi skilled jobs in the Pittsfield labor market show a wage rates that vary from $7.92 for food preparation workers (including fast food) to $10.65 for retail clerks. In between fall such occupations as cashiers that earn an average of $8.72 per hour and home care aides that earn an average of $10.24 per hour.[3] Employment at these low wages is made more problematic by the cost and scheduling of childcare. As her children get older, this problem will diminish, but at present it is a real constraint. Prior to her termination, Mrs. Beebe was done with work in time to care for her sons after school. Now this is a problem and her hours would have to fit childcare requirements. Given this situation, I have included mitigation in my analysis of future damages, but finding suitable employment may be difficult and even unrealistic at present.

The calculation of the present value of damages in that case is shown in Table 3 below. The first column shows the year in question followed by Michelle Beebe's age in that year. The third column shows what her prior earnings at Williams. Future earnings are assumed to only increase at the cost of living (i.e. real earnings are in constant dollars). Lost future benefits are based the value of the TIAA-CREF contributions that Williams was making. Mitigation is base on full-time employment starting on January 1, 2008 at an hourly wage of $10.00 per hour. In my opinion, this is a reasonable wage rate to use given Michelle Beebe's education, experience and the prevailing wage rates in the Pittsfield Labor Market for semi-skilled workers. The net loss is then reduced to present value using a real after tax rate of return of 2%. The computations are made monthly assuming the payment at the end of each month and summed to an annual value shown in the last column of the table.

As the computations in Table 3 show, the present value of lost future income based on the assumption that Michelle Beebe could have worked to age 67 given that she is able to make at least $10.00 per hour in real wages is approximately $358,216.65. Given her current circumstance, it seems more likely that her actual damages will be higher.

## Long-term Financial Impact on the Beebe Household

The total impact of Michelle Beebe's termination is evident when one begins to sort through the Beebe's household financial records and consider the affect this action by Williams has had on future retirement benefits.

The Beebe family is deeply in debt based on having to borrow against their home equity and they have incurred substantial new credit card debt following Michelle's termination. They also had to sell one of their cars to get money.

Mrs. Beebe has already lost substantial contributions to her TIAA-CREF account. Following her termination, it became necessary to withdraw funds from this account to support the family. In addition, she lost Social Security contributions that will diminish her retirement income after the age of 67.

---

[3] Massachusetts Department of Employment and Training, September 2004 , Hourly earnings by occupation and labor market figures published by the Bureau of Labor Statistics for all labor markets in the United States.

8

Present Value of Future Economic Damages
Table 3.

| Year | Age | Prior Earnings | Lost Benefits | Mitigation | Net Loss | Present Value |
|------|-----|----------------|---------------|------------|----------|---------------|
| 2008 | 44 | $ 36,511.83 | $ 3,083.16 | $ 20,800.00 | $ 18,794.99 | $ 18,592.95 |
| 2009 | 45 | 36,512.83 | 3,083.16 | 20,800.00 | 18,795.99 | 18,226.06 |
| 2010 | 46 | 36,513.83 | 3,083.16 | 20,800.00 | 18,796.99 | 17,866.41 |
| 2011 | 47 | 36,514.83 | 3,083.16 | 20,800.00 | 18,797.99 | 17,513.85 |
| 2012 | 48 | 36,515.83 | 3,083.16 | 20,800.00 | 18,798.99 | 17,168.26 |
| 2013 | 49 | 36,516.83 | 3,083.16 | 20,800.00 | 18,799.99 | 16,829.48 |
| 2014 | 50 | 36,517.83 | 3,083.16 | 20,800.00 | 18,800.99 | 16,497.38 |
| 2015 | 51 | 36,518.83 | 3,083.16 | 20,800.00 | 18,801.99 | 16,171.84 |
| 2016 | 52 | 36,519.83 | 3,083.16 | 20,800.00 | 18,802.99 | 15,852.72 |
| 2017 | 53 | 36,520.83 | 3,083.16 | 20,800.00 | 18,803.99 | 15,539.91 |
| 2018 | 54 | 36,521.83 | 3,083.16 | 20,800.00 | 18,804.99 | 15,233.26 |
| 2019 | 55 | 36,522.83 | 3,083.16 | 20,800.00 | 18,805.99 | 14,932.66 |
| 2020 | 56 | 36,523.83 | 3,083.16 | 20,800.00 | 18,806.99 | 14,638.00 |
| 2021 | 57 | 36,524.83 | 3,083.16 | 20,800.00 | 18,807.99 | 14,349.15 |
| 2022 | 58 | 36,525.83 | 3,083.16 | 20,800.00 | 18,808.99 | 14,066.00 |
| 2023 | 59 | 36,526.83 | 3,083.16 | 20,800.00 | 18,809.99 | 13,788.43 |
| 2024 | 60 | 36,527.83 | 3,083.16 | 20,800.00 | 18,810.99 | 13,516.35 |
| 2025 | 61 | 36,528.83 | 3,083.16 | 20,800.00 | 18,811.99 | 13,249.63 |
| 2026 | 62 | 36,529.83 | 3,083.16 | 20,800.00 | 18,812.99 | 12,988.18 |
| 2027 | 63 | 36,530.83 | 3,083.16 | 20,800.00 | 18,813.99 | 12,731.88 |
| 2028 | 64 | 36,531.83 | 3,083.16 | 20,800.00 | 18,814.99 | 12,480.65 |
| 2029 | 65 | 36,532.83 | 3,083.16 | 20,800.00 | 18,815.99 | 12,234.37 |
| 2030 | 66 | 36,533.83 | 3,083.16 | 20,800.00 | 18,816.99 | 11,992.95 |
| 2031 | 67 | 36,534.83 | 3,083.16 | 20,800.00 | 18,817.99 | 11,756.29 |

