UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE BEEBE,

                Plaintiff,

    v.

WILLIAMS COLLEGE,

                Defendant.

Civil Action No.  05-30182

## DEFENDANT'S MOTION IN LIMINE NO. 4 TO PRECLUDE ANY EVIDENCE OR TESTIMONY FROM PLAINTIFF'S ECONOMIC EXPERT ON THE ISSUE OF POTENTIAL HOURS WORKED

Defendant Williams College (the "College") hereby moves the Court for an order precluding Plaintiff Michelle Beebe ("Plaintiff") from presenting any evidence or argument from her economic expert, Craig L. Moore, Ph.D., concerning the issue of potential hours worked. Even if Dr. Moore could accurately explain the concept and reliably apply it, which, thus far, he has not shown he can, he is precluded by virtue of the business judgment rule from opining on the reasonableness of the College's decision to terminate Plaintiff for excessive absenteeism. Alternatively, this evidence should not be the subject of opinion testimony as it is not the product of reliable principles and methods, and further, Dr. Moore has not applied the principles and methods reliably to the facts of the case.

### Factual Background and Summary of Argument

In this case, Plaintiff argues that the College violated the Family and Medical Leave Act, 29 U.S.C. 2601 et seq. ("FMLA") when it disciplined her and ultimately terminated her for excessive absenteeism.  Plaintiff retained an economic expert, Craig L. Moore, Ph.D., who prepared a report setting forth Plaintiff's claim for damages.  In this report, he included a chart

entitled, "Hours Worked as a Custodian." Report of Craig L. Moore, Ph.D., at 3 (Mar. 30, 2007) (attached as <u>Exhibit A</u>) ("Moore Report"). The chart contained a column labeled "Potential" and percentages purportedly representing percentages of "Potential." *Id*. Immediately following the chart, he then opined that, "[i]t is interesting to note that Michelle Beebe worked 93.3% of the potential hours after being made a Custodian in 2001. In 2002 she worked over 86% of potential hours and in the first half of 2003 prior to being terminated, she worked over 75% of the potential hours on the job." *Id*. at 4. In correspondence he shared with Plaintiff's counsel, Dr. Moore stated that the analysis "doesn't really fit into the damages portion of the case," but rather, served to "call[] into question the basis of Williams' decision to terminate [Plaintiff]." Memo from Craig Moore to Thomas McCormick, Plaintiff's counsel, at 2 ("Moore Memo") (attached as <u>Exhibit B</u>).

These related excerpts of his report and any testimony by Dr. Moore on the issue of potential hours worked should be excluded because Dr. Moore may not substitute his judgment for that of the College in determining whether the number of absences were sufficiently excessive to warrant termination. Alternatively, Dr. Moore should not be able to opine on this issue where he failed to both use reliable principles and methods and apply them reliably to the facts of the case.

## ARGUMENT

### I.    EVIDENCE OR TESTIMONY ON THE ISSUE OF POTENTIAL HOURS MUST BE EXCLUDED PURSUANT TO THE BUSINESS JUDGMENT RULE.

Federal Rule of Evidence 702 does not allow opinion testimony from an expert on whether the College's decision to terminate Plaintiff for excessive absenteeism was reasonable. Specifically, Rule 702 provides that an expert may testify in the form of an opinion "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the

evidence or to determine a fact in issue." Pursuant to the "business judgment rule," employers are entitled to make employment decisions for a good reason, for a bad reason, or for no reason at all, so long as the decision is not unlawful. *Webber v. Int'l Paper Co.,* 417 F.3d 229, 238 (1st Cir. 2005); *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004); *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Courts and juries "may not sit as super personnel departments assessing the merits--or even the rationality--of employers' nondiscriminatory business decisions." *Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 537 (1st Cir. 1996) (quoting *Mesnick*, 950 F.2d at 825). Since the jury may not substitute its own collective judgment as to whether it was reasonable for the College to terminate Plaintiff based on the number of her absences, Dr. Moore may not either. His testimony on this point and related portions of his report, therefore, would not assist the jury in understanding the evidence or determining a fact in issue.

Here, the College terminated Plaintiff's employment for excessive absenteeism. Dr. Moore included in his report an analysis that "doesn't really fit into the damages portion of the case" and was really just intended to challenge the College's reason for terminating Plaintiff. Moore Memo, at 1-2. He claims that by his calculations, "I think it is hard to characterize this attendance record as excessively absent." *Id.*, at 1. Whether Dr. Moore viewed the number of Plaintiff's absences as excessive is irrelevant. Just as a jury may not second-guess the College's decision or substitute its own judgment for that of the College, Dr. Moore may not opine as to whether the College acted reasonably in terminating Plaintiff for excessive absenteeism. *See id.* at 2.

Furthermore, as evidenced by the Joint Pretrial Memorandum, both Plaintiff and the College intend to introduce as evidence at trial Plaintiff's attendance records. (Docket Entry No.

34, at pp. 20, 22).  Both parties also intend to elicit testimony from employees of the College

who counseled Plaintiff on her record of absenteeism and ultimately participated in the decision

to terminate her.  *Id.* at pp. 19-20.  Based on this evidence, the jury will be able to decide

whether the decision was pretextual.

## II.     EVIDENCE OR TESTIMONY ON THE ISSUE OF POTENTIAL HOURS WORKED MUST BE EXCLUDED AS UNRELIABLE.

Aside from the business judgment rule as grounds for excluding Dr. Moore's opinion

testimony, Federal Rule of Evidence 702 only allows expert testimony in the form of opinion "if

(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the principles and methods reliably to the

facts of the case."   The Court must determine whether all proffered expert testimony is

sufficiently reliable to be admitted.  *U.S. v. Monteiro*, 407 F. Supp. 2d 351, 356 (D. Mass. 2006).

The Court must determine whether "the reasoning or methodology underlying the testimony is

scientifically valid and of whether that reasoning or methodology properly can be applied to the

facts in issue." *Id.* at 357; *Daubert v. Merrell Dow,* 509 U.S. 579, 592-93 (1993); *Gen. Elec. Co.*

*v. Joiner,* 522 U.S. 136, 142 (1997).  This determination should be informed by the factors listed

in *Daubert,* namely: "(1) whether the theory or technique can be and has been tested; (2) whether

the technique has been subject to peer review and publication; (3) the technique's known or

potential rate of error; (4) the existence of standards controlling the technique's operation; and (5)

the level of the theory's or technique's acceptance within the relevant discipline."  509 U.S. at

593-94.  "In deciding whether a step in an expert's analysis is unreliable, the district court should

undertake a rigorous examination of the facts on which the expert relies, the method by which

the expert draws an opinion from those facts, and how the expert applies the facts and methods to

the case at hand." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002); *Monteiro*, 407 F.

