UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE BEEBE,

        Plaintiff,

  v.

WILLIAMS COLLEGE,

        Defendant.

Civil Action No. 05-30182

**DEFENDANT'S MOTION IN LIMINE NO. 5 TO PRECLUDE TESTIMONY OF PLAINTIFF'S UNIDENTIFIED WITNESS**

Pursuant to Federal Rule of Civil Procedure 37(c)(1) and Federal Rule of Evidence 402, Defendant Williams College (the "College") hereby moves the Court for an order precluding Plaintiff Michelle Beebe ("Plaintiff") from calling a witness who has yet to be fully or accurately identified. Even if the failure to identify her could be corrected, her testimony would be irrelevant anyway.

**Factual Background and Summary of Argument**

In this case, Plaintiff argues that the College violated the Family and Medical Leave Act, 29 U.S.C. 2601 et seq. ("FMLA") when it disciplined her and ultimately terminated her for excessive absenteeism. As evidenced by the Joint Pretrial Memorandum (Docket Entry No. 34), Plaintiff intends to call a woman named Heather (last name unknown) who is described as employed by Berkshire Commons Nursing Home, North Adams, Massachusetts. She indicated that this individual is a "[p]otential employer of Plaintiff, who in the recent past received a negative employment reference for the Plaintiff from the Defendant." Testimony by this witness should be precluded as untimely because less than two weeks before the trial, Plaintiff still has

not disclosed full, accurate identifying information for this witness. This failure violates the requirements for disclosure set forth in the Federal Rules of Civil Procedure. Additionally, this testimony, even if accepted despite its untimely disclosure, would be irrelevant. Its sole purpose would be to support a claim of relief for which Plaintiff may not recover under the Act.

## ARGUMENT

**I.   PLAINTIFF'S UNIDENTIFIED WITNESS SHOULD BE PRECLUDED FROM TESTIFYING AS PLAINTIFF HAS FAILED TO TIMELY DISCLOSE HER.**

The Federal Rules of Civil Procedure require parties to submit initial disclosures of the names of persons likely to have discoverable information that the disclosing party may use in support of its claims or defenses and identifying the subject of the information. Fed. R. Civ. P. 26(a)(1)(A). Rule 26 also requires that each party provide to the other party the name, address and telephone number of each witness that it may present at trial. Fed. R. Civ. P. 26 (a)(3)(A). Both sets of disclosures are subject to the duty to supplement found in Rule 26(e). Pretrial disclosures must be made at least 30 days before trial or as otherwise directed by the Court. *Id*. Here, the Court's February 12 Procedural Order ordered the parties to provide identifying information about witnesses prior to the pretrial conference set for June 21, 2007. Less than two weeks before trial, the College still has not received accurate, identifying information for Plaintiff's supposed witness. Testimony may be excluded due to untimely witness disclosure. Fed. R. Civ. P. 37(c)(1); s*ee, e.g., Paradigm Sales, Inc. v. Weber Marking Systems, Inc.,* 880 F. Supp. 1247, 1250-51 (N.D. Ind. 1995).

Plaintiff intends to call a woman named Heather (last name unknown) who is described as employed by Berkshire Commons Nursing Home, North Adams, Massachusetts. This individual was first listed as a potential witness on the afternoon of June 15, 2007, the date the parties filed the Joint Pretrial Memorandum with the Court. Not only has Plaintiff failed to

provide even the full name of this witness, she apparently has provided inaccurate information about her place of employment.  The College has called directory assistance, which did not find a business named "Berkshire Commons Nursing Home" in North Adams, Massachusetts.  Likewise, Internet search engines did not locate a business by that name.  The College also searched Dun & Bradstreet's Business Information Reports, the Secretary of the Commonwealth's Corporations Database, and the U.S. Government's Medicare database for listings of Medicare and Medicaid certified nursing homes, and all of these records indicate that this business does not in fact exist.

