UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE BEEBE,<br><br>               Plaintiff,<br><br>   v.<br><br>WILLIAMS COLLEGE,<br><br>               Defendant. | Civil Action No.  05-30182 |

**DEFENDANT'S MOTION IN LIMINE NO. 6 TO PRECLUDE ANY JURY INSTRUCTION, ARGUMENT, OR EVIDENCE ON THE ISSUE OF FRONT PAY**

Defendant Williams College (the "College") hereby moves the Court for an order precluding Plaintiff Michelle Beebe ("Plaintiff") from obtaining an instruction to the jury on the issue of front pay or presenting any evidence or argument in support of a claim for front pay. The evidence of record in this case is demonstrably insufficient as a matter of law to support a front pay claim under the relevant federal standards. In this case, Plaintiff, who earned roughly $30,000 per year prior to her termination, is seeking compensatory damages in excess of $1 million. The majority of these claimed damages are based on lost wages and benefits through 2031, when Plaintiff would be 67 years old.

**Introduction and Summary of Argument**

In this case, Plaintiff argues that the College violated the Family and Medical Leave Act, 29 U.S.C. 2601 *et seq.* ("FMLA") when it disciplined her and ultimately terminated her for excessive absenteeism. Among other forms of relief, Plaintiff seeks money damages in the form of back pay for this alleged violation. As evidenced by the report of her expert, Craig L. Moore, Ph.D., it appears that Plaintiff also seeks an award of front pay until the time of her retirement at

age sixty-seven, in approximately twenty-five years. (Plaintiff is now a healthy, forty-two year-old woman.) Her expert's approach, if accepted, would give the Plaintiff a substantial windfall. His presentation of these damages would be irrelevant as Plaintiff's admissions by deposition testimony and interrogatory responses make clear that she is precluded from receiving any award of front pay as she has totally failed to exercise reasonable diligence in searching for comparable employment since the date of her termination from the College.

For the foregoing reasons as well as the reasons set forth below, Plaintiff should not obtain an instruction to the jury on the issue of front pay or present any evidence or argument in support of a claim for front pay.

## ARGUMENT

**I.    PLAINTIFF IS NOT ENTITLED TO AN AWARD OF FRONT PAY AS IT IS NOT A REMEDY EXPRESSLY PROVIDED FOR BY THE FMLA.**

The FMLA does not expressly provide for an award of front pay. If successful in proving a FMLA violation, Plaintiff would be entitled only to damages equal to the amount of "any wages, salary, employment benefits, or other compensation denied or lost to [her] by reason of the violation," prevailing interest, "such equitable relief as may be appropriate, including employment, reinstatement, and promotion," and reasonable fees and costs. 29 U.S.C. § 2617(a)(1), (3). The statute, thus, does not expressly provide for front pay. The Supreme Court has stated that the "cause of action under the FMLA is a restricted one: The damages recoverable are strictly defined." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 739-40 (2003). Additionally, no court in the First Circuit appears to have awarded front pay as a remedy for a FMLA violation.

Aside from the language of the Act, front pay should not be considered as a form of relief under the FMLA since it is a disfavored remedy in that it is entirely speculative in nature and

creates the real possibility that a successful plaintiff will reap a "windfall." *Miller v. AT&T*, 83 F. Supp. 2d 700, 708 (S.D.W.Va. 2000), *aff'd,* 250 F.3d 820 (4th Cir. 2001); *Hite v. Vermeer Mfg Co.*, 361 F. Supp. 2d 935, 944-45 (S.D. Iowa 2005), *aff'd*, 446 F.3d 858 (8th Cir. 2006). Because of the potential for windfall, its use must be tempered. *Miller*, 83 F. Supp. 2d at 708. For these reasons, the College argues that an award of front pay is not available under the FMLA.

## II.  PLAINTIFF IS NOT ENTITLED TO FRONT PAY AS SHE HAS FAILED TO DEMONSTRATE REASONABLE DILIGENCE IN FINDING EMPLOYMENT

Alternatively, should this Court find that the FMLA may be construed to include an award of front pay damages, as admittedly some courts in other circuits have found, the Court, not a jury, decides whether it is appropriate in a particular case. In the context of FMLA and other federal employment statutes, front pay is considered an equitable remedy, not susceptible to legal standards. As such, the decision to award or withhold front pay is, at the outset, within the equitable discretion of the trial court, not the jury. *Lussier v. Runyon*, 50 F.3d 1109, 1108 (1st Cir. 1995); *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 380 (1st Cir. 2004); *Hite*, 361 F. Supp. 2d at 944.

