UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE BEEBE,<br><br>     Plaintiff,<br><br>v.<br><br>WILLIAMS COLLEGE,<br><br>     Defendant. | Civil Action No. 05-30182 |

# DEFENDANT'S MOTION IN LIMINE NO. 7 TO PRECLUDE ANY ARGUMENT OR EVIDENCE ON THE ISSUE OF THE HEALTH CONDITIONS OF PLAINTIFF'S CHILDREN

Defendant Williams College (the "College") hereby moves the Court for an order precluding Plaintiff Michelle Beebe ("Plaintiff") from presenting any evidence or argument in support of a claim that she was entitled to FMLA leave based on absences purportedly attributed to the health of one or both of her two minor children prior to July 2003. Plaintiff waived her claim that these absences were covered by the FMLA when she failed to obtain a medical certification supporting those absences.

**Factual Background and Summary of Argument**

In this case, Plaintiff argues that the College violated the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA") when it disciplined her and ultimately terminated her for excessive absenteeism. Specifically, she claims that the College "interfered with [her] rights under the FMLA by failing and refusing to grant [Plaintiff] medical leave to care for the serious medical conditions of her minor children during the period from before January 1, 2002 until July 2003." Complaint, at ¶ 46 (Docket Entry No. 1). Furthermore, she alleges that the College "discriminated against [her] in violation of the FMLA by disciplining [Plaintiff] for taking

medical leave to care for the serious medical conditions of her minor children." *Id.*, ¶ 48.

After receiving four verbal warnings concerning her poor attendance since September 2001, Plaintiff received a written warning on July 1, 2003 from Beatrice Miles, Manager, Custodian Services/Special Functions. Letter from Beatrice Miles to Michelle Beebe (July 1, 2003) (attached as Exhibit A). This written warning letter indicates that it serves as "the next step in the College's disciplinary process because of this excessive use of unscheduled time off." Miles also wrote as follows:

> Much of the time taken has been because of child care issues and although I am sympathetic to the challenges associate with child care, it is my expectation that you would make appropriate arrangements so that you can meet the requirements of your work schedule. If you need time off because of serious childcare issues you are entitled to apply for FMLA (Family Medical Leave Act) leave as outlined in your staff handbook. If you choose to apply for FMLA leave and it is granted, it is my expectation that when you return to work, you will be able to dramatically improve your attendance. If you do not take FMLA leave at this time, please understand that I expect to see an immediate improvement in your attendance.
>
> Michelle, your excessive use of unscheduled time off is not acceptable and continued absenteeism will result in further disciplinary action up to and including termination.

*Id.*

Plaintiff testified at her deposition that she met with Miles on July 1, 2003 concerning her written warning. Deposition of Plaintiff Michelle Beebe, at 106:18-20 (Feb. 2, 2007) ("Plaintiff's Dep.") (attached as Exhibit B). Peter Mason, Plaintiff's immediate supervisor, was present for this meeting. *Id.* at 108:9-11. During the meeting, Miles reviewed the written warning letter with Plaintiff, including the section referring specifically to the FMLA. *Id.* at 110:7-12. According to Plaintiff, Miles explained to her that the FMLA applies to take care of seriously ill children. *Id.* at 110:15-20. Plaintiff testified that Miles told her to speak with Kris

Maloney in the Benefits Office if her children have any serious health issues. *Id.* at 110:15-20. She further was told by Miles that if FMLA leave is not taken, Plaintiff's attendance had to improve immediately. *Id.* at 112:7-11. From her conversation with Miles, Plaintiff knew that her "job was on the line," that is, that she could lose her job if her attendance did not improve. *Id.* at 112:12-113:4.

Plaintiff admits that she followed Miles' instruction and spoke by phone with Maloney within a day or two of receiving her written warning. *Id.* at 109:15-16, 110:15-20, 119:1-10. According to Plaintiff, in her conversation with Maloney, Plaintiff learned that she could be granted twelve weeks of unpaid leave if the children had a serious enough condition. *Id.* at 117:18-22. When speaking with Maloney, Plaintiff states that she expressed her concerns about whether her children's illnesses were serious. *Id.* at 120:10-14. Plaintiff testified that Maloney said she would send Plaintiff "some papers" and "they at the end would determine family medical leave, whether my children's illnesses were serious enough or not to be granted the Family and Medical Leave Act." *Id.* at 120:17-23, 122:15-19. Plaintiff indicated that she and Maloney agreed that Maloney would leave the papers out for Plaintiff's husband, an employee of the College, to pick up because he had to go to the Benefits Office anyway to get his paycheck stubs. *Id.* at 122:20-123:8.

