UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELLE BEEBE, | |
| Plaintiff, | |
| v. | Civil Action No.  05-30182 |
| WILLIAMS COLLEGE, | |
| Defendant. | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF THE DEFENDANT'S MEDICAL EXPERT AND SUPPORTING MEMORANDUM**

Defendant Williams College (the "College") files this Opposition to the Motion *In Limine* of Plaintiff Michelle Beebe ("Plaintiff"), who seeks to exclude evidence from the College's medical expert, Dr. Aaron Waxman.  Plaintiff's Motion *In Limine* misstates the relevant statutory and regulatory provisions governing the obligation placed on the employee first to provide notice to her employer of the need for leave qualifying under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA" or "Act") and the subsequent right of the employer to request a medical certification supporting the need for leave.

**Factual Background**

Plaintiff left work early on July 24 telling her supervisor that she "didn't feel well." Deposition of Michelle Beebe, at 168:22-169:1 (Feb. 2, 2007) ("Plaintiff's Dep."), excerpts attached as Exhibit A.  She "called in sick" on July 25.  Plaintiff's Motion *In Limine*, at 2.  At her deposition, Plaintiff explained that she had a sinus headache on these days.  Plaintiff's Dep. at 168:17-20.  She did not go to the doctor and did not fill any prescription medications.  Instead, she took over-the counter Sudafed for relief.  *Id*. at 169:11-13.  On Saturday, July 26 Plaintiff

was seen by co-workers, and later admitted to, attending a fireworks display with her husband and family during which she testified that she drank alcohol. *Id*. at 170:14-20, 171:12-23.

At around 10:00 in the evening on Sunday, July 27, Plaintiff drove herself to the emergency room of a local hospital. *Id*. at 175:1-12. The doctor provided her with a note on North Adams Regional Hospital letterhead, which indicated only that Plaintiff "should be excused from work until 7-31-03." The doctor's signature is illegible. *See* Doctor's Note No. 1, attached as <u>Exhibit B</u>. Plaintiff drove herself home from the hospital after her discharge. Plaintiff's Dep. at 179:6-7. Rather than have her husband, who is a College employee, drop off this doctor's note, Plaintiff drove to the College the morning of July 28 and delivered it. She did not report to work from July 28 through July 30.

On July 30, Plaintiff drove herself to her primary care doctor's office. After this visit, Plaintiff received a note on a prescription pad for William Kober, M.D. of Northern Berkshire Family Practice, P.C. indicating that Plaintiff would be "Out of work until Aug. 4th". It was signed by Dr. Kober. *See* Doctor's Note No. 2, attached as <u>Exhibit C</u>. Again, instead of asking her husband to provide this note to their employer, Plaintiff drove to campus to personally deliver this second doctor's note. She did not report to work for the remaining two days of the work week. She did, however, drive back to the College again on Friday, August 1 to drop off some plants she had grown for a co-worker. Plaintiff's Dep. at 186:16-22.

Plaintiff's Motion *In Limine* also states that in June 2003 and March 2003, Plaintiff informed the College that she needed to be absent due to "sick children." Plaintiff's Motion *In Limine*, at 8-9.

## ARGUMENT

In Plaintiff's Motion *In Limine* to exclude the testimony and report of the College's

medical expert, Plaintiff bases her argument on the flawed proposition that an employee discharges her obligation to provide notice under the FMLA simply by informing her employer that she is "sick" or she has "sick children."  Plaintiff claims that once an employee relays such sparse information, the burden shifts to the employer to request a medical certification if it questions whether the sickness qualifies as a "serious health condition" under the Act.  Under the Plaintiff's theory, if the employer fails to request such a certification, then the employer has waived its right to later challenge whether the employee qualified for leave.  This is a gross misreading of the Act and its implementing regulations.

Compared to the watered-down version described by Plaintiff, the Act and its accompanying regulations actually place more of a substantive obligation on the employee to provide notice to her employer of the need for FMLA leave.  Specifically, an employee giving notice of the need for FMLA leave must *explain the reasons* for needing leave so as to allow the employer to determine whether the leave qualifies under the Act.  If the employee fails to explain the reasons, leave may be denied.  In providing notice an employee does not need to expressly assert rights under the Act or even mention the FMLA, but the employee does need to provide enough information to reasonably apprise her employer of her request to take time off for a serious health condition.  Only once such notice is provided, does the burden then shift to an employer to inquire further.

## I.    EMPLOYEE MUST PROVIDE NOTICE TO HER EMPLOYER OF NEED FOR FMLA-QUALIFYING LEAVE.

### A.    Employee Must Explain the Reason for Needing Leave.

An employee has the obligation to provide sufficient information to her employer to alert it to the fact that the reason she seeks time off from work is for a potentially FMLA-qualifying reason.  The regulations implementing the FMLA provide that "[a]n employee giving notice of

the need for unpaid FMLA leave must explain the reasons for the needed leave so as to allow the employer to determine that the leave qualifies under the Act."  29 C.F.R. § 825.208(a)(1); *Szabo v. Trustees of Boston University*, No. 96-10806, 1998 WL 151272, at *5 (D. Mass. Mar. 18, 1998).  The regulations further provide that  "[i]f the employee fails to explain the reasons, leave may be denied."  § 825.208(a)(1); *Phillips v. Quebecor World RAI Inc.*, 450 F.3d 308, 311 (7th Cir. 2006).  In providing notice "an employee … does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave." §825.308(a)(2); *Szabo,* 1998 WL 151272, at *5.  The critical question, therefore, is "whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."  *Id.*, at *5 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).  An "employer is not required to be clairvoyant."  *Brunelle v. Cytec Plastics, Inc.*, 225 F. Supp. 2d 67 (D. Me. 2002) (quoting *Satterfield v. Wal-Mart Stores, Inc.*, 135 F. 3d 973, 980 (5th Cir. 1998)); *Lukacinsky v. Panasonic Service Co.,* No. 03-40141, 2004 WL 2915347, at *12 (D. Mass. Nov. 29, 2004) (quoting same).

If an employee provides false reasons or otherwise withholds the true reason for her absence, her notice is deemed inadequate.  For example, in *Aubuchon v. Knauf Fiberglass, GMBH,* 359 F.3d 950, 952 (7th Cir. 2004), the court quipped, "If you have brain cancer but just tell your employer that you have a headache, you have not given the notice that the Act requires."  The *Aubuchon* court added: "Employees should not be encouraged to mousetrap their employers by requesting FMLA leave on patently insufficient grounds and then after the leave is denied obtaining a doctor's note that indicates that sufficient grounds existed, though they were never communicated to the employer."  *Id.* at 953.  *See also Gay v. Gilman Paper Co*., 125 F.3d

1432, 1436 (11th Cir. 1997) (withholding information and providing false information).

Plaintiff places substantial reliance on the case of *Wheeler v. Pioneer Developmental Services, Inc.*, 349 F. Supp. 2d 158 (D. Mass. 2004), although she fails to recognize that nothing in *Wheeler* suggests that an employee need not explain the reasons for needing leave. Instead, *Wheeler* instructs that "the circumstances [must] suggest that the employee's request may involve FMLA leave" 349 F. Supp. 2d at 166. For this proposition, the *Wheeler* court cited to *Williams v. Shenango, Inc.*, 986 F. Supp. 309 (W.D. Pa. 1997). In *Shenango*, the employee provided three months notice to his employer of his wife's impending surgery and his need for taking leave. Under those circumstances, the court held that the employer had an obligation to inquire further. *Id*. at 319-20.