**Total**                                                    $    358,216.65

## Summary of Findings

Based on my assessment of the documents, figures and facts as related to me in this case, I believe to a reasonable degree of economic certainty, that the present value of economic damages arising from the termination of Michelle Beebe by Williams is equal to at least $555,500. This figure does not encompass the financial loss that the family has and will continue to suffer due to increased interest payments on debt. Nor does it include the present value of lost retirement benefits that Michelle Beebe will suffer after the age of 67.

If further information become available, I reserve my right to supplement this opinion in a timely fashion.

The opinions expressed here are based the documents and information listed below and their disclosure is made in accordance with "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony":

1. A copy of the complaint filed in United States District Court;
2. A copy of the Defendant's Answers to Plaintiff's First Set of Interrogatories;
3. A copy of attendance records for Michelle Beebe from her personnel file;
4. A copy of federal tax returns for the Beebe family and W-2 forms for the years 2001 through 2004;
5. A copy of the Williams College Buildings and Grounds Support Staff Handbook;
6. A copy of a letter from Martha Tetrault, Director of Human Resources at Williams College to Michelle Beebe dated May 16, 2003;
7. A copy of the deposition transcript of Michelle Beebe;
8. A copy of the deposition transcript of David Beebe;
9. Information provided to me in a personal interview with Michelle Beebe and David Beebe made in the presence of their counsel.

I hereby disclose that I am being paid at the rate of $200 per hour for any time spent working on this case and will be paid $300 per hour for any testimony that is required. I have received a $1,000 retainer for work done to date.

A list of recent testimony is attached in the appendix to this report along with a current copy of my curriculum vitae as required under "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony."


Craig L. Moore, Ph.D.

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION
NO. 05-30182-MAP

|  |  |
|---|---|
| MICHELLE BEEBE, | ) |
|  | ) |
|     Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| WILLIAMS COLLEGE, | ) |
|  | ) |
|     Defendant. | ) |
|  | ) |

PLAINTIFF'S RESPONSES TO THE DEFENDANT'S FIRST REQUEST FOR THE
PRODUCTION OF DOCUMENTS

The Plaintiff, Michelle Beebe, responds to the Defendant's first request for the

production of documents as follows:

RESPONSE TO REQUEST NO. 1:  Please see Exhibit 1 and/or response to Request No. 1,
for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 2:  Please see documents attached as Exhibit 1.  Also
responsive to this request are a copy of the Williams College Buildings and Grounds Support
Staff Handbook, Sixth Edition, which was attached as Exhibit 1 to the Defendant's
Memorandum in Support of Its Motion to Dismiss, dated November 23, 2005, in this case
and a copy of the medical records for Nicolas Boucher from Dr. Gerrity, certified on
November 17, 2006, sent to Plaintiff's counsel in response to the Defendant's subpoena.
Because Defendant's counsel has copies of these latter two items, the Plaintiff is not
physically producing them here.

The Plaintiff reserves the right to supplement this response.

RESPONSE TO REQUEST NO. 3:  Please see Exhibit 1 and/or response to Request No. 1,
for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 4:  Please see Exhibit 1 and/or response to Request No. 1,
for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 54: Please see Exhibit 1 and/or response to Request No. 1, for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 55: Please see Exhibit 1 and/or response to Request No. 1, for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 56: Please see Exhibit 1 and/or response to Request No. 1, for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 57: Please see Exhibit 1 and/or response to Request No. 1, for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 58: Please see Exhibit 1 and/or response to Request No. 1, for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 59: Please see Exhibit 1 and/or response to Request No. 1, for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 60: Please see Exhibit 1 and/or response to Request No. 1, for documents that are responsive to this request, if any.

RESPONSE TO REQUEST NO. 61: Please see Exhibit 1 and/or response to Request No. 1, for documents that are responsive to this request, if any.

Respectfully submitted,
MICHELLE BEEBE
By Her Attorney,

Dated: 12/8/06

_____
Thomas J. McCormick, BBO # 561760
Heisler, Feldman, McCormick
& Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988
Fax (413) 788-7996

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served by ~~first~~ ~~class~~ mail upon the attorneys of record for the Defendant on _12 / 8_ , 2006.