Supp. 2d at 358 (quoting same).

Here, Dr. Moore did not employ reliable principles and methods, nor did he reliably apply them to the facts in this case. Dr. Moore's report included a chart entitled, "Hours Worked as a Custodian," and which contained a column labeled "Potential" and percentages purportedly representing percentages of "potential." Moore Report, at 3. At his deposition, Moore explained that this term "Potential" "is just something I made up." Deposition of Craig L. Moore, Ph.D., at 90:17-19 (June 19, 2007) ("Moore Dep.") (excerpts attached as <u>Exhibit C</u>); *see also id.* at 91:20-21 ("And again, this idea of potential is my own concept."). He did not indicate whether this concept of his has been tested or subject to peer review, or whether it has been accepted by any other economists.

This novel concept of potential hours apparently refers to the potential number of work hours in a particular pay period. That "Potential" number for a two-week pay period would not necessarily be 80 hours. Rather, Dr. Moore defined "Potential" as,

> a calculation that I made that looks at those actual dates and determines, were there holidays, were there, you know, what were the actual dates that were inclusive, how many work days were in them. And then takes the number of hours per day and says, here is the number of potential hours that during that time period that if you were at work, all the time that was required, that would be the potential number of hours you would work.

*Id*. at 77:18-78:4. He further explained,

> You're home and you're sick. You can't work you. You just lost a day's potential. All right. So instead of being able to work 40 hours that week, you can only work 32. Now that's your potential for that week because you're just not available, you're sick.

*Id*. at 91:9-14. As additional explanation he stated,

> part of my compensation package is the right to be compensated or uncompensated in certain cases, in certain situations where I can't work because of illness, because I'm entitled to vacation, because

> I'm entitled to personal days off, because I have a sick family
> member whatever it is.  Whatever those are, that I'm entitled to as
> part of my compensation package are netted out.  They're no
> longer part of my potential because I can't do them for those
> reasons, whatever they are.

*Id*. at 91:23-92:10.

With that explanation as background, during the deposition, counsel for the College asked Dr. Moore to apply his explanation of "Potential" to a particular pay period.  For example, for the pay period from June 17, 2001 until June 30, 2001, Dr. Moore's chart indicates that the Potential hours are 72.  Moore Report, at 3.  During that pay period his chart shows that Plaintiff worked 64 regular hours and 4 overtime hours, while taking 8 hours of vacation and 8 hours of sick leave.  *Id*.  He could not explain how he arrived at a potential number of 72 hours for that pay period.  Moore Dep., at 88:24-89:22.  He admitted that "[n]ow this potential number may not be calculated in the precise way that it should be."  *Id*. at 92:20-22.  He could not support his conclusion that Plaintiff worked 93.3% of the potential hours after being made a custodian in 2001 since he could not figure out his own calculations for potential hours.  *Id*. at 90:1-15.

The potential number, even if he could correctly calculate it, would be largely irrelevant anyway to any understanding of Plaintiff's record of absenteeism.  The potential does not account for whether the reason is good, bad or indifferent; "they are what they are."  *Id*. at 92:11-13.  Thus, a vacation day scheduled months in advance would be treated the same as an absence where the employee called in sick and was later seen the same day playing in a soccer tournament.

### Conclusion

For the foregoing reasons, the College requests that the Court grant this Motion *In Limine* and preclude Plaintiff from presenting any evidence or argument from her economic expert

concerning the issue of potential hours worked.

Respectfully submitted,
Williams College
By its attorneys,


*/s/  Patricia M. Mullen*

Judith A. Malone (BBO #316260)
Patricia M. Mullen (BBO # 663318)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199-7613
617.239.0100
jmalone@eapdlaw.com
pmullen@eapdlaw.com

Dated: July 2, 2007


CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/  Patricia M. Mullen*

# EXHIBIT A

65B Hatfield St.
Northampton MA 01060
Tel: 413-587-9405
Fax: 413-587-9581
craiglmoore@hotmail.com

**CRAIG L. MOORE**
*ECONOMIC CONSULTING*

# *Economic Report*

| | |
|---|---|
| *To:* | **Thomas J. McCormick, Esq.** |
| *From:* | **Craig L. Moore, Ph.D.** |
| *Date:* | **March 15, 2007** |
| *Re:* | ***Michelle Beebe v. Williams College*** |

## Background

It is my understanding that Michelle Beebe was terminated from her job as a custodian at Williams College (Williams) on August 4, 2003 after approximately 15 years of service. She claims, in summary, that she was wrongfully terminated by Williams when absences were not credited under FMLA. Mrs. Beebe has stated that she missed work to care for her children who suffered from serious medical conditions and when she was seriously ill during the month just prior to being fired. Further, she claims that Williams terminated her for having excessive absences after failing to comply with its own stated policies regarding medical leave and thereby breached its employment contract with Mrs. Beebe.

Michelle Beebe was born on December 19, 1964. She lives with her husband, David Beebe, and their two sons, David Jr. (DOB 5/99), and Daniel (DOB 11/00) in Clarksburg, Massachusetts. She also has a son, Nicholas (DOB 12/86), by a prior marriage who now lives with his father.

The focus of my analysis is to estimate the economic damages arising from her termination by Williams. The facts relied upon in this analysis will be stated and all computations of estimated damages will be shown in tables included in this report.

## The Basis for Economic Damages

Economic damages are based on the concept of *opportunity cost*. If, as a result of an illegal act, a person is deprived of the opportunity to earn a living, enjoy life, or anything else that would have been possible prior to that act, the resulting damages are equal to the cost of restoring the injured person's opportunity or providing what would have reasonably been the fruits of exercising it. In this case, Michelle Beebe lost the opportunity to earn a living and to pursue her occupation in the most advantageous manner. She was forced to incur substantial debt to survive financially. She was forced to withdraw funds from her retirement account and has lost substantial employee benefits including tuition for her oldest son. The Beebe household has suffered and will continue to suffer financial losses for many years as a result of her termination by Williams.

Economic damages can be reasonably estimated and evaluated using methods that are regularly employed in economics and recognized by the courts. Damages should be equal to what a person would reasonably demand for giving up the opportunities they had prior to the illegal act. The general method used to evaluate such damages is to determine the present value of reasonably anticipated future cash flows that could have accrued to the injured party less any mitigating income earned. Making such an assessment of opportunity costs begins with an understanding of the background and situation that the plaintiff enjoyed prior to the alleged illegal termination by Williams.