Plaintiff may not be excused from her obligation to provide timely and accurate disclosures or to supplement those disclosures as necessary.  As the College has not received actual notice of this witness, Plaintiff should not be permitted to call her as a witness.

## II. PLAINTIFF'S UNIDENTIFIED WITNESS SHOULD BE PRECLUDED FROM TESTIFYING AS HER TESTIMONY WOULD BE IRRELEVANT.

Alternatively, even if Plaintiff finally produces additional identifying information about this witness, her testimony still should be precluded as irrelevant.  Plaintiff has indicated that this witness is a "[p]otential employer of Plaintiff, who in the recent past received a negative employment reference for the Plaintiff from the Defendant."  Such testimony would be irrelevant under Federal Rules of Evidence 401, even if not excluded due to its untimely disclosure.  Plaintiff's proffered evidence would only be relevant for proving a claim of lost future earning capacity, a compensatory remedy not available under the plain language of 29 U.S.C. § 2617. *Hite v. Vermeer Mfg. Co.,* 361 F. Supp. 2d 935, 947 (S.D. Iowa 2005), *aff'd*, 446 F.3d 858 (8th Cir. 2006); *Williams v. Pharmacia, Inc.*, 137 F.3d 944 (7th Cir. 1998).

If successful in proving a FMLA violation, Plaintiff would be entitled only to damages equal to the amount of "any wages, salary, employment benefits, or other compensation denied

or lost to [her] by reason of the violation," prevailing interest, "such equitable relief as may be appropriate, including employment, reinstatement, and promotion," and reasonable fees and costs. 29 U.S.C. § 2617(a)(1), (3). The FMLA does not provide for recovery of emotional and other nonmonetary damages. Report and Recommendation With Regard to Defendant's Motion to Dismiss, at 5-6 (Apr. 18, 2006) (Docket Entry No. 12) (reasoning that FMLA specifically lists the kinds of recovery available, all of which relate to actual monetary damages); *Lufkin v. Eastern Maine Medical Center*, 401 F. Supp. 2d 145 (D. Maine 2005) (holding that FMLA does not allow for the recovery of non-economic compensatory damages for pain and suffering, emotional distress, and damaged reputation); *McAnnally v. Wyn South Molded Prods., Inc.*, 912 F. Supp. 512 (N.D. Ala. 1996) (refusing to award relief for loss of job security reasoning that because the phrase "other compensation denied or lost" appears with the terms "wages," "salary," and "employment benefits," the phrase implies some type of quid pro quo exchange between employer and employee). While an award of lost future earnings capacity may be available under other statutes, such as Title VII of the Civil Rights Act, 42 U.S.C. § 1981a(b)(3), the plain language of the FMLA does not provide a remedy for this type of intangible, nonpecuniary loss. *Pharmacia,* 137 F.3d at 952; *Hite*, 361 F. Supp. 2d at 947.

Lost future earning capacity has been analogized to an "injury to professional standing" and to an "injury to character and reputation," both of which have been classified as nonpecuniary losses.[1] *Pharmacia*, 137 F.3d at 952; *see Lufkin*, 401 F. Supp. 2d at 145 ("damaged reputation" is a non-economic compensatory damage). To recover for lost future earning capacity, a plaintiff must put forth competent evidence demonstrating that her injuries

---

[1] While often confused, the concepts of lost future earnings and front pay are quite separate and distinct as they compensate a plaintiff for different injuries. *Pharmacia*, 137 F.3d at 953-54. A front pay award, an equitable remedy, approximates the benefit a plaintiff would have received had she been able to return to her old job. Lost future earnings, on the other hand, is a compensatory remedy designed to compensate a plaintiff for the diminished

have "narrowed the range of economic opportunities available" to her and have caused a "diminution in [her] ability to earn a living." *Pharmacia*, 137 F.3d at 952. In *Pharmacia*, for example, the plaintiff argued that her termination tainted her employment record. *Id*. Lost future earnings compensate for the diminished earnings resulting from the reputational harm suffered by a termination and the subsequent decrease in the employee's attractiveness to other employers into the future. *Id*. at 953.