When awarded, front pay is intended to be temporary in nature. *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987). A wrongfully discharged employee must use reasonable diligence in attempting to secure other suitable employment. *Thorson v. Gemini, Inc.*, 96 F. Supp. 2d 882, 890 (N.D. Iowa 1999), *aff'd*, 205 F.3d 370 (8th Cir. 2000) (duty to mitigate in FMLA case); *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32 (1982) (Title VII); *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 15-16 (1st Cir. 1999) (ADA). "An award of front pay 'does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing.'" *Cassino,* 817 F.2d at 1347 (quoting *Whittlesey v. Union Carbide Corp.*, 724, 728 (2d Cir. 1984)).

Front pay gives the former employee only the earnings she would have received if reinstated to her old job at the time of judgment until the time at which the former employee finds comparable or superior employment. *Hite*, 361 F. Supp. 2d at 946. Once the former employee finds such employment, the damages from her unlawful termination, at least the damages that reinstatement/front pay are designed to remedy, are mitigated down to zero. *Id.* Thus, an award of front pay is limited to a finite period of time, after which the plaintiff using reasonable diligence should have found comparable employment. *Criado v. IBM Corp.*, 145 F.3d 437, 445 (1st Cir. 1998); *Selgas v. American Airlines, Inc.*, 104 F.3d 9, 12-13 (1st Cir. 1997); *Ward v. Tipton County Sheriff Dep't*, 937 F. Supp. 791, 796 (S.D. Ind. 1996).

A request for front pay that extends over many years to an estimated retirement date should be closely examined since "the greater the period of time upon which a front pay award is calculated in a case involving an at-will employee the less likely it is that the loss of future earnings can be demonstrated with any degree of certainty or can reasonably be attributed to the illegal conduct of the employer." *Cummings v. Standard Register Co.*, 265 F.3d 56, 66 (1st Cir. 2001) (quoting *Conway v. Electro Switch Corp.,* 402 Mass. 385, 523 N.E.2d 255, 257 (1988)). While the court in *Cummings* did affirm the award of front pay, it did so only after considering the evidence of the former employee's diligent efforts to mitigate his damages. There, the former employee submitted his resume to Internet employment services, unsuccessfully applied for and interviewed for positions with his former company's competitors, acquired a job from which he was later laid off through no fault of his own, and then eventually secured permanent employment earning a substantially lower salary than the one he had while with his former employer. 265 F.3d at 66-67.

Courts have refused to award front pay where the former employee has failed to actively

and consistently seek comparable permanent employment following her termination. *See, e.g., Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc.*, 399 F.3d 52, 67 (1st Cir. 2005); *Sellers v. Delgado College*, 902 F.2d 1189, 1196 (5th Cir. 1990); *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 54 (2d Cir.1998) (vacating an award of front pay where plaintiff did not mitigate his damages); *Frazier v. IBP, Inc*., CNO. 97-0023, 1999 WL 33655745, at *9 (N.D. Iowa Feb. 2, 1999); *see also* C. Geoffrey Warwick, *Employment Discrimination Law,* 1249 n. 106 (2000 supp.).  In *Rodriguez-Torres*, the court reasoned that it could not assess the plaintiff's likely future damages without information on whether the plaintiff would have mitigated those damages by obtaining alternative employment. 399 F.3d at 67 (affirming decision to deny front pay as overly speculative where former employee testified that she applied for a few jobs after her termination but that these applications did not lead to any opportunities and where the testimony on this point was, at best, sketchy).

In *Sellers*, 902 F.2d at 1196, the court held that the former employee did not exercise reasonable diligence in seeking alternative employment, and therefore, denied front pay.  The court reasoned that it was the lack of reasonable diligence on the part of the employee and not any wrong by the employer which accounted for her failure to obtain substantially equivalent employment. *Id*. at 1196.  Specifically, the *Sellers* court explained that the former employee applied for only three jobs in the ten months after her discharge; submitted only nine applications the following year; and over a three-year period averaged less than one job application per month. *Id*. at 1194-95.  The court added that the former employee allowed months to pass without submitting any job applications.  It also noted her lack of diligence in answering job advertisements. *Id*. at 1195.  The court stated that as she continued to remove herself from the job market, she caused herself to become less and less employable in a substantially equivalent

job as she was doing nothing to maintain her skills. *Id*. at 1196; *see also Hite,* 361 F. Supp. 2d at 948 (reducing front pay award where employee had failed to making a showing of sufficient mitigation).