At her deposition, Plaintiff claimed that she never received the papers from Maloney. *Id.* at 123:13-15. Plaintiff, however, never called Maloney back in order to get another set sent to her because "maybe I misunderstood, thinking I had thirty days, but my husband and I didn't come up with a conclusion on the thing yet, I don't believe." *Id.* at 123:16-124:6, 125:15-20; *see also id.* at 119:11-15. She thought she had thirty days to act in order to get leave designated as FMLA. *Id.* at 123:24-124:11. Plaintiff also did not call her immediate supervisor, Mason, or

Miles to ask them any questions about the FMLA during this period. *Id.* at 125:21-24.

After speaking with both Miles and Maloney, Plaintiff discussed with her husband whether they could manage twelve weeks of unpaid leave and whether their children's illnesses were serious enough. *Id.* at 118:5-9. During this period, Plaintiff also consulted her employee handbook, as suggested by Miles in her written warning letter to Plaintiff. *Id.* at 113:9-20. Plaintiff reviewed the sections of the College's handbook explaining intermittent leave. *Id.* at 117:24-118:3, 119:17-23, 121:1-5.

Plaintiff should be precluded from presenting any evidence or argument in support of a claim that she was entitled to FMLA leave based on absences purportedly attributed to the health of one of her two minor children before July 1, 2003 as she has already conceded by deposition testimony that she failed to timely submit to her employer a medical certification supporting those absences.

## ARGUMENT

If an employee provides sufficient notice to make the employer aware that the employee is requesting time off for a potentially serious health condition, an employer has the right under the FMLA to require that an employee support her request for leave with a medical certification issued by the employee's health care provider. 29 U.S.C. § 2613(a); 29 C.F.R. § 825.305(a). Once requested, the employee must provide a completed copy of the certification to the employer. § 825.305(b). The employer must allow the employee at least fifteen calendar days after the request to comply. *Id.* The regulations provide guidance to an employer who doubts the validity of a medical certification and provides that such an employer may obtain a second opinion. § 825.307. However, this procedure for obtaining a second opinion is not triggered where an employee fails to submit *any* portion of the medical certification. The regulations, in

two separate provisions, make clear that "If the employee never produces the certification, the leave is not FMLA leave." §§ 825.311(b), 825.312(b). *See also Urban v. Dolgencorp of Texas, Inc.*, 393 F.3d 572, 576 (5th Cir. 2004) (noting failure to submit medical evidence of any kind prior to the specified deadline).

Here, the College requested medical certification from the Plaintiff on or about July 1, 2003, and it is undisputed, that by the time of Plaintiff's termination on August 4, 2003, Plaintiff had neglected to obtain a certification supporting the absences which she attributed to caring for her sick children. After meeting with both her supervisor and the benefits administrator and after consulting the FMLA policy as set forth in the College's employee handbook, Plaintiff understood that she needed to obtain a medical certification from a health care provider to support a claim for FMLA leave on account of her children's absences. She was counseled about the FMLA and warned, in writing, that a failure to immediately improve her attendance could result in termination. She concedes that she did not obtain a certification from a health care provider, in part, because she mistakenly believed she had thirty, rather than fifteen, days to comply. Plaintiff's Dep. at 123:16-124:6, 125:15-20. She and her husband were spending that time determining whether leave would be manageable and whether the children really suffered from serious conditions. *See id.* at 118:5-9, 123:21-23.

Even if it could be believed that Plaintiff did not receive the medical certification form that Maloney made available to Plaintiff's husband per their arrangement, "there is nothing in the FMLA that requires an employer to request medical documentation on a particular form." *Urban*, 393 F.3d at 576 n.3. Plaintiff simply opted against obtaining the certification because she too did not think her children suffered from serious health conditions. Plaintiff's decision, made more than four years ago, should preclude her right to now claim that she was entitled to

leave for numerous absences she attributes to her sick children.

## Conclusion

For the foregoing reasons, the College requests that the Court grant this Motion *In Limine* precluding Plaintiff from presenting any evidence or argument in support of a claim that she was entitled to FMLA leave based on absences purportedly attributed to the health of one or both of her two minor children prior to July 2003. Plaintiff waived her claim that these absences were covered by the FMLA when she failed to obtain a medical certification supporting those absences.