Here, the College does not dispute that at the end of July 2003 Plaintiff informed her supervisors that she was "sick" and that in March and June 2003 Plaintiff stated that her children were "sick." Plaintiff, however, plainly failed to explain the reason for needing leave "so as to allow the employer to determine that the leave qualifies under the Act." "Sick" is not a qualifying reason for leave. Rather, an illness must constitute a *serious* health condition that incapacitates an employee or an immediate family member.

After her termination, Plaintiff submitted evidence, and intends to present evidence at trial, in an attempt to suggest that both she and her children suffered from serious health conditions. As predicted by the Seventh Circuit, Plaintiff has endeavored to "mousetrap" her former employer by requesting FMLA on insufficient grounds, *i.e.* "I am sick" or "my kids are sick," and now some four years later, try to argue that sufficient grounds did in fact exist, though they were never communicated to the College. Since the regulations require an employee to provide notice of a serious health condition "as soon as practicable," her notice now is too late.

Even worse for Plaintiff's case, the College's medical expert has opined in his report, and is expect to testify at trial, that neither she nor her children suffered from a serious health condition. Plaintiff only qualifies for FMLA leave if she can demonstrate both that she had a serious health condition *and* that she provided adequate notice to her employer. As part of its defense, the College is entitled to challenge both aspects of her claim and show that she did not qualify for leave because of her failure to meet both prongs.

**B.    An Employee Who Informs Her Employer that She Is "Sick," Has Not Fulfilled Her Obligation to Provide Adequate Notice to Her Employer.**

"Adequate notice requires more, however, than a mere profession of 'sickness' or 'illness'." *Lukacinsky v. Panasonic Service Co.,* No. 03-40141, 2004 WL 2915347, at *12 (D. Mass. Nov. 29, 2004). According to the *Lukacinsky* court, "the employee must provide the employer with some information about the medical condition at issue." *Id.* (also stating that "employers obviously are entitled to an explanation of their employees' absences). Supplying general and vague statements about one's health will not suffice to alert an employer to a potentially FMLA-qualifying event. *Szabo v. Trustees of Boston University*, No. 96-10806, 1998 WL 151272, at *5 (D. Mass. Mar. 18, 1998) (citing to holding in *Gay v. Gilman Paper Corp.*, 125 F.3d 1432 (11th Cir. 1997) that simply informing employer that the employee was in the hospital for tests was not sufficient notice); *Beaver v. RGIS Inventory Specialists, Inc.*, 144 Fed. Appx. 452 456 (6th Cir. 2005) (finding insufficient notice in employee's statements that "she didn't feel good," was "sick" and that she "needed a couple of days to get better, a few days"); *Niese v. General Elec. Co.,* 2001 WL 290382 (S.D. Ind. Jan. 31, 2001).

Moreover, in cases like this one, where an employee has a particularly bad attendance record, an employer should not be expected to differentiate between a possible "serious health condition" and just another unscheduled absence by an unreliable employee based only on a

claim by the employee that she is "sick." *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 44 n.9 (6th Cir. 2004); *Collins v. NTN-Bower Corp.,* 272 F.3d 1006, 1007-08 (7th Cir. 2001).

Moreover, the *Wheeler v. Pioneer Developmental Services, Inc.* case also suggests that professing sickness alone would not be sufficient notice. Specifically, in *Wheeler*, the Court noted "*Although* Wheeler said that she felt 'sick and tired' as she handed in the note, [her supervisor] understood that Wheeler requested a medical leave, upon the advice of her physician, for a period of four weeks." 349 F. Supp. 2d at 162 (emphasis added). The "although" in that sentence means that an employee saying to her employer that she feels "sick and tired" would not alone be sufficient notice. There, the employee's profession of sickness was accompanied by a physician's note indicating a substantial leave of absence, four weeks, which the supervisor *understood* to be a request for medical leave. *Id.*

Here, Plaintiff admits in her Motion *In Limine* that she only informed her employer that she was "sick" or her children were "sick." This generic notice is insufficient. Nowhere does Plaintiff claim that she told her employer the diagnoses she and her children received from their doctors or the medications prescribed. Furthermore, Plaintiff had numerous opportunities to provide this information to her employer. At any one of five disciplinary meetings with her supervisor about her absenteeism, Plaintiff could have, but failed to, supply additional information about the reason for her absences. *See Rask v. Fresenius Medical Care North America*, No. 05-1267, 2006 WL 3060143, at *15-16 (D. Minn. Oct. 26, 2006).

### C.    A Note Written By a Doctor on Behalf of an Employee Must Explain the Reason for Needing Leave to Constitute Adequate Notice.

Just as inadequate as the voicemail message or phone call from an employee telling her supervisor that she is "sick," is the doctor's note which neglects to mention the employee's purported illness. A note from a doctor excusing an employee from work must contain some

information concerning the employee's health. *See Lukacinsky v. Panasonic Service Co.,* No. 03-40141, 2004 WL 2915347, at *13 (D. Mass. Nov. 29, 2004) (finding sufficient notice in doctors' notes where notes described medical problem at issue).

Like the Plaintiff in the case at bar, in *Phillips v. Quebecor World RAI Inc.*, 450 F.3d 308, 309 (7th Cir. 2006), the employee previously had taken FMLA leave. In addition, the employee had been disciplined for "habitual absenteeism." *Id.* On October 15, the plaintiff reported to work, told her supervisor that she was "sick" and left early. *Id.* at 310. The plaintiff submitted a form to a human resources secretary "indicating that she was seen at the Comprehensive Health Center that day and should be off work from October 15 until October 19." After several more absences in the next couple of months, the employee was terminated. She was later diagnosed with a head tumor. *Id.*

The employee in *Phillips* first claimed that the time period of her absence alone made for adequate notice to her employer that she may have an FMLA-qualifying reason for needing leave. *Id.* at 311. The court rejected this argument. The term "continuing treatment" under the regulations requires a period of incapacity of more than three consecutive days, which is also accompanied by treatment from a health care provider and a "regime of continuing treatment" such as a prescription medication. *Id.*; 29 C.F.R. § 825.114(a)(2)(i). Thus, standing alone, an absence for more than three days does not signal to an employer that the leave may qualify.

Second, even though the employee in *Phillips* was later diagnosed with a serious health condition, the court held that she never communicated this condition to her employer. Instead, she simply provided a note from a doctor excusing her from work for four days, and further indicated only that she was "sick." 450 F.3d at 311-12. The court reasoned that "sick" does not suggest that the condition might be serious. *Id.* at 312. Thus, the information available to the

employer did not trigger any duty on the part of the employer to request more information.  *Id*.

The court in *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 986-87 (8th Cir. 2005) also found insufficient notice provided by an employee via doctors' notes which merely excused the employee from work, but failed to mention the health condition at issue.  In order to benefit from the protections of the statute, the *Woods* court reasoned that an employee must provide his employer with enough information to show that he may need FMLA leave.  *Id*. at 990. According to the *Woods* court, reference, even in a doctor's note, to unspecified evaluation and treatment was not sufficient.  *Id*. at 993.