_____
Thomas J. McCormick

7

# Heisler, Feldman, McCormick & Garrow P.C.

Attorneys at Law

Hugh D. Heisler
Joel H. Feldman
Thomas J. McCormick
Suzanne Garrow
Kimberly M. Skadan
  *Access to Justice Fellow*

March 17, 2007

Patricia M. Higgins, Esq.
Edwards, Angell, Palmer & Dodge, LLP
111 Huntingdon Avenue
Prudential Center
Boston, MA 02199

      Re:    <u>Michelle Beebe v. Williams College</u>, U.S. Dist. Ct., Western Division, Civil
               Action No. 05-30182-MAP.

Dear Ms. Higgins:

Enclosed please find copies of the Plaintiff's answers to the Defendant's second set of interrogatories along with her responses to the Defendant's second request for documents. I have forwarded the signature page to my client for her signature and will send you a copy of the signature page when I receive it.

In addition, and in response to your letter of January 30, 2007 with regard to the Plaintiff's responses to the Defendant's first document requests numbered 56, 57, 58, 59, and 60, I can confirm that for requests numbered 57, 58, and 59, the Plaintiff does not have documents that are responsive to those requests.

With regard to request number 56, please see the documents included with this letter segregated as Exhibit 2.

With regard to request number 60, please see the Plaintiff's response to request number 62 in the Defendant's second set of requests. Along with documents responsive to the time period in number 62, I have included documents responsive to the time period set out in request number 60. The Plaintiff does object to the production of tax returns for the reasons stated in her response to request number 62.

Very truly yours,

Thomas J. McCormick

Enclosures

BEEBE MICHELE M.
01/01/2003 Thru 12/31/2003

Refilled in any Brooks Pharmacy

BROOKS MAXI DRUG #0313                                                                Page:   1
60 LINCOLN STT                                                                    Date: 02/05/2004
NORTH ADAMS, MA 012473417
(413) 663-5270

Name: BEEBE MICHELE M.                                                          DOB: 12/19/1964
Addr: 509 N. HOUGHTON ST                                                        SEX: Female
      CLARKSBURG MA 01247                                                       PHONE: (413) 663-7336

| Rx # | Ref | Date of Service | Store | N.D.C. | Drug Name | | 1st Cvg | 2nd Cvg | Qty | Patient Cost |
|------|-----|-----------------|-------|--------|-----------|---|---------|---------|-----|--------------|
| 0373754 | 6 | 03/28/2003 | 0313 | 00049-4900-66 ZOLOFT | TAB 50MG | | MBC | | 51 | 15.00 |
| 0373754 | 5 | 03/04/2003 | 0313 | 00049-4900-66 ZOLOFT | TAB 50MG | | MBC | | 51 | 15.00 |
| 0373754 | 4 | 02/05/2003 | 0313 | 00049-4900-66 ZOLOFT | TAB 50MG | | MBC | | 51 | 15.00 |
| 0373754 | 3 | 01/14/2003 | 0313 | 00049-4900-66 ZOLOFT | TAB 50MG | | MBC | | 51 | 15.00 |

Date Written:11/04/2002          Written By:PAYNE, STEPHEN                                60.00

| 0374740 | 1 | 04/07/2003 | 0313 | 00591-0241-10 LORAZEPAM | TAB 1MG | | MBC | | 60 | 10.00 |

Date Written:10/31/2002          Written By:PAYNE, STEPHEN                                10.00

| 0385508 | 1 | 05/14/2003 | 0313 | 00024-5421-31 AMBIEN | TAB 10MG | | MBC | | 6 | 14.69 |
| 0385508 |   | 04/15/2003 | 0313 | 00024-5421-31 AMBIEN | TAB 10MG | | MBC | | 14 | 15.00 |

Date Written:04/15/2003          Written By:PAYNE, STEPHEN                                29.69

| 0385605 |   | 04/16/2003 | 0313 | 00173-0135-55 WELLBUTRIN | TAB 150MG SR | | MBC | | 60 | 15.00 |

Date Written:04/16/2003          Written By:PAYNE, STEPHEN                                15.00

| 0385887 |   | 04/21/2003 | 0313 | 00049-4900-66 ZOLOFT | TAB 50MG | | MBC | | 51 | 15.00 |

Date Written:04/21/2003          Written By:PAYNE, STEPHEN                                15.00

| 0388339 | 3 | 08/05/2003 | 0313 | 00049-4900-66 ZOLOFT | TAB 50MG | | MBC | | 51 | 15.00 |
| 0388339 | 2 | 07/08/2003 | 0313 | 00049-4900-66 ZOLOFT | TAB 50MG | | MBC | | 51 | 15.00 |
| 0388339 | 1 | 06/16/2003 | 0313 | 00049-4900-66 ZOLOFT | TAB 50MG | | MBC | | 51 | 15.00 |
| 0388339 |   | 05/23/2003 | 0313 | 00049-4900-66 ZOLOFT | TAB 50MG | | MBC | | 51 | 15.00 |