## Education, Work History and Earnings

Michelle Beebe attended Mount Greylock Regional High School through the 10th grade. She did not complete high school. She left school to take care of her mother who was ill and took employment in a fast food restaurant and then a pizza parlor. She worked for Excelsior Printing as an inspector for approximately 2 years. She then worked as a cashier at a Cumberland Farms store for about 1 year before taking a job at Williams in 1988. During her first 13 years at Williams, Mrs. Beebe was a food service worker and earned between $11 and $12 per hour. In April of 2001, she became a Custodian in the Buildings and Grounds Department at Williams and received a substantial raise.

At the time of her termination, Mrs. Beebe's duties included "dusting and polishing furniture, washing walls, washing windows, cleaning bathrooms, using an automatic floor machine, mopping floors, vacuuming, using a rotary machine, removing trash and recycling materials, moving furniture and boxes, reporting damages and work orders, scrubbing showers, using carpet extractor, shoveling snow, making beds, policing the grounds, changing light bulbs, and making minor equipment repairs." While her regular pay of $15.13 per hour was based on a 40 hour work week, she was often required to work overtime on weekends when there were alumni events, graduation ceremonies, conferences, at the end and start of each semester when students were moving in and out of campus housing and when it snowed. For this extra work she received time and a half and, at times, was given time off as compensation.

Following her termination, she searched for alternative employment. She reports contacting a number of companies for jobs as a cashier and as a CNA at a nursing home. At present, she remains unemployed and blames, in part, Williams for telling perspective employers that she was terminated for excessive absenteeism when she believes that her absences were for good cause and covered under FMLA. She is about to have surgery that will make it impossible for her to work until early summer. She intends to continue her job search at that time. She has also earned a small amount of money selling produce.

I have reviewed Williams' employment records for Michelle Beebe that indicates her hours of regular work, overtime, vacations, sick time, STD, unpaid leave, holidays, and personal leave. I have also calculated the potential regular hours in each pay period in each year. The annual totals at the bottom of each year show the percent of time that falls into each category. These figures are shown in Table 1 below:

2

Hours Worked as a Custodian
Table 1.

| 2001 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/22 to 5/5 | 13.64 | 77.00 | 3.00 | 3.00 | | | | | | 77.00 |
| 5/6 to 5/19 | 13.64 | 48.00 | | 17.50 | 14.50 | | | | | 62.50 |
| 5/20 to 6/2 | 13.64 | 72.00 | 20.00 | | | | | 8.00 | | 72.00 |
| 6/3 to 6/16 | 13.64 | 72.00 | 6.00 | 8.00 | | | | | | 72.00 |
| 6/17 to 6/30 | 13.64 | 64.00 | 4.00 | 8.00 | 8.00 | | | | | 72.00 |
| 7/1 to 7/14 | 14.19 | 61.50 | 7.00 | | 10.50 | | | 8.00 | | 61.50 |
| 7/15 to 7/28 | 14.19 | 56.00 | | 16.00 | 8.00 | | | | | 64.00 |
| 7/29 to 8/11 | 14.19 | 64.00 | 3.00 | 16.00 | | | | | | 64.00 |
| 8/12 to 8/25 | 14.19 | 72.00 | 7.50 | | | | | | | 80.00 |
| 8/26 to 9/8 | 14.19 | 72.00 | | | | | | 8.00 | | 72.00 |
| 9/9 to 9/22 | 14.19 | 72.00 | | | 8.00 | | | | | 80.00 |
| 9/23 to 10/6 | 14.19 | 72.00 | | 8.00 | | | | | | 72.00 |
| 10/7 to 10/20 | 14.19 | 53.00 | | 3.00 | | | | 8.00 | 16.00 | 69.00 |
| 10/21 to 11/3 | 14.19 | 73.00 | | 7.00 | | | | | | 73.00 |
| 11/4 to 11/17 | 14.19 | 72.00 | | | 8.00 | | | | | 80.00 |
| 11/18 to 12/1 | 14.19 | 52.00 | | 12.00 | | | | 16.00 | | 52.00 |
| 12/2 to 12/15 | 14.19 | 61.50 | 2.00 | 10.50 | 8.00 | | | | | 69.50 |
| 12/16 to 12/29 | 14.19 | 43.00 | | 16.00 | 5.00 | | | 16.00 | | 48.00 |
| Totals | | 1,157.00 | 52.50 | 135.50 | 59.50 | - | - | 64.00 | 16.00 | 1,240.50 |
| % of Potential | | 93.3% | 4.2% | | 4.8% | | | | | 1.3% |