Here, Plaintiff seeks to call a witness, who if finally identified and located, would presumably testify that the College provided a negative employment reference for Plaintiff. This testimony purportedly supports a claim for lost earning capacity in that it tends to show Plaintiff suffers from a reputational harm brought about by her termination and ensuing lawsuit. Such testimony is irrelevant in this case as it seeks to establish her entitlement to an award for a nonpecuniary loss, which is not available under the FMLA.

Furthermore, it appears that Plaintiff hopes that such evidence would serve to somehow excuse her total failure to mitigate damages. Any reputational harm Plaintiff claims she suffers has no bearing on her duty to exercise reasonable diligence in attempting to secure comparable employment. *See Thorson v. Gemini, Inc.*, 96 F. Supp. 2d 882, 890 (N.D. Iowa 1999), *aff'd*, 205 F.3d 370 (8th Cir. 2000) (successful FMLA plaintiff has duty to mitigate damages). This duty is discharged by responding to help wanted advertisements, submitting employment applications, registering with employment agencies and headhunters. Thus, had Plaintiff engaged in these activities, she could show sufficient diligence in seeking comparable employment regardless of whether any employer actually hired her. *See Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 286 (8th Cir. 1993) ("Efforts to mitigate should be honest and in good faith, but need not be successful."). Plaintiff, however, by her own

---

earnings resulting from the reputational harm suffered as a result of the employer's unlawful conduct. *Id.* at 953.

admission, applied for at most four jobs in nearly four years and made no efforts to secure employment during at least the first two years after she left the College. Plaintiff Michelle Beebe's Deposition at 23:22-26:17 (attached as Exhibit A); Plaintiff's Answers to Defendant's First Set of Interrogatories, No. 17 (attached as Exhibit B). She may not try to confuse a jury into thinking the reason she is not employed is due to some alleged unfavorable reference provided by her former employer. Rather, Plaintiff is not currently employed because she has simply failed to put forth any effort to find permanent employment.

## Conclusion

For the foregoing reasons, the College requests that the Court grant this Motion *In Limine* and preclude this unidentified witness from testifying.

    Respectfully submitted,
    Williams College
    By its attorneys,

    /s/  Patricia M. Mullen
    Judith A. Malone (BBO #316260)
    Patricia M. Mullen (BBO # 663318)
    EDWARDS ANGELL PALMER & DODGE LLP
    111 Huntington Avenue
    Boston, MA  02199-7613
    617.239.0100
    jmalone@eapdlaw.com
    pmullen@eapdlaw.com

Dated: July 2, 2007

### CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

    /s/  Patricia M. Mullen

# EXHIBIT A

---

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHELLE BEEBE
vs.                    Civil Action No. 05-30182
                       Pages 1-226
WILLIAMS COLLEGE

DEPOSITION OF: **MICHELLE BEEBE**, taken before Heather J. Davis, Certified Shorthand Reporter and Notary Public, pursuant to Rule 30 of the Federal Rules of Civil Procedure, at the offices of Grinnell, Dubendorf & Smith, Bank Street, Williamstown, Massachusetts on February 2, 2007, commencing at 10:45 AM.

APPEARANCES:

(SEE PAGE TWO)

Heather J. Davis
Registered Merit Reporter

DAVIS & MITCHELL
P.O. Box 1367
Pittsfield, MA 01202
Tel. (413) 499-0035    Fax (413) 499-7823

DAVIS & MITCHELL
(413) 499-0035

---

**Page 2**

APPEARANCES:

HEISLER, FELDMAN, MCCORMICK & GARROW, P.C, 1145 Main Street, Springfield, Massachusetts, 01103, representing the Plaintiff.
BY: THOMAS J. MCCORMICK, ESQUIRE