In *Frazier*, 1999 WL 33655745, at *9, the court denied an award of front pay due to his failure to mitigate his damages. The court acknowledged that the plaintiff's lower educational qualifications and shoulder injury understandably limited his ability to find comparable employment, but he had three and a half years to find comparable work, only sixth months of which he spent actively looking (with the rest of his attempts being "few and far between"). It also noted that plaintiff, who was under fifty years of age, had a "substantial work and life expectancy remaining." *Id*.

Here, Plaintiff intends to present evidence of damages through her economic expert, Craig L. Moore, Ph.D., from the date of judgment until her retirement almost twenty-five years from now in 2031. Such evidence should be excluded as irrelevant since Plaintiff is not entitled to such damages, as a matter of law, due to her total failure to seek comparable employment from the time of her termination from the College until the present. Further, to the extent such damages are available, it is for the court to decide and not the jury. To allow the jury to hear an expert opine on damages which they can neither consider nor award would be prejudicial.

Plaintiff's deposition testimony and answers to the College's interrogatories make clear that she has never embarked on a search for full-time employment. Over the past nearly four years, Plaintiff only picked up one local newspaper "from time to time" to learn about available job listings. Deposition of Michelle Beebe, at 23:19 (Feb. 2, 2007) ("Plaintiff's Dep.") (attached as Exhibit A). Since her termination, she only has applied for positions at a Big Y in their bake shop in early 2006, at a Cumberland Farms in approximately September 2006, at Angelina's sub

shop days before her deposition in February 2007, and at the Clarksburg School in their kitchen on some unknown date.  Plaintiff's Dep., at 23:22-26:17; Plaintiff's Answers to Defendant's First Set of Interrogatories, at No. 17 ("Plaintiff's Interrogatory Answers") (attached as Exhibit B).  She inquired about employment at another Cumberland Farms, which was not hiring.  Plaintiff's Dep., at 25:7-9.  She has never applied anywhere as a custodian since her termination.  Id. at 31:23-32:1.

Plaintiff's minimal earnings over the past four years reflect her failure to mitigate damages.  On her federal income tax returns for 2003 through 2006, which she produced in response to the College's document requests, she reported earning no income as wages, salaries, or tips since the date of her termination.  By interrogatory response, she indicated that, in addition to the small amount of money earned in a gardening business, she did earn $1,000 through work for Baystate Nurses and $60 working for Pooches, a pet grooming business run by her sister.  Plaintiff's Interrogatory Answers, at No. 18.  In addition to the limited earnings from her gardening business (discussed below), this represents the totality of earnings in nearly four years.

Additionally, Plaintiff never embarked on a real job search since she already considered herself self-employed, on a full-time basis, in a gardening business.  Plaintiff's Dep., at 20:11-15, 21:12-14.  She has worked in this gardening business since 1998, but while she was employed by the College, she only worked for the business part-time.  Id. at 23:1-6.  In this gardening business, she grows vegetable plants, some flowers and herbs in a small greenhouse and in her cellar under grow lights.  Id. at 20:20-21:4.  She then sells these items at a farmer's market in North Adams.  She testified that she spends "[a]s many [hours] as I can get in … [c]ould be sixty.  I mean from daylight to nighttime, dawn to dusk."  Id. at 21:15-19.  She recognizes that

this business is not financially rewarding; indeed, she unequivocally states, "It's not worth my time." *Id*. at 22:3-5. According to her testimony, she only earns between $1,000 and $2,000 a year on this business. *Id*. at 22:12-13; *see also* Plaintiff's Interrogatory Answers, at No. 18. Nevertheless, she enjoys the business and finds it fulfilling; in fact, she has always loved it. Plaintiff's Dep., at 21:20-22:2.

By concentrating so much time on a gardening business, which she loves, she effectively abandoned any job search efforts. As noted by the court in *Miller v. AT&T*, 83 F. Supp. 2d 700, 709 (S.D.W.Va. 2000):

> [Plaintiff] is certainly entitled to a change of career. However, her new career and lifestyle choice should not be subsidized by [the former employer]. A successful FMLA plaintiff cannot simply reevaluate her career goals, accept a lesser paying job, and receive the same amount of compensation as before through front pay. The possibilities for abuse are patent and the Court finds that front pay is not appropriate in such circumstances.