> Respectfully submitted,
> Williams College
> By its attorneys,
>
> /s/ Patricia M. Mullen
> Judith A. Malone (BBO #316260)
> Patricia M. Mullen (BBO # 663318)
> EDWARDS ANGELL PALMER & DODGE LLP
> 111 Huntington Avenue
> Boston, MA 02199-7613
> 617.239.0100
> jmalone@eapdlaw.com
> pmullen@eapdlaw.com

Dated: July 2, 2007

### CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Patricia M. Mullen

# EXHIBIT A

**WILLIAMS COLLEGE**  WILLIAMSTOWN, MASSACHUSETTS 01267

RECEIVED JUL 02 2003 HUMAN RESOURCES WILLIAMS COLLEGE



*OFFICE OF THE DIRECTOR OF FACILITIES*
*AND AUXILIARY SERVICES*
60 Latham Street
TEL: (413) 597-2301
FAX: (413) 597-4141

Michelle Beebe
509 North Houghton Street
Clarksburg, MA 01247

July 1, 2003

Dear Michelle,

On a number of occasions beginning in September of 2001 you have been given verbal warnings about your absenteeism. At each of those times you have expressed a desire to improve your attendance record; however you have been unable to do so. In 2002 you used 10.5 days of sick time and took another 10.4 days without pay. Since January of this year you have taken 7.2 days of sick time and another 19 days without pay. As a result, I am writing this letter as the next step in the College's disciplinary process because of this excessive use of unscheduled time off.

Much of the time taken has been because of child care issues and although I am sympathetic to the challenges associated with child care, it is my expectation that you would make appropriate arrangements so that you can meet the requirements of your work schedule. If you need time off because of serious childcare issues you are entitled to apply for FMLA (Family Medical Leave Act) leave as outlined in your staff handbook. If you choose to apply for FMLA leave and it is granted, it is my expectation that when you return to work, you will be able to dramatically improve your attendance. If you do not take FMLA leave at this time, please understand that I expect to see an immediate improvement in your attendance.

Michelle, your excessive use of unscheduled time off is not acceptable and continued absenteeism will result in further disciplinary action up to and including termination.

Sincerely,

*[signature]*

Beatrice M. Miles
Manager Custodial Services/Special Functions

Cc: Martha Tetrault
    File

WIL 00266

# EXHIBIT B

---

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

**MICHELLE BEEBE**

vs.                Civil Action No. 05-30182
                   Pages 1-226
**WILLIAMS COLLEGE**

    DEPOSITION OF: **MICHELLE BEEBE**, taken before Heather J. Davis, Certified Shorthand Reporter and Notary Public, pursuant to Rule 30 of the Federal Rules of Civil Procedure, at the offices of Grinnell, Dubendorf & Smith, Bank Street, Williamstown, Massachusetts on February 2, 2007, commencing at 10:45 AM.

APPEARANCES:

(SEE PAGE TWO)

Heather J. Davis
Registered Merit Reporter

DAVIS & MITCHELL
P.O. Box 1367
Pittsfield, MA 01202
Tel. (413) 499-0035    Fax (413) 499-7823

DAVIS & MITCHELL
(413) 499-0035

---

2

APPEARANCES:

HEISLER, FELDMAN, MCCORMICK & GARROW, P.C., 1145 Main Street, Springfield, Massachusetts, 01103, representing the Plaintiff.
BY: THOMAS J. MCCORMICK, ESQUIRE

EDWARDS ANGELL PALMER & DODGE, 111 Huntington Avenue, Boston, Massachusetts, 02199, representing the Defendant.
BY: JUDITH A. MALONE, ESQUIRE
    PATRICIA M. HIGGINS, ESQUIRE

DAVIS & MITCHELL
(413) 499-0035

---

3

INDEX

WITNESSES:       DIRECT  CROSS  REDIRECT  RECROSS

MICHELLE BEEBE     5      209    212      219
                                           221

| EXHIBITS: | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Answers to Interrogatories | 11 |
| Exhibit 2 | Offer of Employment, 10/17/88 | 54 |
| Exhibit 3 | Document | 60 |
| Exhibit 4 | Williams College Dining Services Handbook Receipt | 60 |
| Exhibit 5 | Building and Grounds Handbook | 64 |
| Exhibit 6 | Custodial meeting summary | 71 |
| Exhibit 7 | Attendance calendar | 72 |
| Exhibit 8 | Functional Capacity Form | 76 |
| Exhibit 9 | Treatment Form | 79 |
| Exhibit 10 | FMLA Request for Leave | 86 |
| Exhibit 11 | FMLA Request for Leave | 99 |
| Exhibit 12 | Document | 105 |
| Exhibit 13 | Letter dated 7/1/03 | 108 |
| Exhibit 14 | Family and Medical Leaves of Absence Policy | 114 |
| Exhibit 15 | Certification of Healthcare Provider | 126 |
| Exhibit 16 | Handwritten note | 151 |