For this point, Plaintiff again misconstrues *Wheeler v. Pioneer Developmental Services, Inc*.  In *Wheeler*, the supervisor "understood that Wheeler requested a medical leave, upon the advice of her physician, for a period of *four weeks*."  349 F. Supp. 2d at 162 (emphasis added). Quite unlike the employee in *Wheeler*, here, Plaintiff had a doctor's note excusing her from work for *three days*.  She later received another note excusing her from work for *two* more days.  Also, unlike the supervisor in *Wheeler*, who recognized that the note was a request for medical leave by an employee with no known absenteeism problem, here, the circumstances are quite different. Plaintiff's supervisors knew that Plaintiff had a serious attendance problem for which she had been disciplined on at least five prior occasions with no improvement.  Her supervisors also knew that, less than one month after receiving a written warning for excessive absenteeism, Plaintiff had left work early the prior Thursday, called in sick for all of the prior Friday (without any doctor's note covering those absences), and was seen by coworkers at a fireworks display consuming beer that Saturday night.  No such circumstances existed in the *Wheeler* case.

**D.      Employee Must Provide Adequate Notice as Soon as Practicable for Each Absence for Which She Seeks to Have Leave Designated as FMLA.**

When the need for leave is unforeseeable, the employee must give the employer notice of

the need for the leave "as soon as practicable." 29 C.F.R. § 825.303(a). "As soon as practicable" means that in most circumstances notice will be provided to the employer within no more than one or two working days of learning of the need for leave. *Id.* Such timely notice must be provided for each absence in order to claim that absence as qualifying for FMLA protected leave. *Lukacinsky v. Panasonic Service Co.,* No. 03-40141, 2004 WL 2915347, at *12 (D. Mass. Nov. 29, 2004). A notification does not operate retroactively to excuse previous unexplained absences unless it is given as soon as practicable after an emergency or unforeseeable medically-related absence. *Id.*

In *Brock v. United Grinding Technologies, Inc.*, 257 F. Supp. 2d 1089, 1104 (S.D. Ohio 2003), for example, the court noted that where an employee fails to provide notice that the plaintiff seeks FMLA leave, the relevant regulatory provision appears to be § 825.208, which provides the time periods for an employer designating leave as FMLA leave. In relevant part, the regulations provide

> (e) Employers may not designate leave as FMLA leave after the employee has returned to work with two exceptions: (1) If the employee was absent for an FMLA reason and the employer did not learn the reason for the absence until the employee's return (*e.g.*, where the employee was absent for only a brief period), the employer may, upon the employee's return to work, promptly (within two business days of the employee's return to work) designate the leave retroactively…

§ 825.208(e)(1). In the absence of such timely notification by the employee, the employee, may not subsequently assert FMLA protections for the absence. *Id.*; *Brock*, 257 F. Supp. 2d at 1104.

Here, Plaintiff relied on vague, general statements that failed to inform her employer of the illness from which she claimed she or her children suffered. Providing more information concerning these illnesses any later than within two days is too late under the Act's regulations.

## II.  THE EMPLOYER'S RIGHT TO REQUEST ADDITIONAL INFORMATION IS TRIGGERED ONLY WHEN AN EMPLOYEE PROVIDES ADEQUATE NOTICE OF THE NEED FOR LEAVE.

Once an employee provides sufficient notice to make the employer aware that the employee is requesting time off for a potentially serious health condition, the employer then has the right under the FMLA to require that an employee support her request for leave with a medical certification issued by the employee's health care provider.  29 U.S.C. § 2613(a); 29 C.F.R. § 825.305(a); *Wheeler v. Pioneer Developmental Servs., Inc.*, 349 F. Supp. 2d 158, 166 (D. Mass. 2004).  Once requested, the employee must provide a completed copy of the certification to the employer.  § 825.305(b).

There is no requirement, however, that an employer provide a medical certification to an employee who has failed to first provide notice that her need for leave may be FMLA qualifying.  *See Brock*, 257 F. Supp. 2d at 1106; *Phillips v. Quebecor World RAI Inc.*, 450 F.3d 308, 312 (7th Cir. 2006).  If this requirement did exist, then employers would have to provide medical certifications to every employee whenever they call in sick.  *Lukacinsky*, 2004 WL 2915347, at *12; *Brock*, 257 F. Supp. 2d at 1100 (finding inconsistent with the purposes of the FMLA to require an employer to investigate whether FMLA-leave is appropriate each time an employee calls in sick); *Aubuchon v. Knauf Fiberglass, GMBH,* 359 F.3d 950, 953 (7th Cir. 2004).

Congress did not intend to place such a heavy and largely unnecessary burden on employers.  *Brock,* 257 F. Supp. 2d at 1101.  Indeed, Congress never intended the FMLA to substitute for "even the most modest sick leave policies."  S. Rep. No. 103-3, at 28 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 30.

Although Plaintiff again relies on *Wheeler* for support, that case makes clear that only "[o]nce an employee gives notice, and the circumstances suggest that the employee's request may involve FMLA leave, [does it become[]] the employer's obligation to inquire further…"

349 F. Supp. 2d at 166.  Here, where Plaintiff failed to give notice and the circumstances did not suggest the presence of a serious health condition, the College never had the obligation to inquire further.  *Wheeler* is also quite distinguishable from the case at bar because the employer in that case terminated the employee the day after Christmas, after providing less than five days for the employee's doctor to complete the medical certification.  Such facts do not exist in this case.

With respect to her children, Plaintiff specifically told her supervisor on or about July 1, 2003 that she did not need FMLA leave.  Deposition of Beatrice Miles, at 37:9-21 (Feb. 1, 2007) (attached as Exhibit D).  Kris Maloney of the benefits office arranged with Plaintiff to leave the forms used to apply for FMLA leave, including the request for leave form and Department of Labor's Certification of Health Care Provider form, at the receptionist's desk to be picked up by Plaintiff's husband.  Deposition of Kristine Maloney, at 19:9-15, 19:22-20:5, 21:10-18 (Feb. 15, 2007) (attached as Exhibit E).  Maloney testified that she did in fact leave the documents for Plaintiff's husband to pick up and they were picked up.  *Id*. at 24:9-10.  Maloney did not hear from Plaintiff again after that conversation.  *Id*. at 24:14-19.

As of the date of her termination on August 4, 2003, however, Plaintiff had still not completed and returned any of the forms to the College.  Further, although Plaintiff had been told on July 1, 2003 that additional absences which were unexcused by the FMLA would subject her to discipline up to an including termination, she made no effort during that week to apprise the College that she was seeking such leave or to even inquire about the availability of such leave.  Where an employee refuses to complete a medical certification and informs her employer that she does not need the benefit, she can not return several years later and sue her employer seeking to enforce her rights.  *Sharer v. State of Oregon*, 481 F. Supp. 2d 1156, 1168 (D. Or. 2007).

### III. AN EMPLOYER IS ENTITLED TO REBUT ALLEGATIONS THAT PLAINTIFF AND HER CHILDREN SUFFERED FROM SERIOUS HEALTH CONDITIONS.

As part of its defense to an FMLA claim, an employer may rebut allegations that the employee or an immediate family member suffered from a serious health condition. For example, the College may choose to demonstrate through its medical expert that Plaintiff was not incapacitated during the period from July 28 through August 1 when Plaintiff's provided two doctor's notes. The First Circuit Court of Appeals in *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 163 (1st Cir. 1998) indicated that a note signed by an employee's health care provider excusing the employee from work due to illness carries only an inference that the period of absence was medically necessary. An employer may offer evidence to contradict that inference, *i.e.* to show that the employee was not incapacitated for the period and was in fact capable of working. *Id.* Other courts have found that some of the activities engaged in by Plaintiff during the last week of July 2003 undercut her argument that she was incapacitated. *See, e.g., Stevenson v. Hyre Electric Co.,* No. 04-C-7990, 2006 WL 2497783 (N.D. Ill. Aug. 24, 2006) (finding plaintiff not incapacitated where she drove to and attended union meetings); *Haefling v. United Parcel Service, Inc.*, 169 F.3d 494, 500 (7th Cir. 1999) (finding plaintiff not incapacitated when he testified that he was able to take care of himself).