Date Written:05/23/2003          Written By:PAYNE, STEPHEN                                60.00

| 0492809 |   | 07/28/2003 | 0313 | 00456-0672-99 AEROBID | AER 250MCG | | MBC | | 7 | 15.00 |

Date Written:07/28/2003          Written By:LANDES, FRED                                  15.00

| 0492810 |   | 07/28/2003 | 0313 | 00069-3060-75 ZITHROMAX | TAB Z-PAK | | MBC | | 6 | 15.00 |

Date Written:07/28/2003          Written By:LANDES, FRED                                  15.00

| 0493485 |   | 08/06/2003 | 0313 | 00591-0241-10 LORAZEPAM | TAB 1MG | | MBC | | 60 | 10.00 |

Date Written:08/06/2003          Written By:PAYNE, STEPHEN                                10.00

```
OBERT HERTZIG, MD.
ICHAEL L. GERRITY, MD.
MY B. GRIFFIN, M.D.
7 HOSPITAL AVE, SUITE 102
ORTH ADAMS, MA 01247-2593
elephone (413) 663-8365
D# 04-2772469
```

                    RECEIPT FOR SERVICES

```
DANIEL BEEBE (14204F)  DOB:11082000  INS:BH   AAY
509 NORTH HOUGHTON STREET  CLARKSBURG, MA 01247              PMS      02/12/04
H:663-7336                                                  ⊘⊘⊘⊘
```

| Date | Code | Detail | Description | Amount | Patient | Insurance |
|------|------|--------|-------------|--------|---------|-----------|
| | | | BALANCE CARRIED FORWARD ----------------------> | | 5.00- | 175.00 |
| 010703 | MLG | | MICHAEL L. GERRITY, MD | | | |
| | BSCK | 42 | BLUE SHIELD CHECK | -92.72 | -5.00 | 82.28 |
| | BSWO | 42 | BLUE SHIELD WRITEOFF | -17.28 | -5.00 | 65.00 |
| | NOTE | | BS 11/20/02 | | | |
| 011603 | BG | | AMY B. GRIFFIN, M.D. | | | |
| | BSCK | 43 | BLUE SHIELD CHECK | -53.76 | -5.00 | 11.24 |
| | BSWO | 43 | BLUE SHIELD WRITEOFF | -11.24 | -5.00 | 0.00 |
| | NOTE | | BS 12/3/02 | | | |
| 012303 | NAO | 3 | NORTH ADAMS OFFICE | | | |
| | RH | | ROBERT HERTZIG, MD. | | | |
| | OM | 382.9 | OTITIS MEDIA | | | |
| | OVLMT | 99213 | OFFICE/OUTPATIENT VISI | 70.00 | -5.00 | 70.00 |
| | LHCT | 85014 | HEMATOCRIT | 6.00 | -5.00 | 76.00 |
| | LLT | 83655 | LEAD TEST | 5.00 | -5.00 | 81.00 |
| | BHCO | 44 | BHP COPAYMENT | 10.00 | 5.00 | 71.00 |
| | CS | 44 | PAYMENT - CASH | -10.00 | -5.00 | 71.00 |
| | BH | -44 | BH Claim 012903 $81 | | | |
| 020703 | NAO | 3 | NORTH ADAMS OFFICE | | | |
| | RH | | ROBERT HERTZIG, MD. | | | |
| | URI | 465.9 | UPPER RESPIRATORY INFE | | | |
| | OVLMT | 99213 | OFFICE/OUTPATIENT VISI | 70.00 | -5.00 | 141.00 |
| | BHCO | 45 | BHP COPAYMENT | 5.00 | 0.00 | 136.00 |
| | BH | -45 | BH Claim 021103 $70 | | | |
| 021303 | | | | | | |
| 020903 | NARHER | 2 | NORTH ADAMS ER | | | |
| | MLG | | MICHAEL L. GERRITY, MD | | | |
| | AST | 49390 | ASTHMA | | | |
| | CRO | 464.4 | CROUP | | | |
| | ERD | 99283 | ER VISIT/LOW | 75.00 | 0.00 | 211.00 |
| | BH | -46 | BH Claim 021403 $75 | | | |
| 021803 | SENTBI | | BILL SENT | | | |
| 030603 | CRR | 38 | REMOVE CREDIT FROM VIS | 5.00 | 5.00 | 211.00 |
| | RH | | ROBERT HERTZIG, MD. | | | |
| | CRA | 45 | APPLY CREDIT TO VISIT | -5.00 | 0.00 | 211.00 |
| | BSCK | 44 | BLUE SHIELD CHECK | -56.43 | 0.00 | 154.57 |
| | BSWO | 44 | BLUE SHIELD WRITEOFF | -14.57 | 0.00 | 140.00 |
| | NOTE | | BS 1/23/03\ SCAN | | | |
| 031003 | NAO | 3 | NORTH ADAMS OFFICE | | | |
| | MLG | | MICHAEL L. GERRITY, MD | | | |
| | PHARYN | 462 | PHARYNGITIS | | | |