| 2002 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/30 to 1/12 | 14.19 | 56.00 | 2.00 | 8.00 | | | | 16.00 | | 56.00 |
| 1/13 to 1/26 | 14.19 | 59.50 | 2.00 | 9.50 | 11.00 | | | | | 70.50 |
| 1/27 to 2/9 | 14.19 | 59.00 | 2.00 | 13.00 | 8.00 | | | | | 67.00 |
| 2/10 to 2/23 | 14.19 | 24.00 | | 41.00 | | | 7.00 | 8.00 | | 31.00 |
| 2/24 to 3/9 | 14.19 | 22.00 | | | | 20.75 | 37.25 | | | 80.00 |
| 3/10 to 3/23 | 14.19 | 60.00 | | | 5.25 | 6.75 | 8.00 | | | 80.00 |
| 3/24 to 4/6 | 14.19 | 78.50 | | | 1.50 | | | | | 80.00 |
| 4/7 to 4/20 | 14.19 | 35.00 | | | 9.25 | | 35.75 | | | 80.00 |
| 4/21 to 5/4 | 14.19 | 66.00 | | | 5.00 | | 9.00 | | | 80.00 |
| 5/5 to 5/18 | 14.19 | 58.50 | | | 3.00 | | 18.50 | | | 80.00 |
| 5/19 to 6/1 | 14.19 | 72.00 | 22.00 | | | | | 8.00 | | 72.00 |
| 6/2 to 6/15 | 14.19 | 72.00 | 9.50 | | | | 8.00 | | | 80.00 |
| 6/16 to 6/29 | 14.19 | 71.50 | | | 8.00 | | 0.50 | | | 80.00 |
| 7/1 to 7/13 | 14.69 | 67.00 | 2.50 | | | | 5.00 | 8.00 | | 72.00 |
| 7/14 to 7/27 | 14.69 | 80.00 | | | | | | | | 80.00 |
| 7/28 to 8/10 | 14.69 | 72.00 | | | 8.00 | | | | | 80.00 |
| 8/11 to 8/24 | 14.69 | 80.00 | 7.00 | | | | | | | 80.00 |
| 8/25 to 9/7 | 14.69 | 67.50 | | | 4.50 | | | 8.00 | | 72.00 |
| 9/8 to 9/21 | 14.69 | 76.00 | | | 4.00 | | | | | 80.00 |
| 9/22 to 10/5 | 14.69 | 80.00 | 5.25 | | | | | | | 80.00 |
| 10/6 to 10/19 | 14.69 | 51.50 | 2.00 | 8.00 | 12.50 | | | 8.00 | | 64.00 |
| 10/20 to 11/2 | 14.69 | 73.50 | 2.00 | 3.00 | 2.50 | | | | 1.00 | 77.00 |
| 11/3 to 11/16 | 14.69 | 51.50 | 1.00 | 24.00 | | | | | 4.50 | 56.00 |
| 11/17 to 11/30 | 14.69 | 56.00 | | | 3.00 | | | 16.00 | 5.00 | 64.00 |
| 12/1 to 12/14 | 14.69 | 57.00 | 1.50 | 19.00 | | | | | 4.00 | 61.00 |
| 12/15 to 12/28 | 14.69 | 37.00 | | 27.00 | | | | 16.00 | | 37.00 |
| Totals | | 1,583.00 | 58.75 | 152.50 | 85.50 | 27.50 | 129.00 | 88.00 | 14.50 | 1,839.50 |
| % of Potential | | 86.1% | 3.2% | | 4.6% | 1.5% | 7.0% | | 0.8% |

| 2003 | Rate | Regular | Overtime | Vac | Sick | STD | Unpaid | Holiday | Per. Leave | Potential |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/29 to 1/11 | 14.69 | 36.00 | | 16.00 | 20.00 | | | 8.00 | | 56.00 |
| 1/12 to 1/25 | 14.69 | 56.00 | | 23.00 | 1.00 | | | | | 57.00 |
| 1/26 to 2/8 | 14.69 | 70.50 | | | 8.00 | | | | 1.50 | 80.00 |
| 2/9 to 2/22 | 14.69 | 56.00 | | | 0.50 | | 15.50 | 8.00 | | 72.00 |
| 2/23 to 3/8 | 14.69 | 72.00 | 1.00 | | | | 8.00 | | | 80.00 |
| 3/9 to 3/22 | 14.69 | 40.00 | | | | | 32.00 | | | 80.00 |
| 3/23 to 4/5 | 14.69 | 78.50 | | | 1.50 | | | | | 80.00 |
| 4/6 to 4/19 | 14.69 | 78.50 | | | 1.50 | | | | | 80.00 |
| 4/20 to 5/3 | 14.69 | 32.00 | | | 14.50 | | 33.50 | | | 80.00 |
| 5/4 to 5/17 | 14.69 | 76.00 | | | | | 4.00 | | | 80.00 |
| 5/18 to 5/31 | 14.69 | 62.50 | 8.00 | | | | 9.50 | 8.00 | | 72.00 |
| 6/1 to 6/14 | 14.69 | 72.00 | 10.00 | | 8.00 | | | | | 80.00 |
| 6/15 to 6/28 | 14.69 | 51.00 | | | | | 29.00 | | | 80.00 |
| 6/29 to 7/12 | 15.13 | 64.00 | | | | | 8.00 | 8.00 | | 72.00 |
| 7/13 to 7/26 | 15.13 | 69.00 | | | | | 32.00 | | | 80.00 |
| 7/27 to 8/9 | 15.13 | 1.00 | | | | | 32.00 | | | 80.00 |
| Totals | | 915.00 | 19.00 | 39.00 | 53.50 | - | 176.00 | 32.00 | 1.50 | 1,399.00 |
| % of Potential | | 75.7% | 1.6% | | 4.4% | 0.0% | 14.6% | | 0.1% |

3

It is interesting to note that Michelle Beebe worked 93.3% of the potential hours after being made a Custodian in 2001. In 2002 she worked over 86% of potential hours and in the first half of 2003 prior to being terminated, she worked over 75% of the potential hours on the job. It is also interesting to observe that the majority of the time she took off, over and above vacation and sick time to which she was entitled, was unpaid leave and cost Williams nothing. The most important information, however, shows her hourly wages and is the basis for establishing her earnings capacity on this job. Income tax records, including W-2 forms, verify the earnings that are reflected in Table 1 above.

**Employee Benefits**

In addition to wages, Michelle Beebe's earnings capacity also includes employee benefits that were part of her compensation package. The scope and cost of employee benefits have been increasing steadily as many employees would rather receive these benefits than an increase in wages because they represent non-taxable income. Social Security taxes, state and federal unemployment taxes, Medicare contributions, and Workers Compensation premiums are often cited as employee benefits. They are not. The payments going to support these programs are taxes and the amount paid in does not directly affect the benefits received by the employee.

As an employee of Williams, Michelle Beebe received a variety of benefits paid by her employer. These included 3 weeks of paid vacation, 10 paid holidays, 1 day per month of sick leave, and 16 hours of paid personal leave. She was provided with Blue Cross Blue Shield HMO Blue and dental insurance through Delta Dental that Williams contributed $591.64 and $66.08 respectively. She also received contributions from her employer of $7 monthly for life insurance, $8.40 monthly for long term disability and $9.10 monthly for supplemental long term disability insurance. Williams also made biweekly matching contributions of $69.90 and $34.95 to the TIAA-CREF retirement plan.

David Beebe worked for Williams at the time Michelle was terminated and still does. At that time, the family was receiving health and dental coverage based on Michelle's employment. Following her termination, these benefits were transferred over to David and the family continued to have this coverage. What Michelle lost was the contributions to her retirement plan. The Beebe family also lost the added protection they had when both of them worked there. If anything happens to David at this point and he was unable to work, all the family benefits will be lost.

The other important benefit that was lost was college tuition. In October of 2003 Michelle would have become eligible for an annual tuition benefit for her son Nicholas who was planning on going to college. That benefit was worth $13,946 per year. While that benefit may still be available for David Jr. and Daniel because their father still works for Williams, it does not cover Nicholas as he is not David's son. As a result, he has not been able to afford to go to college and has had to go to work since graduating from high school. The tuition benefits, along with the lost retirement contributions are the primary benefits that Mrs. Beebe and her family lost. And, Michelle Beebe's retirement income will now be much lower in her later years.