EDWARDS ANGELL PALMER & DODGE, 111 Huntington Avenue, Boston, Massachusetts, 02199, representing the Defendant.
BY: JUDITH A. MALONE, ESQUIRE
    PATRICIA M. HIGGINS, ESQUIRE

DAVIS & MITCHELL
(413) 499-0035

---

**Page 3**

INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHELLE BEEBE | 5 | 209 | 212 | 219 |
| | | 221 | | |

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Answers to Interrogatories | 11 |
| Exhibit 2 | Offer of Employment, 10/17/88 | 54 |
| Exhibit 3 | Document | 60 |
| Exhibit 4 | Williams College Dining Services Handbook Receipt | 60 |
| Exhibit 5 | Building and Grounds Handbook | 64 |
| Exhibit 6 | Custodial meeting summary | 71 |
| Exhibit 7 | Attendance calendar | 72 |
| Exhibit 8 | Functional Capacity Form | 76 |
| Exhibit 9 | Treatment Form | 79 |
| Exhibit 10 | FMLA Request for Leave | 86 |
| Exhibit 11 | FMLA Request for Leave | 99 |
| Exhibit 12 | Document | 105 |
| Exhibit 13 | Letter dated 7/1/03 | 108 |
| Exhibit 14 | Family and Medical Leaves of Absence Policy | 114 |
| Exhibit 15 | Certification of Healthcare Provider | 126 |
| Exhibit 16 | Handwritten note | 151 |

DAVIS & MITCHELL
(413) 499-0035

---

**Page 4**

EXHIBITS CONTINUED:

| Exhibit 17 | NARH record, 7/27/03 | 175 |
|---|---|---|
| Exhibit 18 | Radiology report, 7/27/03 | 178 |
| Exhibit 19 | NARH Note | 179 |
| Exhibit 20 | Note dated 7/30/03 | 184 |
| Exhibit 21 | Handwritten note, 7/31/03 | 188 |
| Exhibit 22 | Letter dated 8/4/03 | 201 |
| Exhibit 23 | Handwritten document | 202 |

DAVIS & MITCHELL
(413) 499-0035

### Page 21

1  that we do.
2  Q. Are these house plants or vegetables?
3  A. Vegetable plants, some flowers, and herbs.
5  Q. And when you are ready to transplant
6  them, do you transplant them on to your own
7  property to grow them?
8  A. Well, yeah, and also to sell.
9  Q. To sell them as plants for people who
10 want their own gardens?
11 A. Right.
12 Q. Okay. And is that a full-time
13 occupation?
14 A. Yes.
15 Q. And about how many hours a week do
16 you spend on that business?
17 A. As many as I can get in. I can't
18 recall. Could be sixty. I mean from daylight to
19 nighttime, dawn to dusk.
20 Q. Do you enjoy that business?
21 A. Yes, I do.
22 Q. Is it something you find fulfilling?
23 A. Yes.
24 Q. And is it something you've wanted to

### Page 22

1  do for a while?
2  A. I've always loved it.
3  Q. And how much do you earn with this
4  gardening business?
5  A. It's not worth my time. It's not
6  worth my time. Every year is different. I'm not
7  sure how you want -- do you want a figure?
8  Q. Just if you can give me a range, that
9  would be fine.
10 A. I'm not exactly sure what I had wrote
11 down, I don't have my book in front of me, but we
12 try to keep logs. It could be anywhere from a
13 thousand to two thousand.
14 Q. And what are in these logs that you
15 keep?
16 A. The type of produce that we have,
17 what we sold on that given day. You know what I
18 mean? It's just a log to give us some idea --
19 Q. Sure.
20 A. -- for the following year of what
21 more to do or what less to do.
22 Q. And how long have you actually been
23 in this business?
24 A. Since I married my husband.