Although Plaintiff answered the College's interrogatories on December 12, 2006, she has not supplemented these interrogatory responses to indicate applying for employment with any other prospective employers or to report additional income earned. The College should be able to rely upon these admissions as it prepares for trial.

In an analysis of awarding front pay, the Plaintiff's failure to undertake a reasonable job search by itself precludes Plaintiff from an award of front pay. The College need not present evidence that comparable positions existed since the date of her termination in 2003, although it is prepared to do so if this Motion is denied. *See, e.g. Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 15-16 (1st Cir. 1999); *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54-55 (2d Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991); *Sellers v. Delgado College*, 902 F.2d at 1193.

## Conclusion

Therefore, as a matter of law, Plaintiff's total failure to exercise reasonable diligence in finding comparable permanent employment over the past four years precludes her from an award of front pay damages. For the foregoing reasons, the College requests that this Motion *in Limine* be granted and the Court issue an order precluding Plaintiff from obtaining an instruction to the jury on the issue of front pay or presenting any evidence or argument in support of a claim for front pay.

Respectfully submitted,
Williams College
By its attorneys,


*/s/  Patricia M. Mullen*
Judith A. Malone (BBO #316260)
Patricia M. Mullen (BBO # 663318)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199-7613
617.239.0100
jmalone@eapdlaw.com
pmullen@eapdlaw.com

Dated: July 2, 2007

CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/  Patricia M. Mullen

# EXHIBIT A

## Page 1

```
         UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACUSETTS

MICHELLE BEEBE
   vs.                    Civil Action No. 05-30182
                          Pages 1-226
WILLIAMS COLLEGE

     DEPOSITION OF: MICHELLE BEEBE, taken
before Heather J. Davis, Certified Shorthand
Reporter and Notary Public, pursuant to Rule 30 of
the Federal Rules of Civil Procedure, at the
offices of Grinnell, Dubendorf & Smith, Bank
Street, Williamstown, Massachusetts on February 2,
2007, commencing at 10:45 AM.

APPEARANCES:
(SEE PAGE TWO)


              Heather J. Davis
              Registered Merit Reporter




                   DAVIS & MITCHELL
                    P.O. Box 1367
                  Pittsfield, MA 01202
          Tel. (413) 499-0035    Fax (413) 499-7823
                   DAVIS & MITCHELL
                    (413) 499-0035
```

## Page 2

APPEARANCES:

HEISLER, FELDMAN, MCCORMICK & GARROW, P.C., 1145 Main Street, Springfield, Massachusetts, 01103, representing the Plaintiff.
BY: THOMAS J. MCCORMICK, ESQUIRE

EDWARDS ANGELL PALMER & DODGE, 111 Huntington Avenue, Boston, Massachusetts, 02199, representing the Defendant.
BY: JUDITH A. MALONE, ESQUIRE
    PATRICIA M. HIGGINS, ESQUIRE

DAVIS & MITCHELL
(413) 499-0035

## Page 3

INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHELLE BEEBE | 5 | 209 | 212 | 219 |
|  |  | 221 |  |  |

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Answers to Interrogatories | 11 |
| Exhibit 2 | Offer of Employment, 10/17/88 | 54 |
| Exhibit 3 | Document | 60 |
| Exhibit 4 | Williams College Dining Services Handbook Receipt | 60 |
| Exhibit 5 | Building and Grounds Handbook | 64 |
| Exhibit 6 | Custodial meeting summary | 71 |
| Exhibit 7 | Attendance calendar | 72 |
| Exhibit 8 | Functional Capacity Form | 76 |
| Exhibit 9 | Treatment Form | 79 |
| Exhibit 10 | FMLA Request for Leave | 86 |
| Exhibit 11 | FMLA Request for Leave | 99 |
| Exhibit 12 | Document | 105 |
| Exhibit 13 | Letter dated 7/1/03 | 108 |
| Exhibit 14 | Family and Medical Leaves of Absence Policy | 114 |
| Exhibit 15 | Certification of Healthcare Provider | 126 |
| Exhibit 16 | Handwritten note | 151 |