DAVIS & MITCHELL
(413) 499-0035

---

4

EXHIBITS CONTINUED:

| Exhibit 17 | NARH record, 7/27/03 | 175 |
|---|---|---|
| Exhibit 18 | Radiology report, 7/27/03 | 178 |
| Exhibit 19 | NARH Note | 179 |
| Exhibit 20 | Note dated 7/30/03 | 184 |
| Exhibit 21 | Handwritten note, 7/31/03 | 188 |
| Exhibit 22 | Letter dated 8/4/03 | 201 |
| Exhibit 23 | Handwritten document | 202 |

DAVIS & MITCHELL
(413) 499-0035

**105**

1 two together, though. You know what I mean? I
2 thought it was a benefit. Yes, I did read that,
3 but maybe I just didn't comprehend it. Maybe I
4 didn't like dwell on it.
5     Q. (BY MS. MALONE) Is there anything
6 ambiguous about that sentence that I just read to
7 you?
8     A. No.
9         (Exhibit Number 12
        offered and marked for
10         identification)
11     Q. (BY MS. MALONE) I'm showing you a
12 document that's been marked Beebe Exhibit 12,
13 Miss Beebe. Have you ever seen this posting
14 before?
15     MR. MCCORMICK: Objection.
16     MS. MALONE: What's your
17 objection?
18     MR. MCCORMICK: That it's a
19 posting, that it is a posting --
20     Q. (BY MS. MALONE) Have you ever seen
21 this document before?
22     A. I don't believe I have.
23     Q. Well, have you ever been inside of
24 the human resources office at the college, going

**106**

1 back to 2002-2003, when I believe they were
2 located in Dropper's and Hopkins Hall?
3     A. I've been in those buildings, yes.
4     Q. All right. Did you ever see Exhibit
5 12 in either of those buildings?
6     A. If they were, I wasn't looking for
7 them.
8     Q. Okay. Did you ever see it inside the
9 break room of the building and grounds
10 department?
11     A. No, I never took break in there.
12     Q. Okay. Where did you take your
13 breaks?
14     A. Perry House. Wherever we all decided
15 to join for lunch. Or we'd go grab something to
16 eat. The snack bar. Maybe even on Spring
17 Street.
18     Q. Now, do you recall speaking with Bea
19 Miles on July 1st, 2003?
20     A. Yes.
21     Q. And that was the day that she gave
22 you a formal written warning, isn't that correct?
23     A. Correct.
24     Q. And during the conversation with Miss

**107**

1 Miles in 2003 didn't she tell you about the
2 Family and Medical Leave Act?
3     A. She asked me if I've heard of it.
4     Q. All right. And what did you tell
5 her?
6     A. Right then and there, I said no.
7     Q. Even though the year before you
8 had -- in the last two years you had been
9 granted -- or I'm sorry, strike that.
10     In the last three years you had
11 been granted two leaves under the Family Medical
12 Leave Act.
13     A. I could have been caught off guard,
14 because I was in there for a warning. Maybe my
15 thoughts weren't clear but that is what I said.
16     Q. Isn't it true that you told Ms. Miles
17 that you didn't need Family and Medical Leave Act
18 leave to deal with the issues?
19     A. I don't recall saying that.
20     Q. Well, tell me everything that you
21 recall being said about -- well, she handed you a
22 letter. Let me strike that.
23     A. Right.
24     Q. She handed you a letter that day.

**108**

1     MS. MALONE: Let's mark that as
2 the next exhibit.
3     (Exhibit Number 13
    offered and marked for
4     identification)
5     Q. (BY MS. MALONE) Is this the letter,
6 Exhibit 13, the letter that you received from
7 Ms. Miles on or about July or on July 1, 2003?
8     A. Yes, it is.
9     Q. And who else was present when you
10 received this letter?
11     A. Peter Mason.
12     Q. All right. Do you remember what time
13 of day it was?
14     A. I can't recall. It would have been
15 after lunch. It could have been before lunch, I
16 don't know.
17     Q. All right. Did you read the letter
18 while you were in Ms. Miles' office?
19     A. After a short period of conversation,
20 yes.
21     Q. All right. And did you disagree with
22 anything that was in the letter?
23     A. I don't believe I did. I don't
24 understand why I would.

**Page 109**

Q. All right. And tell me what you remember about the conversation between you and Ms. Miles concerning the availability of Family and Medical Leave Act.