Also, the College may introduce evidence to show that Plaintiff was not incapacitated on July 24 and July 25, the absences for which Plaintiff produced no doctors' note. Only a health care provider may make the determination of whether or not Plaintiff or one of her children was incapacitated -- that is, whether Plaintiff or one of her children was unable to attend work, school or engage in other routine daily activities for more than three consecutive calendar days. An employee's own judgment concerning incapacity is insufficient. 29 C.F.R. § 825.115; *Olsen v. Ohio Edison Co.,* 979 F. Supp. 1159, 1166 (N.D. Ohio 1997); *Austin v. Haaker,* 76 F. Supp. 2d

1213, 1221 (D. Kan. 1999).

In *Wheeler*, it was uncontested that the plaintiff there remained completely incapacitated during the first six days of her absence. 349 F. Supp. 2d at 168. Here, the College contests the allegation that Plaintiff and her children were incapacitated on the dates in question and it seeks to introduce evidence that will demonstrate that they were not in fact incapacitated.

### Conclusion

For the foregoing reasons, the College requests that this Court deny Plaintiff's Motion *In Limine* seeking to exclude evidence from the College's medical expert, Dr. Aaron Waxman.

Respectfully submitted,
Williams College
By its attorneys,


/s/ Patricia M. Mullen
Judith A. Malone (BBO #316260)
Patricia M. Mullen (BBO # 663318)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199-7613
617.239.0100
jmalone@eapdlaw.com
pmullen@eapdlaw.com

Dated: July 16, 2007

CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Patricia M. Mullen

# EXHIBIT A

**Page 1**

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MICHELLE BEEBE

vs.                    Civil Action No. 05-30182
                       Pages 1-226
WILLIAMS COLLEGE

DEPOSITION OF: **MICHELLE BEEBE**, taken
before Heather J. Davis, Certified Shorthand
Reporter and Notary Public, pursuant to Rule 30 of
the Federal Rules of Civil Procedure, at the
offices of Grinnell, Dubendorf & Smith, Bank
Street, Williamstown, Massachusetts on February 2,
2007, commencing at 10:45 AM.

APPEARANCES:

(SEE PAGE TWO)

Heather J. Davis
Registered Merit Reporter

**DAVIS & MITCHELL**
P.O. Box 1367
Pittsfield, MA 01202
Tel. (413) 499-0035    Fax (413) 499-7823

**DAVIS & MITCHELL**
(413) 499-0035

---

**Page 2**

1  **APPEARANCES:**

2  HEISLER, FELDMAN, MCCORMICK & GARROW, P.C, 1145

   Main Street, Springfield, Massachusetts, 01103,

3  representing the Plaintiff.

   BY: THOMAS J. MCCORMICK, ESQUIRE

4

   EDWARDS ANGELL PALMER & DODGE, 111 Huntington

5  Avenue, Boston, Massachusetts, 02199,

   representing the Defendant.

6  BY: JUDITH A. MALONE, ESQUIRE

   PATRICIA M. HIGGINS, ESQUIRE

**DAVIS & MITCHELL**
(413) 499-0035

---

**Page 3**

1              I N D E X

2 ----------------------------------------------
3  W I T N E S S E S:    DIRECT CROSS REDIRECT RECROSS
  ----------------------------------------------
4  MICHELLE BEEBE    5    209   212   219
5                         221
  ----------------------------------------------
6  EXHIBITS:   DESCRIPTION              PAGE
  ----------------------------------------------
7
  Exhibit 1    Answers to Interrogatories    11
8
  Exhibit 2    Offer of Employment, 10/17/88  54
9
  Exhibit 3    Document                 60
10
  Exhibit 4    Williams College Dining
11               Services Handbook Receipt    60
12 Exhibit 5    Building and Grounds Handbook  64
13 Exhibit 6    Custodial meeting summary     71
14 Exhibit 7    Attendance calendar      72
15 Exhibit 8    Functional Capacity Form      76
16 Exhibit 9    Treatment Form           79
17 Exhibit 10   FMLA Request for Leave       86
18 Exhibit 11   FMLA Request for Leave       99
19 Exhibit 12   Document                 105
20 Exhibit 13   Letter dated 7/1/03      108
21 Exhibit 14   Family and Medical Leaves
               of Absence Policy         114
22 Exhibit 15   Certification of Healthcare
23             Provider              126
24 Exhibit 16   Handwritten note         151

**DAVIS & MITCHELL**
(413) 499-0035

---

**Page 4**

1  **EXHIBITS CONTINUED:**

2  Exhibit 17   NARH record, 7/27/03      175

3  Exhibit 18   Radiology report, 7/27/03   178

4  Exhibit 19   NARH Note               179

5  Exhibit 20   Note dated 7/30/03         184

6  Exhibit 21   Handwritten note, 7/31/03   188

7  Exhibit 22   Letter dated 8/4/03        201

8  Exhibit 23   Handwritten document       202

**DAVIS & MITCHELL**
(413) 499-0035

165

1  to look at your schedule, fine.
2      **A.   Yes.**
3      **Q.**   And then you had an additional day of
4  sick time in June.  So you're out six days in
5  June, is that correct?
6      **A.   It appears to be, yes.**
7      **Q.**   Now, how did you -- did someone tell
8  you to report to Miss Miles' office on July 1st?
9  How did you know to go to Miss Miles' office?
10     **A.   I believe it was Pete Mason.**
11     **Q.**   All right.  And what did he tell you?
12     **A.   We need to go speak with Bea.**
13     **Q.**   And what did you say when he said
14  that?
15     **A.   Okay.  I go, I'm in trouble, let's go**
16  **speak with Bea.  I can't really recall what I**
17  **said.**
18     **Q.**   Well, did you think it was funny?
19     **A.   No, I don't think it was funny.**
20     **Q.**   Did you ever joke about that, am I
21  going to get another written warning?
22     **A.   I don't think I joked.  I might have**
23  **asked.  I don't think any of this was funny.**
24     **Q.**   After four oral warnings were you

DAVIS & MITCHELL
(413) 499-0035

166

1  surprised to get a written warning?
2      **A.   No.**
3      **Q.**   Because you understood after the last
4  verbal that the next thing that was going to
5  happen was a written warning?
6      **A.   Correct.**
7      **Q.**   And so you understood the seriousness
8  of it?
9      **A.   Correct.**
10     **Q.**   And you understood that there was
11  very little leeway for you in terms of
12  absenteeism, isn't that correct?
13     **A.   Correct.**
14         MR. MCCORMICK: Objection.
15     **Q.**   (BY MS. MALONE)  And we've talked,
16  and I won't repeat that testimony, because we've
17  talked about the conversations that you had with
18  Miss Miles about the Family and Medical Leave
19  Act, and in looking at Exhibit 13, which is the
20  July 1st letter, Miss Beebe, the last line of
21  that says: Michelle, your excessive use of
    unscheduled time off is not acceptable and
22  continued absenteeism will result in further
23  disciplinary action up to and including