| Date | Code | | Description | | | |
|---|---|---|---|---|---|---|
| | OVLMT | 99213 | OFFICE/OUTPATIENT VISI | 70.00 | 0.00 | 210.00 |
| | LRST | 87880 | RAPID STREP TEST | 20.00 | 0.00 | 230.00 |
| | BHCO | 47 | BHP COPAYMENT | 5.00 | 5.00 | 225.00 |
| | BH | -47 | BH Claim 031203 $90 | | | |
| 031403 | NAO | 3 | NORTH ADAMS OFFICE | | | |
| | MLG | | MICHAEL L. GERRITY, MD | | | |
| | CRO | 464.4 | CROUP | | | |
| | OVLMT | 99213 | OFFICE/OUTPATIENT VISI | 70.00 | 5.00 | 295.00 |
| | BHCO | 48 | BHP COPAYMENT | 15.00 | 20.00 | 280.00 |
| | CS | 48 | PAYMENT - CASH | -15.00 | 5.00 | 280.00 |
| | BH | -48 | BH Claim 031903 $70 | | | |
| 032403 | RH | | ROBERT HERTZIG, MD. | | | |
| | BSCK | 45 | BLUE SHIELD CHECK | -48.76 | 5.00 | 231.24 |
| | BSCO | 45 | BLUE SHIELD COPAYMENT | 5.00 | 10.00 | 226.24 |
| | BSWO | 45 | BLUE SHIELD WRITEOFF | -11.24 | 10.00 | 215.00 |
| | NOTE | | B:BXBS CK.2/7/03 | | | |
| 032403 | MLG | | MICHAEL L. GERRITY, MD | | | |
| | BSCK | 46 | BLUE SHIELD CHECK | -65.26 | 10.00 | 149.74 |
| | BSWO | 46 | BLUE SHIELD WRITEOFF | -9.74 | 10.00 | 140.00 |
| | NOTE | | BS 2/9/03 | | | |
| 032503 | SENTBI | | BILL SENT | | | |
| 032803 | NAO | 3 | NORTH ADAMS OFFICE | | | |
| | MLG | | MICHAEL L. GERRITY, MD | | | |
| | AST | 49390 | ASTHMA | | | |
| | SIN | 473.9 | SINUSITIS | | | |
| | OVLMT | 99213 | OFFICE/OUTPATIENT VISI | 70.00 | 10.00 | 210.00 |
| | BHCO | 49 | BHP COPAYMENT | 5.00 | 15.00 | 205.00 |
| | BH | -49 | BH Claim 040203 $70 | | | |
| 041903 | TRANSF | 48 | TRANSFER TO CORRECT | 5.00 | 10.00 | 210.00 |
| 041903 | BHCO | 47 | BHP COPAYMENT | 5.00 | 15.00 | 205.00 |
| 041903 | BHCO | 49 | BHP COPAYMENT | 5.00 | 20.00 | 200.00 |
| 041903 | RH | | ROBERT HERTZIG, MD. | | | |
| | CS | 45 | PAYMENT - CASH | -5.00 | 15.00 | 200.00 |
| | MLG | | MICHAEL L. GERRITY, MD | | | |
| | #CS | 47 | PAYMENT - CASH | -10.00 | 5.00 | 200.00 |
| 041903 | CRR | 48 | REMOVE CREDIT FROM VIS | 5.00 | 10.00 | 200.00 |
| 041903 | CS | 49 | PAYMENT - CASH | -5.00 | 5.00 | 200.00 |
| | CRA | 49 | APPLY CREDIT TO VISIT | -5.00 | 0.00 | 200.00 |
| 041903 | T26 | 47 | Correct CASH PAYMENTS | 10.00 | 10.00 | 200.00 |
| | NOTE | | 041903 CS ERROR | | | |
| | #COURT | 47 | PROFESSIONAL COURTESY | -10.00 | 0.00 | 200.00 |
| | NOTE | | PER DR G | | | |
| 041903 | T67 | 47 | Correct PROFESSIONAL C | 10.00 | 10.00 | 200.00 |
| | NOTE | | 041903 COURTESY ERROR | | | |
| | COURTE | 47 | PROFESSIONAL COURTESY | -5.00 | 5.00 | 200.00 |
| | CS | 47 | PAYMENT - CASH | -5.00 | 0.00 | 200.00 |
| 042203 | BSCK | 47 | BLUE SHIELD CHECK | -61.43 | 0.00 | 138.57 |
| | BSWO | 47 | BLUE SHIELD WRITEOFF | -18.57 | 0.00 | 120.00 |
| | NOTE | | BS 4/19/03 | | | |
| 042503 | BSCK | 48 | BLUE SHIELD CHECK | -48.76 | 0.00 | 71.24 |
| | BSWO | 48 | BLUE SHIELD WRITEOFF | -11.24 | 0.00 | 60.00 |
| | NOTE | | BS 3/14/03 | | | |
| 042603 | NAO | 3 | NORTH ADAMS OFFICE | | | |
| | MLG | | MICHAEL L. GERRITY, MD | | | |
| | CROUP | 464.4 | CROUP | | | |
| | OVINT | 99214 | OFFICE/OUTPATIENT VISI | 90.00 | 0.00 | 150.00 |
| | BHCO | 50 | BHP COPAYMENT | 10.00 | 10.00 | 140.00 |
| | CS | 50 | PAYMENT - CASH | -5.00 | 5.00 | 140.00 |
| | BH | -50 | BH Claim 043003 $90 | | | |
| 042803 | COURTE | 50 | PROFESSIONAL COURTESY | -5.00 | 0.00 | 140.00 |