4

**Work-life Estimates**

An important element in the analysis is the determination of the normal work-life expectancy of Ms. Beebe. The estimate that was often used in the past came from the *Worklife Estimates* published by the United States Department of Labor, Bureau of Labor Statistics, February 1986, Bulletin 2254. These tables provide the number of active and inactive years of work-life a person has given their age, sex, race, education and work-life status.

The accuracy of using these work-life estimates has been criticized in recent years as understating the work-life associated with most people and women in particular. The changing economic demands, lifestyles, participation rates of women and people of various age groups clearly make it inappropriate to use the average work histories of people over the past thirty years to predict what a person is likely to do in the future. The government has, in fact, suspended the publication of these tables and does not plan to provide them past the 1986 estimates. Subsequent published estimates all suffer from the same problems that the earlier government tables did because they are based on historical patterns that no longer apply. There have been more recent estimates presented in the *Journal of Legal Economics* in 1995 using a Markov chain approach, for example, but these are also open to the same criticisms. The most recent studies show that people are tending to retire later rather than earlier.

One could argue that any of several ages might be most appropriate for the work-life a particular individual based on their personal characteristics. It is reasonable to assume that most people have the capacity to work until age 65 and have a financial incentive to work to age 67 under the rules concerning Social Security retirement benefits. Recent published studies indicate that the majority of Americans plan on working beyond the age of 65 to insure their financial security.

In this particular case, there are a number of factors that make it reasonable to assume that Michelle Beebe would have continued to work at Williams until retirement had she not been fired. First, she had 15 years of seniority. Second, there is virtually no chance that Williams will either go out of business or experience falling sales making it necessary to lay off employees. Williams is a non-profit institution that has consistently ranked as one of the very top liberal arts colleges in America. Third, Williams is one of the largest and best paying employers in the region. Fourth, David Beebe works at Williams and this provided security and convenience. Finally, and most important, Mrs. Beebe has told me that it was her intention to continue to work at Williams until she retired. This opportunity has been taken away and her alternative employment opportunities in the area are clearly less desirable in terms of security, pay and benefits. Had she been terminated by a company that was vulnerable to ever changing technology, foreign competition, and other market factors, one might think it unreasonable to estimate lost earnings for so many years into the future. But given the very great likelihood of Williams remaining in business and offering the best alternative employment in the area, in my opinion it is quite reasonable to assume that Michelle Beebe would have continued to work at Williams until she retired. Thus, it will be assumed that Michelle Beebe will work to at least the age of 67 and the earnings she would have garnered at Williams, less reasonable mitigation, will be the basis for future economic damages.

5

## Estimating the Present Value of Lost Future Earnings

The determination of the present value of lost future earnings involves two steps. First, it is necessary to estimate what the loss of earnings will be during Michelle Beebe's work-life. This involves projecting her prior earnings to age 67 and netting out the earnings she now is making in her present employment. The second step requires the computation of the present value of those losses today rather than in the future. To do this it is necessary to calculate how much would have to be invested today to provide those losses in each period that they will occur. Each of these elements of the analysis is described in the following sections in detail.

## Rate of Economic Growth, Prices, and Real Wages

The current economic picture is characterized by moderate economic growth. Interest rates are expected to be stable and inflation, with the exception of energy and transportation costs, remains relatively low. There is uncertainty related to the price of oil and the future of the Iraq war, but over the long-term, most economists expect the economy to experience continued moderate growth and stability.

In this case Ms. Beebe's earnings were typically increased each July. Williams indicates that in the years following her termination that the flat rate raises given to Custodians were 3% in 2004, 3 % in 2005, 3.25% in 2006, and 3.25% in 2007. These figures will be used to determine the lost earnings from the time of termination to through 2007. For future years, it is assumed that real earnings will only increase at the cost of living. The analysis will apply a real discount (also net of inflation) and thus, speculation regarding future inflation is avoided.

## Present Value

Once the rate of growth of future earnings and the value of lost future income is established, this must be reduced to its present value. That is, one must determine how much money would have to be set aside and invested today to provide that future financial support. The only element in calculating the present value that is uncertain is the net rate of return that will be earned on the funds that are invested for future use.

The courts have found that it is reasonable to use a real rate of return in the range of 1% to 3% that is net of taxes on the earnings. In 1983, the United States Supreme Court ruled in *Jones & Laughlin Steel Corp. v. Pfeifer* that 1% to 3% is an appropriate discount rate interval within which courts may operate without risk of reversal on appeal[1]. In this case, a net real discount rate of 2% would be conservative and is in line with the net real rate of return on a combination of long and medium term securities as currently reflected in the financial markets[2].

---

[1] For a discussion of *Pfeifer* and related cases, see George, Simien & Culbertson, "The Courts and Inflation", *TRIAL*, July 1984, p22.

[2] In cases where the number of years taken into account is great, such as in this case, the discount rate used reflects the rate of return earned on a portfolio of short, medium and long term securities as the losses must be compensated over a variety of time horizons. No one interest rate or security is appropriate.

**Determination of Damages To Date**

The termination of Michelle Beebe by Williams in 2003 cost her a great deal. She lost a secure job with good benefits. She lost at least 15 years of seniority. Given this situation, one has to first look at the value of lost earnings and benefits from the time of the termination to the present. This is summarized in Table 2 below. Prior Earnings are based on employment records through the time of termination and subsequent raises given by Williams as described above. There has also been some mitigation for unemployment compensation received following her termination as well as some cash income from selling produce at the local farmer's market and working at a nursing home.

The benefits include the lost tuition that would have been available for Nicholas when he graduated from high school in 2004 and continuing for 4 years of college. It also includes TIAA-CREF contributions by Williams. These contributions have also been increased based on the percent increases in wages given in each year.

Based on this analysis, the termination of Michelle Beebe by Williams in August of 2003 resulted in lost earnings and benefits of approximately $197,300 to date. What this does not capture, however, is the withdrawals that the Beebe family had to make from Michelle's retirement account to remain financially solvent. Nor does it include the cost of a $46,000 home equity loan they had to borrow and their large credit card debt.