### Page 23

1  Q. So since 1998? No. '98?
2  A. Yeah.
3  Q. And so you did it on a part-time
4  basis while you were still employed?
5  A. As part-time, maybe more. Like I
6  said, between work and that, it was a lot.
7  Q. More than a full-time job?
8  A. Meaning just --
9  Q. Both of them?
10 A. Oh, yeah. Yeah.
11 Q. Are you currently looking for
12 full-time employment outside of the gardening
13 business?
14 A. Yes. Yes, I am.
15 Q. And what are you doing to find
16 full-time employment outside of the gardening
17 business?
18 A. I've filled out some applications.
19 I've picked up The Advocate from time to time. I
20 have applied, with no response.
21 Q. Can you tell me where you've applied?
22 A. I applied at Big Y.
23 Q. All right. And did you get a
24 response from Big Y?

### Page 24

1  A. I didn't even get through my
2  application and they said they had other people
3  more qualified.
4  Q. All right. So you didn't even fill
5  out an application?
6  A. Yes, I did.
7  Q. Oh, okay. And they told you right
8  then they had other people?
9  A. On the computer, yes.
10 Q. Okay. And when was that, do you
11 recall?
12 A. I want to say, and I'm not exactly
13 sure, it could have been over a year ago.
14 Q. Is there anything you could look at
15 that would tell you when that happened?
16 A. Not to my knowledge, no.
17 Q. All right. Where else have you
18 applied?
19 A. Cumberland Farms.
20 Q. All right. And when did you apply at
21 Cumberland Farms?
22 A. I actually applied at two Cumberland
23 Farms.
24 Q. Okay. And which two Cumberland Farms

DAVIS & MITCHELL
(413) 499-0035

**Page 25**

```
1  did you apply at?
2      A.  On Union Street about six months ago.
3      Q.  Union Street where?
4      A.  North Adams, Mass.
5      Q.  All right. And did you fill out an
6  application?
7      A.  I went in seeking work. I didn't
8  exactly fill out an application at that one
9  because they weren't hiring.
10     Q.  Okay. And where is the second
11 Cumberland Farms that you sought work from?
12     A.  Ashland Street.
13     Q.  And where is that?
14     A.  In North Adams, Mass.
15     Q.  And what happened with that attempt?
16     A.  I filled it out and never got called.
17     Q.  So you don't know why you were never
18 called?
19     A.  No, I don't. For that reason, no.
20     Q.  And at Big Y they told you that they
21 had other more qualified applicants?
22     A.  Yes. And I believe it was because I
23 didn't -- I always tell the truth, and I told
24 them I was terminated. They asked me on the
```

**Page 26**

```
1  application if I was terminated, I said yes.
2      Q.  Okay.
3      A.  And as I finished filling out the
4  application, it came up, thank you but we might
5  have more qualified people. And that's how that
6  happened.
7      Q.  And you never heard anymore from
8  them, is that right?
9      A.  Right.
10     Q.  And anyplace else you've applied?
11     A.  Angelina's.
12     Q.  All right. And when did you apply at
13 Angelina's?
14     A.  Actually, it was the other night.
15 The other day, excuse me.
16     Q.  Which day, I'm sorry?
17     A.  Three days ago.
18     Q.  And what caused you to apply at
19 Angelina's three days ago?
20     A.  Two things. An ad in the paper and a
21 help wanted sign in the window.
22     Q.  And what is Angelina's?
23     A.  It's a sub shop.
24     Q.  And where are they located?
```

**Page 27**

```
1      A.  Ashland Street Plaza there, North
2  Adams.
3      Q.  And did you fill out an application?
4      A.  Yes, I did.
5      Q.  And what happened?
6      A.  I handed it in that day. That night
7  I received a phone call from the owner. There
8  was two shifts that they wanted, they wanted a
9  9:00 to 5:00, which I thought would be pretty
10 much perfect for me, and then they wanted 5:00 to
11 12:00, which I couldn't do. My husband works
12 second and third shift. So when he called me he
13 said he was impressed with my application, with
14 thirteen years in food service, but he said he
15 had a question, he wanted to know why I left
16 Williams College. And I said, well, I didn't
17 leave willingly. And he said, may I ask why?
18 And I said, well, I was terminated. I said,
19 we're in the process of dealing with it. That's
20 all I said. And he changed his tune and said,
21 well, I need somebody who is going to be
22 flexible, but I'll keep your application on hold.
23 And that was it.
24     Q.  And is that everything you told him
```