DAVIS & MITCHELL
(413) 499-0035

## Page 4

EXHIBITS CONTINUED:

| Exhibit 17 | NARH record, 7/27/03 | 175 |
|---|---|---|
| Exhibit 18 | Radiology report, 7/27/03 | 178 |
| Exhibit 19 | NARH Note | 179 |
| Exhibit 20 | Note dated 7/30/03 | 184 |
| Exhibit 21 | Handwritten note, 7/31/03 | 188 |
| Exhibit 22 | Letter dated 8/4/03 | 201 |
| Exhibit 23 | Handwritten document | 202 |

DAVIS & MITCHELL
(413) 499-0035

**17**

1  both be working in the same department?
2     A.  No.
3     Q.  Okay. And when did you stop working
4  at Williams?
5     A.  August 3, '04.
6     Q.  And prior to working as a custodian
7  in buildings and grounds, did you ever have any
8  attendance problems at Williams College?
9     A.  Yes.
10    Q.  All right. And when did you have
11 those problems?
12    A.  Consistently.
13    Q.  So all through your employment at
14 Williams College you had attendance problems?
15    A.  Are you talking buildings and grounds
16 or the whole --
17    Q.  No. I'm talking before you went to
18 buildings and grounds. Let's take buildings and
19 grounds and put it aside.
20    A.  Okay.
21    Q.  From the time you went to Williams
22 College as a salad B, through the time you went
23 to buildings and grounds, which I believe is
24 April of 2001, did you ever have attendance

**18**

1  problems in that period of time?
2     A.  Yes, I believe.
3     Q.  Often?
4     A.  I can't recall that. I wouldn't say
5  often.
6     Q.  Okay. Were you ever disciplined for
7  attendance problems?
8     A.  I was brought in for a talk.
9     Q.  Do you remember when that happened?
10    A.  I don't recall the time but it was
11 with my supervisor, Carol Luscier, and I can't
12 remember the person that was in charge at the
13 time, who no longer works there. He gave me a
14 verbal warning. He understood my kids were sick.
15 He told me that I just needed to try to correct
16 the problem.
17    Q.  So this was then toward the end of
18 your tenure in the snack bar, because you had
19 children at that point? Is that after you had
20 both of your last two children?
21    A.  I think it was prior to that, because
22 I had my older son at the time, which had
23 bronchial asthma conditions, also.
24    Q.  So do you think it was before you had

**19**

1  your last two children or after?
2     A.  It was before I had my last two
3  children.
4     Q.  All right. So you just had the one
5  child at that point?
6     A.  Right.
7     Q.  And was his health the only reason
8  that you were having attendance problems?
9     A.  Yes, I believe that was the case.
10    Q.  And was he living with you at the
11 time?
12    A.  Yes.
13    Q.  For what period of time did your
14 older son Nicholas live with you?
15    A.  I want to say David was six months --
16 I would say it was 1999 to maybe the beginning of
17 2000.
18    Q.  That's the period of time he lived
19 with you?
20    A.  No. He lived with me all his life up
21 until then.
22    Q.  Up until either 1999 or 2000?
23    A.  Correct.
24    Q.  And can you tell me why he no longer

**20**

1  lived with you after that?
2     A.  He chose to live with his father.
3     Q.  Okay. Now, after you were terminated
4  from Williams College did you apply for
5  unemployment benefits?
6     A.  Yes, I did.
7     Q.  All right. And did you receive them?
8     A.  Yes, I did.
9     Q.  And are you currently employed?
10    A.  No.
11    Q.  Are you self-employed?
12    A.  Yes.
13    Q.  And what is the nature of your
14 self-employment?
15    A.  Gardening. Gardening business.
16    Q.  And tell me what's entailed in that
17 gardening business, Miss Beebe.
18    A.  It's a lot of work. It's starting
19 seedlings, transplanting, getting them ready.
20    Q.  Do you have a greenhouse where you
21 live?
22    A.  We have a small one, and I have grow
23 lights, I do it down cellar, and then I bring
24 them up onto my sun porch. There's a process

DAVIS & MITCHELL
(413) 499-0035

## Page 21

1  that we do.
2     Q.  Are these house plants or vegetables?
3     A.  **Vegetable plants, some flowers, and herbs.**
5     Q.  And when you are ready to transplant them, do you transplant them on to your own property to grow them?
8     A.  **Well, yeah, and also to sell.**
9     Q.  To sell them as plants for people who want their own gardens?
11    A.  **Right.**
12    Q.  Okay. And is that a full-time occupation?
14    A.  **Yes.**
15    Q.  And about how many hours a week do you spend on that business?
17    A.  **As many as I can get in. I can't recall. Could be sixty. I mean from daylight to nighttime, dawn to dusk.**
20    Q.  Do you enjoy that business?
21    A.  **Yes, I do.**
22    Q.  Is it something you find fulfilling?
23    A.  **Yes.**
24    Q.  And is it something you've wanted to