A. When she first asked me, before I saw the letter, she asked me if I ever heard of it. That's when I said no.

Well, she handed me the letter, we went over the letter. I don't recall her asking me and I replied, I don't think I need it. I don't know why I would say that, knowing -- the only thing I was confused about is she mentioned that I go to call benefits, Kris Maloney. And if I have any questions, Kris can guide me. Basically that's it. And I followed through and called Kris. But that's basically all I remember besides reading this.

Now, I would never say no if I knew I had something, but, see, the whole thing is confusing. I didn't --

MR. MCCORMICK: The question was what was the conversation.

THE WITNESS: I was asked to call Kris Maloney.

**Page 110**

Q. (BY MS. MALONE) And you testified a couple of minutes ago that you and Miss Miles went through this letter.

A. After a brief conversation, when we were sitting there, before she handed me the letter.

Q. Okay. And did you go over the part of the letter that says, if you need time off because of serious child care issues, you are entitled to apply for FMLA, Family Medical Leave Act, leave as outlined in your staff handbook.

A. Yes.

Q. And did you ask her what that meant?

A. Yes.

Q. And what did she say?

A. What it pertains to, basically. To take care of serious children. If your kids are that serious, maybe I need to go talk to Kris Maloney. And that's what I did. I followed through with it.

Q. So she told you if your children were seriously ill and you needed time off you should talk to Kris Maloney about the Family and Medical Leave Act?

**Page 111**

A. The only thing I don't believe she said is the word --

MR. MCCORMICK: That was the question that was put to you.

MS. MALONE: Well, she can answer. I'm sorry.

MR. MCCORMICK: It was a yes or no question.

MS. MALONE: Well, she doesn't have to answer yes or no, sir. Go ahead.

THE WITNESS: I believe the word was ill, nothing seriously was brought into that.

Q. (BY MS. MALONE) But it says here, if you need time off because of serious child care issues, you're entitled to apply --

A. Okay.

Q. So does that refresh your memory that it was discussed that it had to be a serious issue for you to get Family and Medical Leave Act?

A. Yes.

Q. Okay. And do you recall her telling you that if you took FMLA leave, if you applied for -- I'm sorry.

**Page 112**

The next sentence says: If you choose to apply for FMLA leave and it is granted, it is my expectation that when you return to work you will be able to dramatically improve your attendance. Did you see that?

A. Yes, I did.

Q. And then did you read where it said, if you do not take FMLA leave at this time, please understand that I expect to see an immediate improvement in your attendance.

A. Yes.

Q. During this meeting did Ms. Miles tell you that your job was on the line because of your attendance problems?

A. Yes.

Q. And you understood what that meant, didn't you?

A. Yes.

Q. And what was your understanding of what she meant by your job being on the line?

A. Exactly what it says.

Q. Well, what does the term -- she used the phrase, your job is on the line?

A. Is on the line.

### 113

1  Q. And you understood that that meant
2  that you could lose your job if your attendance
3  didn't improve?
4  A. Correct.
5  Q. And it had to improve dramatically
6  unless you were granted FMLA leave, isn't that
7  correct?
8  A. Correct.
9  Q. All right. In this letter, if you
10 need time off because of serious child care
11 issues, you're entitled to apply for FMLA leave
12 as outlined in your staff handbook. Did you
13 review the staff handbook, as she suggested, to
14 find out about FMLA leave?
15 A. I might have.
16 Q. Do you recall doing that?
17 A. I believe after I talked to Kris.
18 Q. You reviewed the handbook?
19 A. For the FMLA, after I talked to Kris
20 Maloney.
21 Q. What handbook did you review?
22 A. The one at home. The Williams dining
23 services.
24 Q. All right. And, again, were you

DAVIS & MITCHELL
(413) 499-0035

### 114

1  concerned that you were looking at a dining
2  services handbook, even though you no longer
3  worked at dining services?
4  A. No.
5  Q. All right. I am going to show you --
6      MS. MALONE: Let me just mark
7  this separately.
8      (Exhibit Number 14
9      offered and marked for
10     identification)
10 Q. (BY MS. MALONE) I'm going to show
11 you -- I'm going to ask you to look at what has
12 been marked as Exhibit 14 and ask you if that, to
13 the best of your memory, is the policy that you
14 reviewed in July, 2003 to find out about the
15 Family and Medical Leave Act.
16 A. I don't recall seeing this. I recall
17 seeing the other handbook. The FMLA other
18 papers. I don't recall --
19 Q. The ones that you filled out when you
20 took --
21 A. The ones that were in the handbook, I
22 looked at. This doesn't bring anything to me.
23 Q. Well, did you see the papers that you
24 think you looked at this morning? Have you seen