DAVIS & MITCHELL
(413) 499-0035

167

1  termination.
2      **A.   Correct.**
3      **Q.**   Did you understand that even one
4  additional absence that was unscheduled could
5  result in a termination?
6         MR. MCCORMICK: Objection.
7         THE WITNESS:  I didn't believe
8  one.
9      **Q.**   (BY MS. MALONE) Did you ask her?
10     **A.   No.**
11     **Q.**   Did you think that you could get
12  terminated if they decided that you weren't
13  making an effort to improve?
14     **A.   Yes.**
15     **Q.**   And it was after that, as we
16  discussed earlier, that you had the conversations
17  with Kris Maloney about the Family Medical Leave
18  Act, and I won't re plow that ground.
19         Now, looking at the calendar for
20  June of 2003, your attendance calendar, that
21  calendar indicates that -- I'm sorry, July is
22  what I'm looking for -- that you left work early,
23  three hours early, on July 24.
24     **A.   Correct.**

DAVIS & MITCHELL
(413) 499-0035

168

1      **Q.**   Is that consistent with your memory?
2      **A.   Yes.**
3      **Q.**   And that you were out of work on July
4  25.  Is that consistent with your memory?
5      **A.   Yes.**
6      **Q.**   All right.  And for July 25 you
7  received three hours of sick pay and three hours,
8  no pay, is that correct?
9      **A.   Correct.**
10     **Q.**   Or five hours no pay, correct?  Three
11  hours, no pay; five hours of sick pay -- excuse
12  me -- is that correct?
13     **A.   Yes.**
14     **Q.**   Now, what was the reason that you
15  were out of work on Thursday afternoon and all
16  day Friday, July 24 and July 25?
17     **A.   I believe I left work Thursday after**
18  **lunch.  I went in sick -- I went into work sick**
19  **that day with a lot of pressure in my head, my**
20  **sinuses, sinus headache.**
21     **Q.**   All right.
22     **A.   I worked as long as I possibly could**
23  **and I called Pete up on the phone, I believe I**
24  **left a message and told him that I was leaving**

DAVIS & MITCHELL
(413) 499-0035

169

1 that day, I didn't feel well.
2     Q.  Okay. And what did you do after you
3 left?
4     A.  I went home.
5     Q.  Did you pick up your children from
6 daycare?
7     A.  I don't recall. That or my husband.
8 I don't recall.
9     Q.  All right. And what about Friday?
10 What did you do on Friday?
11     A.  Friday I started feeling a little
12 better towards the night, because I took some
13 Sudafed, some head relief. You know, it wasn't
14 as bad, even though I still didn't feel good
15 enough to come back to work. Constant runny
16 nose, just a lot of pressure, cheek bones hurt,
17 and probably a low grade fever.
18     Q.  Did you call in sick on Friday?
19     A.  I believe I did.
20     Q.  All right. Did your children go to
21 daycare on Friday?
22     A.  I believe they did.
23     Q.  Did you take them to daycare?
24     A.  That, I'm not sure. I could have or

DAVIS & MITCHELL
(413) 499-0035

170

1 my husband could have. I would recall that my
2 husband picked them up, I know that, but I can't
3 recall if he dropped them off. Or if my mother
4 brought them.
5     Q.  All right. Was your mother not yet
6 working at the dog grooming business?
7     A.  Yes, but there were times, if I
8 needed her and they didn't have any dogs
9 scheduled, she could step out.
10     Q.  Okay.
11     A.  Not all the time, though. Once in
12 awhile. But I'm not even sure if that's the
13 case.
14     Q.  Now, that weekend, July 26, did you
15 attend a fireworks display in Pownal, Vermont?
16     A.  Yes, I did.
17     Q.  Okay. And how did you get there?
18     A.  My husband drove us.
19     Q.  Okay. And did your children go?
20     A.  Yes, they did.
21     Q.  What else did you do that weekend?
    Well, strike that.
22         What time did you go to the
23 fireworks display?

DAVIS & MITCHELL
(413) 499-0035

171

1     A.  Well, they start at 9:00 or 9:30. We
2 were only there like an hour and a half.
3     Q.  But were you there until the end of
4 the fireworks display?
5     A.  Yeah. We were there probably a half
6 hour prior, watched the fireworks display, which
7 I believe was like not even an hour, forty-five
8 minutes, and left.
9     Q.  And were you drinking anything when
10 you were there?
11     A.  No.
12     Q.  You had no alcohol at all?
13     A.  No. Oh, I might have had one beer.
14     Q.  Did you see anyone from Williams
15 College while you were there?
16     A.  A former custodian.
17     Q.  Who was that?
18     A.  John Rose.
19     Q.  Anyone else?
20     A.  I think I saw another woman working
21 in -- I don't recall who she is. Actually, she
22 must work in one of the buildings. I don't even
23 know her name but she looked familiar.
24     Q.  Was anyone else with you besides your

DAVIS & MITCHELL
(413) 499-0035

172

1 husband and children?
2     A.  My sister.
3     Q.  Anyone else?
4     A.  Her husband, her children. My aunt
5 and uncle might have been there.
6     Q.  Did you pack food to eat?
7     A.  No. You could buy food there.
8     Q.  And did you all go together or did
9 you just meet there?
10     A.  We met there. They were there -- my
11 sister has to be there all day, she runs it, kind
12 of like. She donates her time.
13     Q.  And did you talk to John Rose?
14     A.  He came up to me.
15     Q.  All right.
16     A.  We were sitting on a blanket and he
17 said hi. And I said hi. I mean we didn't carry
18 on this big conversation.
19     Q.  How long do you think you spoke to
20 Mr. Rose?
21     A.  He not only just spoke to me, he was
22 speaking to my sister and everything. Five
23 minutes or something.
24     Q.  At the time you spoke to him was he

DAVIS & MITCHELL
(413) 499-0035

173

1 still employed at Williams College?
2    A.  Yes.  He was in our department, where
3 I was.
4    Q.  Okay.  So he still worked at the
5 college at that point, and he worked in your
6 department?
7    A.  I believe he was still with me,
8 unless he moved over to -- maybe it was the
9 building across the street with a new team.  I'm
10 not exactly sure.  I just know I worked with him
11 at one time.
12    Q.  And how were you feeling Saturday?
13    A.  Honestly?  Not very good.  I didn't
14 want to go.  My husband actually told me we were
15 going.  I had promised my children a month prior
16 we were going to go.  My husband said, we'll just
17 lay on the blanket, we'll get the fireworks
18 over with, we'll come back home.  And that's
19 exactly what we did.
20    Q.  Is there some reason he couldn't have
21 taken the children without you?
22    A.  He could have, but he didn't want to.
23 And, you know what, I didn't mind going, as sick
24 as -- sometimes you do what you do with your kids

DAVIS & MITCHELL
(413) 499-0035

174

1 and I wanted it to be -- I didn't mind going.  At
2 first I didn't want to go but it was like a
3 family event for that one hour and a half.  Did I
4 have to go?  No.
5    Q.  All right.  And then Sunday, the
6 26th, or 27th, excuse me, I believe it was the
7 27th, how did you feel on Sunday?
8    A.  I woke up very bad.
9    Q.  Okay.  And what was the matter with
10 you on Sunday?
11    A.  There was no clearing up of my head,
12 the sinuses were worse, I started this chronic
13 cough.  It actually started about 4:00 in the
14 morning.  I tried to nurture it, take care of it
15 during the day, not knowing what was to happen
16 that night.  I laid around the house, tried to
17 take care of myself.  And it was about nine
18 o'clock that night that I said to my husband, I'm
19 having a hard time breathing, I felt like
20 somebody was sitting on my chest, on top of the
21 chronic cough, constant.  I got nervous.  It was
22 about 10:30, I told him I need to go to the
23 hospital.
24    Q.  Okay.