567 STATE ROAD  NORTH ADAMS, MA  01247  
H:664-7506  

| | Date | Code | Detail | Description | Amount | Patient | Insurance |
|---|---|---|---|---|---|---|---|

       Press:  Detail  Visit  Correct  Repeat    F9 for more  Help  Esc to Stop  
567 STATE ROAD  NORTH ADAMS, MA  01247  
H:664-7506  
█████████████████PMS02/05/03◎◎◎◎  

| | | | BALANCE CARRIED FORWARD ---------------------> | | 0.00 | 413.94 |
|---|---|---|---|---|---|---|---|
| | 010902 | BSCK | 25 | BLUE SHIELD CHECK | -50.00 | 0.00 | 363.94 |
| BS 12/4/01 | | | | | | NOTE | BS |
| | 010902 | CS | 28 | ██████████████ | ███████ | -5.00 | 363.94 |
| PAYMNT FROM MOM | | | | | | NOTE | PA |
| | 010902 | NAO | 3  OF | NORTH ADAMS OFFICE | | | |
| | | MLG | GEJ050 | MICHAEL L. GERRITY, MD | | | |
| | | OM | 382.9 | OTITIS MEDIA | | | |
| | | OVM | 1-9921 | OFFICE/OUTPATIENT VISI | 25.00 | -5.00 | 388.94 |
| | | BHCO | 28 | BHP COPAYMENT | 5.00 | 0.00 | 383.94 |
| | | BH | *28 | BH Claim 011602 $25 | | | |
| | 011502 | BSCK | 23 | BLUE SHIELD CHECK | -104.26 | 0.00 | 279.68 |
| | | BSWO | 23 | BLUE SHIELD WRITEOFF | -12.74 | 0.00 | 266.94 |
| BS 11/17/01 | | | | | | NOTE | BS |
| | 011502 | BSCK | 24 | BLUE SHIELD CHECK | -70.00 | 0.00 | 196.94 |
| BS 11/18/01 | | | | | | NOTE | BS |
| | 013002 | CS | 29 | ██████████████ | ███████ | -5.00 | 196.94 |
| PAYMENT FROM DAD | | | | | | NOTE | PA |
| | | NAO | 3  OF | NORTH ADAMS OFFICE | | | |
| | | MLG | GEJ050 | MICHAEL L. GERRITY, MD | | | |
| | | PHARYN | 462 | PHARYNGITIS | | | |
| | | OVLMT | 1-9921 | OFFICE/OUTPATIENT VISI | 55.00 | -5.00 | 251.94 |
| | | BHCO | 29 | BHP COPAYMENT | 5.00 | 0.00 | 246.94 |
| | | BH | *29 | BH Claim 020102 $55 | | | |
| | 013102 | BSCK | 26 | BLUE SHIELD CHECK | -70.00 | 0.00 | 176.94 |
| BS 12/22/01 | | | | | | NOTE | BS |
| | 020702 | BG | GRJ181 | AMY B. GRIFFIN, M.D. | | | |
| | | BSCK | 27 | BLUE SHIELD CHECK | -50.00 | 0.00 | 126.94 |
| BS 12/27/01 | | | | | | NOTE | BS |
| | 020702 | MLG | GEJ050 | MICHAEL L. GERRITY, MD | | | |
| | | BSCK | 8 | BLUE SHIELD CHECK | -48.17 | 0.00 | 78.77 |
| | | BSWO | 8 | BLUE SHIELD WRITEOFF | -8.77 | 0.00 | 70.00 |
| BS 2/14/01 | | | | | | NOTE | BS |
| | 022002 | BSCK | 28 | BLUE SHIELD CHECK | -17.69 | 0.00 | 52.31 |
| | | BSWO | 28 | BLUE SHIELD WRITEOFF | -2.31 | 0.00 | 50.00 |
| BS 1/9/02 | | | | | | NOTE | BS |
| | 022702 | NAO | 3  OF | NORTH ADAMS OFFICE | | | |
| | | MLG | GEJ050 | MICHAEL L. GERRITY, MD | | | |
| | | PHY | V20.2 | WELL CHILD | | | |
| | | WELL1- | 1-9939 | WELL CHILD AGES 1-4 | 110.00 | 0.00 | 160.00 |
| | | HIBT | | | 12.00 | 0.00 | 172.00 |
| | | MMR | 1-9070 | MEASLES MUMPS RUBELLA | 12.00 | 0.00 | 184.00 |
| | | BHCO | 30 | BHP COPAYMENT | 5.00 | 5.00 | 179.00 |
| | | CS | 30 | ██████████████ | ███████ | 0.00 | 179.00 |
| | | BH | *30 | BH Claim 030102 $134 | | | |
| | 032502 | | | | | | |
| | 032402 | NAO | 3  OF | NORTH ADAMS OFFICE | | | |
| | | MLG | GEJ050 | MICHAEL L. GERRITY, MD | | | |
| | | ADEN | 289.3 | ADENITIS | | | |
| | | OVINT | 1-9921 | OFFICE/OUTPATIENT VISI | 75.00 | 0.00 | 254.00 |
| | | BHCO | 31 | BHP COPAYMENT | 5.00 | 5.00 | 249.00 |

```
        CS      31                                          0.00      249.00
        BH     *31     BH Claim 032602 $75
 032602 BSCK    29     BLUE SHIELD CHECK        -50.00      0.00      199.00
BS 1/30/02                                                          NOTE     BS
 040502 BSCK    30     BLUE SHIELD CHECK       -113.26      0.00       85.74