Lost Earnings and Benefits to Date
Table 2.

| Period | Lost Earnings | Lost Benefits | Mitigation | Total |
|--------|--------------|---------------|------------|-------|
| 2003 | $ 17,490.28 | $ 1,572.75 | $ 16,817.00 | $ 2,246.03 |
| 2004 | 33,297.50 | 16,753.88 | 5,923.50 | 44,127.88 |
| 2005 | 34,287.84 | 16,838.12 | 2,500.00 | 48,625.96 |
| 2006 | 35,366.01 | 16,932.11 | 1,525.00 | 50,773.13 |
| 2007 | 36,511.83 | 17,029.16 | 2,000.00 | 51,540.99 |
| Total | | | | $ 197,313.99 |

**Determination of the Present Value of Future Damages**

To calculate the present value of future damages one has to begin with a set of reasonable assumptions. Under a reasonable scenario, one could assume that Mrs. Beebe will be able to work at some job commensurate with her skills until retirement. She only has a 10th grade education and has never worked at more than a semi-skilled job in her life. Given the potential employers in the local labor market, it is unlikely that she will be able to find a job as good as the one at Williams. It is more likely that she might be able to work as a kitchen helper in a school cafeteria or restaurant, as a cashier in a supermarket or retail store, or at a comparable job. Such jobs typically do not have any retirement benefits or 401(k) matching. They pay much less than what she was earning at Williams.

A survey of unskilled and semi skilled jobs in the Pittsfield labor market show a wage rates that vary from $7.92 for food preparation workers (including fast food) to $10.65 for retail clerks. In between fall such occupations as cashiers that earn an average of $8.72 per hour and home care aides that earn an average of $10.24 per hour.[3] Employment at these low wages is made more problematic by the cost and scheduling of childcare. As her children get older, this problem will diminish, but at present it is a real constraint. Prior to her termination, Mrs. Beebe was done with work in time to care for her sons after school. Now this is a problem and her hours would have to fit childcare requirements. Given this situation, I have included mitigation in my analysis of future damages, but finding suitable employment may be difficult and even unrealistic at present.

The calculation of the present value of damages in that case is shown in Table 3 below. The first column shows the year in question followed by Michelle Beebe's age in that year. The third column shows what her prior earnings at Williams. Future earnings are assumed to only increase at the cost of living (i.e. real earnings are in constant dollars). Lost future benefits are based the value of the TIAA-CREF contributions that Williams was making. Mitigation is base on full-time employment starting on January 1, 2008 at an hourly wage of $10.00 per hour. In my opinion, this is a reasonable wage rate to use given Michelle Beebe's education, experience and the prevailing wage rates in the Pittsfield Labor Market for semi-skilled workers. The net loss is then reduced to present value using a real after tax rate of return of 2%. The computations are made monthly assuming the payment at the end of each month and summed to an annual value shown in the last column of the table.

As the computations in Table 3 show, the present value of lost future income based on the assumption that Michelle Beebe could have worked to age 67 given that she is able to make at least $10.00 per hour in real wages is approximately $358,216.65. Given her current circumstance, it seems more likely that her actual damages will be higher.

## Long-term Financial Impact on the Beebe Household

The total impact of Michelle Beebe's termination is evident when one begins to sort through the Beebe's household financial records and consider the affect this action by Williams has had on future retirement benefits.

The Beebe family is deeply in debt based on having to borrow against their home equity and they have incurred substantial new credit card debt following Michelle's termination. They also had to sell one of their cars to get money.

Mrs. Beebe has already lost substantial contributions to her TIAA-CREF account. Following her termination, it became necessary to withdraw funds from this account to support the family. In addition, she lost Social Security contributions that will diminish her retirement income after the age of 67.

---

[3] Massachusetts Department of Employment and Training, September 2004 , Hourly earnings by occupation and labor market figures published by the Bureau of Labor Statistics for all labor markets in the United States.

Present Value of Future Economic Damages
Table 3.

| Year | Age | Prior Earnings | Lost Benefits | Mitigation | Net Loss | Present Value |
|------|-----|------------|----------|------------|----------|---------------|
| 2008 | 44 | $ 36,511.83 | $ 3,083.16 | $ 20,800.00 | $ 18,794.99 | $ 18,592.95 |
| 2009 | 45 | 36,512.83 | 3,083.16 | 20,800.00 | 18,795.99 | 18,226.06 |
| 2010 | 46 | 36,513.83 | 3,083.16 | 20,800.00 | 18,796.99 | 17,866.41 |
| 2011 | 47 | 36,514.83 | 3,083.16 | 20,800.00 | 18,797.99 | 17,513.85 |
| 2012 | 48 | 36,515.83 | 3,083.16 | 20,800.00 | 18,798.99 | 17,168.26 |
| 2013 | 49 | 36,516.83 | 3,083.16 | 20,800.00 | 18,799.99 | 16,829.48 |
| 2014 | 50 | 36,517.83 | 3,083.16 | 20,800.00 | 18,800.99 | 16,497.38 |
| 2015 | 51 | 36,518.83 | 3,083.16 | 20,800.00 | 18,801.99 | 16,171.84 |
| 2016 | 52 | 36,519.83 | 3,083.16 | 20,800.00 | 18,802.99 | 15,852.72 |
| 2017 | 53 | 36,520.83 | 3,083.16 | 20,800.00 | 18,803.99 | 15,539.91 |
| 2018 | 54 | 36,521.83 | 3,083.16 | 20,800.00 | 18,804.99 | 15,233.26 |
| 2019 | 55 | 36,522.83 | 3,083.16 | 20,800.00 | 18,805.99 | 14,932.66 |
| 2020 | 56 | 36,523.83 | 3,083.16 | 20,800.00 | 18,806.99 | 14,638.00 |
| 2021 | 57 | 36,524.83 | 3,083.16 | 20,800.00 | 18,807.99 | 14,349.15 |
| 2022 | 58 | 36,525.83 | 3,083.16 | 20,800.00 | 18,808.99 | 14,066.00 |
| 2023 | 59 | 36,526.83 | 3,083.16 | 20,800.00 | 18,809.99 | 13,788.43 |
| 2024 | 60 | 36,527.83 | 3,083.16 | 20,800.00 | 18,810.99 | 13,516.35 |
| 2025 | 61 | 36,528.83 | 3,083.16 | 20,800.00 | 18,811.99 | 13,249.63 |
| 2026 | 62 | 36,529.83 | 3,083.16 | 20,800.00 | 18,812.99 | 12,988.18 |
| 2027 | 63 | 36,530.83 | 3,083.16 | 20,800.00 | 18,813.99 | 12,731.88 |
| 2028 | 64 | 36,531.83 | 3,083.16 | 20,800.00 | 18,814.99 | 12,480.65 |
| 2029 | 65 | 36,532.83 | 3,083.16 | 20,800.00 | 18,815.99 | 12,234.37 |
| 2030 | 66 | 36,533.83 | 3,083.16 | 20,800.00 | 18,816.99 | 11,992.95 |
| 2031 | 67 | 36,534.83 | 3,083.16 | 20,800.00 | 18,817.99 | 11,756.29 |

Total                                                    $    358,216.65

## Summary of Findings

Based on my assessment of the documents, figures and facts as related to me in this case, I believe to a reasonable degree of economic certainty, that the present value of economic damages arising from the termination of Michelle Beebe by Williams is equal to at least $555,500. This figure does not encompass the financial loss that the family has and will continue to suffer due to increased interest payments on debt. Nor does it include the present value of lost retirement benefits that Michelle Beebe will suffer after the age of 67.