**Page 28**

```
1  about the reasons that you left Williams College?
2      A.  Yup.
3      Q.  That you didn't leave willingly and
4  that you were dealing with it?
5      A.  Right. That's what I said.
6      Q.  Anyplace else?
7      A.  For a time period I worked with
8  Baystate Nurses.
9      Q.  What did you do for Baystate Nurses?
10     A.  Home healthcare.
11     Q.  And what are your qualifications for
12 home healthcare?
13     A.  Are you asking qualifications or what
14 my job entailed?
15     Q.  Let me ask you that first, what was
16 your job?
17     A.  Sitting with sick people, helping
18 them, feeding them, cooking for them, shopping
19 for them.
20     Q.  And how long did you do that?
21     A.  Bathing them.
22     Q.  And how long did you do that?
23     A.  I can't recall how long, because it
24 was like a sporadic job, it's off and on. When I
```

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION
NO. 05-30182-MAP

MICHELLE BEEBE, )
)
Plaintiff, )
)
v. )
)
WILLIAMS COLLEGE, )
)
Defendant. )

## PLAINTIFF'S ANSWERS TO THE DEFENDANT'S FIRST SET OF INTERROGATORIES

The Plaintiff, Michelle Beebe, answers the Defendant's first set of interrogatories as follows:

INTERROGATORY NO.1:

Identify each and every person, other than those already identified as part of Plaintiff's Initial/Automatic Disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A), who has knowledge of any of the facts alleged in the Complaint, including, without limited to, facts concerning any ailment or health condition from which you suffered in July 2003; any ailment or health condition from which any of your children suffered from during the period from "prior to January, 2002 to July, 2003;" and your termination from Williams; and describe with particularity the information you believe to be known or possessed by each such person.

Describe any and all efforts by you to find employment since August 5, 2003, and as part of your answer, identify each and every employer for whom you have worked since your termination from Williams.

ANSWER NO. 17:

I have been self-employed doing a garden business. I have three gardens that I tend and I sell produce grown in the garden at the farmer's market in North Adams, MA. I also sell home made goods, such as jams, at the market.

I worked for a short while at Pooches, a pet grooming business run by my sister.

I also worked for over a year for Baystate Nurses, Pownal, Vermont, ran by Susan Rebideaux (sic).

I have applied to work at the Big-Y in their bake shop; the Clarksburg School, in their kitchen; and at Cumberland Farms, Union Street, N. Adams, MA. I was not hired at any of the above places.

I look through the want ads of the local papers.

INTERROGATORY NO. 18:

State all income earned or received by you from any source during the period from August 5, 2003 through the present, including any monies you received as unemployment benefits from the Commonwealth of Massachusetts.

ANSWER NO. 18:

I earned approximately the following amounts each year from my gardening business: 2003 (after 8/4/03) -- $500.00; 2004 -- $1,687.50; 2005 -- $1,500.00; 2006 -- $1,525.00.

I earned about $1,000.00 working for Baystate for a little over one year -- mostly during 2005.

I earned about $60.00 when I worked for Pooches.

21

Signed under the pains and penalties of perjury this 12th day of Dec, 2006.

_Michelle Beebe_
Michelle Beebe

Dated: 12/12/06

Respectfully submitted,
MICHELLE BEEBE
By Her Attorney,

_____
Thomas J. McCormick, BBO # 561760
Heisler, Feldman, McCormick
& Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988
Fax (413) 788-7996

CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served by first class mail upon the attorneys of record for the Defendant on 12/12, 2006.

_____
Thomas J. McCormick

23