DAVIS & MITCHELL
(413) 499-0035

## Page 22

1  do for a while?
2     A.  **I've always loved it.**
3     Q.  And how much do you earn with this gardening business?
5     A.  **It's not worth my time. It's not worth my time. Every year is different. I'm not sure how you want -- do you want a figure?**
8     Q.  Just if you can give me a range, that would be fine.
10    A.  **I'm not exactly sure what I had wrote down, I don't have my book in front of me, but we try to keep logs. It could be anywhere from a thousand to two thousand.**
14    Q.  And what are in these logs that you keep?
16    A.  **The type of produce that we have, what we sold on that given day. You know what I mean? It's just a log to give us some idea --**
19    Q.  Sure.
20    A.  **-- for the following year of what more to do or what less to do.**
22    Q.  And how long have you actually been in this business?
24    A.  **Since I married my husband.**

DAVIS & MITCHELL
(413) 499-0035

## Page 23

1     Q.  So since 1998? No. '98?
2     A.  **Yeah.**
3     Q.  And so you did it on a part-time basis while you were still employed?
5     A.  **As part-time, maybe more. Like I said, between work and that, it was a lot.**
7     Q.  More than a full-time job?
8     A.  **Meaning just --**
9     Q.  Both of them?
10    A.  **Oh, yeah. Yeah.**
11    Q.  Are you currently looking for full-time employment outside of the gardening business?
14    A.  **Yes. Yes, I am.**
15    Q.  And what are you doing to find full-time employment outside of the gardening business?
18    A.  **I've filled out some applications. I've picked up The Advocate from time to time. I have applied, with no response.**
21    Q.  Can you tell me where you've applied?
22    A.  **I applied at Big Y.**
23    Q.  All right. And did you get a response from Big Y?

DAVIS & MITCHELL
(413) 499-0035

## Page 24

1     A.  **I didn't even get through my application and they said they had other people more qualified.**
4     Q.  All right. So you didn't even fill out an application?
6     A.  **Yes, I did.**
7     Q.  Oh, okay. And they told you right then they had other people?
9     A.  **On the computer, yes.**
10    Q.  Okay. And when was that, do you recall?
12    A.  **I want to say, and I'm not exactly sure, it could have been over a year ago.**
14    Q.  Is there anything you could look at that would tell you when that happened?
16    A.  **Not to my knowledge, no.**
17    Q.  All right. Where else have you applied?
19    A.  **Cumberland Farms.**
20    Q.  All right. And when did you apply at Cumberland Farms?
22    A.  **I actually applied at two Cumberland Farms.**
24    Q.  Okay. And which two Cumberland Farms

DAVIS & MITCHELL
(413) 499-0035

### 25

1  did you apply at?
2  A.  On Union Street about six months ago.
3  Q.  Union Street where?
   A.  North Adams, Mass.
5  Q.  All right. And did you fill out an
6  application?
7  A.  I went in seeking work. I didn't
8  exactly fill out an application at that one
9  because they weren't hiring.
10  Q.  Okay. And where is the second
11  Cumberland Farms that you sought work from?
12  A.  Ashland Street.
13  Q.  And where is that?
14  A.  In North Adams, Mass.
15  Q.  And what happened with that attempt?
16  A.  I filled it out and never got called.
17  Q.  So you don't know why you were never
18  called?
19  A.  No, I don't. For that reason, no.
20  Q.  And at Big Y they told you that they
21  had other more qualified applicants?
22  A.  Yes. And I believe it was because I
23  didn't -- I always tell the truth, and I told
24  them I was terminated. They asked me on the

DAVIS & MITCHELL
(413) 499-0035

### 26

1  application if I was terminated, I said yes.
2  Q.  Okay.
3  A.  And as I finished filling out the
4  application, it came up, thank you but we might
5  have more qualified people. And that's how that
6  happened.
7  Q.  And you never heard anymore from
8  them, is that right?
9  A.  Right.
10  Q.  And anyplace else you've applied?
11  A.  Angelina's.
12  Q.  All right. And when did you apply at
13  Angelina's?
14  A.  Actually, it was the other night.
15  The other day, excuse me.
16  Q.  Which day, I'm sorry?
17  A.  Three days ago.
18  Q.  And what caused you to apply at
19  Angelina's three days ago?
20  A.  Two things. An ad in the paper and a
21  help wanted sign in the window.
22  Q.  And what is Angelina's?
23  A.  It's a sub shop.
24  Q.  And where are they located?