DAVIS & MITCHELL
(413) 499-0035

### 115

1  them here today?
2  A. This just doesn't --
3  Q. If I were to represent, Miss Miles,
4  that the family -- Miss Beebe, sorry -- Miss
5  Beebe, that the Family and Medical Leave Act
6  policy that is before you is the same policy that
7  was in the dining services contract, or handbook,
8  would that refresh your memory as to whether
9  you've seen this?
10 A. I could have, I don't recall. I
11 could have.
12 Q. All right. But sitting here today,
13 you don't remember looking at that?
14 A. I could have. I don't remember.
15 Q. Miss Beebe, do you see on the first
16 page of that, under the third paragraph
17 concerning eligible employee, the third paragraph
18 down gives the four reasons that an employee may
19 apply for Family Medical Leave Act. Do you see
20 that?
21 A. Yes.
22 Q. Do you see the third reason is when
23 the employee is needed to care for a child,
24 spouse, or parent?

DAVIS & MITCHELL
(413) 499-0035

### 116

1      MR. MCCORMICK: I want to object
2  to your characterization, the four reasons that
3  an employee may apply for the act. I don't see
4  the --
5      MS. MALONE: May request. That
6  was my word.
7  Q. (BY MS. MALONE) May request, if you
8  think there's a difference, four reasons you
9  think an employee may request unpaid leave. The
10 third reason is when the employee is needed to
11 care for a child, spouse, or parent who has a
12 serious health condition.
13 A. What's the question?
14 Q. Do you remember learning that on or
15 about July, 2003?
16 A. Yes.
17 Q. All right. And under conditions
18 governing the leave it says that: Where you are
19 seeking, number one, leave for your own serious
20 health condition or to care for a seriously ill
21 child, spouse, or parent, you must provide
22 appropriate medical certification before such a
23 leave request will be granted.
24 Do you recall seeing that in July

DAVIS & MITCHELL
(413) 499-0035

117

1  of 2003?
2  A. Yes.
3  Q. And in the same paragraph, the first
4  sentence -- paragraph two, do you see where it
5  says: If medically necessary for your own
6  serious health condition or for that of your
7  spouse, child, or parent, leave may be taken on
8  an intermittent or reduced leave schedule. Do
9  you recall learning that in July of 2003?
10           MR. MCCORMICK: I'm going to
11 object on foundation. The witness testified that
12 she does not recall specifically seeing this
13 document.
14           MS. MALONE: But I can ask her
15 about the contents of this document.
16           MR. MCCORMICK: Fine.
17           THE WITNESS: This might clarify
18 your question. When I talked to Kris Maloney I
19 was clearly misunderstood. The conversation
20 went, if I was to be granted twelve weeks
21 straight unpaid leave it would have to be for a
22 serious enough condition that my children had. I
23 went home and discussed this with my husband.
24 That was all I was told. Intermittent wasn't

DAVIS & MITCHELL
(413) 499-0035

118

1  brought up. I had to look that up myself.
2  Q. (BY MS. MALONE) And did you?
3  A. Yes, I did.
4  Q. All right.
5  A. And what got my husband and I was
6  how, first of all, would we manage twelve weeks
7  off straight without pay. Second of all, were
8  our kids under that serious condition they state?
9  That was our two questions.
10 Q. Okay. And how did you attempt to get
11 those questions answered?
12 A. I didn't really have time. During
13 that time, from July 1st to my termination, we
14 were in the two-week period of debating what we
15 were going to do. I did call Kris Maloney and
16 talk to her. I came down with pneumonia. We
17 never even had a chance to follow through, in my
18 opinion.
19 Q. All right. Well, let's stop there.
20 Let's go back and talk about that a little bit.
21 Let's do this in a logical manner. After you
22 talked to Miss Miles, the next thing you did is
23 talk to Kris Maloney, is that correct?
24 A. Correct.