DAVIS & MITCHELL
(413) 499-0035

175

1    A.  I needed to have somebody stay with
2 the kids.  I told him I would drive myself and
3 then when I get back, I will tell him what
4 happened.  Or if I didn't come back, I would call
5 him.
6    Q.  So you drove yourself to the
7 hospital?
8    A.  It's only right down the road where I
9 live.
10    Q.  All right.  And so you went to the
11 hospital about ten o'clock or 10:30?
12    A.  Somewhere around there, yes.
13    Q.  All right.  Okay.  And your husband
14 stayed home with the children?
15    A.  Yes.
16       MS. MALONE:  Can we mark that as
17 the next exhibit, please?
18          (Exhibit Number 17
            offered and marked for
19          identification)
20    Q.  (BY MS. MALONE)  I'm showing you a
21 document that says North Adams Regional Hospital.
22 It's dated July 27, 2005, 10:36.
23       MR. MCCORMICK:  2003.
24       MS. MALONE:  2003, excuse me.

DAVIS & MITCHELL
(413) 499-0035

176

1 10:36 PM, I believe it is.
2    Q.  (BY MS. MALONE)  Is that consistent
3 with your memory of when you went to the
4 hospital?
5    A.  Yeah.  Right around there, yes.
6    Q.  And is this the admission sheet from
7 your visit to the hospital that day?
8       MR. MCCORMICK:  If you know.
9       THE WITNESS:  I believe so.  I
10 don't think I ever --
11    Q.  (BY MS. MALONE)  Okay.  And under
12 significant medical history I notice it lists
13 sinus infection and anxiety.
14    A.  Mm-hmm.
15    Q.  Is that what you told the doctor?
16    A.  I think he diagnosed me with my sinus
17 infection that night.
18    Q.  Okay.  And I notice under relative or
19 friend to notify, you list Patricia Morin.  Is
20 that your mother?
21    A.  Yes.
22    Q.  Is there a reason why you listed her
23 and not your husband?
24    A.  Probably because when we were

DAVIS & MITCHELL
(413) 499-0035

177

1  separated, I never turned it back. I never did
2  the paperwork to revise it. But I have her on my
3  daycare and school and everything. Just in case
4  they couldn't reach my husband.
5       Q.  Mm-hmm. Now, did they do any x-rays
6  of you while you were there?
7       A.  I can't remember. They could have.
8  It says x-ray right here.
9             MS. MALONE: Could you mark that
10 as the next exhibit, please?
11            (Exhibit Number 18
12            offered and marked for
13            identification)
13      Q.  (BY MS. MALONE) I'm showing you a
14 document that's been marked Beebe Exhibit 18,
15 North Adams Regional Hospital, Department of
16 Radiology. It says exam date, 7/27/2003. And it
17 appears to be the report of a lung x-ray that was
18 done on 7/27/2003, is that correct?
19      A.  Yeah.
20      Q.  And the findings are that the lungs
21 are clear, the heart is normal in size, pulmonary
22 vasculature unremarkable, negative exam. Is that
23 what that says?
24      A.  Yes, it is.

DAVIS & MITCHELL
(413) 499-0035

178

1       Q.  So is that consistent with your
2  understanding that you didn't have pneumonia on
3  July 27, 2003?
4             MR. MCCORMICK: Objection.
5             THE WITNESS: Only what they told
6  me in the ER.
7       Q.  (BY MS. MALONE) Okay. What did
8  they tell you in the ER?
9       A.  Well, I know they said the sinus
10 infection caused postnasal into my bronchial
11 tubes, which set off an asthma attack. Something
12 like that is what I was told. They put me on
13 inhalants. I had one treatment there. I went
14 home with some medication.
15            MR. MCCORMICK: You've gone well
16 beyond the question.
17      Q.  (BY MS. MALONE) You went home with
18 some medication, and what else happened? Did you
19 ask the doctor for a note to keep you out of
20 work?
21      A.  That was his suggestion, not mine, I
22 believe. I'm not positive.
23      Q.  Well, what do you recall about that?
24      A.  I can't recall. I can't remember.

DAVIS & MITCHELL
(413) 499-0035

179

1       Q.  What time did you leave the hospital?
2       A.  Approximately, I want to say,
3  somewhere around 2:00 or 2:30.
4       Q.  In the morning?
5       A.  Yeah.
6       Q.  And did you drive yourself home?
7       A.  Yes.
8       Q.  And what do you recall about
9  receiving a note from the doctor concerning your
10 presence at work the next day?
11      A.  I really can't recall what he said.
12 I would be -- there was a lot of things said that
13 night.
14            MR. MCCORMICK: The question
15 wasn't what anyone said. The question was: What
16 do you recall about receiving a note.
17            THE WITNESS: I don't.
18            (Exhibit Number 19
19            offered and marked for
18            identification)
19            (offered and marked for
20      Q.  (BY MS. MALONE) I'm showing you a
21 document that's been marked Beebe Exhibit 19. Is
22 that the note that you obtained at North Adams
23 Regional Hospital?
24      A.  Yeah.

DAVIS & MITCHELL
(413) 499-0035

180

1       Q.  And --
2       A.  Yes.
3       Q.  What did you do with this note?
4       A.  I brought it into Pete's office.
5       Q.  When did you bring it to Pete's
6  office?
7       A.  My understanding, I believe it was
8  brought in, I want to say, Monday, but I'm not
9  positive.
10      Q.  Did you bring it in?
11      A.  I could have, or my husband.
12      Q.  Well, --
13      A.  I don't recall.
14      Q.  Lots of things could have happened.
15 What is your best memory about how this note --
16      A.  I know I delivered one note there
17 that week, I know I did, but I can't recall on
18 what day.
19      Q.  Do you recall seeing Pete that week?
20      A.  The only one I recall was seeing Bea
21 at that point.
22      Q.  All right. And why did you bring or
23 have delivered this note that is Exhibit 19 to
24 Williams College?

DAVIS & MITCHELL
(413) 499-0035

---

185

1    Q.  Did you ask Doctor Kober for this
2  note that is Exhibit 20?
3    A.  No.
     Q.  Did he offer --
     A.  He suggested I stay out.
6    Q.  Did he tell you how long you should
7  stay out for?
8    A.  August 4.
9    Q.  Okay.  Did you tell him at the time,
10 you know, I've really been taking a lot of time
11 off from work, I don't think I should stay out
12 any longer?
13   A.  I might have talked to him, I can't
14 recall.  I don't know.
15   Q.  Okay.
16   A.  I think my concern was to get the
17 followup so I could get back to work.
18   Q.  All right.  During that week of July
19 28, did your children go to daycare?
20   A.  Yes, I believe so.
21   Q.  Take your time.
22   A.  Yes, I believe so.
23   Q.  Okay.  And did you take them to
24 daycare?