        BSWO    30     BLUE SHIELD WRITEOFF     -15.74      0.00       70.00
BS 2/27/02                                                          NOTE     BS
 041502 NAO     3  OF  NORTH ADAMS OFFICE
        RH      HEI190 ROBERT HERTZIG, MD.
        NCD     7813   ATAXIA
        OVINT   1-9921 OFFICE/OUTPATIENT VISI     90.00     0.00      160.00
        BH     *32     BH Claim 041702 $90
 041502 CS      32                                         -5.00      160.00
        BHCO    32     BHP COPAYMENT              5.00      0.00      155.00
 042602 NAO     3  OF  NORTH ADAMS OFFICE
        MLG     GEJ050 MICHAEL L. GERRITY, MD
        NCD     7813   ATAXIA
        OVB     1-9921 OFFICE/OUTPATIENT VISI     50.00     0.00      205.00
        BHCO    33     BHP COPAYMENT              5.00      5.00      200.00
        CS      33                                          0.00      200.00
        BH     *33     BH Claim 050102 $50
 050202 BSCK    31     BLUE SHIELD CHECK        -70.00      0.00      130.00
BS 3/24/02                                                          NOTE     BS
 052202 RH      HEI190 ROBERT HERTZIG, MD.
        BSCK    32     BLUE SHIELD CHECK        -82.01      0.00       47.99
        BSWO    32     BLUE SHIELD WRITEOFF      -2.99      0.00       45.00
BS 4/15/02                                                          NOTE     BS
 052902 NAO     3  OF  NORTH ADAMS OFFICE
        MLG     GEJ050 MICHAEL L. GERRITY, MD
        PHY     V20.2  WELL CHILD
        WELL1-  1-9939 WELL CHILD AGES 1-4      115.00      0.00      160.00
        DTAP    1-9070 DTaP INJECTION            12.00      0.00      172.00
        IPV     1-9071 INJECTABLE POLIO VACCI    12.00      0.00      184.00
        BHCO    34     BHP COPAYMENT              5.00      5.00      179.00
        CS      34                                          0.00      179.00
        MLG     GEJ050 MICHAEL L. GERRITY, MD
        BH     *34     BH Claim 060302 $139
 061202 BSCK    33     BLUE SHIELD CHECK        -35.02      0.00      143.98
        BSWO    33     BLUE SHIELD WRITEOFF      -9.98      0.00      134.00
BS 4/26/02                                                          NOTE     BS
 061302
 061202 NAO     3  OF  NORTH ADAMS OFFICE
        MLG     GEJ050 MICHAEL L. GERRITY, MD
        TEET    5289   TEETHING
        OVLMT   1-9921 OFFICE/OUTPATIENT VISI     70.00     0.00      204.00
        BHCO    35     BHP COPAYMENT              5.00      5.00      199.00
        CS      35                                          0.00      199.00
        BH     *35     BH Claim 061702 $70
 070502 NAO     3  OF  NORTH ADAMS OFFICE
        MLG     GEJ050 MICHAEL L. GERRITY, MD
        PHARYN  462    PHARYNGITIS
        OVLMT   1-9921 OFFICE/OUTPATIENT VISI     70.00     0.00      269.00
        LRST    5-8788 RAPID STREP TEST          20.00      0.00      289.00
        BHCO    36     BHP COPAYMENT              5.00      5.00      284.00
        CS      36                                          0.00      284.00
        BH     *36     BH Claim 071002 $90
 072202 BSCK    35     BLUE SHIELD CHECK        -50.91      0.00      233.09
        BSWO    35     BLUE SHIELD WRITEOFF     -14.09      0.00      219.00
BS 6/12/02                                                          NOTE     B:
V:34 Claim Resubmitted to  BH Insurance 072502        072502 NOTE     V
```

```
ROBERT HERTZIG, MD.
MICHAEL L. GERRITY, MD.
AMY B. GRIFFIN, M.D.
77 HOSPITAL AVE, SUITE 102
NORTH ADAMS, MA 01247-2593
Telephone (413) 663-8365
ID# 04-2772469
```