If further information become available, I reserve my right to supplement this opinion in a timely fashion.

The opinions expressed here are based the documents and information listed below and their disclosure is made in accordance with "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony":

1. A copy of the complaint filed in United States District Court;
2. A copy of the Defendant's Answers to Plaintiff's First Set of Interrogatories;
3. A copy of attendance records for Michelle Beebe from her personnel file;
4. A copy of federal tax returns for the Beebe family and W-2 forms for the years 2001 through 2004;
5. A copy of the Williams College Buildings and Grounds Support Staff Handbook;
6. A copy of a letter from Martha Tetrault, Director of Human Resources at Williams College to Michelle Beebe dated May 16, 2003;
7. A copy of the deposition transcript of Michelle Beebe;
8. A copy of the deposition transcript of David Beebe;
9. Information provided to me in a personal interview with Michelle Beebe and David Beebe made in the presence of their counsel.

I hereby disclose that I am being paid at the rate of $200 per hour for any time spent working on this case and will be paid $300 per hour for any testimony that is required. I have received a $1,000 retainer for work done to date.

A list of recent testimony is attached in the appendix to this report along with a current copy of my curriculum vitae as required under "Rule 26 of Federal Rules of Civil Procedure, subsection (a)(2)(B), Disclosure of Expert Testimony."


Craig L. Moore, Ph.D.

# EXHIBIT B

### *Were Michelle Beebe's absences actually that excessive?*

Tom,

Look at this chart:

| | Days | Hours | Entitled to Paid Time Off | | | | Net | Actual Hours Worked | |
| | | | Vacation | Holidays | Paid Leave | Sick Time | | Regular | Overtime |
|---|---|---|---|---|---|---|---|---|---|
| Typical Year | 262 | 2,096 | 120 | 80 | 16 | 96 | 1,784 | | |
| 2001 | 180 | 1,440 | 136 | 64 | 16 | 60 | 1,165 | 1,157 | 52.5 |
| Taken | | | 136 | 64 | 16 | 59.5 | 100% | 99.3% | |
| 2002 | 262 | 2,096 | 120 | 80 | 16 | 96 | 1,784 | 1,583 | 58.8 |
| Taken | | | 153 | 88 | 14.5 | 86 | 100% | 88.7% | |
| 2003 | 155 | 1,240 | 120 | 32 | 16.0 | 72 | 1,000 | 915 | 19 |
| Taken | | | 39 | 32 | 1.5 | 54 | 100% | 91.5% | |

In the first row I show the typical full-time year with paid time off as a benchmark. The number of workdays in a typical year, times 8 hours per day equals hours. I then show the number of hours that Michelle was entitled to under each category of paid time off. When these are subtracted from Hours it equals the Net hours she is required to work.

In the next row I show the same figures for the time period in 2001 that she was a Custodian at Williams. The Net number of hours for that time period is 1,165. She actually worked 1,157 or 99.3% attendance. In addition, she also worked 52.5 hours of overtime. The highlighted row below that shows the actual hours of paid time off she took during 2001 while she was a Custodian. It shows that Vacation was 136 hours when there are only 120 in a typical year. I assume she had accumulated vacation time that was untaken from previous periods. In any case, this clearly shows that Williams can not claim that she was excessively absent during 2001.

In 2002 I show the same analysis. She worked 88.7% of the Net hours in that year. She was entitled to more paid sick time than she took and more paid leave than she took. Again, the vacation days are much higher? I think we have to find out why... But, Michelle did have an 88.7% attendance record for 2002. In addition to that, she also worked 58.8 hours of overtime. Again, I think it is hard to characterize this record as excessively absent.

In 2003, up to the time she was terminated, she worked 91.5% of the Net hours. She took only 39 hours of vacation, only 54 hours of sick leave when she was entitled to 72, and used only 1.5 hours of paid leave when she could have taken 16. The facts seem to be that she took unpaid leave during this period when she still had both sick time and personal leave available... She also worked 19 hours of overtime. Again, I think it is hard to characterize this attendance record as excessively absent.

While this analysis doesn't really fit into the damages portion of the case, I think it will be very helpful to you in comparing the claim of excessive absence to the facts. I don't

think a reasonable person (say a juror) would see this record as excessively absent and justifying Michelle's termination. It calls into question the basis of Williams' decision to terminate Michelle. Was it a reasonable decision?

I was looking at the table in my report this morning and these figures just really popped out at me. I hope they are helpful.

Craig

# EXHIBIT C

1

1         UNITED STATES DISTRICT COURT
2           DISTRICT OF MASSACHUSETTS
3               WESTERN DIVISION
4
5 * * * * * * * * * * * * * * * *
6 MICHELLE BEEBE,                    *
7            Plaintiff             *
8 v.                                 *
9 WILLIAMS COLLEGE,                  *
10           Defendant             *
11 * * * * * * * * * * * * * * * *
12
13
14       DEPOSITION OF:  DR. CRAIG MOORE
15          Heisler, Fledman & McCormick
16              1145 Main Street
17        Springfield, Massachusetts
18          June 19, 2007    10.01 a.m.
19
20
21
22
23          Jessica M. DeSantis
24             Court Reporter

2

1 APPEARANCES:
2
3 Representing the Plaintiff:
4      HEISLER, FELDMAN, MCCORMICK & GARROW
5      1145 Main Street, Suite 508
6      Springfield,  MA 01103
7      BY THOMAS J. MCCORMICK, ESQ.
8      413.788.7988  Fax:  413.788.7996.
9
10 Representing the Defendant:
11     EDWARDS, ANGELL, PALMER & DODGE
12     111 Huntington Avenue
13      oston,  MA  02199