DAVIS & MITCHELL
(413) 499-0035

### 27

1  A.  Ashland Street Plaza there, North
2  Adams.
3  Q.  And did you fill out an application?
4  A.  Yes, I did.
5  Q.  And what happened?
6  A.  I handed it in that day. That night
7  I received a phone call from the owner. There
8  was two shifts that they wanted, they wanted a
9  9:00 to 5:00, which I thought would be pretty
10  much perfect for me, and then they wanted 5:00 to
11  12:00, which I couldn't do. My husband works
12  second and third shift. So when he called me he
13  said he was impressed with my application, with
14  thirteen years in food service, but he said he
15  had a question, he wanted to know why I left
16  Williams College. And I said, well, I didn't
17  leave willingly. And he said, may I ask why?
18  And I said, well, I was terminated. I said,
19  we're in the process of dealing with it. That's
20  all I said. And he changed his tune and said,
21  well, I need somebody who is going to be
22  flexible, but I'll keep your application on hold.
23  And that was it.
24  Q.  And is that everything you told him

DAVIS & MITCHELL
(413) 499-0035

### 28

1  about the reasons that you left Williams College?
2  A.  Yup.
3  Q.  That you didn't leave willingly and
4  that you were dealing with it?
5  A.  Right. That's what I said.
6  Q.  Anyplace else?
7  A.  For a time period I worked with
8  Baystate Nurses.
9  Q.  What did you do for Baystate Nurses?
10  A.  Home healthcare.
11  Q.  And what are your qualifications for
12  home healthcare?
13  A.  Are you asking qualifications or what
14  my job entailed?
15  Q.  Let me ask you that first, what was
16  your job?
17  A.  Sitting with sick people, helping
18  them, feeding them, cooking for them, shopping
19  for them.
20  Q.  And how long did you do that?
21  A.  Bathing them.
22  Q.  And how long did you do that?
23  A.  I can't recall how long, because it
24  was like a sporadic job, it's off and on. When I

DAVIS & MITCHELL
(413) 499-0035

**29**

1  lose one, if there's nothing else for me, I have
2  to wait. It could be -- there was occasions
3  where I had one woman three days a week to go
4  bathe her for an hour. Actually, I had two of
5  them, you know, just go in and bathe them, make
6  sure they're all set, put clean clothes on them.
7  That would be three hours a week. The other one
8  was three hours a week, it would be like Monday,
9  Wednesday and Friday. I did have a case with a
10 cancer patient that I had, that was full-time. I
11 want to say for about -- I want to say, and this
12 is just roughly guessing, three months or so, and
13 then she passed away.
14      Q.   Are you still sort of on call for
15 Baystate Nursing?
16      A.   They have not called me back. I had
17 called them at one point and they had nothing for
18 me.
19      Q.   All right. And when was that that
20 you called them?
21      A.   I haven't heard from them in about,
22 I'd say, roughly six months.
23      Q.   And do you have any reason to believe
24 that there's any reason other than a lack of work

DAVIS & MITCHELL
(413) 499-0035

**30**

1  that they haven't called you?
2       A.   They were always very happy with my
3  work. I believe it's lack of work.
4       Q.   And where is their office located, do
5  you know?
6       A.   They're located in Pownal, Vermont.
7  It's an office out of her home.
8       Q.   Okay. And who is the her?
9       A.   Sue Rebadou.
10      Q.   Can you spell that last name?
11      A.   I don't know if I can. R-E-B-A-D-O-U
12 or something. It's just a really weird spelling,
13 I'm sorry, I can't.
14      Q.   That's okay. Do you know if they
15 have a website?
16      A.   I'm not sure.
17      Q.   Have you ever -- have you applied --
18 in the last three years have you applied anywhere
19 else for work?
20      A.   I didn't apply. I filled in. I
21 tried to learn -- my mother and my sister have a
22 grooming, dog grooming place, and for a couple
23 months they tried to train me. You know, it was
24 more or less ten dollars for three hours to go in