DAVIS & MITCHELL
(413) 499-0035

119

1  Q. All right. And how soon after
2  talking to Miss Miles on July 1, 2003 did you
3  talk to Miss Maloney?
4  A. I'm not sure. It could have been the
5  following day, maybe the day after I discussed
6  this with my husband.
7  Q. So within a day or two you went to
8  see Kris Maloney?
9  A. I don't think I went to see, I think
10 I talked on the phone with her.
11 Q. All right. And how many phone calls
12 did you have with Kris Maloney about Family
13 Medical Leave Act?
14 A. I know one. I don't recall any more
15 after that.
16 Q. All right. So you had one phone call
17 with her. And at the time you talked to Miss
18 Maloney had you checked the handbook, the policy
19 in the handbook?
20 A. Yes.
21 Q. All right. So you had already read
22 the policy in the handbook?
23 A. After I talked to Kris.
24 Q. It was after you talked to Kris, not

DAVIS & MITCHELL
(413) 499-0035

120

1  before, okay.
2           So the first thing you did after
3  speaking with Miss Miles was talk to Kris
4  Maloney?
5  A. Right.
6  Q. And what did she say to you and what
7  did you say to her?
8  A. I asked about the family medical
9  leave.
10 Q. And what did you tell her you were
11 concerned about?
12 A. I didn't know if my kids' situation
13 was in the serious enough category. That was
14 what I was thinking about.
15 Q. Okay.
16 A. That was my concern.
17 Q. Okay. And what did she say to you?
18 A. That she would get some papers to me.
19 And they at the end would determine family
20 medical leave, whether my children's illnesses
21 were serious enough or not to be granted the
22 Family Medical Leave Act. That's basically what
23 it was.
24 Q. Okay. Now, after you spoke with

DAVIS & MITCHELL
(413) 499-0035

**121**

1  Kris, you looked at the policy, and that's when
2  you learned there was something called
3  intermittent leave, or reduced leave, is that
4  correct?
5      A.  Correct.
6      Q.  So at that point you knew maybe you
7  didn't have to take the full twelve weeks, is
8  that correct?
9      A.  I really wasn't sure.
10     Q.  All right.  So what did you do to try
11 to find out whether you needed to take twelve
12 weeks or maybe this intermittent leave might be
13 something you could use?
14     A.  It wasn't until like a week after
15 that I realized about the intermittent, after my
16 husband and I spoke about it.
17     Q.  And what caused you to realize about
18 the intermittent leave a week or so later?
19     A.  Because I looked.
20     Q.  In the handbook?
21     A.  Yes.
22     Q.  And after you realized there was this
23 thing called intermittent leave, what did you do,
24 if anything, to try to find out about it?

DAVIS & MITCHELL
(413) 499-0035

**122**

1      A.  I assume I probably called Kris, and
2  that's --
3      Q.  I don't want you to assume.  You just
4  testified a few minutes ago you remember having
5  one phone call with Kris Maloney.  Did you have a
6  second phone call with Kris Maloney?
7      A.  I possibly could have.
8      Q.  Do you remember having that phone
9  call?
10     A.  Not specifically.
11     Q.  Okay.  Well, do you remember,
12 specifically, anything you did to find out about
13 intermittent leave in July of 2003?
14     A.  I can't recall.
15     Q.  Okay.  Now, when you spoke with Kris
16 Maloney after your meeting with Bea Miles, in the
17 day or so after your meeting, what, if anything,
18 did she say she was going to do for you?
19     A.  She would send me some papers.
20     Q.  All right.  And how was she going to
21 get you those papers?
22     A.  I think we discussed that she would
23 leave them out for my husband to pick up.  That's
24 what I think.

DAVIS & MITCHELL
(413) 499-0035

**123**

1      Q.  And was there a reason --
2      A.  I'm not positive.
3      Q.  And was there a reason that your
4  husband was going to pick them up and not
5  yourself?
6      A.  He had to head that way to get two
7  paycheck stubs.  And I'm not sure if it was for
8  like daycare, I'm not sure.
9      Q.  Okay.  And did your husband in fact
10 pick up some forms that Miss Maloney left for
11 you?
12     A.  To my knowledge, no.
13     Q.  So is it your testimony that you
14 never received any forms from Kris Maloney?
15     A.  No.  I never received anything.
16     Q.  Did you call her back and say, where
17 are those forms?
18     A.  No, I didn't, actually.  And I think
19 that was probably around the time that I became
20 not myself.  And maybe I misunderstood, thinking
21 I had thirty days, but my husband and I didn't
22 come up with a conclusion on the thing yet, I
23 don't believe.
24     Q.  What did you think you had thirty