---

186

1    A.  I might have.
2    Q.  All right.  And during the week of
3  July 28 did you continue to work at your farm
4  stand?
5    A.  The stand wasn't out.
6    Q.  Okay.  You weren't in that business
7  yet?
8    A.  We had plants, but nothing in the
9  garden or nothing growing, as in produce or
10 anything.
11   Q.  Well, were you still growing plants
12 for people?
13   A.  But they weren't ready.  They were
14 just growing.  I didn't have to do anything but
15 stay in bed.
16   Q.  Well, let me ask you this:  Didn't
17 you testify a little while ago that sometime in
18 June or July, while you were out sick, I think
19 you said August 1st, while you were out sick, you
20 had come onto the Williams campus to deliver
21 plants to someone?
22   A.  Yes.
23   Q.  All right.  Were those the plants
24 that you had grown?

---

187

1    A.  Yes.
2    Q.  And were those the plants that you
3  were tending?  Were you tending those plants that
4  week while you were out sick?
5    A.  Watering them, yes, but they weren't
6  ready to be sold to the public.
7    Q.  Okay.  Except for those that you
8  delivered on August 1st?
9    A.  To a friend, right, correct.
10   Q.  So some of them were ready?
11   A.  Well, even if they weren't, --
12   Q.  So did you cook your family's meals
13 that week?
14   A.  I think we both kind of pitched in on
15 that note.
16   Q.  Did you do laundry?
17   A.  Probably not.
18   Q.  Did you pick your children up from
19 daycare?
20   A.  I believe my husband did.  I'm not
21 positive but I believe my husband did.
22   Q.  How many -- strike that.
23        Exhibit 20.  Do you recall how
24 Exhibit 20 was transmitted to Williams College?

---

188

1    A.  It's either that one or the other one
2  that I brought in to Bea.  I recall bringing in a
3  doctor's note to Bea.
4    Q.  All right.  And do you recall why you
5  were on campus?  Was it for the sole purpose of
6  bringing the doctor's note to Bea?
7    A.  Most likely, yes.
8    Q.  Well, I don't want most likely,
9  ma'am.
10   A.  I'm sorry.  Yes.
11   Q.  I want to know what's your best
12 memory of why you were there.
13   A.  Yes.
14   Q.  So if I were to show you one of Miss
15 Miles' notes where she references this doctor's
16 note, would you have any reason to believe that
17 it was inaccurate?
18   A.  I don't see why I would.
19   Q.  Okay.  Let me see if I can take a
20 moment and I'll find it.
21        (Exhibit Number 21
            offered and marked for
22          identification)
23   Q.  (BY MS. MALONE)  I'm showing you a
24 document that's been marked Beebe Exhibit 21.  It

---

# EXHIBIT B



**NORTH AdAMS
REGIONAL
HOSPITAL**
A Community Hospital Committed to Excellence

Hospital Avenue
North Adams, MA 01247
(413) 663-3701

NAME _Michelle, Beebe_____     DATE__7/27/03_____

TREATED FOR _____

_____

☐ MAY RETURN TO WORK IMMEDIATELY

☐ MAY RETURN TO WORK WITH THE FOLLOWING RESTRICTIONS
_____

_____

☑ SHOULD BE EXCUSED FROM WORK UNTIL _7-31-C3_

                              DR. _____

_Thursday - left @ 1 p.m._
_Friday — _____
_Monday ___ ___ ___ no pay_

WIL 00367

# EXHIBIT C

## Northern Berkshire Family Practice, P.C.
820 State Road – North Adams, MA 01247
Telephone (413) 664-4088 – Fax (413) 663-6405

William Kober, M.D.

FED DEA #BK 0437649
MA DEA # MK 0121690A

Patient _____ Michelle Beebe _____ Age: _____

Address _____

Date 7/30/03

R̸ out of work until
Aug 4th

Refill (circle one)   0   1   2   3   4   5   1 Year

SIGNATURE _____

PRINT or TYPE _____ M.D.

Interchange is mandated unless the practitioner writes
the words "NO SUBSTITUTION" in this space.

# EXHIBIT D

1

```
1           UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4     MICHELLE BEEBE

5     vs.              Civil Action No. 05-30182
                       Pages 1-65
6     WILLIAMS COLLEGE

7

8          DEPOSITION OF: BEATRICE MILES, taken
      before Heather J. Davis, Certified Shorthand
9     Reporter and Notary Public, pursuant to Rule 30 of
      the Federal Rules of Civil Procedure, at the
10    offices of Grinnell, Dubendorf & Smith, Bank
      Street, Williamstown, Massachusetts on February 1,
      2007, commencing at 3:30 PM.
11

12    APPEARANCES:

13    (SEE PAGE TWO)

14

15

16

17              Heather J. Davis
                Registered Merit Reporter
18

19

20

21

22

23              DAVIS & MITCHELL
                  P.O. Box 1367
24              Pittsfield, MA 01202
        Tel. (413) 499-0035    Fax (413) 499-7823

                 DAVIS & MITCHELL
                  (413) 499-0035
```

3

```
1                    I N D E X

2     -----------------------------------------------

      WITNESSES:    DIRECT  CROSS  REDIRECT RECROSS
3     -----------------------------------------------

4     BEATRICE MILES    5

5     -----------------------------------------------

      EXHIBITS:   DESCRIPTION           PAGE
6     -----------------------------------------------

7     Exhibit 40    Notice of Taking Deposition   4

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                 DAVIS & MITCHELL
                  (413) 499-0035
```

2

```
1   APPEARANCES:

2   HEISLER, FELDMAN, MCCORMICK & GARROW, P.C, 1145
    Main Street, Springfield, Massachusetts, 01103,
3   representing the Plaintiff.
    BY: THOMAS J. MCCORMICK, ESQUIRE
4
    EDWARDS ANGELL PALMER & DODGE, 111 Huntington
5   Avenue, Boston, Massachusetts, 02199,
    representing the Defendant.
6   BY: JUDITH A. MALONE, ESQUIRE
        PATRICIA M. HIGGINS, ESQUIRE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                 DAVIS & MITCHELL
                  (413) 499-0035
```

4

```
1                   (Exhibit Number 40
                    offered and marked for
2                   identification)

3          MS. HIGGINS: It's our
4   understanding today that Bea Miles does not have
5   any photo identification with her today. My name
6   is Patricia Higgins, I represent the Defendant,
7   Williams College, I know Bea Miles and can verify
8   that this is in fact Bea Miles who is with us
9   today.

10             Before we get started, the same
11  stipulations as before.
12             MR. MCCORMICK: Yes, please.
13             MS. HIGGINS: So we will reserve
14  all objections except those as to form until the
15  time of trial. Also reserve motions to strike.
16  And the witness will read and sign the transcript
17  of the deposition under the pains and penalties
18  of perjury.
19             MR. MCCORMICK: Fine.
20
21         BEATRICE MILES, the Deponent, having
22  first been properly identified by the Notary
23  Public through satisfactory evidence of
24  identification per Executive Order No. 455

                 DAVIS & MITCHELL
                  (413) 499-0035
```

BEATRICE MILES  2.1.07

37

1   the illness of her children?
2       A.   Yes.  Not in -- yes.
3       Q.   All right.  Did you have an idea, a
4   specific idea, in mind at that meeting, when you
5   referred Shelly to the FMLA, as to how that could
6   help, how the FMLA leave could help her?
7       A.   Well, I know how FMLA works.
8       Q.   Okay.
9       A.   I know that it's a standard procedure
10  for me to say to employees who are in this
11  situation that we always recommend the employee
12  assistance program.  We always talk about FMLA.
13  I am not an expert on FMLA.  I mention it, I tell
14  them it's available, and I refer them to the
15  benefits office and tell them that they need to
16  go over there and talk to those people.
17  Certainly it's something that I'm aware of can
18  help, given if there's a situation.  Shelly
19  didn't.  At that point she told me she didn't
20  think she needed it, but if she did she would
21  look into it.
22      Q.   All right.  And I appreciate that
23  answer.  You said you know how FMLA works, you're
24  not an expert but you know how it works.  Did you