                    RECEIPT FOR SERVICES

```
DAVID BEEBE (14907Fr)  DOB:05071999  INS:BH    AAY
567 STATE ROAD  NORTH ADAMS, MA   01247                    PMS      02/05/03
H:664-7506                                                 ⊚⊚⊚⊚
```

| Date | Code | Detail | Description | Amount | Patient | Insurance |
|------|------|--------|-------------|--------|---------|-----------|
| | | BALANCE CARRIED FORWARD ----------------------> | | | 0.00 | 0.00 |
| 040502 | CS | 8 | ▆▆▆▆▆▆▆ | ▆▆▆▆ | -5.00 | 0.00 |
| 040502 | NAO | 3 OF | NORTH ADAMS OFFICE | | | |
| | MLG | GEJ050 | MICHAEL L. GERRITY, MD | | | |
| | VAR | V05.4 | VARICELLA VACCINATION | | | |
| | IMMAD1 | 1-9047 | IMMUNIZATION ADMIN.1DO | 20.00 | -5.00 | 20.00 |
| | VARIVA | 1-9071 | VARIVAX INJECTION | 12.00 | -5.00 | 32.00 |
| | BHCO | 8 | BHP COPAYMENT | 5.00 | 0.00 | 27.00 |
| | BH | *8 | BH Claim 041002 $32 | | | |

```
    You are responsible for this balance ---->        0.00
    We have asked your insurance carrier
          to send this balance directly to us ------------>            0.00
```

# EXHIBIT C

1

```
 1            UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3                 WESTERN DIVISION
 4
 5 * * * * * * * * * * * * * * * *
 6 MICHELLE BEEBE,                  *
 7            Plaintiff             *
 8 v.                               *
 9 WILLIAMS COLLEGE,                *
10           Defendant             *
11 * * * * * * * * * * * * * * * *
12
13
14          DEPOSITION OF:  DR. CRAIG MOORE
15            Heisler, Fledman & McCormick
16                 1145 Main Street
17          Springfield, Massachusetts
18            June 19, 2007    10.01 a.m.
19
20
21
22
23            Jessica M. DeSantis
24               Court Reporter
```

2

```
 1 APPEARANCES:
 2
 3 Representing the Plaintiff:
 4     HEISLER, FELDMAN, MCCORMICK & GARROW
 5     1145 Main Street, Suite 508
 6     Springfield,  MA 01103
 7     BY THOMAS J. MCCORMICK, ESQ.
 8     413.788.7988  Fax:  413.788.7996.
 9
10 Representing the Defendant:
11     EDWARDS, ANGELL, PALMER & DODGE
12     111 Huntington Avenue
13      oston,  MA  02199
```

8    Q.    Have you done any study of that?
Case 3:05-cv-30182-MAP    Document 44-4    Filed 07/02/2007    Page 3 of 4
9    A.    No.

10    Q.    So you have no knowledge one way or

11 the other whether institutions, like, Williams

12 College are out-sourcing more and more of their

13 custodial services?

14    A.    I spent 30 years in academics and

15 most of that was in administration.  And I could

16 not name for you a single college I know of where

17 they have out-sourced their custodial services.

18    Q.    Are you familiar with an institution

19 called Harvard university?

20    A.    Yes.

21    Q.    Do you know whether they have

22 out-sourced --

23    A.    I do not know.  I don't know of any

24 that have.  Maybe some have, but it's not the


63


1 general rule of them.

2    Q.    Okay.  Now, you also testified that

3 she was forced to incur -- and I'm looking at the

4 first page of your report.  Incur substantial

5 debt to survive financialy.

6         Do you know what the -- what the

7 specific cause of the debt was?

8    A.    I remember that they borrowed

9 money.

10    Q.    Do you know when they borrowed

11 money?

12    A.    I don't know if I remember the

13 details sitting here.  I remember we discussed it

14 and they told me.  But they said that they had a

15 home equity loan that was $45,000.  And I asked

16 whether or not that was a second mortgage.  They

17 refinanced that again later.  They took on large

18 credit card balances and paid a lot of interest

19 on them.

20         And that this hurt their credit

21 rating eventually.  They had to sell a car to

22 raise money for $4,000.

23    Q.    Mm-hmm.

64

1 that they told me that had been a financial

2 problem.

3       Q.     Okay.  But did you know that

4 whether, prior to Ms. Beebe losing her job at

5 Williams, they were debt free?

6       A.     I do not know if they were debt

7 free.  And I did not include any of those losses

8 in my estimates or damages.

9       Q.     All right.  So Then why is it in

10 your report if it's not an element of their

11 damages?

12      A.     Because it is, like some other

13 elements of damages, something that rather than

14 make an accounting type of estimate of it, I

15 would rather leave that to the direct testimony

16 of them if this case goes to court because it is

17 what it is.  I can't say anything more about it

18 than it is.  You don't need an economist to tell

19 you what those facts are.  they're financial

20 facts.

21      Q.     Okay.

22             THE WITNESS:  Can we take a short

23      break?

24             MS. MALONE:  Absoulutely.

65

1             (Break taken)

2

3             MS. MALONE:  Back on the record.

4      Q.     (By Ms. Malone)  Dr. Moore, I think

5 when we took our break we were talking about the

6 debt that the Beebe's incurred as a result of Ms.

7 Beebe's termination.

8             And you said you didn't include any

9 of those costs in your report; is that correct?