18    A.    Potential is a calculation that I
19 made that looks at those actual dates and
20 determines, were there holidays, were there, you
21 know, what were the actual dates that were
22 inclusive, how many work days were in them.
23          And then takes the number of hours
24 per day and says, here is the number of potential

78

1 hours that during that time period that if you
2 were at work, all the time that was required,
3 that would be the potential number of hours you
4 would work.
5          So you can see that it varies.  It
6 varies anywhere from 80 down to as low as 61,
7 maybe 56.
8    Q.    Well, but, for example.  Let me make
9 sure I understand this.
10          On 4.22 -- in the time period 4.22
11 to 5.5, she worked 80 hours and she had 3 hours
12 of vacation?
13    A.    Right.
14    Q.    So why is her potential only 77
15 hours?
16    A.    Because she took vacation.  And she
17 took 3 hours of vacation; in other words, she was
18 entitled to take 3 hours of vacation.
19          So any time that she took time off
20 for which she was entitled, those are hours that,
21 potentially, you know, were taken out, out of the
22 number of hours that she --
23    Q.    So --
24    A.    That she worked.

79

1    Q.    Did you also include that with sick
2 time.  Take that out of --
3    A.    Sure.
4          I mean, if she's entitled to sick

87

1 potential that she worked?

2     A.    Yup.

3     Q.    How do you calculate that?

4     A.    That's just taking total hours that

5 she worked as a percentage of the potential.  I

6 believe that's all it is.

7     Q.    But what's it a percentage of?

8     A.    I don't recall whether I included

9 the overtime with regular.  I believe it's

10 probably -- let me see if I can just check.

11            I'm trying to be more helpful here.

12            So the percentage under each

13 collum.

14     Q.    Yup.

15     A.    Is simply the number above it

16 divided by the total in the potential collum for

17 that year.

18     Q.    Okay.  So I want to make sure I

19 understand this.

20            So if you go down, I'm looking at

21 2001, here.

22            If you look at 6.3 to 6.16, 2001.

23            She worked 72 hours of regular time.

24     A.    Mm-hmm.

88

1     Q.    She worked 6 hours of overtime.

2     A.    Mm-hmm.

3     Q.    She took 8 hours of vacation.

4            Even if you back out that 8 hours of

5 vacation, why wouldn't her potential have been 74

6 rather than 72 because she actually worked -- do

7 you see what I'm saying?  Even if you say that 80

8 is generally the percentage.

9     A.    Yes.

10     Q.    She actually worked 78 hours that

11 we...

12      A.      Which part are you talking about?

13 Oh, I see it.  6.3 to 6.16.  Okay.

14              So that was 78 hours.

15      Q.      And then you back out the 8.  And

16 wouldn't that leave you with 70 rather than 72?

17      A.      Hmm.

18              Yeah, the only way I can check this

19 is to go back to the original spreadsheet and see

20 what the formula is on it.

21      Q.      Well, I'm going to have to ask you

22 to do this because I need to understand this.

23      A.      Sure, that's fine.

24      Q.      See.  And, again, you know, if you

89

1 go down to 6.17.

2               She worked 68 hours.

3       A.      64 hours.

4       Q.      And she worked 4 hours of overtime.

5       A.      Oh, Right.  Overtime.  Right.

6 Sure.

7       Q.      But that's actually worked.

8               Those are hours she actually

9 worked?

10      A.      Yup.

11      Q.      And then she had 16 hours of sick

12 and vacation.

13              And yet you have her, the potential

14 being 72?

15      A.      Which is 64 and 16.

16      Q.      64 and 16?

17      A.      No.

18      Q.      No.  That's --

19      A.      Doesn't work.

20      Q.      No.

21      A.      No, I'll have to go back and see how

22 it was calculated.

23              Again, it wasn't something that I

24 was I was using in my financial analysis.

90

1      Q.     Well, except that you do say in your

2 report how that she -- let's see.

3             You do say that she worked 93% of

4 her potential hours.  So we need to understand

5 how you got to those numbers obviously.

6      A.     Well, the 93%.  I can tell you

7 exactly where that number comes from.

8             That number comes from the

9 percentage that regular hours are at 1,057

10 divided by potential.

11     Q.     Right.  But the problem we're

12 getting into, Dr. Moore --

13     A.     Is what is in potential.

14     Q.     Is what is in potential.

15     A.     That's right.

16     Q.     And it's consistent and --

17     A.     And potential is just something I

18 made up.  It doesn't mean -- it is just what it

19 is.  It is now --

20     Q.     Well, wouldn't she have potential

21 hours -- the potential would be 80 hours a week,

22 right?

23     A.     Well --

24     Q.     I mean, because what does that

91

1 really tell you?  does it tell you about her

2 availability for work?

3      A.     It says to me that suppose this week

4 you could work 40 hours.

5      Q.     Right.

6      A.     Suppose you're entitled -- you are

7 sick and you're entitled to take a day off.

8      Q.     Right.

9      A.     You're home and you're sick.  You

10 can't work you.  You just lost a day's potential.

11 All right.  So instead of being able to work 40

12 hours that week, you can only work 32.  Now

13 there's your potential for that week if

14 you're just not available, you're sick.

15      Q.      For whatever reason.

16      A.      Or you're on vacation, or whatever

17 reason.

18      Q.      Or you're having fun, whatever?

19      A.      No.  No.  Not if you're having fun.

20              If -- I mean, in my mind.  And,

21 again, this idea of potential is my own concept.

22 I'm just simply saying that if I'm -- if I

23 have -- part of my compensation package is the

24 right to be compensated or uncompensated in

92

1 certain cases, in certain situations where I

2 can't work because of illness, because I'm

3 entitled to a vacation, because I'm entitled to

4 personal days off, because I have a sick family

5 member, whatever it is.

6              Whatever those are, that I'm

7 entitled to as part of my compensation package

8 are netted out.  They're no longer part of my

9 potential because I can't do them for those

10 reasons, whatever they are.

11      Q.      And you don't know if the reasons

12 are good, bad or indifferent?

13      A.      Well, they are what they are.

14      Q.      They are what the records say they

15 are?

16      A.      The records say sick.  They say

17 vacation.  They say short-term disability.  They

18 say holiday.  Obviously, if there's a holiday

19 that week you don't have the potential.

20              Now, this potential number may not

21 be calculated in the precise way that it should

22 be.  And I'll go back and I'll check that.

23      Q.      Well, you know, under your theory

24 you shouldn't be backing out unpaid leave then,