DAVIS & MITCHELL
(413) 499-0035

**31**

1  and bathe dogs and learn how to bathe them, and
2  it didn't work out. They weren't getting enough
3  business. So that stopped.
4       Q.   So have you now told me all of the
5  efforts you've made to find employment since
6  2003?
7       A.   Well, there's one that I actually
8  thought it was a favor, my brother asked me to
9  clean his house for like I think it was a
10 three-month term, off and on, and I would once a
11 week clean his house and he'd give me twenty
12 dollars. But I didn't look at it as income, I
13 looked at it as I was doing a favor for my
14 brother.
15      Q.   But aside from that and trying to
16 learn dog grooming, are there any other regular
17 full-time jobs that you've applied for since
18 2003?
19      A.   I don't believe.
20      Q.   All right. Have you ever applied for
21 any custodian positions since leaving Williams
22 College?
23      A.   No, I don't believe there was any
24 that I was aware of or read about. There was one

DAVIS & MITCHELL
(413) 499-0035

**32**

1  I could have but it was at night.
2       Q.   Okay.
3       A.   And I think it was for a school.
4       Q.   Okay. Now, you just sat through your
5  husband's deposition and he has worked at the
6  college for six or seven years, is that correct?
7       A.   Correct.
8       Q.   And when you were an employee of the
9  college your family's health insurance was
10 through you, is that correct?
11      A.   Correct.
12      Q.   And after you were terminated did you
13 receive health insurance through your husband?
14      A.   Yes.
15      Q.   All right. Now, are you aware of any
16 bills that were not paid because of any gap in
17 your insurance between your coverage and that
18 through your husband?
19      A.   As he said, that one day.
20      Q.   There was a one-day gap?
21      A.   Yeah. That we weren't covered.
22      Q.   Did you incur any expenses as a
23 result of that one-day gap?
24      A.   I think so. I think we were billed

DAVIS & MITCHELL
(413) 499-0035

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION
NO. 05-30182-MAP

MICHELLE BEEBE,

        Plaintiff,

v.

WILLIAMS COLLEGE,

        Defendant.

## PLAINTIFF'S ANSWERS TO THE DEFENDANT'S FIRST SET OF INTERROGATORIES

The Plaintiff, Michelle Beebe, answers the Defendant's first set of interrogatories as follows:

INTERROGATORY NO.1:

Identify each and every person, other than those already identified as part of Plaintiff's Initial/Automatic Disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A), who has knowledge of any of the facts alleged in the Complaint, including, without limited to, facts concerning any ailment or health condition from which you suffered in July 2003; any ailment or health condition from which any of your children suffered from during the period from "prior to January, 2002 to July, 2003;" and your termination from Williams; and describe with particularity the information you believe to be known or possessed by each such person.

Describe any and all efforts by you to find employment since August 5, 2003, and as part of your answer, identify each and every employer for whom you have worked since your termination from Williams.

ANSWER NO. 17:

I have been self-employed doing a garden business. I have three gardens that I tend and I sell produce grown in the garden at the farmer's market in North Adams, MA. I also sell home made goods, such as jams, at the market.

I worked for a short while at Pooches, a pet grooming business run by my sister.

I also worked for over a year for Baystate Nurses, Pownal, Vermont, ran by Susan Rebideaux (sic).

I have applied to work at the Big-Y in their bake shop; the Clarksburg School, in their kitchen; and at Cumberland Farms, Union Street, N. Adams, MA. I was not hired at any of the above places.

I look through the want ads of the local papers.

INTERROGATORY NO. 18:

State all income earned or received by you from any source during the period from August 5, 2003 through the present, including any monies you received as unemployment benefits from the Commonwealth of Massachusetts.

ANSWER NO. 18:

I earned approximately the following amounts each year from my gardening business: 2003 (after 8/4/03) -- $500.00; 2004 -- $1,687.50; 2005 -- $1,500.00; 2006 -- $1,525.00.

I earned about $1,000.00 working for Baystate for a little over one year -- mostly during 2005.

I earned about $60.00 when I worked for Pooches.

21

Signed under the pains and penalties of perjury this 12th day of Dec, 2006.

_____
Michelle Beebe

Respectfully submitted,
MICHELLE BEEBE
By Her Attorney,

Dated: 12/12/06

_____
Thomas J. McCormick, BBO # 561760
Heisler, Feldman, McCormick
& Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988
Fax (413) 788-7996

CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served by first class mail upon the attorneys of record for the Defendant on 12/12, 2006.

_____
Thomas J. McCormick

23