DAVIS & MITCHELL
(413) 499-0035

**124**

1  days for?
2      A.  That's what I thought.
3      Q.  Thirty days to do what?
4      A.  To act.
5      Q.  In order to get FMLA leave?
6      A.  Yes.
7      Q.  And why did you think that?
8      A.  I misunderstood, maybe.
9      Q.  And what did you misunderstand?
10     A.  Something I read in the records, I
11 don't know.
12     Q.  Well, I'm looking at the second page
13 of that document, 14, Miss Beebe, where it says
14 notification requirements.  When the need for the
15 requested leave is foreseeable, or in the case
16 where intermittent leave or reduced leave is
17 necessary for planned medical treatment, you must
18 provide as much prior notice as possible, as
19 reasonably possible, and make efforts to schedule
20 the leave so as not to disrupt work.  Does that
21 require you, give you, thirty days to make your
22 request?
23     A.  No.
24     Q.  Do you know a woman named Kim Allard

DAVIS & MITCHELL
(413) 499-0035

125

1  in the human resources department?
2  **A.  Briefly, I might have seen her.  Oh,**
3  **yeah, actually, I think I do.**
4      Q.  Okay.  And if Miss Allard recalled
5  that your husband picked up the envelope with the
6  Family Medical Leave Act information, would you
7  have any reason to believe that she's telling the
8  truth?
9          MR. MCCORMICK:  Objection.
10         THE WITNESS:  No.  All I know is
11 I didn't receive them.
12     Q.  (BY MS. MALONE)  You don't ever
13 recall seeing any Family Medical Leave Act forms?
14     **A.  No.**
15     Q.  And you don't recall specifically
16 calling Kris Maloney to find out where those
17 forms were?
18     **A.  No.**
19     Q.  Okay.
20     **A.  No, as in I don't think I called her.**
21     Q.  All right.  Did you call Bea Miles or
22 Pete Mason with any further questions about the
23 possibility of Family and Medical Leave Act?
24     **A.  I don't think I did.  I don't recall.**

DAVIS & MITCHELL
(413) 499-0035

126

1           (Exhibit Number 15
2            offered and marked for
             identification)
3      Q.  (BY MS. MALONE)  Miss Beebe, I'm
4  showing you a document that's been marked, a
5  multi-page document, that's been marked Beebe
6  Exhibit 15.  I'm going to ask you if you've ever
7  seen this document before.
8      **A.  No.**
9      Q.  Take your time.
10     **A.  No.**
11     Q.  You're sure?
12     **A.  I'm positive.**
13     Q.  All right.  Did you ever speak to
14 your doctor or your children's doctor about
15 whether you or your children would qualify for
16 Family and Medical Leave Act leave?
17     **A.  I believe after I was terminated**
18 **Doctor Payne suggested that that should have been**
19 **an option.  You know what I mean?  He mentioned**
20 **that to me in his office.**
21     Q.  And is Doctor Payne your doctor or
   your children's doctor?
23     **A.  My doctor.**
24     Q.  And did you tell Doctor Payne, when

DAVIS & MITCHELL
(413) 499-0035

127

1  he mentioned that to you, that the college had
2  raised that issue with you before you were
3  terminated?
4      **A.  I might have.**
5      Q.  Now, I'd like to talk to you, Miss
6  Beebe, about your history of attendance during
7  the time that you worked for building and
8  grounds.  So that would be April, 2001 through
9  August of 2003.
10     **A.  Okay.**
11     Q.  During that time did you ever miss
12 work because either you or your children were
13 sick?
14     **A.  Yes.**
15     Q.  All right.  Now, when you were going
16 to have to miss work because either you were sick
17 on your children were sick, what would you do to
18 notify your supervisor?
19     **A.  Call in.**
20     Q.  All right.  And who was your
21 supervisor?
22     **A.  Pete Mason.**
23     Q.  All right.  And did you always talk
24 to Mr. Mason directly?

DAVIS & MITCHELL
(413) 499-0035

128

1      **A.  Not always.**
2      Q.  All right.  And if you didn't talk to
3  him directly, what would you do?
4      **A.  They have a voicemail.**
5      Q.  All right.
6      **A.  Or if he wasn't in, another**
7  **supervisor.**
8      Q.  All right.  And just your best
9  estimate, can you give me a breakdown of the
10 percentage of time you would have talked to Pete
11 directly and the percentage of time you would
12 have left a voicemail or talked to some other
13 supervisor?
14     **A.  There are so many events, I really**
15 **don't know.  It could be equal; so much, say,**
16 **face to face, so much phone conversation.  I**
17 **really can't tell you or break it down.**
18     Q.  Okay.  How long would those
19 conversations be?
20     **A.  Hi, Peter, I have to call in sick, my**
21 **kids are sick.  I don't know, I didn't put a time**
22 **scale on it.**
23     Q.  So you didn't give much detail about
24 why you were sick or how your children were sick,

DAVIS & MITCHELL
(413) 499-0035