DAVIS & MITCHELL
(413) 499-0035

38

1   have something specific in mind about the FMLA
2   that might help Shelly specifically?
3       A.   No.
4       Q.   Okay.
5       A.   Just it's -- like I say, it's what we
6   recommend to our employees.  Because I don't know
7   what's going on exactly and it's always important
8   we need to make sure that employees are aware of.
9       Q.   All right.  In like fashion, the EAP
10  referral, I take it?
11      A.   I have magnets on my desk that if
12  people -- if people are experiencing problems
13  that sometimes they're not comfortable talking to
14  me about, and that's strictly confidential, you
15  would recommend to someone.  People
16  sometimes avail themselves of it or they don't,
17  and I wouldn't know who does and who doesn't.
18      Q.   Williams' policy is that that's
19  strictly confidential, if they go to EAP?
20      A.   Correct.
21      Q.   All right.  So part of your function
22  is to make sure the employee is at least aware
23  that EAP is available and they should, if they
24  feel they it could help, they should go there?

DAVIS & MITCHELL
(413) 499-0035

39

1       A.   Yes.
2       Q.   In like fashion, did you refer Shelly
3   specifically to Kris Maloney?
4       A.   Yes, I did.
5       Q.   Okay.
6       A.   Kris is the person that I refer all
7   of the employees to.  I know there are other
8   people in the office but Kris is the one that I
9   deal with the most, so when I send people over, I
10  tell them.  Because if Kris is not the
11  appropriate person then Kris knows who that
12  appropriate person is.
13      Q.   All right.  And do you know if Shelly
14  took advantage of going to see Kris?
15      A.   I think after the fact I know.  I
16  know that she asked for papers.  I'm not sure how
17  I know that but I know that she did ask for
18  papers.
19      Q.   But you don't necessarily -- you
20  didn't necessarily learn that at the time that
21  she went?
22      A.   I don't know.
23      Q.   All right.
24      A.   I can't tell you when I knew that she

DAVIS & MITCHELL
(413) 499-0035

40

1   went and asked for them.
2       Q.   All right.  That's fair.  While I'm
3   searching in vein, were you -- who was present --
4   you terminated Shelly then on the 4th of August,
5   is that right?
6       A.   Yes.
7       Q.   Okay.  And who was present for that?
8       A.   Shelly, Peter Mason and myself.
9       Q.   All right.  Back to Exhibit 8.  I'm
10  no longer stalling for time.  You indicate here
11  that on a number of occasions, beginning in
12  September, you've been given verbal warnings
13  about your absenteeism.  We've reviewed the
14  warnings, the warnings both formal and informal,
15  that you've given to her.
16          MS. HIGGINS:  Objection.  I want
17  to clarify that this is September of 2001.
18          MR. MCCORMICK:  Yes.  What did I
19  say?
20          MS. HIGGINS:  You said September.
21  I just wanted to clarify.
22          MR. MCCORMICK:  Yes, September,
23  2001.
24      Q.   (BY MR. MCCORMICK) And then at the

DAVIS & MITCHELL
(413) 499-0035

# EXHIBIT E

**Kristine A. Maloney**
**February 15, 2007**

1

Pages:      71
Exhibits:      0


UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


No. 05-30182-MAP

MICHELLE BEEBE
            Plaintiff

vs

WILLIAMS COLLEGE
            Defendant



DEPOSITION OF KRISTINE A. MALONEY

February 15, 2007, 3:00

Real-Time Court Reporting

1331 Main Street

Springfield, Massachusetts




Ann A. Preston
Certified Shorthand Reporter

**Kristine A. Maloney**
**February 15, 2007**

18

1      A.  Whether they can use it during a -- I
2   probably don't know that most of the time when
3   people are -- when they're using a sick day.
4   With a thousand employees here, I wouldn't
5   necessarily know when anyone specific was using a
6   sick day.
7      Q.  That's fine.  Let me turn specifically
8   to Michelle Beebe, who is the plaintiff in this
9   case.  I want to turn directly to a specific day
10  that's on or near July 1, 2003.  I want to ask
11  you a few questions about that date.  To put it
12  in context, let me just ask you, are you aware of
13  having any interaction with Miss Beebe on that
14  day?
15     A.  Yes.
16     Q.  Can you tell me what occurred, what
17  your interaction with her was?
18     A.  I received a phone call from Michelle
19  that day.
20     Q.  And what did she say in the phone
21  conversation with you?
22     A.  I recall that she said that she had
23  just had a meeting with Bea Miles and she
24  received a written warning because her attendance

19

1   had been poor.
2      Q.  What did you say -- did she say
3   anything else to you?
4      A.  She said that Bea Miles recommended
5   that she call me to see if FMLA might be
6   available to her or her children.
7      Q.  Did you have any further conversation
8   with her over the phone about that issue?
9      A.  Just that conversation, and we agreed
10  -- I told her that there would be paperwork that
11  would need to be completed by her children's
12  physician to determine whether they had a serious
13  health condition, and we agreed that I would
14  leave the form at our front desk for her husband
15  to pick up.
16     Q.  Anything else said by either her or
17  you during that phone conversation?
18     A.  Not that I can recall.
19     Q.  How long would you say that phone
20  conversation lasted?
21     A.  I don't really know.
22     Q.  And the forms that you were referring
23  to, which forms are those?
24     A.  They were a form that Michelle would

20

1   complete to actually request the time off, and
2   then the DOL forms for certification from the
3   health care provider.
4      Q.  Are those two separate forms?
5      A.  Yes.
6      Q.  And the first form, the form to
7   request the leave, can you briefly describe what
8   is on that form -- I'm sorry, let me back up.  We
9   are talking about 2003.
10     A.  Yes.
11     Q.  Has that form changed between then and
12  now?
13     A.  Yes, it has.
14     Q.  So let's talk about what's on that --
15  what was on that form, the request form, in July
16  of 2003, okay?
17     A.  Yes.
18     Q.  Can you tell me what was on that form
19  then?
20     A.  It was a form where the employee would
21  fill in their name, and it explained the reasons
22  why someone could take an FMLA leave, and they
23  could circle the reason why they were taking the
24  leave, and I believe they could write in the

21

1   probable duration of the leave, and then sign it
2   and date it.
3      Q.  Can you think of anything else that
4   was on that form, or does that cover it?
5      A.  I'm not looking at the form, so I
6   can't recall everything that's on there.
7      Q.  All right.  And the other form was a
8   -- I think you said something for the doctor to
9   sign?
10     A.  It was.  It was several pages that --
11  it was the actual DOL version of -- it's called
12  the Certification of Health Care Provider.
13     Q.  Does that have some definitions
14  appended to it at the end of the form?
15     A.  Yes, the last page would have been a
16  description for the physician to refer to to
17  determine if there was, in fact, a serious health
18  condition.
19     Q.  Now, you said that the first form,
20  which was the request form, has been modified
21  since 2003?
22     A.  Yes.
23     Q.  Can you tell me in what ways it's been
24  modified?